## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Q & R ASSOCIATES, INC., | : | Case No.: C-1-01-641 |
| | : | |
| Plaintiff, | : | Judge Beckwith |
| | : | |
| v. | : | **MOTION OF DEFENDANTS UNIFI** |
| | : | **TECHNICAL FABRICS LLC AND W.** |
| | : | **MICHAEL MEBANE FOR SUMMARY** |
| | : | **JUDGMENT.** |
| | : | |
| UNIFI TECHNICAL FABRICS LLC, et | : | |
| al., | : | |
| | : | |
| Defendants. | : | |

Pursuant to F.R.C.P. 56, Defendants Unifi Technical Fabrics LLC ("UTF") and W. Michael Mebane move for summary judgment against Plaintiff Q&R Associates, Inc. on the grounds that there are no genuine issues of material fact and they are entitled to summary judgment as a matter of law on all counts of the Amended Complaint.

This Motion is submitted upon the pleadings and the depositions and Affidavits of Michael F. Quinn, John Ranz, Jr. and Defendant W. Michael Mebane, and the depositions of Michael Delaney and Ronald Smith, officers of Unifi Inc., UTF's parent. Excerpts from their depositions are attached as Exhibits A through E, respectively.

/s/ Frederick J. McGavran
Frederick J. McGavran (0011284)
Trial Attorney for Defendants Unifi
Technical Fabrics, LLC and
W. Michael Mebane
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 651-6940 Telephone
(513) 651-6981 Facsimile
fmcgavran@fbtlaw.com

i

OF COUNSEL FOR DEFENDANT
UNIFI TECHNICAL FABRICS LLC
Gregory A. Wendling
426 W. Friendly Avenue, Suite A
Greensboro, North Carolina 27401
(336) 274-0001
(336) 375-2625

OF COUNSEL FOR DEFENDANTS
Frost Brown Todd LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 651-6800
(513) 651-6981 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

This is to certify I served James E. Burke, Esq., and Dwight A Packard II, Trial

Attorneys for Plaintiff Q&R Associates, Inc., 1800 Provident Tower, 1 East Fourth St.,

Cincinnati, Ohio 45202 by ordinary U.S. mail this 31st day of March 2004.

/s/ Frederick J. McGavran _____
Frederick J. McGavran (0011284)

ii

## MEMORANDUM

**I.    STATEMENT OF THE CASE**

A.    Summary.

This is a diversity action by Q&R Associates, Inc. ("Q&R") against Defendants Unifi Technical Fabrics, LLC ("UTF") and W. Michael Mebane for breach of contract (Count One), promissory estoppel (Count Two), fraudulent inducement (Count Three) negligent misrepresentation (Count Four), and intentional interference with a business relationship (Count Five).   All counts arise from the parties' negotiations for Q&R to become a sales agent for UTF.  Q&R demands economic and punitive damages.

Q&R alleges that Mr. Mebane represented that UTF would not be sold to Avgol, the manufacturer Q&R currently represented, and that this representation was either a term of their agreement or that Q&R justifiably relied on it.  The evidence, particularly the testimony of Mr. Quinn and Mr. Ranz, the principals of Q&R, contradicts this allegation.  According to their own testimony, Mr. Mebane told them and sent Mr. Quinn Emails and a letter confirming that he was "not able to bind Unifi to anything regarding change of control."[1]   Therefore, there was no contract because there was no meeting of the minds. *Noroski v. Fallet*, 2 Ohio St. 3d 77, 79, 442 N.E.2d 1302 (Ohio 1982); *Croom v. Goldsboro Lumber Co*., 182 N.C. 217; 108 S.E. 735, 737 (N.C. 1921).

B.    Parties

Q&R is an Ohio corporation with its principal place of business in West Chester, Ohio.  It is a sales and marketing company that represents manufacturers of fabrics for

---

[1] Quinn depo. (EX. A) at 179-181; see Ranz depo. (EX. B) at 75-76; Mr. Mebane's Email to Mr. Quinn dated March 30, 2001, DX 80; Mr. Quinn's Email to Mr. Mebane April 1, 2001, DX 81; Mr. Mebane's Email to Mr. Quinn dated April 2, 2001, Exhibit 4 to Mr. Mebane's Affidavit (doc 4); Mr. Mebane's letter to Mr. Quinn dated April 25, 2001, DX 83.

1

disposable diapers to customers in the United States.  Amended Complaint, ¶¶ 1, 2.  Mr. Quinn and Mr. Ranz are its principals.  Quinn depo. at 15 (EX. A).

Defendant UTF is a North Carolina limited liability company with its principal place of business in Greensboro, North Carolina.  Mr. Mebane was the President of UTF from August 3, 1999 until July 31, 2001.  Amended Complaint ¶¶ 3, 4; Affidavit of Michael Mebane (doc. 4) at ¶¶ 1 and 2.[2]

## II.    STATEMENT OF FACTS

Prior to selling its manufacturing assets to Avgol America, Inc. ("Avgol"), UTF owned a manufacturing plant in Mocksville, North Carolina that produced spunmelt fabrics (also called non-wovens) for diapers, protective clothing and similar products.  Mebane Affidavit at ¶ 5.  From 1995 through March 2001, Q&R was a sub-agent of Cleaver Associates, which in turn had an exclusive written agreement with Avgol Non Woven Industries, an Israeli manufacturer, to distribute Avgol spunmelts in the United States.  Quinn depo. at 61-62; 74.  Avgol spunmelts are used for the top sheet, back sheet and leg cuff barrier on disposable diapers.  Quinn depo. at 16 (EX A).

In 1999 and 2000 UTF built a plant in Mocksville, North Carolina and installed the latest equipment to manufacture spunmelts.  Mebane Affidavit at ¶ 5; see Quinn depo. at 142-143.  Around mid-year 2000, Defendant Michael Mebane, then President of UTF, telephoned Mr. Quinn to ask if Q&R would be interested in representing UTF.  Quinn said no. Quinn depo. at 42.  In his Affidavit (DX 68)[3], Mr. Quinn says:

> In January 2001, I called Mebane back, he suggested that Q&R visit the UTF Mocksville facility, without commitment on the part of any party.  We agreed to visit North Carolina on February 13 and 14, 2001.

---

[2] A copy of Mr. Mebane's Affidavit is attached as Exhibit F.
[3] A copy of Mr. Quinn's Affidavit is attached as Exhibit G.

On February 13 and 14 2001, Mr. Quinn and Mr. Ranz visited UTF's new plant in Mocksville, North Carolina.  Because of the small number of spunmelt manufacturers, "there were no secrets in our industry."  Ranz depo. at 57 (EX B).  Mr. Quinn had heard rumors that Avgol was negotiating to buy UTF's new facility.  Quinn depo. at 153-157 (EX A).

The evening of February 13, 2001, Mr. Quinn and Mr. Ranz had dinner with Mr. Mebane in Yadkinville, North Carolina.  They asked him about the Avgol rumors.  Mr. Mebane said that there was a confidentiality agreement between UTF and Avgol, that there had been several meetings between the parties and that he could not tell them anything about the status.  Ranz depo. at 59; Quinn depo. at 160, 161; Mebane Affidavit at ¶ 12.

Mr. Quinn understood that a confidentiality agreement meant that there was some serious talk going on between UTF and Avgol.  Quinn depo. at 156.  At the end of their dinner, Messrs. Quinn and Ranz agreed with Mr. Mebane to keep their meeting confidential.  They shook hands on their confidentiality agreement.  Mr. Mebane called their handshake confidentiality agreement "a North Carolina agreement."  Ranz depo. at 60, 61; Ranz Affidavit at ¶ 9.[4]  Mr. Quinn and Mr. Ranz thought they should have another meeting with Mr. Mebane.  Quinn depo. at 165.

Mr. Mebane requested that Q&R provide a "customer matrix" that showed customer requirements but not customer names.  Mr. Ranz prepared a matrix which showed the total U.S. monthly requirements of five customers.[5]  Mr. Ranz was asked:

> Q.    Okay.  This is not a sales projection at all, it's a statement of what - - what they purchase?

---

[4] A copy of Mr. Ranz Affidavit is attached as Exhibit H.
[5] A copy of the matrix, DX 75, is attached as Exhibit I.

3

A.      It's a statement of what they totally purchase –

Q.      Okay.

--on a monthly basis.

Q.      Okay.  And this includes no estimate of how much, if any, of that volume Q&R could switch from Avgol to UTF; is that correct.'

A.      It is no estimate whatsoever.  Ranz depo. at 68-69 (EX B); see Quinn depo. at 166-167; DX 75 (EX A).

On March 27, 2001, Mr. Quinn, Mr. Ranz and Mr. Mebane met in UTF's suite at the Idea trade show in Miami, Florida to discuss Q&R representing UTF in the sale of spunmelts.  Mr. Ranz had prepared an Agenda with proposed terms that he gave to Mr. Mebane.  Quinn depo. at 171-172; Ranz depo. at 70-71; DXS 78, 79.  The three reached a consensus that Q&R would have exclusive account responsibility for the personal hygiene market in the United States for a three year term, commissions of 4% except on sales to Proctor and Gamble and SCA, which would be at 2%, guaranteed draw against commissions of $25,000 a month for the first three months, then $20,000, $15,000, $10,000 and $5,000 for the succeeding four months to give Q&R time to transition customers and that Mr. Mebane would review Q&R's proposal to hire a UTF sales employee.  Quinn depo. at 176-178 (EX A); Ranz depo. at 72-75 (EX B); Mebane depo. at 114 (EX C).

Also at the Miami meeting the three discussed industry rumors about UTF's new plant being sold to Avgol.  Mr. Quinn testified:

A.      We discussed, again, the rumors of UTF being sold, especially to Avgol, that we would be protected, that there was a commitment being made to Q&R Associates.

Q.      What did Mr. Mebane say?

4

A.    <u>He said he would have to talk to in-house counsel.</u>

. . . .

Q.    I'm trying to find out what he said.

A.    He said there will be a commitment to Q&R.  <u>He didn't say what that commitment was.</u>

Q.    He didn't say what the commitment was, but he said he wold have to talk to in-house counsel about what that commitment would be?

A.    Right.  <u>I requested a dollar amount.</u>

Q.    And he said he couldn't?

A.    <u>He said we'll have to get the attorneys involved and I said okay.</u>

. . . .

Q.    In fact, you left that meeting not knowing what the commitment was; isn't that true?

A.    I took the man at his word.

Q.    <u>You said there was a commitment, but you didn't know what the commitment was, did you?</u>

A.    <u>I did not</u> [emphasis added].

Quinn depo. at 179-181 (EX A); see Ranz depo. at 75 (EX B), 76; see Mebane depo. at 107-109 (EX C).

Messrs. Quinn, Ranz and Mebane all agreed to reduce their

understandings to a definitive written agreement.  Quinn depo. at 183; Mebane

depo. at 114, 115.  Mr. Quinn stated in his Affidavit[6]:

At the end of the March 27, 2001 meeting, I shook hands with Mebane and he said "do we have an agreement?"  I responded affirmatively.  Although we had an agreement, both parties discussed memorializing it in a written

---

[6] A copy of Mr. Quinn's Affidavit is attached as Exhibit G.

5

contract.  Mebane said he would start the ball rolling.
Quinn Affidavit ¶ 17.

Mr. Quinn and Mr. Ranz elected to notify Cleaver and Avgol that they were terminating Q&R's verbal relationship with them on March 30, 2001, the last day of the tradeshow.  Quinn depo. at 182-183; Ranz depo. at 81.

Mr. Mebane sent Mr. Quinn an Email on March 30, 2001 stating the terms of the verbal understanding discussed at the Miami meeting. The Email began:

> I am happy that we have agreed upon terms for you to represent Unifi Technical Fabrics.    Following are the conditions we discussed.  Please let me know if I got any of it wrong or I misunderstood anything we agreed to.  DX 80.[7]

UTF offered that Q&R would have exclusive account responsibility for hygiene products in the United States and Canada at 4% commissions except for P&G and SCA, which would be 2%.  UTF agreed to pay monthly draws against future commissions on a declining scale from $25,000 to $5,000 a month from April through October 2001.  The term was to be 3 years, but either party could terminate by giving the other 120 days notice.  There was no "commitment" to Q&R if UTF's assets were sold.  Mr. Mebane proposed a lower commission "or sharing the pain" if the price of the product dropped below one dollar a cubic yard.

Mr. Mebane attached a projection of what Q&R's commissions would be if they sold all the products on Mr. Ranz "matrix", DX 75.  Quinn depo. at 167-168; DX 74.[8] Mr. Quinn testified:

> Q.    Well, he wasn't telling you that regardless of how much of this stuff you sell you're going to earn these commissions, did he?

---

[7] A copy of Mr. Mebane's March 30, 2001 Email is attached as Exhibit J.
[8] A copy of the attachment to the March 30, 2001 Email is attached as Exhibit K.

> A.    He said this - - I am forecasting this is the amount of commission you will make from Unifi Technical Fabrics.
>
> Q.    If you sell this volume of product?
>
> A.    Yes.  Quinn depo. at 169.

By email dated April 1, 2001, Mr. Quinn responded "with 2 exceptions" to UTF's stated terms.[9]  First, Q&R did not agree on a $1 threshold for "sharing the pain."  Second, Q&R wanted to be protected against a possible sale of UTF.  Mr. Quinn wrote:

> 2-If Unifi's spunbond operation is sold Q&R will be protected.  As John said in our last meeting, this is our last trip down the spunbond road.  We do need to discuss a $ amount.
>
> Other then [sic] these 2 issues I'm ok with the agreement, but I do want John's input.  I am travelling tomorrow for the week.  Feel free to call me on the cellphone or e-mail me.  I can not take the cellphone to the golf course on Tuesday. DX 81; Quinn depo. at 186.

Mr. Quinn and Mr. Ranz never talked with Mr. Mebane about a specific dollar commitment.  Quinn depo. at 187.  In a reply to Mr. Quinn's Email on April 2, 2001, Mr. Mebane said:

> Item 1 below, we'll talk on anything below $0.96.  I am sure we will both be reasonable.  Item 2 below, I don't know how to approach without a long drawn-out legal department process which usually doesn't work very well either.  As we discussed this AM, lets [sic] commit to making this a mute point by doing great.  If something does change down the road, I'll look after you guys the same way I am looking after Gene today [emphasis added]. Mebane Affidavit, ¶ 19, Affidavit Exhibit 4.[10]

Although there was no agreement on a dollar commitment to Q&R if Avgol acquired UTF's assets or "sharing the pain" on a price drop, Q&R chose to begin

---

[9] A copy of Mr. Quinn's April 1, 2001 Email is attached as Exhibit L.

[10] A copy of Mr. Mebane's Email dated April 2, 2001 is attached as Exhibit M.

marketing UTF's products.  Mr. Mebane sent Mr. Quinn an Email dated April 2, 2001, with sales information.  Quinn depo. at 187; DX 82.  Mr. Quinn and Mr. Ranz attended a two-day meeting at UTF's plant in mid April.  Quinn depo. at 205, 206; Quinn Affidavit (DX 68) ¶ 20.  Mr. Mebane was not present.  Quinn depo. at 142.

Neither Mr. Quinn nor Mr. Ranz ever spoke to Mr. Mebane again about the terms of the proposed agreement or a dollar "commitment to Q&R" or a pain-sharing price drop provision.  Quinn depo. at 188 ; Ranz depo. at 85.  By letter to Mr. Quinn dated April 25, 2001, Mr. Mebane stated he had consulted with Charles F. McCoy, Esq., company counsel, and reported

> I have passed our e-mail correspondence to Mr. Charles McCoy, our general counsel, who told me that without a definitive agreement (contract), we are just operating on a month to month basis.  He recommends that if we want to enter an agreement for something other than month to month, he would draft definitive agreements for us.  I would like to ask you if there are any items that are unclear or require further definition in our mutual understanding.

Mr. Mebane asked Mr. McCoy "to include some reference" that the parties would discuss "sharing the pain" if prices dropped below ninety-six cents.  Quinn depo. at 187; Ranz depo. at 85, 86; DX 83.[11]

Mr. Mebane responded to Mr. Quinn's request for a dollar commitment if Avgol acquired UTF's assets by quoting Mr. Quinn's April 1 Email and then stating as follows:

> I told him [Mr. McCoy] that you and I discussed this and you understood that I was not able to bind Unifi to anything regarding change of control.  Our objective was to be so successful quickly that Unifi would not want to sell the operation.  I referenced my email to you of April 2nd. [emphasis added].

---

[11] A copy of Mr. Mebane's April 25, 2001 letter is attached as Exhibit N.

Mr. Mebane enclosed a check from UTF to Q&R for $25,000 as its draw, pursuant to his March 30, 2001 Email (DX 80) and April 25 letter (DX 83). Neither Mr. Quinn nor Mr. Ranz ever responded to Mr. Mebane's letter. Quinn depo. at 190; Ranz depo. at 89. In his depo. Mr. Quinn testified that he had not agreed to the 120 day termination provision in Mr. Mebane's March 30, 2001 Email (DX 80). He conceded that he had not disagreed with the 120 day termination provision in his April 1 Email response. Quinn depo. at 190-191; DX 80. The parties never executed a definitive written agreement.

On April 20, 2001, UTF and Avgol executed a non-binding letter of intent for Avgol to purchase UTF's manufacturing facilities upon the meeting of certain conditions. Depo. of Michael Delaney at 104, 105 (EX D); Depo. of Ronald Smith at 105, 106 (EX E); PX 12. On May 11, 2001, UTF and Avgol executed a binding letter of intent for Avgol to purchase UTF's manufacturing facilities. Delaney Depo. at 106, 107; PX 13. UTF publicly disclosed the pending transaction on May 14, 2001. Mebane Affidavit at ¶¶ 22-24. When Mr. Quinn saw the press release, he called Mr. Mebane, who confirmed the sale. Quinn depo. at 210. Q&R filed its original Complaint on August 20, 2001.

## III.    ARGUMENT

### A.    Summary Judgment Standard.

This Court summarized the standard for summary judgment in *Sally Harrison-Pepper v. Miami University*, 246 F. Supp. 2d 854, 858-859 (S.D. Ohio 2003), and Defendants adopt that statement here.

9

B.    Ohio Conflict of Laws Analysis

In a diversity action, the district court applies the choice of law rules of the forum state. *Babcock & Wilcox Co. v. Arkwright-Boston Mfg Mutual Ins. Co.,* 867 F. Supp. 573, 577 (N.D. Ohio 1992). In contract actions, Ohio follows the law of state with the more significant relationship to the contract. *Id.* In determining which state has the more significant contacts, Ohio considers the places of contracting, negotiation and performance; location of the subject matter; and domicile, residence, nationality, place of incorporation and business of the parties. *Id.* (*quoting* Restatement (Second) Conflict of Laws, §188). Ohio only resorts to a choice of law analysis when the law of the various jurisdictions conflicts and there is an actual conflict of law. *Gouge v. BAX Global Inc.,* 252 F. Supp. 2d 509, 521 (N.D. Ohio 2003).

Only two of the five counts, promissory estoppel (Count II) and tortious interference with a business relationship (Count Five) involve actual conflicts of North Carolina and Ohio law. Because the other three counts do not involve an actual conflict of law, dual state analysis is unnecessary.

North Carolina law should apply because it is the state with the more significant relationship to the contract. Q&R alleges that in mid February 2001, Messers. Quinn and Ranz visited Mocksville to discuss a possible agreement with UTF. Amended. Complaint at ¶ 13. The location of the subject matter of the contract was North Carolina. UTF is a North Carolina limited liability corporation with its principle place of business in North Carolina. North Carolina is the place of performance, because all purchase orders submitted by Q&R must have been received in and shipped from North Carolina.[12]

---

[12] The place of negotiating was Florida at an industry trade show, but this was the only activity that took place in Florida. Florida does not have a more significant relationship than North Carolina or Ohio.

10

Finally, although Plaintiff is an Ohio corporation and although communications from defendants entered Ohio, North Carolina is where the majority of the negotiations took place and where the facilities are located. North Carolina law should apply to this action.

    C.    There was no meeting of the minds.

Summary judgment is appropriate in a breach of contract action where no contract was formed because there was no meeting of the minds. *Shafer v. P.S.I. Paper Sys., Inc.*, 61 Fed. Appx. 949, 2003 U.S. App. LEXIS 5522 (6th Cir. March 19, 2003)[13] (summary judgment affirmed because there was no meeting of the minds).

Regardless of whether Ohio or North Carolina law applies, the result is the same. *See Noroski v. Fallet*, 2 Ohio St. 3d 77, 79, 442 N.E.2d 1302 (1982) ("The law is clear that to constitute a valid contract, there must be a meeting of the minds of the parties . . .*"); Boyce v. McMahan*, 285 N.C. 730, 208 S.E.2d 692 (1974) ("The courts generally hold a contract, or offer to contract, leaving material portions open for future agreement is nugatory and void for indefiniteness . . . Therefore, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as a result of future negotiations."); *Croom v. Goldsboro Lumber Co*., 182 N.C. 217; 108 S.E. 735, 737 (N.C. 1921) ("[The parties] must assent to the same thing in the same sense, and their minds must meet as to all terms. If any portion of the proposed terms is not settled . . . there is no agreement."). In this case, there was no meeting of the minds on terms concerning a sale or merger between UTF-Avgol or sharing the pain on a price drop.

In paragraphs 18, 20, 28 and 32 of its Amended Complaint, Q&R alleges that Mr. Mebane's March 31, 2001 Email to Mr. Quinn constitutes a binding agreement between

11

the parties.  DXS 80 and 74.[14]  Q&R, however, never agreed to the terms that Mr.

Mebane proposed.   In his Email to Mr. Mebane dated April 1, 2001, Mr. Quinn

responded "with 2 exceptions" to Mr. Mebane's Email.   Q&R did not agree on a $1

threshold for "sharing the pain.", and Q&R wanted to be protected against a possible sale

of UTF.  DX 81.[15]

These material terms/differences were never agreed upon or resolved.  In an email

to Mr. Quinn on April 2, Mr. Mebane said that "we'll talk on anything below $0.96.  Item

2 below [change of control], I don't know how to approach without a long drawn-out

legal department process which usually doesn't work very well either."   Exhibit 4 to

Mebane Affidavit.[16]   Q&R did not respond.

Nearly a month later, by letter to Mr. Quinn dated April 25, 2001, Mr. Mebane

stated he had consulted with Charles F. McCoy, Esq., company counsel, who said there

was only a month to month agreement without a written contract.  DX 83.[17]  Mr. Mebane

stated:

> I told him [Mr. McCoy] that you and I discussed this and
> you understood that <u>I was not able to bind Unifi to anything
> regarding change of control</u> [emphasis added].

Q&R never responded to Mr. Mebane's letter.  Thus there was no agreement,

because there was not a meeting of the minds on essential terms, and because both parties

agreed that their agreement had to be reduced to writing.  Quinn depo. at Quinn Affidavit

(DX 68) ¶ 17; Quinn depo. at 183; Mebane depo. at 114, 115.

---

[13]  A copy is attached as Exhibit O.
[14]  A copy of the Mr. Mebane's March 30 Email is attached as Exhibit J.
[15]  A copy of Mr. Quinn's April 1 Email is attached as Exhibit L.
[16]  A copy of Mr. Mebane's April 2, 2001 Email is attached as Exhibit M.
[17]  A copy of Mr. Mebane's April 25, 2001 letter is attached as Exhibit N.

In *Rice v. Liebert Corp.,* 1991 Ohio App. LEXIS 779 (Ohio Ct. App. 1991), an employee claimed he switched jobs because an employer promised a lifetime position. The Court of Appeals reasoned:

> While Rice may have been emphasizing long-term employment in all of his discussions, he did not receive a commitment from Liebert and there was obviously no meeting of the minds regarding an employment contract of unlimited duration and/or guaranteed duration. *Id.* at 12-13.

The Court relied on the absence of a written agreement and that no Liebert executive below the president or vice president had the authority to offer employees employment for a specified time period. *Id.* at 4, 12-13. T

The result under North Carolina law is the same: no contract was formed because there was no meeting of the minds. "If the alleged contract is made by conversations and correspondence . . . [and] if the whole correspondence and negotiations show that there were other terms contemplated by both parties, as essential to the proposed contract, on which they fail to agree, there is no contract." *Elks v. N. State Ins. Co.*, 159 N.C. 619, 75 S.E. 808, 810 (N.C. 1912).

The facts in this case are similar to those in *Rice.* As shown by the correspondence between Mr. Quinn and Mr. Mebane, the parties failed to agree on a term providing a dollar assurance to Q&R if UTF were sold and share the pain for a price drop. Here reasonable minds can only come to one conclusion – there was no meeting of the minds on this term.

    D.    <u>UTF and Mr. Mebane Are Not Estopped to Deny an Agreement.</u>

        <u>1.</u>    North Carolina Does Not Recognize <u>Promissory Estoppel.</u>

13

"North Carolina does not recognize the doctrine of promissory estoppel in actions for breach of an employment agreement." *Swanson v. Chem—Nuclear Sys., Inc.,* 1997 U.S. Dist. Lexis 16054, *6 (E.D. N.C. September 15, 1997)[18]. Therefore, if the Court applies North Carolina law, then summary judgment in favor of the defendants must be granted on plaintiff's promissory estoppel claim.

<u>2.    Q&R fails to prove promissory estoppel as a matter of law.</u>

Under Ohio law, the elements for establishing a claim of promissory estoppel in the employment context are that the employer must make a promise that the employer should reasonably expect to induce action or forbearance by the employee, that promise must have actually induced action or forbearance that was detrimental to the employee; and enforcement of the promise is necessary to avoid injustice. *Snyder v. AG Trucking, Inc.,* 57 F.3d 484, 488 (6th Cir. 1995) (*citing Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150, 155 (1985).

In *Snyder* the Sixth Circuit granted the employer's summary judgment motion on the employee's promissory estoppel claim, because the employee could not demonstrate the detrimental reliance element. *Id.* at 488. The employee alleged that he detrimentally relied on the employer's "promises of job security by leaving his former position." *Id.* While the Court recognized that "giving up a job . . . may constitute detrimental reliance in certain circumstances . . . [the employer's] alleged promise was not sufficiently specific to induce reliance." *Id.* at 489. He had alleged the employer stated that "he could expect to be at [the company] until retirement if he performed his job well." *Id.* at 487. The Court concluded that general comments about career growth are not sufficient to establish detrimental reliance. *Id.* at 489; *see also Gouge v. BAX Global Inc.,* 252 F.

_____
[18] A copy is attached as Exhibit P.

14

Supp. 2d 509, 519 (N.D. Ohio 2003) ("Courts do not allow vague assurances of job security to serve as the basis for promissory estoppel claims.").

Q&R alleges that it terminated its prior employment "based upon: (1) Mebane's repeated assurances that there was no possibility of an UTF-Avgol transaction; (2) Mebane's expression that the parties had an 'agreement;' and Mebane's written forecasts of commissions and other compensation . . ." Amended Complaint at ¶ 33. As a matter of law, these general comments are not enough to establish a *prima facie* case of detrimental reliance.

Q&R's allegation that UTF assured Q&R that there was no possibility of an UTF-Avgol transaction is directly contradicted by the testimony of Messrs. Quinn and Ranz and Mr. Mebane's April 25 letter to Mr. Quinn that he is "not able to bind Unifi to anything regarding a change of control." Quinn depo. at 179-181; Ranz depo. at 75. DX 83. Thus, there can be no detrimental reliance on this allegation. Q&R's allegation that there was an "agreement" is about as general as it gets. Both *Snyder* and *Gouge* show that such general statements cannot form the basis for the element of detrimental reliance.

Q&R's allegation that it detrimentally relied on forecasts of commissions and compensation cannot establish detrimental reliance. Indeed, "[a] promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment-at-will." *Gouge*, 252 F. Supp. 2d at 520 (quotation omitted). Thus, Q&R cannot establish the element of detrimental reliance.

Q&R has not provided any evidence of the other two elements of promissory estoppel. Mr. Quinn's testimony and Mr. Mebane's communications stating that he

15

could not bind Unifi to anything regarding a change of control shows that no such promise was made.  Q&R cannot prove the third element that the promise must be enforced to avoid injustice, because there was no promise.  Therefore, under both North Carolina and Ohio law, Q&R's claim for promissory estoppel fails as a matter of law.

      E.      <u>There Was No Fraudulent Inducement.</u>

Both Ohio and North Carolina recognize the narrow scope of fraudulent inducement.  "In each state, the mere failure to carry out a promise in contract does not support a tort action for fraud."  *Norman v. Tradewinds Airlines, Inc.,* 286 F. Supp. 2d 575, 594 (M.D. N.C. 2003) (*citing Wall v. Firelands Radiology, Inc.,* 106 Ohio App. 3d 313, 326, 666 N.E.2d 235, 243 (1995) for Ohio law).  Moreover, both states require a definite and specific material misrepresentation of a past or existing fact; made with knowledge of its falsity or in culpable ignorance of its truth with the intent that it should be acted upon plus reasonable reliance resulting in damages.  *Forbes v. The Par Ten Group, Inc.,* 394 S.E.2d 643, 647 (1990); *Gouge,* 252 F. Supp. 2d at 515.

An alleged oral promise cannot be the basis of a fraudulent inducement claim when it is directly contradicted by writing.  *Norman,* 313 S.E.2d at 595 (applying North Carolina law); *National City Bank v. Facilities Asset Management*, 145 Ohio App. 3d 340, 345, 762 N.E.2d 1060, 1064 (2001) ("It is well established that Ohio law does not allow a party to prove fraud by claiming that the inducement to enter into an agreement was a promise which is squarely contradicted by the written terms of that agreement.").  Mr. Quinn's testimony and Mr. Mebane's Emails and letter to Mr. Quinn directly contradict the alleged oral promise.  Therefore, the fraudulent inducement claim fails.

16

Like promissory estoppel claims, "[f]raud cannot be predicated upon promises or representations relating to future actions or conduct." *Gouge*, 252 F. Supp. 2d at 516. More specifically, the *Gouge* court noted that the plaintiff cannot point to any legal authority for the proposition that a corporation has a duty to disclose to job applicants the possibility that the corporation might be sold. *Id.* at 517. For this reason, the fraudulent inducement claim must fail.

"[W]here a plaintiff does nothing more than assert that a promisor never intended to honor its obligations under an agreement, dismissal [of a fraudulent inducement claim] as a matter of law is appropriate" *Norman,* 286 F. Supp. 2d at 594. Such are the allegations here. For this reason, the fraudulent inducement claim must fail.

In short, "[f]raud is a much overused and misused cause of action." *Id.* Such is the case here. Q&R simply cannot establish a *prima facie* claim for fraudulent inducement for a number of reasons.

E.     The Negligent Misrepresentation Claim Cannot Stand.

1.     The Economic Loss Rule Bars the Claim.

Under both North Carolina and Ohio law, "a party cannot bring a cause of action in tort (such as negligent misrepresentation) for economic losses." *Picker Int'l v. Mayo Foundation*, 6 F. Supp. 2d 685, 688-89 (N.D. Ohio 1998); *see also City of Gastonia v. Balfour Beatty Construction Corp. Inc.,*222 F. Supp. 2d 771, 775 (M.D. N.C. 2002) (applying North Carolina law). North Carolina does recognize four exceptions to this rule, but none apply here. *See City of Gastonia*, 222 F. Supp. 2d at 775. In this case, Q&R only seeks compensatory and punitive damages based on an alleged breach of

17

contract. Therefore, the economic loss rule applies to bar recovery and the negligent misrepresentation claim must be dismissed.

<u>2.    Q&R cannot prove the elements of the claim.</u>

Both Ohio and North Carolina have adopted the Restatement (Second) of Torts definition of a claim for negligent misrepresentation, which requires justifiable reliance. Restatement of the law 2d, Torts § 577 (1977) (*cited in Forbes,* 394 S.E.2d at 648 – North Carolina) (*cited in Delman v. City of Cleveland Heights,* 41 Ohio St.3d 1, 4, 534 N.E.2d 835 (1989)).

A "core requirement in a claim for negligent misrepresentation is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction." *Hayes v. Computer Assoc. Int'l, Inc.,* 2003 U.S. Dist. LEXIS 10712, *19 (N.D. Ohio June 24, 2003)[19] "This 'special' relationship does not exist in ordinary business transactions." *Id.* (citation omitted). Rather, this special relationship usually occurs when the "defendant is a professional (e.g. an accountant) who is in the business of rendering opinions to others for their use in guiding their business . . . ." In *Hayes,* the Court held that no special relationship existed during hiring negotiations because this was simply an "arms length agreement between two sophisticated parties." *Id.* at *20. Similarly, there was no special relationship between Q&R and UTF during the negotiations.

<u>3.    Q&R's contributory negligence bars recovery.</u>

Assuming Q&R can state a claim for negligent misrepresentation, its contributory negligence in relying on alleged oral promise in the face of a writing that expressly disavows any such promise prevents recovery. "'[T]he recipient of a negligent

18

misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying.'" *Forbes*, 394 S.E.2d at 648 (*quoting* Rest. of the Law 2d, Torts, § 552A). "'This means that the plaintiff is held to the same standard of care, knowledge, intelligence, and judgment of a reasonable man, even though he does not possess the qualities necessary to enable him to conform to that standard.'" *Forbes*, 394 S.E.2d at 648 (*quoting* Rest. of the Law 2d, Torts, § 552A, comm. (a)). Q&R cannot meet this burden in light of Mr. Mebane's email and its own admissions as stated above.

### F.    The Intentional Interference With A Business Relationship Claim Fails.

#### 1.    North Carolina does not recognize this cause of action.

There is a difference between a claim for tortious interference with a business relationship and claim for tortious interference with contractual relations. Q&R has pled the former. North Carolina, however, does not recognize a cause of action for tortious interference with a business relationship. *See Wayne v. 320 Comm. Co.,* 1999 U.S. Dist. LEXIS 9727, *6 (E.D. N.C. April 30, 1999)[20]

To state a cause of action for tortious interference with contractual relations, a plaintiff must show a valid contract between plaintiff and a third person which confers upon the plaintiff a contractual right against the third person, that the defendant knows of the contract, that the defendant intentionally induces the third person not to perform the contract; in doing so, the defendant acted without justification; and plaintiff was thereby damaged. *Embree Construction Group, Inc., v. Rafcor, Inc.,* 330 S.E.2d 916, 924 (N.C. 1992) (citations omitted).

---

[19]   A copy is attached as Exhibit Q.
[20]   A copy is attached as Exhibit R.

In this case, there is no allegation that UTF induced a third person not perform a contract with Q&R. Rather, it is alleged that UTF induced Q&R to terminate its contract with Cleaver Associates. Thus, Q&R cannot meet the third element.

Q&R cannot meet the fourth element because "interference with contract is justified if it is motivated by a legitimate business purpose . . ." *Id.* (citations omitted). UTF's alleged interference was justified because it was motivated by a legitimate business purpose to have a distributor for its product. Thus, even if Q&R pled this cause of action, it could not make a *prima facie* case for it.

<u>2.    Q&R cannot state a claim under Ohio law.</u>

Under Ohio law, a claim for tortious interference with a business or contractual relationship requires proof of the existence of a contract; the defendant's knowledge of the contract; the defendant's intentional procurement of the contract's breach; lack of justification; and resulting damages. *Aetna Casualty & Surety Co., Leahey Construction Co., Inc.,* 22 F. Supp. 2d 695, 705 (N.D. Ohio 1998). At the very least, Q&R cannot show that UTF lacked justification in seeking to employ Q&R. As a competitor of Avgol, UTF had a legitimate business interest in seeking the services of Q&R. Therefore, this claim must fail as well.

**IV.    CONCLUSION**

The testimony of Messrs. Quinn and Ran and the exhibits to their depositions show that Q&R cannot prove the elements of its claims against UTF and Mr. Mebane. On this record Defendants are entitled to summary judgment.

20

Respectfully submitted,

/s/ Frederick J. McGavran _____
Frederick J. McGavran (0011284)
Trial Attorney for Defendants Unifi
Technical Fabrics, LLC and
W. Michael Mebane

CinLibrary/1360007.4

21