# EXHIBIT A

```
1              IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
2                      WESTERN DIVISION

3                   -   -   -   -   -

4    Q&R ASSOCIATES, INC.,        :
                                  :
5              Plaintiff,         :
                                  : CONFIDENTIAL
6    vs.                          : CASE NO. C-1-01-641
                                  : VOLUME I
7    UNIFI TECHNICAL FABRICS, LLC,:
     ET AL.,                      :
8                                 :
               Defendants.        :
9                   -   -   -   -   -

10

11

12

13

14
               DEPONENT: MICHAEL QUINN
15
               NOVEMBER 10, 2003
16
                    9:37 A.M.
17

18

19

20

21

22

23   REPORTED BY:
     Heidi L. Constable, RPR, RMR
24
```

1

CIN-TEL CORPORATION

1          A.      John and I worked together at Clopay.

2    John started, I believe, in 1979 in customer service,

3    transitioned into field sales, and he and I worked as

4    a team on specific customers.

5          Q.      And when was Q&R formed?

6          A.      January 1, 1992.

7          Q.      Okay.  Was it a -- was it formed as a

8    corporation or as a partnership?

9          A.      Corporation.

10          (Defendants' Exhibit 1 was marked for

11          identification.)

12          Q.      Let me hand you a document for

13    identification as Defendants' Exhibit 1 and ask you

14    to identify it if you can.

15          A.      This one?  This is a letter from me to

16    Moshe Goldwasser just introducing him to Q&R

17    Associates.

18          Q.      And it's dated February 23, 1995,

19    correct?

20          A.      Yes.

21          Q.      And you signed it?

22          A.      Yes.

23          Q.      In this letter you say we have been --

24    this is the, oh, maybe the fourth paragraph down

15

CIN-TEL CORPORATION

1        Q.      I'm handing you a document that has

2    been marked for identification as Exhibit 9 and ask

3    if you can identify that.

4        A.      Again, this is a letter from John to

5    John and myself just thanking him -- thanking us for

6    helping him get started.

7        Q.      Okay.  What did you do to help him get

8    started?

9        A.      We have -- we have relationships with

10   customers that he does not have relationships with

11   that would allow Avgol spunbond accelerate the sales

12   versus someone from Cleaver Associates.

13       Q.      Okay.  Did Cleaver have a written

14   agreement with Avgol?

15       A.      Yes.

16       Q.      Have you ever seen it?

17       A.      I have not.

18       Q.      Okay.  Did Mr. Cleaver tell you what

19   the terms of that agreement were?

20       A.      I don't remember.

21       Q.      Did he tell you what commission Avgol

22   was paying Cleaver?

23       A.      Yes.

24       Q.      And what did he tell you?

1          A.        Four and a half percent.

2          Q.        Okay.  Was Cleaver Avgol's sole US

3     agent?

4          A.        In the disposable hygiene market.

5          Q.        And what other markets were there in

6     the US?

7          A.        Could be furniture and bedding,

8     durable goods, that's primarily it, agriculture.

9          Q.        What are they used for agriculture?

10         A.        Used for tenting.  Literally they call

11    it greenhouse where you literally form a tent.  It

12    could be laid on the ground.

13         Q.        Okay.

14                   (Defendants' Exhibit 10 was marked for

15                   identification.)

16         Q.        Okay.  I'm handing you a document

17    marked for identification as 10 and ask you to

18    identify it if you can.

19         A.        This is an internal memo from John

20    Cleaver to Moshe Goldwasser copying Frank Perkins

21    regarding a situation that involved 3M.

22         Q.        Have you seen this before?

23         A.        Yes.

24         Q.        Did you see it about the time it was

1        Q.      Okay.  Was this proposal accepted?

2        A.      No.

3        Q.      There is a list of 18 customers.  Are

4    these customers you were asking to have assigned to

5    Q&R to sell Avgol spunmelt products to?

6        A.      Yes.

7        Q.      What was -- you say it wasn't

8    accepted.  What wasn't accepted?

9        A.      John -- John decided this was in the

10   early stages of the start-up of Cleaver Associates.

11   At this point in time it was John Cleaver, no one

12   else.  He then began bringing people on-board that

13   could do certain administrative things within his

14   organization and that he would -- he would continue

15   selling customers that he had good relationships

16   with, do his own customer service work.  He gave us

17   the customers that we had good relationships with,

18   therefore, we became a sub rep for Cleaver

19   Associates.

20       Q.      When you say customers that you had

21   good relationships with, these were customers for

22   products other than spunmelts; is that correct?

23       A.      Could be.  But in all likelihood they

24   all -- when I put the list together it was customers

74

CIN-TEL CORPORATION

1    in representing them.

2         Q.    And what did you say?

3         A.    No, thank you very much.

4         Q.    Why did you say no?

5         A.    I was very satisfied with the

6    relationship that Q&R had with Avgol/Cleaver.

7         Q.    When was the next time you spoke or

8    communicated in any way with anybody from UTF?

9         A.    Mr. Mebane called again, I believe it

10   was in early February of 2001, inviting John and I to

11   Mocksville just to take a look-see.  No commitment,

12   just come down, take a look, tell us what you think.

13        Q.    And you and Mr. Ranz decided to go

14   take a look?

15        A.    Yes.

16        Q.    What had happened between the first

17   call from Mr. Mebane to you and the second call that

18   led you to go take a look with the second call?

19        A.    We're always interested or I'm always

20   interested in exploring new possibilities that would

21   allow me to grow our business.  Not any different

22   than I hope most American companies, we're always

23   looking to grow.  Some of the things that Mr. Mebane

24   was offering led me to believe that we could grow and

CIN-TEL CORPORATION

1    make more money.

2         Q.    Well, the same -- what he said in

3    February really wasn't any different from what he

4    said in June of 2000, was it?

5         A.    No, but he enticed me with the fact

6    that he had state-of-the-art equipment, throughout

7    the term exclusivity, that type of thing.

8         Q.    Had anything happened in your

9    relationship with Cleaver or after during that period

10   of time that made you more inclined to go talk with

11   Mr. Mebane?

12        A.    Cleaver -- John Cleaver had, and I

13   don't remember the time frame, had mentioned -- had

14   talked to me about the possibility of taking AHP away

15   from us, while at the same time he said we would pay

16   you for two or three years if that happens.  He in

17   the same conversation said we may also want you to

18   call on Procter & Gamble for us.  Based on that

19   conversation I thought it was worth investigating

20   Unifi.

21        Q.    Well, if you were being offered the

22   Procter & Gamble account, wouldn't that have been a

23   very profitable account had you obtained it for

24   Cleaver and Avgol?

1          Q.      I'm handing you a document marked for

2     identification as 69 and ask you to identify this if

3     you can.

4          A.      This is a trade notice or a press

5     release announcing that Avgol was going to put a

6     manufacturing facility in the United States.

7          Q.      When was the first time you heard that

8     Avgol was going to do this?

9          A.      I don't remember.  I don't remember.

10          Q.      Do you remember seeing this Exhibit

11     69?

12          A.      Yes.

13          Q.      Before today?

14          A.      Yes.

15          Q.      Did you have any concern that the

16     United States might develop an excess capacity for

17     this product with a UTF plant and an Avgol plant?

18          A.      No.

19                  (Defendants' Exhibit 70 was marked for

20                  identification.)

21          Q.      I'm handing you a document marked for

22     identification as Exhibit 70 and ask you to identify

23     this if you can.

24          A.      This was a memo from -- actually this

153

CIN-TEL CORPORATION

1    was from Cleaver just prompting the sales team on the

2    Avgol USA manufacturing facility in response to the

3    trade announcement that they were going to build a

4    facility in the United States.

5          Q.    I see.  It says, "The US site is

6    consistent with Avgol's long-range plan developed

7    over a year ago."  Had you heard of such a plan in

8    '99?

9          A.    No.

10         Q.    It says, "Site has not yet been

11    announced.  We will discuss at an appropriate time."

12    Did you ever ask anybody where the site was?

13         A.    No.

14         Q.    Did anybody ever tell you?

15         A.    No.

16         Q.    Did you suspect that Avgol really

17    wasn't planning on building a plant?

18         A.    No, I think they were.

19         Q.    What makes you think that they were?

20         A.    Primarily because of Procter & Gamble

21    and SCA.  Primarily Procter & Gamble though.

22         Q.    But they didn't -- they never had sold

23    anything to P&G, had they?

24         A.    No.

1          Q.      When did you first hear that Avgol was

2     talking to UTF about buying UTF's plant?

3          A.      There were rumors in the marketplace

4     in late 2000, early 2001.

5          Q.      And in particular who was saying that?

6          A.      I can't remember.

7          Q.      Was it John Cleaver?

8          A.      No, I don't think so, no.

9          Q.      Did you discuss these rumors with Mr.

10    Ranz?

11         A.      Yes.

12         Q.      And did you try to follow up or

13    investigate the rumors?

14         A.      The only follow-up was we asked Mr.

15    Mebane were these, you know, were true, and he

16    responded no.

17         Q.      Well, didn't he respond that he had a

18    confidentiality agreement and couldn't talk about it?

19         A.      He did respond, but he also said, no,

20    that the rumors are not true.

21         Q.      But he said he had a confidentiality

22    or there was some sort of confidentiality agreement

23    with Avgol?

24         A.      He did -- yes, he did say that.


                              155

                       CIN-TEL CORPORATION

1          Q.      So that you're -- as a businessman,

2     you know that a confidentiality agreement means that

3     talks of some sort are going on between the parties?

4          A.      Yeah.  It could have been for a

5     variety of things though.

6          Q.      Sure.  But you knew that that meant

7     there was some sort of serious talks going on between

8     the parties?

9               MR. PACKARD:  I'm going to object.

10          Mischaracterized his prior testimony.

11     BY MR. McGAVRAN:

12          Q.      You can answer.

13          A.      Say it again.

14          Q.      Yeah.  As a businessman you know that

15     when somebody says I can't talk to you about it,

16     there is a confidentiality agreement, that there is

17     something serious going on between the people who

18     have the confidentiality agreement?

19          A.      Something serious, yes.

20               MR. PACKARD:  Same objection.

21     BY MR. McGAVRAN:

22          Q.      Did you hear about the possibility of

23     Avgol buying UTF from any of your customers?

24          A.      Customers, no, not that I can

156

CIN-TEL CORPORATION

1    remember.

2         Q.    Did Mr. Ranz tell you he had heard

3    something like this?

4         A.    I'm trying to think.  I think it

5    was -- it was me that had heard the rumor.

6         Q.    Okay.  And did you ask Mr. Goldwasser

7    about it?

8         A.    No.

9         Q.    Did you ask Mr. Cleaver?

10        A.    No.

11              (Defendants' Exhibit 71 was marked for

12              identification.)

13        Q.    I'm handing you a document marked for

14   identification as 71 and ask you to identify this if

15   you can.

16        A.    This is an article from Nonwovens

17   Industry, March 2001, stating new nonwovens player

18   Unifi.

19        Q.    This was produced by your company.

20   Did you copy this and put it in the file?

21        A.    I don't know if I did or not.

22        Q.    Did you read it at the time?

23        A.    I don't remember reading it.

24              (Defendants' Exhibit 72 was marked for

157

CIN-TEL CORPORATION

1          A.      No.  This was a disagreement between
2     John and Dennis Durkin.  John is very protective of
3     his customers, therefore, his customers' inventory.
4     He takes it personally and was not happy that Dennis
5     made a decision to take Hospital Specialty's
6     inventory without telling him.
7          Q.      I want to go back and ask you about
8     your time in Mocksville and Yadkinville, North
9     Carolina.  If you want to look at your affidavit,
10    which is Exhibit 68, you talk about this in Paragraph
11    9.  Where did you spend these two days?  Where did
12    you start?
13         A.      We started at the bed and breakfast, I
14    believe, we had breakfast, and then we toured UTF,
15    and then we went to the yarn plant in Yadkinville.
16         Q.      Was this on the -- did you drive down
17    the 13th, have dinner?
18         A.      Yes.
19         Q.      And did the tours the 14th?
20         A.      Yes.
21         Q.      Okay.  You say -- and you say, During
22    our dinner meeting Q&R brought up the industry rumors
23    about Avgol buying UTF.  Was it you or Mr. Ranz who
24    brought it up?

160

CIN-TEL CORPORATION

```
 1              A.      Me.  I'm guessing -- no, it was me.
 2      It was me.
 3              Q.      And what do you say in the affidavit?
 4      Mebane said he had signed a confidentiality agreement
 5      and could not discuss everything that had transpired
 6      between Avgol and UTF.  Mebane did confirm, however,
 7      that several meetings with Avgol management had taken
 8      place.  When asked about these rumors, Mebane stated
 9      ain't going to happen."  Who asked him about the
10      rumors?
11              A.      We both did.
12              Q.      And his exact words were ain't going
13      to happen?
14              A.      Ain't going to happen.
15              Q.      And when it was -- now, is this on the
16      dinner meeting that he stood up and shook hands with
17      you and Ranz and said this is a North Carolina
18      agreement, you have my word?
19              A.      Yes.
20              Q.      What was the agreement?
21              A.      That -- that he was not going to
22      sell -- UTF would not be sold to Avgol.
23              Q.      Are you sure he said that on the 14th
24      and didn't say that when you shook hands at the March
```

161

CIN-TEL CORPORATION

1    between you and Mr. Ranz and Mr. Mebane that you've
2    already told us about, this was kind of just a meet
3    and greet session between Q&R and people at UTF?
4              A.    Yes, and look at the equipment.
5              Q.    And look at the equipment.  Okay.
6    After you and Mr. Ranz -- after you and Mr. Ranz had
7    spent these two days at UTF, did the two of you talk
8    about whether you wanted to pursue discussions with
9    UTF?
10             A.    We did.
11             Q.    And what did you say and what did he
12   say?
13             A.    We liked what we saw as far as the
14   equipment was concerned.  We liked what we saw.  Mr.
15   Mebane was saying all the right things about
16   commitment.  John and I talked amongst -- between
17   ourselves that, you know, we maybe should go, you
18   know, and have another follow-up meeting.
19             Q.    Had there been any discussion on the
20   13th and 14th about terms for Q&R to represent UTF?
21             A.    Not -- no.
22             Q.    Okay.
23                   (Defendants' Exhibit 75 was marked for
24                   identification.)


165

CIN-TEL CORPORATION

1          Q.     I'm handing you a document marked for
2     identification as 75 and ask you to identify that if
3     you can.
4          A.     This is the customer matrix that Mr.
5     Mebane requested that we provided him blind, not
6     mentioning any customer names specifically.
7          Q.     Okay.  And what's meant -- now we have
8     in front of us what's meant by customer matrix?
9          A.     These are five customers that we
10    thought we could bring in-house in a certain time
11    frame.
12         Q.     Okay.  And if you would, go through
13    these and tell us who each customer is.
14         A.     Without seeing my notes --
15         Q.     Were your notes contemporaneous --
16    were they notes you made at the time or are they
17    notes that you made to talk to your lawyer?
18              MR. PACKARD:  These were later notes
19         that we redacted.
20              MR. McGAVRAN:  Okay.
21         A.     Let me look here.  You want to the
22    know the customers' names?
23    BY MR. McGAVRAN:
24         Q.     Yes.


166

CIN-TEL CORPORATION

1          A.      The first one is Arquest.  Let's see,

2     the second one is -- let's see what -- number five is

3     Drypers.  Number four is Hospital Specialty.  Number

4     two is Whitestone.  Number three is Principle

5     Business Enterprise.

6          Q.      Okay.  Now, I had shown you 74

7     mistakenly thinking this was the matrix.  Is 74 a

8     document that Mr. Mebane sent to you?

9          A.      Yes.

10          Q.      Do you know whether or not part of

11     this document is based on your matrix, Exhibit 75?

12          A.      A part of the document is based on our

13     matrix.

14          Q.      Could you tell us what parts of 75 are

15     based on your matrix?

16          A.      What part of 75?

17               MR. WENDLING:   74.

18     BY MR. McGAVRAN:

19          Q.      I'm sorry.  74 based on your matrix.

20     My mistake.

21          A.      I can't do that.

22          Q.      Okay.  You said that you -- that parts

23     of 74 were based on 75.  How do you know that?

24          A.      Because these are customers that we

167

CIN-TEL CORPORATION

1    would go -- we shared this information with Mr.

2    Mebane.  These are the customers that we would have

3    gone after right away.  We were already in the

4    process of selling Paper-Pak, NCN.  We had meetings

5    set up with Procter & Gamble.  That's how.

6        Q.    So -- well, did Mr. Mebane tell you he

7    had extrapolated from your numbers and he had run out

8    possible sales prices from you?

9        A.    Yeah, he extrapolated this out.

10       Q.    Yes.  And so based on -- based on 75

11   he ran some numbers to show what --

12       A.    I can't be sure of that.

13       Q.    -- sales and commissions might be?

14       A.    I don't know that.

15       Q.    You didn't regard 74 as being some

16   kind of a guarantee that you would actually earn

17   those commissions, did you?

18       A.    Yes.

19       Q.    You considered it a guarantee?

20       A.    Yes, I considered this -- he said this

21   is -- this is the commission I forecast you will

22   make.

23       Q.    Based upon -- but depending on you

24   selling that amount of product, correct?

168

CIN-TEL CORPORATION

1          A.      Yes.

2          Q.      He wasn't telling you you were going

3     to get those commissions regardless of whether you

4     sold the volume you projected, did he?

5          A.      Say that again.

6          Q.      Well, he wasn't telling you that

7     regardless of how much of this stuff you sell you're

8     going to earn these commissions, did he?

9          A.      He said this -- I am forecasting this

10    is the amount of commission you will make from Unifi

11    Technical Fabrics.

12         Q.      If you sell this dollar volume of

13    product?

14         A.      Yes.

15         Q.      Yeah.  So the commissions are all

16    based on percentage --

17         A.      On sales.

18         Q.      -- of sales?  After the February 13-14

19    meeting, when was the next time you or Mr. Ranz spoke

20    with Mr. Mebane?

21         A.      I believe it was in early March when

22    we decided to set up another meeting at the IDEA

23    conference.

24         Q.      And who called whom?  Did you call Mr.

169

1    wants a deal similar to Drypers and Whitestone wants

2    to buy on consignment.

3         Q.    Do you recall seeing this before?

4         A.    I do not remember seeing this.

5         Q.    Okay.

6               (Defendants' Exhibit 78 was marked for

7         identification.)

8         Q.    Let me hand you a document marked for

9    identification as 78 and ask you to identify that if

10   you can.

11        A.    This was the proposed agenda for our

12   March 27th meeting between Q&R and Mr. Mebane at his

13   hotel suite.

14        Q.    And who prepared that?

15        A.    John Ranz.

16        Q.    Okay.  And there's a handwritten note,

17   "Agenda for 3/27/01 meeting prepared by Q&R at

18   Mebane's request."  Who wrote the note?

19        A.    John, Mr. Ranz.

20        Q.    And did Mr. Mebane ask you to prepare

21   an agenda or did he ask Mr. Ranz or both of you?  How

22   did that go?

23        A.    I'm not sure.

24        Q.    Okay.  Now, in -- when you met with

171

1      Mr. Mebane, did you or Mr. Ranz give this to him?

2          A.    Yes.

3          Q.    And which one of you gave it to him?

4          A.    Mr. Ranz.

5          Q.    Where did you meet?

6          A.    In his hotel suite.

7          Q.    And about what time was that?

8          A.    In the morning, I believe.

9          Q.    Who was present?

10         A.    John Ranz, Mike Mebane, and myself.

11         Q.    Did you make a recording of the

12     meeting?

13         A.    No.

14         Q.    Did Mr. Ranz?

15         A.    A verbal recording?

16         Q.    Yeah.

17         A.    No.

18         Q.    Such as a tape-recording or any

19     recording.

20         A.    No.

21         Q.    You have here discussion items.

22     What's meant by Q&R sales alliances?

23         A.    Those are -- underneath that heading,

24     MIP, Urban Consultants, and Vega, those are other

172

CIN-TEL CORPORATION

1    point --

2          Q.    Uh-huh.

3          A.    -- and either agreed to or modified the

4    agreement.

5          Q.    Okay.  Well, we've got the agenda

6    right here.  Let's just go over and tell me what the

7    three of you said and what was agreed.

8          A.    Okay.

9          Q.    I guess it starts with monthly

10   compensation.

11         A.    Yes.  We were to get $25,000 a month

12   for three months, then it would go to 20, then it

13   would go to 15, ten, five.

14         Q.    And what about the exclusive account

15   responsibility?

16         A.    We had exclusive account

17   responsibility for hygiene/personal care in North

18   America.

19         Q.    You and Mr. Ranz had asked for South

20   America also, but he wouldn't give that to you?

21         A.    No.

22         Q.    Then five percent commission on all

23   sales?

24         A.    That ended at four percent with the

176

CIN-TEL CORPORATION

1    exception of Procter & Gamble and SCA, which was two

2    percent.

3        Q.    I forget.  Was SCA a current customer

4    or not?

5        A.    They were not a current customer.

6        Q.    Then what about -- what was the

7    discussion about customer service support?

8        A.    We identified Richard Lewis as our

9    customer service person.

10        Q.    Was there anything more than -- in the

11    discussion more than that?

12        A.    Nothing other than that.  We had

13    already met Richard, we were impressed with Richard.

14    He could have been, you know, he could have been

15    trained very easily.

16        Q.    Was he an employee of UTF?

17        A.    Yes.

18        Q.    Then what about -- what was the

19    discussion about technical support?

20        A.    There was a gentleman there named

21    Krister, and I don't know what Krister -- I can't

22    remember his last name, he was our technical support.

23        Q.    Erlandsson, was that it?

24        A.    Erlandsson.


177

CIN-TEL CORPORATION

1          Q.      He was a present employee of UTF?

2          A.      Yes.

3          Q.      And then Q&R sales alliances, what was

4    the discussion there?

5          A.      Mr. Mebane had no problem with that as

6    long as it was Q&R that was compensating.

7          Q.      Then what was the discussion about

8    Gene Kelly?

9          A.      We reviewed everything that's on this

10   page, and Mr. Mebane said he wanted to think about it

11   and get back to us.

12         Q.      Okay.  What else was talked about at

13   this meeting?

14         A.      The length of time, three-year

15   agreement.

16         Q.      And did Mr. Mebane say that he would

17   agree to a three-year agreement?

18         A.      Yes.

19         Q.      And did you and Mr. Quinn -- Mr. Ranz

20   say that?

21         A.      Yes.

22         Q.      All right.  And what else was

23   discussed at this meeting?

24         A.      We discussed, again, the rumors of UTF

178

CIN-TEL CORPORATION

1    being sold, and if UTF was sold, especially to Avgol,

2    that we would be protected, that there was a

3    commitment being made to Q&R Associates.

4          Q.    What did Mr. Mebane say?

5          A.    He said he would have to talk to

6    in-house counsel.

7          Q.    So it would be true that when you and

8    Mr. Ranz left that meeting with Mr. Mebane there was

9    no agreement on a commitment to Q&R if the assets

10   were sold to Avgol?

11         A.    There was -- when we left, we stood

12   up, shook hands, and left knowing that there was an

13   agreement that we were going to go out and begin

14   selling.

15         Q.    Wait.  There was no agreement for

16   there to be a commitment to Q&R if UTF was sold to

17   Avgol, was there?

18         A.    When I -- when I left, I left with the

19   impression that there was a commitment made to Q&R

20   that we would be taken care of.

21         Q.    Just a minute.  I'm not talking about

22   impressions.  I'm talking about -- I'm trying to

23   focus on exactly what Mr. Mebane said.  Mr. Mebane

24   said he would have to talk to in-house counsel before

179

CIN-TEL CORPORATION

1       making such a commitment, did he not?

2              A.      He said there would be a commitment

3       made to Q&R.

4              Q.      Did he say he would have to talk to

5       in-house counsel before making a commitment or did he

6       say there was a commitment made to Q&R?

7              A.      I'm sorry.

8                      MR. PACKARD:  Let him finish.

9       BY MR. McGAVRAN:

10             Q.      I'm trying to find out what he said.

11             A.      He said there will be a commitment

12      made to Q&R.  He didn't say what the commitment was.

13             Q.      He didn't say what the commitment was,

14      but he said he would have to talk to in-house counsel

15      about what that commitment would be?

16             A.      Right.  I requested a dollar amount.

17             Q.      And he said he couldn't?

18             A.      He said we'll have to get the

19      attorneys involved and I said okay.

20             Q.      Was anything else said about a

21      commitment to Q&R if the company was sold to Avgol?

22             A.      Just that -- again, he reiterated it's

23      not going to happen, it's not going to be sold.

24             Q.      Did Mr. Ranz say anything about a

180

CIN-TEL CORPORATION

1      commitment to Q&R?

2           A.    Yes.  In fact, John wrote it down, he

3      was taking notes during the meeting, and he wrote it

4      down.

5                 (Defendants' Exhibit 79 was marked for

6                 identification.)

7           Q.    Would you look at 79 and identify it

8      if you can.

9           A.    These are -- this is the same agenda

10     with John's notes.

11          Q.    And do you see down here where he says

12     change of ownership includes commitment to Q&R?

13          A.    Yes.

14          Q.    He doesn't say what the commitment

15     was, does he?

16          A.    It does not.

17          Q.    In fact, you left that meeting not

18     knowing what the commitment was; isn't that true?

19          A.    I took the man at his word.

20          Q.    You said there was a commitment, but

21     you didn't know what the commitment was, did you?

22          A.    I did not.

23          Q.    Okay.  What else was said at this

24     meeting?

181

CIN-TEL CORPORATION

1          A.     Mr. Mebane wanted us to inform Cleaver
2     immediately.
3          Q.     Sure.  It was -- Mr. Mebane wanted to
4     inform Cleaver -- wanted you to inform Cleaver
5     immediately and not you and Mr. Ranz?
6          A.     No, it was Mr. Mebane.  He called me,
7     he asked how quickly can you -- how quickly will you
8     tell John Cleaver.  We left the meeting, we're
9     walking the show floor, he called me on my cell phone
10    and wanted to know if I had told Mr. Cleaver yet.  I
11    told him no, I would not until the end of the show, I
12    was not going to disrupt the show for John Cleaver
13    and Avgol.
14         Q.     When did you tell Cleaver?
15         A.     The last day of the show I went to
16    Cleaver's booth, they were very busy, I had a flight
17    to catch, so I left and I called John that -- the
18    Friday of that week.
19         Q.     Now, the meeting you had with Mike
20    Mebane was on what day of the week?
21         A.     Tuesday, March 27th.
22         Q.     Okay.  And so you called Cleaver on --
23         A.     Friday.
24         Q.     -- Friday.  Which would have been?

182

CIN-TEL CORPORATION

1           A.      30th, 31st.  30th.

2           Q.      What else was said at this meeting by

3    anyone, the one on the 27th?

4           A.      You know, I can't remember.  I'm sure

5    that we discussed how successful we were going to be.

6           Q.      Would you look again at your

7    affidavit, Exhibit 68.  Do you have it?

8           A.      Yes, sir.

9           Q.      If you go back to Paragraph 17 you

10   say, "At the end of the March 27, 2001 meeting, I

11   shook hands with Mebane and he said, do we have an

12   agreement?  I responded affirmatively.  Although we

13   had an agreement, both parties discussed

14   memorializing it in a written contract.  Mebane said

15   he would start the ball rolling."  Is that a correct

16   summary of what you said?

17          A.      Yes.

18          Q.      Okay.

19                  (Defendants' Exhibit 80 was marked for

20                  identification.)

21          Q.      I'm handing you a document marked for

22   identification as 80 and ask you to identify it if

23   you can.

24          A.      This is an outline of the agreement.


183

CIN-TEL CORPORATION

1    selling price dropped below a certain level, not

2    using any dollar amounts, yes.

3         Q.    Okay.  And then you pass -- did you

4    discuss Mr. Mebane's memo with Mr. Ranz?

5         A.    This memo of March the 30th?

6         Q.    Yeah.

7         A.    Yes.

8         Q.    Did you discuss it in person or over

9    the phone?

10         A.    Probably both.

11              (Defendants' Exhibit 81 was marked for

12              identification.)

13         Q.    Okay.  We have another document we

14    have marked as 81, and I'll ask you to identify this

15    if you can.

16         A.    Yes, this was my response of April the

17    1st.

18         Q.    Okay.  And in the response under two

19    about Q&R will be protected, you say we do need to

20    discuss a dollar amount?

21         A.    Yes.

22         Q.    "Other than these two issues, I'm okay

23    with the agreement, but I do want John's input."  You

24    and Mr. Ranz never got to talking about a dollar

186

CIN-TEL CORPORATION

1    amount for this commitment with Mr. Mebane, did you?

2         A.    We did not get to a dollar amount.

3              (Defendants' Exhibit 82 was marked for

4              identification.)

5         Q.    I'm handing you a document marked for

6    identification as 82 and ask you to identify that if

7    you can.

8         A.    This is a spreadsheet from Mike Mebane

9    to John and myself regarding sales and samples, as he

10   calls it.

11        Q.    Now, what's -- when he says a

12   spreadsheet of what we've already shipped to your

13   sector, is that sales you had made or sales that had

14   been made by UTF?

15        A.    No.    These were sales that or samples

16   that had been -- already been sent out by UTF.

17        Q.    I see.

18             (Defendants' Exhibit 83 was marked for

19             identification.)

20        Q.    I'm handing you a document marked for

21   identification as 83 and ask you to identify that if

22   you can.

23        A.    Yes.    This is a letter from Mike

24   Mebane to myself.

187

CIN-TEL CORPORATION

1          Q.      Were there any E-mails or

2    correspondence between Q&R and UTF after -- about the

3    terms for an agreement after you sent your E-mail,

4    Exhibit 81, of April 1, 2001 up until the time you

5    get this letter?

6          A.      Between April 21 and April 25th?

7          Q.      Right.

8          A.      Not that I can remember.

9                  MR. WENDLING:  I think Mr. Quinn said

10         April 21.

11         A.      I'm sorry.  April 1st to April 25th.

12   BY MR. McGAVRAN:

13         Q.      Were there any verbal discussions

14   between you and Mr. Mebane on terms for your

15   agreement in that period?

16         A.      Not that I can remember.

17         Q.      Okay.  Now, you were -- you did go to

18   the UTF facility sometime in April of 2001 to look at

19   the facility and meet people; isn't that true?

20         A.      February.

21         Q.      Well, didn't you go in April also?

22         A.      May.  Early May.

23         Q.      Okay.  You went in early May.  Was

24   there any discussion at that point of terms of the

188

CIN-TEL CORPORATION

1          Q.     Actually 20 days later, about 14, and

2     six days in April, five, six days in April.  In that

3     20 days you didn't respond to this at all?

4          A.     I did not.

5          Q.     To your knowledge did Mr. Ranz?

6          A.     To the best of my knowledge, no.

7          Q.     Then in the last paragraph he makes

8     some statements about the 120 days termination terms

9     and ends it up with a question to you about these

10    terms, what do you think, question mark.  Did you or

11    Mr. Ranz ever respond to this?

12         A.     No.  We were working under the premise

13    of a three-year agreement.

14         Q.     In which there would be a 120-day

15    termination provision; isn't that correct?

16         A.     That is mentioned, but was not agreed

17    to.  I could not have walked away from Avgol/Cleaver

18    with 120 -- I would have had a 120-day agreement, I

19    couldn't do that.  If he -- if he says there is a

20    120-day termination clause, then I have nothing more

21    than a 120-day agreement, and I wouldn't have agreed

22    to that.

23         Q.     Well, in the letter that or the first

24    E-mail that he sent to you on, it's Exhibit 80, he

190

CIN-TEL CORPORATION

1    does -- he says at the bottom of it the term will

2    be -- you know, I'll wait until you get it.

3              A.    Yes.

4              Q.    The last paragraph, "The term will be

5    for three years, with 120 days notice, except for

6    cause or nonperformance by either side." Your

7    response, Exhibit 81, doesn't say that's a point that

8    you disagree with, does it?

9              A.    No, it does not. But I was agreeing

10   to a three-year term only.

11                   MR. McGAVRAN:  Off the record.

12                   (Discussion off the record)

13                   (Defendants' Exhibit 84 was marked for

14             identification.)

15             Q.    I'm handing you a document marked for

16   identification as 84 and ask you to identify that if

17   you can.

18             A.    This is a, I assume, a fax message

19   from John Cleaver to Becky Gore at AHP/Drypers just

20   saying that Q&R was now representing a competitor

21   and leaving Cleaver Associates.

22             Q.    And Cleaver Associates was going after

23   Drypers, correct, as a customer?

24             A.    They are -- I mean they already had

191

CIN-TEL CORPORATION

1    cards of five people employed by Unifi Technical

2    Fabrics; is that correct?

3            A.    That is correct.

4            Q.    Are these business cards that you

5    picked up at this meeting?

6            A.    Yes.

7            Q.    Do you now have a recollection --

8            A.    Yes.

9            Q.    -- of the April 10-11 meeting?

10           A.    Yes.

11           Q.    Just to make it a little clearer, do

12   you have in front of you Exhibit 68, your affidavit?

13           A.    Yes.

14           Q.    Go back to Paragraph 20.

15           A.    Yes.

16           Q.    Paragraph 20 discusses the April 10

17   and 11, 2001 meetings?

18           A.    Yes.

19           Q.    At the meetings on April 10 and 11,

20   did you say anything to anybody connected with Unifi

21   Technical Fabrics about an agreement between Q&R and

22   Unifi Technical Fabrics?

23           A.    I don't remember.

24           Q.    Okay.  Did Mr. Ranz say anything to

205

CIN-TEL CORPORATION

1    anybody at Unifi Technical Fabrics about an agreement

2    between Q&R and Unifi Technical Fabrics?

3        A.    Again, I don't remember.

4        Q.    Would it be true that, to the best of

5    your recollection, there was no discussion between

6    you or Mr. Ranz and anybody at Unifi Technical

7    Fabrics about an agreement between Q&R and Unifi

8    Technical Fabrics at that April 10 and 11 meeting?

9        A.    Again, I don't remember if there was

10   or not.

11       Q.    In your affidavit you say, "Mebane was

12   out of town and did not attend these meetings."

13   Yesterday I believe you said that Mike Mebane

14   appeared just as you and Mr. Ranz were leaving.

15       A.    That was on the May 8th.

16       Q.    May 8th?

17       A.    Yeah.

18       Q.    Okay.  So you did not see --

19       A.    No.

20       Q.    -- Mike Mebane at all on April 10 or

21   11?

22       A.    No.

23       Q.    You say, "During this visit,"

24   referring to April 10 and 11, "we discovered that UTF


206

1       A.      On the 14th?

2       Q.      Yes.

3       A.      He said the worst possible thing has

4    happened, we've sold to Avgol.

5       Q.      Okay.  And what else did he say?

6       A.      That's -- that's pretty much it in

7    that conversation.

8       Q.      All right.  And what did you say?

9       A.      I told him that that was -- that was

10   not good news, I wanted to get John on the phone, we

11   were going to have some additional questions.

12       Q.      And then after you talked to Mr.

13   Mebane what did you do?

14       A.      I called John.

15       Q.      And where was he?

16       A.      He was in his office.

17       Q.      Okay.  And what did the two of you do?

18       A.      We -- we got Mr. Mebane back on the

19   phone in a conference call.

20       Q.      And tell me what you said, what Mr.

21   Ranz said, and what Mr. Mebane said.

22       A.      We just -- I asked him to repeat, you

23   know, say again what had transpired, that UTF was

24   sold to Avgol, he said yes, you know, that this was

210

CIN-TEL CORPORATION