# EXHIBIT B

1            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                     WESTERN DIVISION

3                    -   -   -   -   -

4    Q&R ASSOCIATES, INC.,           :
                                     :
5               Plaintiff,           :
                                     : CONFIDENTIAL
6    vs.                             : CASE NO. C-1-01-641
                                     :
7    UNIFI TECHNICAL FABRICS, LLC,:
     ET AL.,                         :
8                                    :
                Defendants.          :
9                    -   -   -   -   -

10

11

12

13

14
                   DEPONENT: JOHN RANZ, JR.
15
                    NOVEMBER 11, 2003
16
                      10:16 A.M.
17

18

19

20

21

22

23   REPORTED BY:
     Heidi L. Constable, RPR, RMR
24

                          1

                 CIN-TEL CORPORATION



1    relationship between Q&R and UTF?

2        A.    I don't remember at that specific

3    point in time that we talked about a possible

4    relationship.  It was somewhat of an exploratory

5    meeting, if you will.  We talked about the industry

6    in general.  We talked about the customers.  We

7    talked about the experience that Mike and I had in

8    this industry.  Mr. Mebane explained to us that --

9    the process that he had gone through, basically the

10   due diligence, if you will, on how Unifi got into the

11   spunbond business.  We talked -- we discussed with

12   Mr. Mebane the rumors in the industry that we had

13   been hearing.  And then we also talked about the --

14   what our schedule was for the next day that he had

15   set up for us.

16       Q.    And what rumors did you and Mr. Quinn

17   tell Mr. Mebane that you had been hearing?

18       A.    Our industry is, we laughingly refer

19   to it as a fraternity.  The disposable hygienic

20   market, nobody ever leaves the industry.  People

21   change jobs, but they don't leave the industry,

22   change companies.  There are no secrets in our

23   industry.  There's rumors weekly, monthly about this

24   company or that company or whatever.  And there

1    of what Mr. Mebane said to you about the industry

2    rumors relating to the sale of UTF to Avgol?

3         A.    It's an accurate statement of my

4    recollection of what Mr. Mebane said, yes.

5         Q.    Did he also say that there was a

6    confidentiality agreement between Avgol and UTF?

7         A.    My recollection was that Mebane said

8    he was not at liberty to discuss all that had

9    transpired.  I don't remember him saying anything

10   about a confidentiality agreement.

11        Q.    But you did understand he wasn't at

12   liberty to tell you everything that had happened,

13   correct?

14        A.    Well, he said that and went on to

15   discuss everything that I've listed here, so he must

16   have been at liberty to say something.

17        Q.    Did Mr. Mebane make a statement about

18   a North Carolina agreement at that February 13

19   meeting?

20        A.    Yes, sir, he did.

21        Q.    And what did he say?  How did that

22   come about?

23        A.    Towards the end of dinner his

24   discussions were winding up, and again, as we had

1    discussed what the plans were for the next day, Mr.

2    Mebane said, At this point in time I would like to

3    request that the fact that you two have come down

4    here to visit and that we've had this meeting, I

5    would like to request that we keep this meeting --

6    the fact that this meeting took place confidential

7    amongst the three of us.  And Mike and I both

8    responded that we have no problem with that.  And at

9    that point Mr. Mebane stood up and we all shook hands

10    and he cheerfully said, We call this a North Carolina

11    agreement.

12         Q.    And that was a North Carolina

13    agreement that you keep your meeting secret?

14         A.    My impression of what he was terming a

15    North Carolina agreement was, yes, we keep this

16    meeting secret, yes, everything that we discussed at

17    this meeting is secret, and that here in North

18    Carolina our word is our bond, and that's what we

19    call a North Carolina agreement.  So if I tell you

20    something, you can take it to the bank and you can

21    trust it to be truthful.  That's what I considered to

22    be the North Carolina agreement.

23         Q.    The sequence of events was he asked

24    you to keep the meeting secret, you and Mr. Quinn

1    said we agree to keep the meeting secret, and he then

2    shook hands with each one of you and said this is

3    what we call a North Carolina agreement; is that

4    correct?

5        A.    That's my recollection, yes, sir.

6        Q.    Okay.  At that point when you shook

7    hands, you, Mr. Mebane, and Mr. Quinn had not

8    discussed any terms for Q&R to represent UTF, had

9    you?

10        A.    No, sir.

11        Q.    Okay.  What happened on the 14th?

12        A.    On the 14th we visited the UTF

13    facility in Mocksville.  He also took us to a POY

14    plant, I believe in Yadkinville.

15        Q.    What is a POY plant?

16        A.    Polyester oriented yarn, I believe.

17    We also went to a third facility, I can't remember

18    what it was.  I believe it was another POY plant.  I

19    do remember that there was -- on the way to that

20    facility he pointed out that there was one or two

21    guest houses on the property or right next to the

22    property that people stayed at quite frequently.

23        Q.    Were you introduced to a number of

24    employees of UTF on the 14th?

CIN-TEL CORPORATION

1          A.     Drypers would be number five.

2          Q.     Okay.  Can you identify any of the

3     others now?

4          A.     It looks like number four is Hospital

5     Specialty.  And I believe number two is Principle

6     Business Enterprises.  And number three -- number

7     three may be Whitestone, Fred, but I'm not a hundred

8     percent sure.

9          Q.     Now, the matrix identifies products

10    and monthly volume; is that correct?

11         A.     Bear with me, I'm trying to keep this

12    in order.

13         Q.     We're talking about Exhibit 75?

14         A.     Right.

15         Q.     Right.

16         A.     It identifies product and monthly

17    volume, that is correct.

18         Q.     Now, does the monthly volume represent

19    what those customers were at the time purchasing

20    through Q&R or does it represent what you thought

21    selling UTF's product you might be able to sell?

22         A.     Neither.

23         Q.     What does it represent?

24         A.     It represents their total purchasing

68

CIN-TEL CORPORATION

1    power, their total --

2            Q.    I see.

3            A.    -- monthly requirements.

4            Q.    Okay.  So this is not a sales

5    projection at all, it's a statement of what -- what

6    they purchase?

7            A.    It's a statement of what they totally

8    purchase --

9            Q.    Okay.

10           A.    -- on a monthly basis.

11           Q.    Okay.  And this includes no estimate

12    of how much, if any, of that volume Q&R could switch

13    from Avgol to UTF; is that correct?

14           A.    It is no estimate whatsoever.

15           Q.    Okay.  If you go to 74, can you

16    identify Exhibit 74?

17           A.    Exhibit 74 is a Q&R commission and

18    draw plan that Mr. Mebane, I believe, sent by E-mail

19    to Mr. Quinn.

20           Q.    Do you know if there is any relation

21    between your matrix, Exhibit 75, and this commission

22    and draw plan 74?

23           A.    No, I do not.

24           Q.    Okay.  Did you or Mr. Quinn prepare

69

CIN-TEL CORPORATION

1    any other material for the meeting on March 27th with

2    Mr. Mebane?

3         A.    I prepared, and I believe it was at

4    Mr. Mebane's request, an agenda for that meeting.

5         Q.    Okay.  Let's look at Exhibit 79.

6         A.    Okay.  I have it.

7         Q.    Is Exhibit 79, the second page that

8    says Unifi/Q&R partnership, is this the agenda?

9         A.    My recollection is that this is the

10   first page of a two-page agenda.

11        Q.    Okay.  Look at Exhibit 78, and keep

12   that exhibit in front of you.

13        A.    Okay, I have 78.

14        Q.    Do you see 78 has on the first page

15   Unifi/Q&R partnership and then there is a second page

16   Gene Kelly, shared employee?

17        A.    Yes.

18        Q.    Is this the -- what should be the

19   second page of the exhibit, the Gene Kelly?

20        A.    Yes.

21        Q.    And did you prepare the Gene Kelly

22   exhibit?

23        A.    I prepared it with Mr. Quinn's input.

24        Q.    Okay.  Let's go back to your notes of

1    the meeting.  Are these your handwritten notes on the
2    second page of Exhibit 79?
3         A.    This page here (indicating)?
4         Q.    Yes.
5         A.    Yes.
6         Q.    Are these the only notes you took in
7    that meeting?
8         A.    Yes, sir.
9         Q.    About how long did that meeting last?
10        A.    If I remember correctly, this meeting
11   started about 9:00 in the morning and lasted to
12   somewhere between 11:30 and 12:00, so approximately
13   two and a half to three hours.
14        Q.    Would you start at the upper left to
15   these notes and read them to us and tell us what they
16   mean.
17        A.    $1,639 per hour run line, 6,000 pounds
18   per hour.  My memory serves me is that Mr. Mebane
19   informed us that they are -- that was the cost to run
20   the production line and the 6,000 pounds is a -- was
21   the throughput on the production line.
22        Q.    Then is that three months, 25,000,
23   three months, 20,000?
24        A.    Yes, sir.

71

CIN-TEL CORPORATION

1          Q.     What's that?

2          A.     Those are notes that if you look -- if

3     you look in the agenda we had initially requested

4     monthly compensation of 25,000 per month during a

5     transition period.  And during the course of this

6     meeting Mr. Mebane had suggested we consider 25 for

7     the first three months and 20 for the second three

8     months.

9          Q.     Then there's a note six to nine, is

10    that months?

11         A.     Yes, sir.

12         Q.     What does that mean?

13         A.     At some point during this meeting

14    somebody had suggested that the length of the

15    transition period would be six to nine months.

16         Q.     That would be the period of time you

17    would be paid some sort of monthly compensation?

18         A.     Yes, sir.

19         Q.     At the end of the meeting with Mr.

20    Mebane, what was the period for you to be paid

21    compensation as opposed to a commission?

22         A.     I don't remember that we had agreed

23    upon a length of time.

24         Q.     Then after five percent commission on

72

CIN-TEL CORPORATION

1    all sales type it says high side.

2              What does that mean?

3    A.    Early on in the meeting Mr. Mebane

4    indicated that he felt that five percent commission

5    on sales -- on all sales it was -- he felt this was

6    on the high side.

7    Q.    At the meeting was the amount for the

8    commission agreed?

9    A.    Yes, sir.

10    Q.    And what was the amount?

11    A.    Four percent except for Procter &

12    Gamble and SCA.

13    Q.    And there's a note down here that says

14    P&G two percent, SCA two percent?

15    A.    Yes, sir.

16    Q.    Then underneath the handwriting I

17    can't read what it says, order -- is it order entry

18    via E-mail?

19    A.    Order entry via E-mail.

20    Q.    What does that mean?

21    A.    As we were discussing the customer

22    services support that we were going to need, Mr.

23    Mebane informed us of this program that Unifi

24    Corporation had called Fiber Serve, which is an order

73

CIN-TEL CORPORATION

1    entry system that is done by the internet.  And he

2    explained briefly what Fiber Serve was all about and

3    explained that we would be trained on that system.

4         Q.    Then what's the note about Richard

5    Lewis (plant), Doug, Christor, Tim Chambers mean?

6         A.    He said -- he also explained that

7    Richard Lewis would be our day-in and day-out

8    customer service contact.  I believe at that point in

9    time Richard -- Richard was an employee of Unifi

10   Corporation, but it was Mr. Mebane's intention to

11   bring him over to UTF -- bring him to the UTF plant

12   as our customer service person.

13                As far as technical support, we

14   discussed technical support internal and with

15   customers.  And he told us that Doug Nichols and

16   Krister Erlandsson, I believe is his last name, that

17   Doug would be our internal support and Krister would

18   be the external customer support that would go with

19   us to customers if we needed support.  Tim Chambers,

20   I don't remember who Tim Chambers is.

21        Q.    And what does US and Canada mean?

22        A.    We had discussed what we had asked

23   for, exclusive account responsibility of hygiene and

24   personal and care in North and South America.  And I

74

CIN-TEL CORPORATION

1    believe Mr. Mebane came back and said US and Canada.

2         Q.    Then five percent over a dollar

3    something a pound.  What's that about?

4         A.    I don't remember.  I don't remember

5    what that is, Fred.

6         Q.    Then it says, Change of ownership

7    includes commitment to Q&R.  What's that?

8         A.    This -- this is the point in

9    discussions, you know, that I had made the comment to

10   Mr. Mebane that this was going to be our last trip

11   down spunbond road, that Q&R was going to make a

12   long-term commitment to Unifi, and that in return

13   that we expected Unifi to make the same type of

14   long-term commitment to Q&R.  Mr. Mebane said any

15   change of ownership in the company would include a

16   commitment to Q&R.

17        Q.    Well, did -- did you or Mr. Quinn ask

18   what that meant, what was the commitment?

19        A.    At that point in time he did not get

20   specific as to what the commitment would be.

21        Q.    Isn't it true that Mr. Mebane said he

22   couldn't give a dollar commitment, he would have to

23   talk to corporate counsel?

24        A.    I don't remember him saying that

75

CIN-TEL CORPORATION

1    during the course of this meeting.

2              Q.    Well, you heard Mr. Quinn yesterday

3    testify to that effect, didn't you?

4              A.    Yes, I believe I did.

5              Q.    Do you have any reason to doubt Mr.

6    Quinn's testimony?

7              A.    No, sir.

8              Q.    Then it says here, Length of

9    agreement, three years, 120-day notice.  So you were

10   talking with Mr. Mebane about a three-year agreement

11   that had -- that either party could exit by giving

12   120-day notice; is that correct?

13             A.    We talked about length of agreement of

14   three years.  The 120 days obviously was mentioned, I

15   put it down in my notes.  In our industry three-year

16   agreements are pretty standard.  And in any type of

17   agreement there usually is an out for performance

18   reasons or what have you, so it -- obviously it was

19   said at some point, but I didn't -- apparently did

20   not feel it was important enough to go into any depth

21   with regards to it.

22             Q.    But you did write a note about length

23   of agreement and 120 days notice, obviously, correct?

24             A.    Yes.

1          Q.     What about -- did you ask not to tell
2   Avgol that you were there?
3          A.     I think the way what I requested Bill
4   and Bobby is that we had reached an agreement with
5   Mr. Mebane to represent Unifi and that we would be
6   informing John Cleaver and Moshe and the Avgol people
7   at the end of the show, so if he could please hold
8   that in confidence until the end of the show I would
9   appreciate it.
10         Q.     Did you have any other contact with
11  Mr. Mebane during the course of the show?
12         A.     Me personally?
13         Q.     Yes.
14         A.     Not that I remember.
15         Q.     Were you part -- who notified Cleaver
16  that you were breaking that relationship?
17         A.     Mr. Quinn.
18         Q.     Were you in on the call?
19         A.     No, I was not.
20         Q.     Okay.  Do you know when that call took
21  place?
22         A.     That took place on Friday morning,
23  which I would believe would have been March 30.
24         Q.     Would you pick up Exhibit 80 and

81

CIN-TEL CORPORATION

1          A.      Mr. Mebane was told in a meeting on

2    March 27 that we needed to be protected.

3          Q.      But did some -- did either you or Mr.

4    Quinn say we need a dollar amount protection?

5          A.      I did not.  I don't remember if Mr.

6    Quinn did or did not.

7          Q.      Okay.  So you recall that you said you

8    wanted to be protected or Mr. Quinn said that, nobody

9    said exactly what that protection was to be?

10         A.      Protection had not been defined, no,

11   sir.

12         Q.      Okay.  When was the next time that you

13   talked with Mr. Mebane about an agreement between Q&R

14   and UTF?

15         A.      I don't remember that I had any -- I

16   personally had any more discussion with Mr. Mebane.

17         Q.      Did you -- were you present when Mr.

18   Quinn had any other discussion either face-to-face or

19   over the phone with Mr. Mebane about an agreement

20   between UTF and Q&R?

21         A.      No, I was not.

22         Q.      Would you look at Exhibit 83 and

23   identify it if you can.

24         A.      This is a letter from Mr. Mebane to

85

CIN-TEL CORPORATION

1    Mr. Quinn dated April 25t, 2001.

2          Q.    Okay. Did -- have you seen this

3    letter before yesterday?

4          A.    Oh, yes.

5          Q.    Okay. Did you see it about the time

6    that Mr. Mebane sent it April 25, 2000?

7          A.    Yes, sir.

8          Q.    He says in here that he has passed on

9    the E-mail correspondence to Mr. McCoy. And then he

10    says he, meaning Mr. McCoy, recommends that if we

11    want to enter an agreement for something other than

12    month to month he would draft definitive agreements

13    for us.

14          Did you or Mr. Quinn consult counsel

15    after you read that the correspondence had been

16    passed on to Mr. McCoy?

17          A.    No, we did not.

18          Q.    Okay. Then he says, "I would like to

19    ask you if there are any items that are unclear or

20    require further definition in our mutual

21    understanding." Did you respond to that?

22          A.    Could you repeat that question.

23          Q.    It says -- he says at the end of the

24    first paragraph, "I would like to ask you if there

86

CIN-TEL CORPORATION

1    recollection of receiving this letter --

2                    MR. PACKARD:  Wait for the question.

3           Q.      What is your recollection of receiving

4    this?

5           A.      We had an agreement that we were going

6    to get a $25,000 check, which we had not received,

7    and my recollection is that Mr. Quinn called Mr.

8    Mebane and asked him when we were going to receive

9    that check.  And at some time after that phone call

10   we received a check with this accompanying letter.

11          Q.      Okay.  Then the last large paragraph,

12   "One final point, he," meaning Mr. McCoy, "asked

13   about the 120 days termination terms."  I'm not going

14   to read the rest of it, but he gives a couple of

15   alternatives, no handling the payments for 120 days,

16   and he ends up saying, "What do you think?"  Did --

17   do you know if Mr. Quinn ever responded to this

18   question?

19          A.      No, I do not know.

20          Q.      Did you ever respond to the question?

21          A.      No, I did not.

22          Q.      Is there some reason that Q&R did not

23   proceed with Mr. Mebane to finalize the agreement and

24   prepare and sign a written agreement?