# EXHIBIT C

William Michael Mebane                                          Page 107

```
 1   end of March, now, are you comfortable
 2   characterizing what your understanding of the
 3   rumors were at that time?
 4        A.   Again, no, I'm not comfortable
 5   characterizing what, specifically, rumors were.
 6   We did talk, specifically, about the circumstances
 7   around what if Unifi sold its plant to Avgol.
 8        Q.   Okay.  What were those discussions?
 9   What did you say; what did they say; how did it
10   go?
11        A.   Help me with a specific question,
12   please.
13        Q.   Well, okay.  Who raised the issue?
14        A.   I believe they raised the issue.
15        Q.   Okay.  Did they raise that early in the
16   meeting or late in the meeting?
17        A.   I don't recall.
18        Q.   Okay.  How much of this meeting was
19   spent talking about that issue?
20        A.   Not very much.
21        Q.   Okay.  When they raised the issue, what
22   did they ask you?
23        A.   They asked me what happens if Unifi
24   loses control of the plant.
25        Q.   And how did you respond?
```

02-24-04                Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                            Page 108

1    A.   And at this point of our discussions, we
2    had already defined the -- the primary terms under
3    which they would represent Unifi.
4    Q.   Uh-huh (yes).
5    A.   We had included in those terms an
6    understanding that either side could withdraw from
7    this representation with a certain number of days
8    of commissions paid.  Originally, they had asked
9    for six months's worth of commissions, or 180
10   days.  I had originally offered 90 days of
11   commissions to be paid for them.
12        And we had come to the understanding
13   that 120 days would be what we put into our
14   agreement.  And any reference to a change of
15   control for Unifi would be covered under the 120-
16   day termination understanding.
17   Q.   Is that how you responded when they
18   raised the issue?
19   A.   As ---
20   Q.   We'll exercise our right to terminate?
21   A.   Yeah, said the protection that you have
22   is covered under the termination clause, whether
23   it's for purposes of change of control of the
24   plant, or unable to fulfill it for any reasons.
25   Q.   Did they respond to you in any way after

02-24-04             Q&R vs. UNIFI\C101641                         COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                                    Page 109

1  you said that?
2       A.   Mr. Quinn had indicated that he
3  preferred to have a more definitive, separate
4  agreement for change of control. And I had
5  indicated to him that I was not authorized to --
6  to do that.
7       Q.   Okay.
8       A.   The constraints I had were regarding a
9  commercial relationship, and I could not agree --
10 I could not -- I was not authorized to do anything
11 beyond that.
12      Q.   Did you believe you had reached an
13 agreement with Q & R at this meeting -- in this
14 suite?
15      A.   Yeah, I believe that we had come to an
16 agreement on the terms and conditions under which
17 they would represent us. Yes, I did.
18      Q.   Now, you said you met with them two
19 other times in Miami. When was the next meeting?
20      A.   I had lunch, and I believe it was with
21 Mr. Ranz, and one other of my staff members, and
22 I'm sorry, I don't recall exactly who it would
23 have been. And then we had a -- a meeting with
24 one of the potential customers of ourselves, and
25 Mr. Ranz asked to be included in that meeting, and

02-24-04                Q&R vs. UNIFI\C101641                        COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                                          Page 114

1   market with a pre-existing employee that we had,
2   named Gene Kelly. That we would pay them,
3   initially, a draw instead of commissions while the
4   business was being built up over the three to six
5   months. And we agreed upon how much that was to
6   be each month while they were actually converting
7   the customers over to the Unifi fabric.
8           And that either one of us could leave
9   the agreement for any reason with 120 days notice.
10      Q.  How were these conditions memorialized,
11  if at all. Were they ever written down anywhere?
12      A.  I mean, I -- I took handwritten notes,
13  and then went back the next day and summarized my
14  notes in an e-mail to Mr. Quinn.
15      Q.  Was there ever a formal contract drawn
16  up and executed by everybody?
17      A.  No, there wasn't.
18      Q.  Now, when you were in Miami, did you
19  anticipate that eventually there would be such a
20  contract?
21      A.  I would have preferred to have any
22  multi-year contract defined specifically in a
23  agreement that would have been drawn between us.
24  So yes, I would have been working towards having a
25  definitive agreement drawn, based on the terms and

02-24-04                Q&R vs. UNIFI\C101641                              COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                                Page 115

1     conditions that we had established.
2         Q.   Did you believe that you had reached a
3     verbal agreement or contract with Q & R, as of ---
4         A.   Yes.
5         Q.   --- at the meeting in the suite?
6         A.   Yes, I had.
7         Q.   Okay.  And you've already gone through
8     the terms and conditions.  Were there any other
9     terms and conditions that you can recall?
10        A.   No.  I'd have to look back over the --
11    the e-mail that I sent to them.  That pretty well
12    defined each one of those.
13             Oh, there were -- there was -- oh, there
14    was a real important issue for me.  If prices
15    dropped below a certain point, that they would
16    yield part of their commissions.
17        Q.   They would be paid a lower commission?
18        A.   Lower commission at a certain point,
19    which would incent (sic) them to sell at a price
20    that was high enough to make it a very profitable
21    business.
22        Q.   Was one of the terms of the agreement
23    that Q & R would have the exclusive right to sell
24    to the hygiene market?
25        A.   Yeah, that was one of the -- with the

02-24-04           Q&R vs. UNIFI\C101641                      COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954