# EXHIBIT H



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Q&R ASSOCIATES, INC., | ) | Case No. C-1-01-641 |
| | : | |
| Plaintiff, | ) | (Judge Spiegel) |
| | : | |
| -v- | ) | |
| | : | **AFFIDAVIT OF JOHN H. RANZ JR. IN** |
| UNIFI, INC., et al., | ) | **OPPOSITION TO DEFENDANTS'** |
| | : | **MOTION TO DISMISS FOR LACK OF** |
| Defendants. | ) | **PERSONAL JURISDICTION** |

STATE OF OHIO )
) ss.
COUNTY OF HAMILTON )

I, John H. Ranz Jr., being first duly sworn, do hereby state the following:

1.    I am the Vice President/Co-Owner of Q&R Associates, Inc. ("Q&R") and have been since its inception on January 1, 1992.

2.    Q&R is an Ohio corporation with its sole place of business in Cincinnati, Ohio.

3.    Q&R is a sales and marketing company founded in January, 1992. Our company represents companies who produce raw materials primarily for the disposable hygienic markets. These markets include infant disposable diapers, feminine hygienic products, and adult incontinent products. Q&R's two primary or emphasis product lines are polyethylene film and spun melt polypropylene nonwoven fabric. Each of these two product lines represent approximately 40% of Q&R's total sales and gross revenues. From September, 1995 until March 30, 2001, Q&R had been selling and marketing spun melt polypropylene nonwoven manufactured by Avgol Nonwoven Industries (Based in Holon, Israel) through a business partnership with Cleaver Associates, Inc. (Based in Paoli, Pennsylvania).

4.    Q&R's sole place of business is in the Greater Cincinnati, Ohio area. Q&R operates two offices: one in West Chester, Ohio and one in Evendale, Ohio. All sales and marketing efforts are coordinated through these two offices. A third office located in Mason, Ohio was closed in September, 2001. This Mason office was closed as a result of the serious economic downturn that Q&R suffered because of the actions of Unifi. Q&R's largest single customer

- 2 -

during (and prior to) the period of Unifi's solicitation and subsequent negotiations operates out of Marion, Ohio. This is where our customer received and used the goods it ordered through Q&R and received from Avgol. Of the business that Q&R did for Avgol, and would have done for Unifi, 50%-60% of these revenues were generated from customers in Ohio. Q&R has never advertised in any trade magazine.

5.    On February 13 and 14, 2001, Michael Quinn and I traveled to Mocksville, North Carolina to visit with Michael Mebane. During this visit we were given a tour of the UTF spun melt nonwoven plant, as well as a tour of two Unifi facilities in Yadkinville, North Carolina. We were introduced to a number of UTF/Unifi employees. During this visit, all business discussions took place with Mebane.

6.    Throughout these negotiations with Mebane, I believed that Unifi and UTF were one and the same, and that we were dealing with both. As I mentioned above, we were given tours of Unifi and UTF facilities and were told at one Unifi facility that it would be Unifi trucks that were delivering the product from our orders to our customers. I was also told that Q&R would be able to sell Sorbtek, a product manufactured exclusively by Unifi. If I believed that we were dealing only with UTF's representative, Mebane, without the full support of Unifi and Unifi's management, there is no question that Q&R would have broken off its discussions with UTF and remained with Avgol.

7.    During these discussions in February, we asked Mebane about the industry rumors relating to the sale of UTF to Avgol. Mebane became very agitated and blamed John Cleaver for starting those rumors. Mebane said that while he was not at liberty to discuss all that had transpired between Unifi and Avgol, he could tell us that he had had numerous meetings, discussions, and visits with the owners of Avgol. He told us that those discussions included Avgol buying UTF, UTF buying Avgol, and a joint venture between UTF and Avgol. He indicated that several of the owners of Avgol, including Moshe Goldwasser, had visited both the Unifi facilities in Yadkinville and the UTF spun melt plant in Mocksville. He told us that John Cleaver had also been invited to visit, but declined. He flatly denied that UTF would be sold to Avgol.

8.    On February 13 and 14, 2001, Q&R and UTF/Unifi (through Mebane) agreed to stay in contact to determine if there might be a mutual interest in the future. Mebane requested Q&R to forward a matrix of potential business to him with a possible time line for obtaining this business. Q&R forwarded this information to Mebane in late February or early March without disclosing specific customers.

9.    During these same business discussions of February 13 and 14, 2001, Mebane suggested that both parties keep this visit and these meetings confidential "at this time." All parties agreed. At that point we all shook hands (Quinn, Ranz, and Mebane) and Mebane said "We call this

- 3 -

a North Carolina Agreement." I understood him to mean that the way Mebane did business was that oral agreements and promises were as binding as written ones.

10.    In early March 2001, Mebane called us again and asked that we meet to discuss the relationship between Unifi and Q&R further. Michael Quinn, Mebane, and I agreed to meet in Miami, Florida at the IDEA Nonwovens show the last week of March to try and finalize a business agreement between Q&R and UTF. In preparation for this meeting, Mebane requested that Q&R put together a list of what we needed in order to get the deal going. Mebane also asked Q&R to address Gene Kelly's position on a go forward basis.

11.    The meeting took place at 9:00 A.M. on March 27, 2001 in Mebane's personal suite at the Loews Hotel in Miami Beach, Florida. Quinn, Mebane, and I were the only parties to this meeting. It ended shortly before noon on March 27, 2001.

12.    During the course of this meeting, Q&R again expressed concern that UTF would be sold to Avgol. I told Mebane, "This is our last trip down the spunbound road." We intended to represent UTF for the rest of our careers, if not longer if the company continued to survive and thrive after Quinn and I retired. Mebane answered unequivocally that UTF would not be sold to Avgol. Mebane also said that any "change in ownership includes a commitment to Q&R." I relied on Mebane's continued assurances that UTF would not be sold to Avgol in my decision to continue discussions with Unifi, and in my ultimate decision to leave Avgol and Cleaver, in favor of Unifi.

13.    Also during this meeting of March 27, 2001, there was a long discussion of remuneration to Q&R. Mebane and Q&R agreed that we would receive compensation for a six-month period starting at $25,000 per month and gradually reducing to $0 after the six months. At that point, Q&R would receive a straight commission rate of 4 % of sales except that commission on sales to Procter & Gamble and S.C.A. Molynke would be at 2%. Mebane indicated he would confirm all of this in writing to Q&R. This was done via e-mail on March 30, 2001. Mebane said that we needed to come to Mocksville, N.C. as soon as possible to formulate a business plan. We agreed, and told Mebane that we, along with Mr. Ron Honerlaw, who was a sales representative for Q&R at that time, would schedule a visit to Mocksville as soon as possible. At that point, we (Quinn, Ranz, and Mebane) shook hands and Mebane asked if we had an agreement. Quinn and I responded that we did.

14.    Although we had already reached a verbal agreement, both parties agreed to proceed with a written agreement, to evidence the deal. Mebane then asked when we were going to inform Cleaver and Avgol of our agreement. We told Mebane that we would not disrupt the trade show for Cleaver and Avgol. We also told Mebane that we had made commitments to both Avgol and our customers at the show, which we would honor. We told Mebane that we would inform Cleaver of our decision at the end of the show on Thursday, March 29, 2001. Over the next two days, Mebane continued to push us very hard to tell Cleaver. He even

- 4 -

called Mike and I on our cell phones several times, urging us to tell Cleaver. Each time, Mebane was told that we would do it at the end of the show.

15. On Thursday, March 29, 2001, we attempted to meet with Cleaver at the Avgol Booth to inform him of our agreement. He was tied up in meetings, and since we had a flight to catch, we were unable to inform him that day.

16. On March 30, 2001 Mebane sent an email to Mike Quinn, recapping the primary points of the agreement, which we had discussed on March 27, 2001. Mebane stated that he was pleased that we had agreed on terms to represent UTF. Mebane also attached a worksheet forecasting revenues to Q&R in the amount of $1,315,000 for the period of April 2001 through April 2003 (26 months).

17. In reliance on Mebane's promises and assurances, Q&R informed Cleaver that we were terminating our relationship with Cleaver/Avgol on March 30, 2001. On April 2, 2001, Cleaver Associates began notifying our customers via fax that Q&R was no longer representing Avgol.

18. On April 3, 2001, John Cleaver faxed a letter to Mike Quinn that Cleaver Associates was making the necessary arrangements to handle all current Avgol customers.

19. Beginning Monday, April 2, 2001, Q&R began to actively solicit business for UTF. This included sales calls, letters, sample orders, trial orders, and production orders. These orders were all received in the Cincinnati offices of Q&R and forwarded to the Unifi offices in Mocksville, North Carolina Per Mebane, our day to day contact in customer service was Richard Lewis. During this time it was not unusual for Q&R to be in contact with Lewis up to ten times a day.

20. On April 10 and 11, 2001, Mike Quinn, Ron Honerlaw and I visited UTF in Mocksville, North Carolina to discuss specific customers and a business strategy. Mebane was out of town and did not participate. During these two days, the three of us were surprised to learn that UTF was nowhere near ready to supply nonwoven to the diaper industry. This is contrary to what Mebane had led us to believe in previous meetings and discussions. During this visit, we came to believe that the time frame to transition our customers over to UTF nonwoven product would take longer than the projected 6 months.

21. On May 11, 2001, UTF requested that we obtain a competitor's raw material sample from Associated Hygiene Products (A.H.P.) in Marion, Ohio, and forward it to UTF. We did so. At the time of this request, Mebane had known about the sale of UTF to Avgol for over two weeks, but he never disclosed it to Q&R.

22. On Monday, May 14, 2001, Mike Quinn called me with the news that Mebane had just called and informed him that UTF had been sold to Avgol. I suggested that we get back on

- 5 -

the phone with Mebane because I had a number of questions for him.   At approximately 11:00 a.m. we had a three-way conference call with Mebane.  I asked Mebane when he had been notified of the pending sale to Avgol.  Mebane told me that on April 18 or 19, 2001, while in England, he had received a phone call from the Unifi mergers and acquisitions group informing him that a non-binding letter of intent had been signed to sell UTF to Avgol. I then asked him if after the IDEA Nonwovens show at the end of March he had notified his senior management that  an agreement had been reached with Q&R. Mebane said that he was not at liberty to answer that question at that time, and that we needed to contact Charles McCoy, their legal counsel.

23.    The witnesses that Q&R would likely call reside in: Cincinnati, Ohio; Marion, Ohio; Dunbridge, Ohio; Lexington, Kentucky; Little Rock, Arkansas; Bloomington, Indiana; Cleveland, Ohio.

Further Affiant Sayeth Naught.

John H. Ranz Jr.

Sworn to before me and subscribed in my presence on this 26th day of _November_ 2001.

Notary Public

JAMES R. BURKE.  Attorney at Law
Notary Public State of Ohio
My commission has no expiration date
Section 147.03 O.R.C.

- 6 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Affidavit of John H. Ranz Jr. was served upon counsel for Unifi, Inc. and UTF, Frederick J. McGavran, Frost Brown Todd LLC, 2200 PNC Center, 201 E. Fifth Street, Cincinnati, Ohio 45202-4182, by ordinary U.S. mail, this *27th* day of November, 2001.

James E. Burke

919779.1