UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Q&R ASSOCIATES, INC. | ) | Case No. C-1-01-641 |
| | ) | |
| Plaintiff, | ) | (Judge Beckwith) |
| | ) | |
| -v- | ) | PLAINTIFF'S MOTION |
| | ) | FOR PARTIAL SUMMARY |
| | ) | JUDGMENT WITH |
| UNIFI, INC., *et al.* | ) | <u>MEMORANDUM IN SUPPORT</u> |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Q&R Associates, Inc. ("Q&R") hereby moves for partial summary judgment against Defendants Unifi Technical Fabric, LLC ("UTF") and Michael Mebane. Partial summary judgment should be granted in favor of Q&R as to Q&R's claims for fraudulent inducement and promissory estoppel. In addition, partial summary judgment should be granted as to $95,000 in undisputed contractually required payments that UTF has failed to pay to Q&R. All other issues, including the remainder of Q&R's damages, should be set for trial.

                                                        Respectfully submitted,

                                                      <u>s/ Dwight A. Packard, II</u>
                                                      James E. Burke (0032731)
                                                      Dwight A. Packard II (0067182)
                                                      1400 Provident Tower
                                                      One East Fourth Street
                                                      Cincinnati, Ohio 45202
                                                      Tel. (513)579-6429
                                                      Fax (513)579-6457
                                                      jburke@kmklaw.com
                                                      dpackard@kmklaw.com
                                                      Attorneys for Plaintiff,
                                                      Q&R Associates

## MEMORANDUM IN SUPPORT

**I.     INTRODUCTION**

UTF solicited two sales persons, who comprised the firm of Q&R, to leave a profitable arrangement in which they were selling products manufactured by Avgol Nonwoven Industries ("Avgol").  At the same time, and without any disclosure to Q&R, UTF was arranging for the complete sale of its manufacturing facilities to Avgol.  Not knowing about the impending sale, Q&R agreed to end its relationship distributing Avgol products and begin selling UTF's products.  Just weeks after Q&R began selling UTF's products, UTF announced the sale of its manufacturing facilities to Avgol, leaving Q&R completely out in the cold.

The material facts as to liability on UTF's claims for fraudulent inducement and promissory estoppel are undisputed.  There is no dispute that: (1) UTF was involved in ongoing negotiations with Avgol at the same time that it was negotiating terms with Q&R; (2) that UTF knew that the sale of the business was of tremendous concern to Q&R; (3) that UTF misrepresented and failed to disclose these negotiations to Q&R despite being asked about the negotiations by Q&R; (4) that Q&R detrimentally relied upon UTF's misrepresentations and/or nondisclosures and (5) that Q&R suffered substantial damage as a result.

In addition, there is no dispute that UTF contractually obligated itself to pay some $95,000 in fees to Q&R and that these fees have not been paid.

**II.    STATEMENT OF RELEVANT FACTS**

Q&R is a sales and marketing company representing raw materials producers selling products used to manufacture diapers and other similar products.  (*Quinn Aff.*, ¶ 3 (Ex. A); *Ranz Aff.*, ¶ 3 (Ex. B)).  Michael Quinn and John Ranz are the principals at Q&R.  (*Quinn Aff.*, ¶ 1 (Ex. A); *Ranz Aff.*, ¶ 1 (Ex. B)).  For a number of years, Q&R had been engaged in a business

partnership with Cleaver Associates, Inc. to distribute Avgol "nonwoven" products. (*Quinn Aff.*, ¶ 3 (Ex. A); *Ranz Aff.*, ¶ 3 (Ex. B)). Avgol is an Israeli concern that manufactures spun melt fabrics, a synthetic raw material used in the disposable hygienic market. (*Id.*) Q&R, acting as a sub-agent for Cleaver Associates, sold the Avgol products to a variety of manufacturers, primarily located in Ohio, Kentucky, Indiana and Arkansas. (*Quinn Aff.*, ¶ 4 (Ex. A)).

UTF, a subsidiary of Unifi, Inc., was a competitor of Avgol. (*Mebane Depo*. at 44 (Ex. C)). In late 1999, UTF constructed a new spun melt plant in Mocksville, North Carolina. (*Mebane Depo*. at 70 (Ex. C)). The Mocksville facility was the only such facility in the United States, and upon its construction UTF began work to develop a sales force to sell the product. (*Id.* at 72-74 (Ex. C)).

### A.    UTF Recruits Q&R

Sometime in mid to late 2000, Michael Mebane, the president of UTF, began attempting to recruit Q&R to sell UTF's spun melt product. (*Quinn Aff.,* ¶ 5 (Ex. A); *Mebane Depo.* at 73-76 (Ex. C)). In January of 2001, Mebane invited Quinn and Ranz to visit the Mocksville, North Carolina facility. (*Mebane Depo.* at 76-81 (Ex. C); *Quinn Aff.,* ¶ 8 (Ex. A)). Quinn and Ranz agreed to tour the facility and made the trip to North Carolina on February 13 and 14. (*Mebane Depo.* at 81-87, 147 (Ex. C); *Ranz Depo.* at 55 (Ex. D)).

On the trip, Quinn and Ranz asked about industry rumors that UTF would be sold to Avgol, and expressed their concern about the devastating effect such a sale would have on their careers if they decided to leave Avgol and move to UTF. (*Quinn Aff.*, ¶ 9 (Ex. A); *Ranz Aff.*, ¶ 7 (Ex. B)). Quinn and Ranz understood the hard feelings on the part of Avgol and Cleaver that would necessarily occur should they leave that relationship for UTF, and they understand that if Avgol were to then purchase UTF they would have committed the equivalent of professional suicide. (*Id.*) But, Mebane was unequivocal that no such sale was in the works. (*Ranz Aff.*, ¶ 7

(Ex. B)). When asked about the potential sale, Mebane replied that a confidentiality agreement prohibited him from discussing all the details of the UTF's discussions with Avgol[1], but he flatly denied that UTF would be sold to Avgol. (*Id*; *see also Mebane Depo*. at 148-150 (Ex. C)). It "ain't gonna happen," he said. (*Quinn Depo*. at 160-161 (Ex. H); *Quinn Aff.*, ¶¶ 9, 10 (Ex. A)). During the same meeting, Mebane stood up and shook hands with Quinn and Ranz and said "This is a North Carolina agreement, you have my word." (*Quinn Aff.*, ¶ 9 (Ex. A); *Ranz Aff.*, ¶ 9 (Ex. B)). Ranz explained what the parties understood Mebane to mean when he referred to a "North Carolina agreement": "here in North Carolina our word is bond, and that's what we call a North Carolina Agreement. So if I tell you something, you can take it to the bank and you can trust it to be truthful." (*Ranz Depo*. at 60 (Ex. D)).

Over the course of the next month and one half, Mebane and Q&R continued to discuss a possible move by Q&R to UTF in various telephone conversations. (*Mebane Depo*. at 88-89, 100 (Ex. C)). Mebane knew Q&R represented Avgol and Mebane discussed Q&R's relationship with Cleaver and Avgol during these telephone conversation. (*Mebane Depo*. at 90 (Ex. C)). Despite the undisputed fact that UTF and Avgol were actively working on a deal during this same time period, Mebane admits that he never mentioned the possible sale to Quinn and Ranz. (*Mebane Depo*. at 104 (Ex. C)).

One issue that the parties discussed during these conversations was UTF's insistence that Q&R take care of Gene Kelly, a UTF employee who had been selling spun melt materials.

---

[1] There is no support in the record for Mebane's statements about a confidentiality agreement. The only confidentiality agreement produced by UTF was not signed until April 16, 2001. (*Ptf's* Ex. 11 (Ex. E)). It appears extremely unlikely that any confidentiality agreement was in effect at the time Avgol was negotiating with Q&R. Mike Delaney, one of UTF's negotiatiors, testified that he had no recollection of seeing such an agreement. (*Delaney Depo*. at 87 (Ex. F)). Notes from an April 4 negotiation meeting between Avgol and UTF indicated that a previous confidentiality agreement that may have been in place when Avgol was discussing a joint venture with UTF several years before had lapsed. (*Ptf.'s* Ex. 7 (Ex. G)). Even Mebane admitted he didn't know where the agreement was, what it covered, when it was signed, who signed it or the length of its term. (*Mebane Depo*. at 75 (Ex. C)).

(*Quinn Aff.*, ¶ 11 (Ex. A)).  As part of the deal, Q&R agreed that they would share a portion of the market with Gene Kelly.  (*Mebane Depo.* at 113-114 (Ex. C)).

In early March, Mebane, Ranz and Quinn agreed to meet at a trade show in Miami to finalize a business arrangement.  (*Quinn Aff.*, ¶ 11 (Ex. A); *Ranz Aff.*, ¶ 16 (Ex. B)).  On March 27, 2002, Quinn and Ranz met with Mebane at the trade show.  (*Ranz Aff.*, ¶ 11 (Ex. B); *Quinn Aff.*, ¶ 12 (Ex. A)).  During that meeting, Quinn and Ranz agreed to leave Cleaver and Avgol and begin representing UTF.  (*Mebane Depo.* at 109 (Ex. C)).  Before doing so, Q&R again expressed their concerns about the possibility of UTF being sold to Avgol.  (*Quinn Depo.* at 179-80 (Ex. H)).  Ranz told Mebane, "This is our last trip down spunbound road."  (*Ranz Aff.*, ¶ 12 (Ex. B); *Quinn Aff.* ¶ 13 (Ex. A)).  By this he meant that Q&R intended to represent UTF for the rest of their careers.  (*Id.*)  Mebane again reiterated that UTF was not going to be sold, but added that if such event did occur that Q&R would be protected.  (*Id.*)  Mebane also promised that in the event anything happened he would take care of Q&R just as he had taken care of Gene Kelly.  (*Mebane Depo.* at 248 (Ex. C)).

At the end of the meeting, Quinn and Ranz shook hands with Mebane and Mebane said "Do we have an agreement?"  Quinn and Ranz responded affirmatively and the parties discussed memorializing the agreement in a written contract.  (*Quinn Aff.* ¶ 27 (Ex. A), *Quinn Depo.* at 183-84 (Ex. H)).  Mebane, once again, used the phrase "North Carolina agreement" to indicate that the parties verbal agreement constituted a binding agreement.  (*Mebane Depo.* at 145-146, 151 (Ex. C)).

Mebane immediately pushed Quinn and Ranz very hard to tell Cleaver of the agreement.  (*Ranz Aff.*, ¶ 14 (Ex. B); *Quinn Aff.*, ¶ 18 (Ex. A)).  Quinn and Ranz reluctantly agreed that they would notify Cleaver at the end of the trade show.  (*Id.*)  On March 30, Quinn and Ranz notified

Cleaver that they were terminating their relationship. (*Ranz Aff.*, ¶ 17 (Ex. B); Quinn Aff., ¶ 19 (Ex. A)).

On March 30, Mebane followed up with an e-mail purporting to summarize the terms of the agreement. (*Ptf's* Ex. 5 (Ex. I)). The e-mail set forth a sliding scale whereby Q&R would receive payments in addition to commissions beginning at $25,000 in April and gradually decreasing to $3,000 in October and thereafter would be paid solely on a commission basis. (*Id.*) The e-mail went on to say that the term would be for three years, "with 120 days notice, except for cause or nonperformance by either side." (*Id.*).

Quinn followed up on April 1, with an e-mail saying that he "agreed with your notes, with two exceptions." (*Dft's* Ex. 81 (Ex. J)). The first exception related to a reduction in commissions in certain circumstances. The other dealt with Mebane's failure to memorialize in writing their agreement that UTF would protect Q&R in the event of any sale to Avgol:

> "2.—if Unifi's spun-bound operation is sold, Q&R will be protected. As John said in our last meeting "this is our last trip down spun-bound road. We do need to discuss a dollar amount." (*Id.*)

Mebane followed up with an e-mail on April 2 that substantially misrepresented the fact that UTF was on the verge of selling out to Avgol. (*Ptf's* Ex. 39 (Ex. K)). In the e-mail Mebane wrote:

> "Item 2 below, I don't know how to approach without a long drawn out legal department process which usually doesn't work very well either. As we discussed this a.m., lets commit to making this a moot point by doing great. If something does change down the road, I will look after you guys the same way I am looking after Gene today." (*Id.*)

Apparently, by "doing great" Mebane meant that Q&R should endeavor to make UTF so successful in selling spun melt materials that UTF would have no desire to sell the plant. (*Dft's* Ex. 83 (Ex. L)).

B.     **UTF negotiates sale to Avgol at the same time that it is recruiting Q&R**

At the same time that UTF was recruiting and finalizing its business relationship with Q&R, UTF was actively engaged in selling out to Avgol. *At the end of this section is a timeline that vividly demonstrates that UTF was negotiating a sale of the business at the same time that it was finalizing arrangements with Q&R.* UTF was taking Q&R over a cliff and keeping them completely in the dark about it.

For several years Mebane had been engaged in intermittent discussions with Avgol about potential business arrangements, including joint ventures, mergers or acquisitions. (*Mebane Depo.* at 69, 118 (Ex. C)). Sometime in late 2000, Avgol indicated an interest in purchasing UTF's manufacturing assets in North America. (*Mebane Depo.* at 120 (Ex. C)). These discussions continued through early 2001.

1.     **February 28-March 15, 2001: Mebane engages in substantive negotiations with Avgol at the same time he is finalizing arrangements with Q&R**.

On February 28, 2001, Mebane wrote a memo to Brian Parke, his superior at UTF's parent company, discussing a possible sale of the plant. (*Ptf's* Ex. 1 (Ex. M); *Mebane Depo.* at 176-179 (Ex. C)). In the memorandum, Mebane made clear that based on market considerations he had "kept my eyes open for an opportunity to sell the plant." (*Ptf's* Ex. 1 (Ex. M)). Mebane summarized the status of negotiations with Avgol and concluded that "currently, none of our people know I am still talking to Avgol, even though rumors are all over the industry that a deal is cooking. I would find a way to handle that." (*Id.*)

Avgol and Mebane continued to go back and forth on the deal during the first week in March. (*Mebane Depo.* at 122 (Ex. C)). On March 7, 2001, Moshe Goldwasser of Avgol sent a memo to Mebane following up a telephone conversation between the two of them the day before in which the sale of UTF's plant had been discussed. (*Ptf.'s* Ex. 31 (Ex. N); *Mebane Depo.* at

190 (Ex. C)).  The first line of Goldwasser's memorandum made clear Avgol's intent to purchase the plant:

> "further to our telephone conversation, I should like to confirm Avgol's intention to begin negotiations with Unified Technical Fabrics ("UTF") regarding Avgol's acquisition of UTF." (*Ptf.'s* Ex. 31 (Ex. N)).

That same day, Mebane sent Goldwasser an e-mail asking for a specific price term, identification of Avgol's financing source, and a list of documents Avgol wished to review for due diligence.  (*Ptf.'s*, Ex. 30 (Ex. O); *Mebane Depo*. at 184 (Ex. C)).  Clearly, the discussions between Avgol and UTF were moving toward an advanced stage – just as Mebane was separately urging Q&R to cut all ties with Avgol.

The next day Goldwasser followed up with another memorandum reiterating Avgol's "intention to enter into negotiations with UTF regarding Avgol's acquisition of the UTF plant." (*Ptf*.'s. Ex. 32 (Ex. P); *Mebane Depo*. at 191 (Ex. C)).  The memo stated that Avgol was able to obtain financing from two of Israel's leading banks and requested various documentation to allow Avgol to evaluate the value of the facility and arrive at a price term. (*Ptf*.'s. Ex. 32 (Ex. P)).  On March 14, Mebane responded with an e-mail asking to meet with Avgol's United States investment advisor.  (*Ptf's* Ex. 2 (Ex. Q)).

      2.    **Mebane turns over negotiations to his mergers and acquisitions department and the sale of UTF rapidly moves to conclusion at the same time Mebane finalizes arrangement with Q&R**.

On March 15, 2001, Mebane sent an e-mail to Ron Smith and Mike Delaney of Unifi's mergers and acquisition departments asking them to take over responsibility for negotiations with Avgol. (*Mebane Depo.* at 197-198 (Ex. C); *Ptf.'s Ex*. 16 (Ex. R)).  Mebane cited the need for him to focus on the start-up of UTF's business and expressed his anger that he had heard rumors from customers about the potential sale which he had traced back to Goldwasser.

Mebane concluded "I need to get as far away from the process as possible and keep starting up the new business. I will help you in any way possible, but you need to be the primary contact. I told them this today." (*Id*. (Ex. R)).

That same day, Goldwasser sent Mebane a memorandum stating that the earliest time Avgol's American negotiator could meet would be March 29 or 30. (*Ptf's* Ex. 17 (Ex. S)). Goldwasser also asked the parties to enter into confidentiality agreements and promise an exclusive right to Avgol to purchase the facility for a period of sixty days. (*Id*.) Goldwasser stated that due diligence procedures "should take two to three days, after which, negotiations for completing the transactions can be immediately conducted." (*Ptf.'s* Ex. 17 (Ex. S)). He concluded: "Should we come to an agreement, it will be possible to complete the transaction during a very short period of time thereafter." (*Ptf's* Ex. 17 (Ex. S)).

Negotiations did in fact proceed very quickly thereafter. UTF's negotiators were aware of the situation with Q&R, and the trust and confidence Q&R had placed in UTF, and made some effort to include them in the deal so that their careers would not be destroyed. (*Delaney Depo.*, at 55-57 (Ex. F); *Smith Depo*. at 33 (Ex. T)). Avgol, however, apparently was not eager to accommodate UTF's need to keep its commitments to Q&R, and UTF did not make their inclusion in the deal a sticking point. (*Smith Depo*. at 35-37 (Ex. T)).

    3.    **The sale is concluded and Q&R is left out in the cold**.

While negotiations with Avgol were rapidly moving forward, UTF was continuing to take steps to keep Q&R in the dark about the impending sale. Mebane even admitted that he prevented the release of information about a letter of intent that had been signed between Avgol and UTF specifically to prevent Q&R from learning about the deal:

> When I was informed of the non-binding letter of intent and their
> desire to make an announcement, it would have been one of the

>reasons why I said they can't do that on a non-binding letter of intent; that I've got a number of business processes underway, with customers with – that I would – I think I mentioned Q&R at that time, that's one of the reasons why, you know, there's no deal with Avgol. And there's no requirement for Avgol to carry out this transaction. So you cannot make an announcement based on the non-binding agreement that you have in place.
>
>Q. So other than citing Q&R as a reason why there shouldn't be a public ---
>
>A. And that's what ---
>
>Q. --- announcement ---
>
>A. That's the only thing I can recall." (*Mebane Depo.*, at 144 (Ex. C)).

Finally, on May 14, 2001, Mebane called Quinn and disingenuously said "the worst possible thing had happened," *i.e.* that UTF had been sold to Avgol. (*Quinn Aff.*, at ¶ 22 (Ex. A); *Mebane Depo*. at 252 (Ex. C)). (Mebane conveniently forgot to mention that he had been intimately involved in the sales discussions since February.) Quinn reacted with shock and anger and asked Mebane when he had learned about the sale and whether he had informed senior management about UTF's relationship with Q&R. (*Quinn Aff.*, ¶ 22 (Ex. A)). Mebane falsely told Quinn that he had learned about the sale on April 18 or 19. (*Quinn Aff.*, ¶ 22 (Ex. A)). He refused to answer Quinn's question about whether he had informed senior management about his agreement with Q&R to act as UTF's exclusive sales agent. (*Id.*, ¶ 22.) Mebane stated that UTF would honor the 120 day clause, but Quinn said that was unacceptable because the 120 day provision related only to termination for cause and this was not such termination. (*Quinn Aff.*, ¶ 23 (Ex. A)). Mebane ended the conversation by saying "well, good luck." (*Quinn Aff.*, ¶ 23 (Ex. A)).

Q&R had terminated its successful relationship with Avgol at UTF's urging and then UTF disappeared after it sold its operations to Avgol as Mebane clearly foresaw. Q&R was left with nothing.

## Timeline:  February 13-April 20, 2001

| February 13, 14, 2001 | Quinn and Ranz tour Mocksville facility and Mebane states that a sale of the facility to Avgol "ain't gonna happen." (*Quinn Aff.*, ¶¶ 9 and 10 (Ex. A); *Ranz Aff.*, ¶ 7 (Ex. B); *Mebane Depo.* at 148-150 (Ex. C); *Quinn Depo.* at 160-161 (Ex. H)). |
|---|---|
| February 14 to March 27, 2001 | Mebane and Q&R continue to discuss a possible move by Q&R to UTF in various telephone conversations. (*Mebane Depo.* at 88-89, 100 (Ex. C)). Mebane never mentions a possible sale during this time period. (*Mebane Depo.* at 104 (Ex. C)). |
| February 28, 2001 | Mebane writes memo to Brian Parke discussing a possible sale of the plant. Mebane states that he is "still talking to Avgol." (*Ptf.'s Ex.* 1 (Ex. M)). |
| March 1 to March 6, 2001 | Avgol and Mebane have various telephone conversations relating to possible sale of UTF to Avgol. (*Mebane Depo.* at 122 (Ex. C)). |
| Early March, 2001 | Mebane, Ranz and Quinn agree to meet at trade show in Miami to finalize business arrangement. (*Quinn Aff.*, ¶ 11 (Ex. A); *Ranz Aff.*, ¶ 16 (Ex. B)). |
| March 7, 2001 | Mebane sends Goldwasser an e-mail asking for a specific price term, indication of financing source, and a list of documents that Avgol wishes to review for due diligence. (*Ptf.'s* Ex. 30 (Ex. O)). |
| March 8, 2001 | Goldwasser sends memorandum confirming financing and again reiterating Avgol's "intention to enter into negotiations with UTF regarding Avgol's acquisition of the UTF plant." (*Ptf.'s* Ex. 32 (Ex. P)). |
| March 14, 2001 | Mebane sends an e-mail to Goldwasser asking to meet with Avgol's U.S. investment advisor. (*Ptf's* Ex. 2 (Ex. Q)). |
| March 15, 2001 | Goldwasser sends Mebane a memorandum stating that their American negotiator could meet on March 29 or 30, suggesting a confidentiality agreement and an exclusive right for Avgol to purchase the facility for 60 days. (*Ptf.'s* Ex. 17 (Ex. S)). Goldwasser further states that due diligence should take two to three days, after which, negotiations for completing the transaction can |

| | |
|---|---|
| | be immediately conducted. (*Id.*) |
| March 15, 2001 (cont.) | Mebane turns over negotiations to Ron Smith and Mike Delaney of Unifi's Mergers and Acquisitions department. (*Mebane Depo.* at 197-198 (Ex. C); *Ptf.'s Ex.* 13 (Ex. U)). |
| March 27, 2001 | Quinn and Ranz meet with Mebane at trade show and finalize agreement for Cleaver to begin representing UTF. (*Ranz Aff.*, ¶ 11 (Ex. B); *Quinn Aff.*, ¶ 12 (Ex. A); *Mebane Depo.* at 109 (Ex. C)). |
| March 30, 2001 | Quinn and Ranz notify Cleaver that they are terminating relationship. (*Ranz Aff.*, ¶ 17 (Ex. B)). |
| April 20, 2001 | Avgol and UTF reach signed agreement setting forth the terms of the potential acquisition. (*Ptf's Ex.* 12 Ex. V)). Agreement states the Avgol "is prepared to provide you aggregate transaction consideration of 42.7 million dollars for the Mocksville, NC real estate and fixed assets . . . of the business less any liabilities assumed, payable in cash to be delivered to you at the closing of the Acquisition (the "Closing"), subject to satisfactory of a completion of our due diligence." (*Id.*) |

### III.    ANALYSIS

### A.    Q&R is entitled to summary judgment on its claim for fraudulent inducement.

The elements of fraud under Ohio law are as follows:

> "(a) a representation or *where there is a duty to disclose, concealment of a fact*,
>
> (b) which is material to the transaction at hand,
>
> (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
>
> (d) with the intent of misleading another into relying upon it,
>
> (e) justifiable reliance upon the representation or concealment, and
>
> (f) a resulting injury proximately caused by the reliance."
> (Emphasis added.) *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St. 3d 69, 23 OBR 200, 491 N.E.2d 1101 syl.

      1.    **Q&R has established the misrepresentation or nondisclosure element of a fraud claim**.

The first element of fraud is a misrepresentation or a nondisclosure where there is a duty to disclose. Here, Mebane engaged in an affirmative misrepresentation. When asked by Q&R about the potential sale to UTF during the North Carolina meeting, Mebane flatly replied that no sale would take place, that it "ain't gonna happen." (*Ranz Aff.*, ¶ 7 (Ex. B)).

Mebane's statement that the sale "ain't gonna happen" constitutes a misrepresentation under Ohio law sufficient to ground of fraud claim. Even if Mebane had not engaged in this misrepresentation, a fraud claim would still be appropriate because of Mebane's failure to disclose material information about the impending transaction with Avgol to Q&R.

A duty to disclose information arises where there is a "relationship of trust and confidence" between the parties. *State v. Warner* (1990), 55 Ohio St.3d 31, 53, 564 N.E. 2d 1839. The Sixth Circuit has made clear that under Ohio law:

> "The duty to speak does not depend on the existence of a fiduciary relationship between the parties. It may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence." *Central States Stamping Co. v. Thermal Equipment Co.,* 727 F.2d 1405, 1409 (6th Cir. 1984).

Here, there can be no doubt that a relationship of trust and confidence existed between the parties. Q&R was relying upon Mebane in entering into this relationship. Mebane invoked their trust and confidence on numerous occasions. He repeatedly referred to their negotiations as "a North Carolina agreement" whereby a handshake was as good as a written contract. (*Mebane Depo.* at 145-146, 151 (Ex. C); *Quinn Aff.*, ¶ 9 (Ex. A); *Ranz Aff.*, ¶ 9 (Ex. B); *Ranz Depo.* at 60 (Ex. D)). Mebane promised Quinn and Ranz that if anything happened, they would be taken care of. (*Ranz Aff.*, ¶ 12 (Ex. B); *Quinn Aff.*, ¶ 13 (Ex. A)). He even invoked his treatment of UTF's

salesperson, Gene Kelly, to assure Quinn and Ranz that they were warranted in placing their trust and confidence in him. (*Mebane Depo.*, at 248 (Ex. C)).

Quinn and Ranz, in turn, made clear the trust that they were placing in Mebane – relying upon his handshake assurances, risking their careers based on his word that a deal with Avgol "ain't gonna happen," and even notifying Cleaver and Associates of their new relationship prior to the formalization of a written contract. As a matter of law, this was a relationship of trust and confidence.

The duty to disclose also may arise "when one party to a business transaction knows matters 'that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading.'" *Gouge v. Bax Global Inc.*, 252 F. Supp.2d 509, 517 (N.D. Ohio 2003) (quoting Restatement of the Law (Second), Torts § 551(2)). Here, at the very least, Mebane's initial statements indicating that a sale would not occur created a duty to disclose the extent of UTF's dealings with Avgol.

2. **Q&R has established the other elements of a fraud claim**.

There can be no dispute that the other elements of a fraud claim are met. The sale of UTF was certainly "material to the transaction at hand." *Burr*, 23 Ohio St. 3d at Syl. (*See Quinn Depo.*, at 179-180 (Ex. H); *Ranz Aff.*, ¶ 12 (Ex. B); *Quinn Aff.*, ¶ 13 (Ex A)). Mebane obviously knew the representations that no sale would take place were false because he was involved in the ongoing negotiations with Avgol. *Burr*, 23 Ohio St. 3d at Syl. (*See, e.g., Ptf's Exs.* 1 (Ex. M), 2 (Ex. Q), 13 (Ex. U), 32 (Ex. P), and 36 (Ex. W)). He refused to disclose the complete truth about the negotiations with Avgol with the "intent of misleading" Q&R. *Burr*, 23 Ohio St. 3d at Syl. (*Ranz Aff.*, ¶ 7 (Ex. B); *Quinn Aff.*, ¶¶ 9 and 10 (Ex. A); *Quinn Depo.* at 160-161 (Ex. H); *Mebane Depo.* at 148-150 (Ex. C)). Q&R justifiably relied upon Mebane's nondisclosures and was injured as a result. *Burr*, 23 Ohio St. 3d at Syl. (*See Ranz Aff.*, ¶ 12 (Ex. B); *Quinn Aff.*, ¶ 13

(Ex. A)). Accordingly, summary judgment is appropriate on Q&R's claim for fraudulent inducement.

### B. Summary judgment is appropriate on Q&R's claim for promissory estoppel

For similar reasons, summary judgment is appropriate on Q&R's claim for promissory estoppel. Q&R entered into its arrangement with UTF in reliance upon Mebane's assurance that no transaction between UTF and Avgol would occur. (*Ranz Aff.*, ¶ 7 (Ex. B); *Quinn Aff.*, ¶¶ 9 and 10 (Ex. A); *Quinn Depo.* at 160-161 (Ex. H)). Q&R changed position in reliance upon these assurances in deciding to leave their established and profitable relationship with Cleaver Associates and Avgol. As a result of their detrimental reliance, Q&R has been damaged. Accordingly, summary judgment should be granted on liability as to Q&R's claim for promissory estoppel and damages should be determined at trial.

### C. Summary judgment is appropriate as to $95,000 in guaranteed payments

It is undisputed that during the March 28, 2001, meeting in Miami, Mebane and Q&R agreed that for the first seven months of their relationship, Q&R would receive guaranteed payments totaling $125,000. Mebane, in his March 30, 2001, e-mail described the commission schedule as follows:

> "We will pay you a monthly contribution (draw against commissions) as follows, until commissions overtake the monthly payment: April $25,000; May $25,000; June $25,000; July $20,000; August $15,000; September $10,000 and October $5,000." (*Ptf's* Ex. 5 (Ex. I)).

Under UTF's own interpretation of the agreement, upon the sale of UTF, Q&R would be entitled to 120 days worth of compensation. (*See Mebane Depo.* at 108, 221-222 (Ex. C); *Quinn Aff.*, ¶ 23 (Ex. A)). Q&R received only their payment for April. Q&R was notified of the sale on May 14. Using May 14 as the effective date for the 120 day period, Q&R would be entitled

to their back commission for May, which they have not been paid, as well as their commission for the next 120 days – June, July, August, September – totaling an additional $95,000.

Under the clear facts of this case, Q&R is entitled to hundreds of thousands of dollars in damages as a result of UTF's wrongful conduct as will be proven at trial. Even UTF's witnesses do not dispute Q&R's entitlement to this first $95,000 in guaranteed payments. (*Mebane Depo.* at 108, 221-222 (Ex. C)). This Court should enter summary judgment in Q&R's favor as to this $95,000 and allow the remainder of Q&R's damages to be determined at trial.

### IV.    CONCLUSION

For these reasons, partial summary judgment should be entered in favor of Q&R as to liability on their fraudulent inducement and promissory estoppel claims and as to their claim for the undisputed $95,000 in guaranteed compensation. The matter should be set for trial as to the remainder of the claims and damages.

Respectfully submitted,

s/ Dwight A. Packard, II
James E. Burke (0032731)
Dwight A. Packard II (0067182)
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio  45202
Tel. (513)579-6429
Fax (513)579-6457
jburke@kmklaw.com
dpackard@kmklaw.com
Attorneys for Plaintiff

OF COUNSEL:
KEATING, MUETHING & KLEKAMP
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio  45202
(513) 579-6400

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 1, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system wich will send notice of such filing to the following:

    Frederick J. McGavran
    Frost Brown Todd, LLC
    2200 PNC Center
    201 East Fifth Street
    Cincinnati, Ohio 45202

    s/ Dwight A. Packard, II
    Dwight A. Packard, II
    KEATING, MUETHING & KLEKAMP
    1400 Provident Tower
    One E. Fourth St.
    Cincinnati, OH 45202
    Tel: (513) 579-6936
    Fax: (513) 579-6457
    dpackard@kmklaw.com

1238003.1