# EXHIBIT C

## MICHAEL MEBANE'S DEPOSITION EXCERPTS 04/24/04



# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

### CASE NO.  C-1-01-641

Q & R ASSOCIATES, INC.,

          Plaintiff,                   **D E P O S I T I O N**

vs.

UNIFI, INC., et al,

          Defendant.



## WITNESS:  WILLIAM MICHAEL MEBANE

**TAKEN AT THE LAW OFFICES OF:**
**CARRUTHERS & ROTH, P.A.**
**235 North Edgeworth Street**
**Greensboro, NC  27401**

**DATE:  02-24-04**
**TIME:  08:57 A.M.**

### REPORTER:  DALE L. RING
### CHAPLIN & ASSOCIATES, INC.

**CHARLOTTE (704) 335-1954    TRIAD (336) 992-1954    RALEIGH (919) 807-1954**

1          A.    How large the market was.

2          Q.    Well, but for ---

3          A.    I don't mean to come across ---

4          Q.    For -- you mean the market for people to

5     purchase the product?

6          A.    Yes.

7          Q.    Okay.

8          A.    The demand.

9          Q.    The demand.

10         A.    The demand for the products.

11         Q.    You said you also evaluated competitors

12    in the market?

13         A.    That's correct.

14         Q.    Was Avgol one of the competitors?

15         A.    Yes.

16         Q.    Did you reach any conclusions about

17    Avgol, or what did you know about Avgol at that

18    time?

19         A.    That they were importing large amounts

20    of fabric into the United States from Israel.

21         Q.    Do you know who the biggest competitors

22    would have been at the time you made your

23    presentation?

24         A.    Yes.

25         Q.    Who were they?

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    typically last?  I mean, were they half a day

2    meetings; were you getting together for a full

3    week; or were you just picking up the phone every

4    now and then, or bumping into him at a convention?

5         A.   I think your later description better

6    describes it.

7         Q.   Just every now and then, there would be

8    some contact?

9         A.   I think that best describes it.

10        Q.   Okay.  How long was that period of time

11   where you were having that kind of communication

12   with Mr. Goldwasser?

13        A.   From -- until the -- until March of '01.

14        Q.   Okay.  Now, during that same period of

15   time -- and I think the time period we're talking

16   about is kind of late '99, early 2000, to March of

17   2001.

18        A.   That's right.

19        Q.   What were you doing on the Greenfield

20   plant project?  Am I describing that right when I

21   say that?

22             How would you describe how -- the

23   construction of the plant.  I just want to get our

24   terminology straightened out.

25        A.   Okay.  Which question do you want me to

---

02-24-04        Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1     answer?

2       Q.    The second one.

3       A.    Which is?

4       Q.    All right. Let's get our terminology

5   straight now.

6       A.    Okay.

7       Q.    How did you refer to the project in

8   which you were developing the Greenfield site into

9   a plant? What did you call it?

10      A.    Building a plant.

11      Q.    Okay. So that's what -- if that's okay

12   with you, that's what we'll call it today.

13      A.    Fine with me.

14      Q.    And that will ---

15      A.    Uh-huh (yes).

16      Q.    --- take about half an hour's worth of

17   verbiage ---

18      A.    Building a plant.

19      Q.    --- out this day today. All right.

20         During the period of time from, say,

21   early 2000 to March of 2001, what were you doing

22   to build the plant?

23      A.    Grading, construction of the building,

24   receipt of the equipment, hiring the people,

25   training the people, contacting customers,

02-24-04      Q&R vs. UNIFI\C101641      COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1      A.   It's a machine to produce spunmelt

2   nonwoven fabric.   And the ancillary equipment

3   necessary to operate it.

4      Q.   Do you know when that equipment was

5   ordered?

6      A.   It would have been in the second quarter

7   of '99.

8      Q.   Of '99 or 2000?

9      A.   Of 2000 -- 2000.  I'm sorry.

10      Q.   Do you know -- how long did it take

11   before you accepted delivery of that equipment?

12      A.   It's about a year delivery and erection

13   process.

14      Q.   So if you ordered it in the second

15   quarter of 2000, when did you receive it?  Do you

16   know -- when did the Ryfenhauser equipment come to

17   the plant?

18      A.   Let me qualify a date with you, and I'm

19   sure it's in your -- in your documents of when it

20   was announced.  When did Unifi announce -- what

21   date did Unifi announce ---

22      Q.   I don't have -- yeah, I don't have the

23   exact thing.  We've got some documents we'll go

24   through later that might help us.

25      A.   Okay.

02-24-04        Q&R vs. UNIFI\C101641        COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1       Q.   But for now, just ---

2       A.   All right.

3       Q.   --- based on your best recollection.

4       A.   It would have been after that we ordered

5   the machinery concurrent with announcing the

6   construction of the plant.  And it would have

7   arrived, beginning eight to ten months later --

8   begin arriving.  It arrives over time.

9       Q.   Okay.  Was the equipment installed by

10  the end of the year 2000?  Do you remember?  Or

11  was it there -- it may not have been completely

12  installed.

13      A.   Yes.  It was being -- the construction

14  was completed in the fourth quarter of 2000.

15      Q.   Okay.  How did you originally hear about

16  my client, Q & R Associates?

17      A.   I saw a small ad in a trade publication

18  that listed them as a representative for nonwovens

19  and other related materials being sold into the

20  hygienic trade.

21      Q.   Do you recall what trade publication you

22  saw that in?

23      A.   No, I really don't.

24      Q.   Had you heard of Q & R Associates prior

25  to seeing that ad in the trade ---

1          A.   No.

2          Q.   --- publication?

3          A.   No.

4          Q.   What did you do after you saw the ad in

5     the trade publication.  Did you call them?

6          A.   Yeah.  I called the number that was on

7     the ad and left a message, introducing myself, and

8     asked is someone would call me back.

9          Q.   And when was that?

10          A.   That would have been in the -- the mid-

11    year 2000.

12          Q.   So let me just get my bearings here.

13    That would have been about the same time that you

14    were beginning to order the equipment, and hire

15    other people for the plant.

16          A.   That's right.

17          Q.   And you were having some, I guess,

18    occasional discussions with Avgol, that we already

19    talked about.  Is that about what was going on

20    around that time?

21          A.   Yes.

22          Q.   Okay.  Incidently, I meant to ask

23    earlier, when you were having these meetings with

24    Avgol's representatives and price terms were being

25    discussed at the end of '99, early 2000, was there

02-24-04        Q&R vs. UNIFI\C101641              COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1      a confidentiality agreement in place between the

2      two companies?

3            A.    Yes.

4            Q.    Okay.  Was that a written agreement?

5            A.    Yes.

6            Q.    Okay.  Do you know where a copy of that

7      agreement could be found today?

8            A.    No, I don't.

9            Q.    Do you recall what the terms of the

10     agreement were.  How long did it last?

11           A.    No.

12           Q.    What did it cover?

13           A.    No.

14           Q.    Do you know when it was signed?

15           A.    No.

16           Q.    Do you know who signed it?

17           A.    No, I don't recall.

18           Q.    Did you sign it?

19           A.    I -- again, I don't recall.

20           Q.    Would you expect this would be something

21     that Unifi would still have a copy of somewhere?

22           A.    I don't know.

23           Q.    Okay.  Let's get back to your contact

24     with Q & R Associates.

25           A.    Uh-huh (yes).

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        Q.    Did -- you said you had left a message

2    at the number you saw in the ad.  Is that correct?

3        A.    That's correct.

4        Q.    Okay.  And you thought that was about

5    mid-year 2000?

6        A.    That's correct.

7        Q.    Did anybody return your call?

8        A.    No.

9        Q.    Okay.  What was the next time you either

10   contacted somebody from Q & R Associates, or

11   somebody from that company contacted you?

12       A.    It would have been in the late January

13   or early February of 2001.

14       Q.    And who initiated that contact?

15       A.    I received a phone call from Mike Quinn.

16       Q.    Had you called him before he called you?

17       A.    No, not since the first call that I made

18   back six months prior.

19       Q.    Was he returning your call from six

20   months ago?

21       A.    No.

22       Q.    What was your understanding of why he

23   called you in late January or early February?

24       A.    I had had a meeting with a guy named

25   Bill Martin at American Nonwovens, who had told me

02-24-04        Q&R vs. UNIFI\C101641              COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    that they represented him.  And asked if I had met

2    them, and I said, no, I had left a message, you

3    know, six months ago, but they didn't return the

4    call.

5           And that Bill said that he would tell

6    him he visited with me, and that they should have

7    called me.

8       Q.   Uh-huh (yes).

9       A.   And then the next I heard was from

10   Mr. Quinn.

11      Q.   Okay.  How long did that conversation

12   last?

13      A.   I don't recall.

14      Q.   What was discussed?

15      A.   I don't recall specifically, except that

16   I would have made an invitation for them to come

17   and visit the facility.

18      Q.   Did you tell anybody at that point -- at

19   Unifi -- did you tell anybody at Unifi, at that

20   point, that you had had conversations with Q & R

21   Associates?

22      A.   What do you mean by anybody?

23      Q.   Let me back up.  Were you, primarily,

24   responsible for overseeing the construction and

25   staffing of the plant?

02-24-04          Q&R vs. UNIFI\C101641                COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        A.   Yes.

2        Q.   Was it your responsibility to hire some

3   sort of sales force to sell the product that the

4   plant was ultimately going to produce?

5        A.   Yes.

6        Q.   Who were you reporting to on the

7   progress of those tasks?

8        A.   I reported to Brian Parke.  And I did

9   not report to him individual tasks that I

10  completed.  I reported to him on the overall

11  project.

12       Q.   Okay.  Did you ever tell Mr. Parke that

13  you were looking for an outside sales

14  representative?

15       A.   I don't recall.

16       Q.   Okay.  My original question that we're

17  kind of coming back to now is, did you tell

18  anybody else at Unifi that, hey, I'm having these

19  discussions with Q & R Associates?

20       A.   Can you define for me what you mean by

21  Unifi?

22       Q.   Any other employee of that company.

23       A.   Of Unifi, Inc., or of UTF.

24       Q.   Well, let's start with Unifi, Inc.?

25       A.   Okay.  No.

02-24-04        Q&R vs. UNIFI\C101641              COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane _____ Page 79

1          Q.   How about UTF?

2          A.   Yes.

3          Q.   Okay.  Who were you talking to at UTF --

4     well, strike that.

5               Who were you talking to at UTF about

6     the -- your contact with Q & R Associates?

7          A.   Okay.  That's a different question than

8     you asked me before.

9          Q.   That's okay.

10         A.   So is this the question that you want

11    me ---

12         Q.   This is the question ---

13         A.   --- ask -- answer?

14         Q.   --- I want you to answer.

15         A.   At that time, no one.

16         Q.   All right.  Well, answer my original

17    question, then.  Who were you having discussions

18    with about Q & R?

19         A.   And you -- as you are characterizing the

20    question, in having discussions with, my answer is

21    no one.

22         Q.   I think I asked, originally, if you told

23    anybody.

24         A.   And my answer is yes.

25         Q.   Okay.

1        A.   At UTF.  I told my secretary, and I told

2    the plant manager, as we had a normal process for

3    any visitors to come to the plant.  So I went

4    through that normal process.

5        Q.   So you had to alert them that, hey,

6    somebody might be coming.

7        A.   That's right.

8        Q.   So you don't want to characterize that

9    as a discussion?

10       A.   No, that's right.

11       Q.   Fair enough.

12            What was the next contact that you had

13   with Q & R Associates after that phone call from

14   Mike Quinn?

15       A.   I do not recall whether we determined

16   the day of their visit at that time, or it took a

17   subsequent phone call to do so, but there was no

18   other conversations except that invitation for

19   them to come and visit.

20       Q.   Okay.  So it was either the original

21   phone call, and there may have been a follow-up

22   phone call to arrange a visit?

23       A.   That's correct.

24       Q.   All right.  What -- did the visit occur?

25       A.   Yes, it did.

02-24-04          Q&R vs. UNIFI\C101641              COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        Q.   And when was that?

2        A.   I don't recall the exact date, but I

3   believe it was in February of '01.

4        Q.   Who was involved in the visit?  Who came

5   from Q & R?

6        A.   Mr. Quinn and Mr. Ranz.

7        Q.   Anybody else?

8        A.   No.

9        Q.   Who did they meet with when they came --

10  well, first of all, where did they come to?

11       A.   I don't remember the first place that we

12  made contact.  I -- I can't -- I think they

13  probably came to the plant.

14       Q.   The new plant?

15       A.   The new plant, yes.

16       Q.   And the new plant was going to be

17  located, at this point, in what, Mocksville?

18       A.   Mocksville.

19       Q.   All right.  Who did they meet with when

20  they came to the Mocksville plant?

21       A.   I think, if you characterize your

22  question with the word "meet," myself only.

23       Q.   How are you using the word "meet"?

24       A.   Sit down and actually have a

25  conversation with.  I believe they would have seen

```
 1    and been exposed to other people as they toured
 2    the facility.
 3          Q.    But they wouldn't have sat down with ---
 4          A.    Yes.
 5          Q.    --- any of those people?
 6          A.    I don't believe there was.
 7          Q.    How long did the meeting last?
 8          A.    Which meeting?
 9          Q.    With you?
10          A.    Okay.  With me.
11          Q.    Okay.
12          A.    We had dinner and toured the plant.
13          Q.    Where did you have dinner?
14          A.    In Mocksville.
15          Q.    Do you recall the restaurant?
16          A.    I think it was Samuels.  Typical place
17    we would have visitors stay.
18          Q.    Was this over the course of one day?
19          A.    Yeah, I believe they came down in the
20    evening, and I don't recall whether we went to the
21    plant that evening, or whether we had dinner
22    first, and then went to the plant the next
23    morning.  I -- I just don't recall.  But I think
24    that -- I think we probably visited the plant
25    first, and then had dinner.
```

02-24-04            Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane _____ Page 83

1        Q.    Okay.

2        A.    And then the next morning, they stayed

3    and visited another facility of Unifi's close by.

4        Q.    Now, when you sat down and talked to

5    them, let's start at -- did you talk to them at

6    the plant?

7        A.    Yes.

8        Q.    Okay.  What did you guys talk about

9    while you were at the plant?

10        A.    The plant.

11        Q.    Okay.  Just the operations and ---

12        A.    Yes.

13        Q.    --- how -- at that point, how far along

14    was the plant construction?

15        A.    It was in start-up.

16        Q.    Was there any discussion of a potential

17    relationship between Q & R Associates and UTF?

18        A.    Don't think so.

19        Q.    Not at the plant?

20        A.    No.

21        Q.    This was purely kind of a show and tell

22    meeting?

23        A.    That's right.

24        Q.    All right.  How about at the dinner.

25    Was there a discussion at the dinner about a

02-24-04        Q&R vs. UNIFI\C101641        COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    potential relationship between Q & R Associates

2    and UTF?

3         A.   No.

4         Q.   Okay.  What did you talk about at the

5    dinner?

6         A.   Business conditions, in general, the

7    markets they served.  It was more of a show and

8    tell on their part to tell me about their company.

9         Q.   How long did the dinner last?

10        A.   I don't recall.

11        Q.   How long did the kind of -- I guess,

12   I'll call it the plant tour.  How long did that

13   last?

14        A.   I don't recall.

15        Q.   Did you meet with them anywhere else

16   while they were in town at that time?

17        A.   I believe that the next morning, we went

18   to another Unifi facility together.

19        Q.   And which facility was that?

20        A.   That would have been Yadkinville.

21        Q.   What was the Yadkinville facility?

22        A.   It was a large polyester extrusion and

23   textstream facility of Unifi's.

24        Q.   Did that have anything to do with the

25   spunmelt business?

1       A.    No.

2       Q.    Nonwovens business?

3       A.    Part of the polyester division.

4       Q.    Would that be what you would consider

5    the core business at Unifi?

6       A.    I don't how to answer that.

7       Q.    Okay.   What was the core business of

8    Unifi at that time?

9       A.    What's the question again?

10       Q.    At the time of the meeting in February,

11    what was the core business of Unifi?

12       A.    Processing and distributing chemical

13    fibers to the textile industry.

14       Q.    Would the nonwoven operations that you

15    were starting up have been part of their -- been

16    part of Unifi's core business?

17       A.    I believe so.

18       Q.    Do you know whether everybody else, or

19    if anybody else at Unifi felt the same way as ---

20       A.    No, I don't know.

21       Q.    Okay.   At the -- did you give them a --

22    did you give Mr. Quinn and Mr. Ranz a tour of the

23    Yadkinville facility?

24       A.    I believe so.

25       Q.    Okay.   What was discussed during that

02-24-04          Q&R vs. UNIFI\C101641                COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    tour?

2        A.    A description of those facilities --

3    those operations.

4        Q.    Why did you show Misters Quinn and Ranz

5    the Yadkinville facility?

6        A.    It was common for me, when I had

7    visitors, to take them to Mocksville.  I would,

8    typically, take them to Yadkinville, which is

9    about 20 minutes away, to demonstrate the capacity

10   that Unifi had in any marketplace it chose to go

11   into.

12       Q.    What do you mean by the capacity?

13       A.    The scale -- scale of the company.

14       Q.    Were you -- was your goal to impress

15   visitors with the level of technology or the sales

16   volume?  I don't understand why you were taking

17   them to Yadkinville.

18       A.    I think you said it very well.

19       Q.    Okay.  So what I said.

20       A.    To -- to -- yeah, what you said.  You

21   answered it for me.

22       Q.    Do you know about how long the tour of

23   the Yadkinville plant would have lasted?

24       A.    No.  Typically, they were less than an

25   hour.

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1      Q.   Okay.  Now, if I've asked you this, I

2   apologize.  But was there any discussion at the

3   Yadkinville plant about a relationship between UTF

4   and Q & R Associates?

5      A.   Not that I recall.

6      Q.   Do you -- I'm trying to get an idea of

7   how long the -- Q & R was in town for this trip.

8   I think you originally said they came in, in an

9   evening -- thought maybe you had met with them

10   that evening and went to the plant the next day.

11            Was the Yadkinville tour the same day as

12   the Mocksville tour?

13      A.   I do not recall exactly.  I believe it

14   was the following morning.  I believe they --

15   because they drove from Cincinnati.  I believe

16   they spent the night in Mocksville, and then we

17   went the next day to Yadkinville.

18      Q.   Okay.

19      A.   I mean, it might have been that we went

20   to both plants the next morning.  I just don't

21   recall.

22      Q.   Is it your recollection they only spent

23   one night in North Carolina?

24      A.   That's correct.

25      Q.   How were things left at the end of that

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    visit?  Was there going to be further

2    communication?

3        A.    I'm sorry.

4        Q.    I just want to understand ---

5        A.    Could you be more specific?

6        Q.    Okay.  After you had -- you had had

7    dinner with them; you had shown them two

8    facilities, what was there going to be the next

9    step?

10       A.    I don't believe there was a next step

11   defined at that meeting.

12       Q.    Okay.  What -- in fact, what did turn

13   out to be the next step?  What was the next time

14   you had any contact with either Mr. Quinn or

15   Mr. Ranz?

16       A.    I do not recall specifically the next

17   contact.  But I began discussions with Mr. Quinn

18   about the possibility of Q & R representing Unifi

19   Technical Fabrics in specific market segments of

20   the nonwovens business.

21       Q.    Were these telephone calls?

22       A.    I believe so.

23       Q.    When you were -- at this -- about what

24   point in time are we here?  You thought that the

25   plant visit was sometime in February of ---

1      A.    We might ---

2      Q.    --- of '01.

3      A.    I think early February.

4      Q.    That was the plant visit?

5      A.    Yeah, yeah.

6      Q.    About how long was it, after that, the

7  visit to the plant, that the telephone

8  communication began?

9      A.    I don't recall exactly.

10      Q.    Days, weeks, months?

11      A.    I would think weeks.

12      Q.    So by maybe the end of February or early

13  March?

14      A.    I think I would probably characterize it

15  more in the early March time frame.

16      Q.    That's when the phone conversation

17  began?

18      A.    That's correct.

19      Q.    And did -- during the course of those

20  conversations, I think you said you raised the

21  possibility of Q & R representing UTF?

22      A.    No.  I don't believe I said that I

23  raised the possibilities.

24      Q.    Okay.

25      A.    I believe ---

1        Q.   How was that possibility raised?

2        A.   It was discussed.

3             During subsequent phone conversations,

4    there were discussions about Q & R's relationship

5    with Cleaver and Avgol.  And to be honest with

6    you, I don't know who broached the subject first,

7    whether I broached it to them, or they broached to

8    me.  I just don't recall.  But the possibility of

9    them representing Unifi was discussed.

10       Q.   Okay.  And this would have been in those

11   telephone conversations that occurred after the

12   plant meeting?

13       A.   That's correct.

14       Q.   Did you know, at the time of the meeting

15   at the plant, that Q & R was representing Avgol

16   Products?

17       A.   They told me that they were representing

18   Avgol Products through Cleaver at that time.  And

19   maybe, I might have learned about that, also, from

20   the visit with Bill Martin from American

21   Nonwovens, I believe is the time that I knew that

22   they -- learned that they were representing Avgol,

23   through John Cleaver's association.

24       Q.   At the meeting at the plant, was there

25   any discussion about the Q & R Associates, Cleaver

1          Q.   During the course of those phone

2     conversations, was there any discussion about

3     whether -- about whether Avgol would acquire

4     either UTF or the plant?

5          A.   And this was when?

6          Q.   In early -- I'm sorry, late February or

7     early March, the phone calls -- the series of

8     phone calls you were describing?

9          A.   No.  I don't recall any conversation

10    about that.

11         Q.   What was being discussed in those phone

12    calls?

13         A.   Whether or not there was interest from

14    either side for Q & R to represent Unifi's product

15    in the market.

16         Q.   Did anybody at Q & R indicate to you

17    that there -- that they were interested?

18         A.   Yes.

19         Q.   Who gave you that indication?

20         A.   Mike Quinn.

21         Q.   Who were you, mostly, talking to?

22         A.   Mr. Quinn.

23         Q.   Okay.  Did you ever have any discussions

24    with John Ranz?

25         A.   I don't think so.

---

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1     time period, just phone calls?

2          A.   That's fine.

3          Q.   Fair enough.

4               During the phone calls was -- I think

5     the way I was asking my questions earlier, I was

6     restricting it to the late February, early March

7     time period.  I didn't realize that they continued

8     all the way through late March at the time I was

9     talking.

10              I just want to know if, during any of

11    those phone calls, was there any discussion about

12    the industry rumors?

13         A.   Not that I recall.

14         Q.   Okay.  Was there any discussion about

15    Avgol potentially acquiring the Mocksville plant?

16         A.   Not that I recall.

17         Q.   Okay.  Now, where did you meet in Miami?

18         A.   At a hotel.

19         Q.   What hotel?

20         A.   The Lowes Hotel, L-o-w-e-s (sic).

21         Q.   You recall the dates of those -- of that

22    meeting?

23         A.   I would have to look at a calendar.

24         Q.   And we'll pin those down later.  You

25    recall it was at the end of March?

1       A.   And at this point of our discussions, we

2   had already defined the -- the primary terms under

3   which they would represent Unifi.

4       Q.   Uh-huh (yes).

5       A.   We had included in those terms an

6   understanding that either side could withdraw from

7   this representation with a certain number of days

8   of commissions paid.  Originally, they had asked

9   for six months's worth of commissions, or 180

10  days.  I had originally offered 90 days of

11  commissions to be paid for them.

12           And we had come to the understanding

13  that 120 days would be what we put into our

14  agreement.  And any reference to a change of

15  control for Unifi would be covered under the 120-

16  day termination understanding.

17      Q.   Is that how you responded when they

18  raised the issue?

19      A.   As ---

20      Q.   We'll exercise our right to terminate?

21      A.   Yeah, said the protection that you have

22  is covered under the termination clause, whether

23  it's for purposes of change of control of the

24  plant, or unable to fulfill it for any reasons.

25      Q.   Did they respond to you in any way after

02-24-04            Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1      you said that?

2          A.    Mr. Quinn had indicated that he

3      preferred to have a more definitive, separate

4      agreement for change of control.  And I had

5      indicated to him that I was not authorized to --

6      to do that.

7          Q.    Okay.

8          A.    The constraints I had were regarding a

9      commercial relationship, and I could not agree --

10     I could not -- I was not authorized to do anything

11     beyond that.

12         Q.    Did you believe you had reached an

13     agreement with Q & R at this meeting -- in this

14     suite?

15         A.    Yeah, I believe that we had come to an

16     agreement on the terms and conditions under which

17     they would represent us.  Yes, I did.

18         Q.    Now, you said you met with them two

19     other times in Miami.  When was the next meeting?

20         A.    I had lunch, and I believe it was with

21     Mr. Ranz, and one other of my staff members, and

22     I'm sorry, I don't recall exactly who it would

23     have been.  And then we had a -- a meeting with

24     one of the potential customers of ourselves, and

25     Mr. Ranz asked to be included in that meeting, and

02-24-04            Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    day?

2        A.    Yeah.

3        Q.    So there was a morning meeting in the

4    suite?

5        A.    Uh-huh (yes).

6        Q.    Then you met for lunch.

7        A.    Then I had lunch.

8        Q.    Okay.

9        A.    And then, I mean, it could have been the

10   following day.  Without looking at a calendar,

11   I -- I can't be sure when we actually met with the

12   customer.  It could have been the following day.

13       Q.    Okay.  You had said earlier that you

14   believed that there was an agreement as to the

15   terms and conditions of a relationship between UTF

16   and Q & R?

17       A.    That's correct.

18       Q.    And that that understanding came about

19   at the meeting in the suite.  What were the terms

20   and conditions that were agreed to?

21       A.    That they would be paid a commission of

22   four percent to customers in the disposable,

23   hygienic business, with the exception of Proctor &

24   Gamble and SCA, which they would be paid two

25   percent.  They had agreed to share a sector of the

02-24-04           Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    market with a pre-existing employee that we had,

2    named Gene Kelly.  That we would pay them,

3    initially, a draw instead of commissions while the

4    business was being built up over the three to six

5    months.  And we agreed upon how much that was to

6    be each month while they were actually converting

7    the customers over to the Unifi fabric.

8              And that either one of us could leave

9    the agreement for any reason with 120 days notice.

10        Q.    How were these conditions memorialized,

11   if at all.  Were they ever written down anywhere?

12        A.    I mean, I -- I took handwritten notes,

13   and then went back the next day and summarized my

14   notes in an e-mail to Mr. Quinn.

15        Q.    Was there ever a formal contract drawn

16   up and executed by everybody?

17        A.    No, there wasn't.

18        Q.    Now, when you were in Miami, did you

19   anticipate that eventually there would be such a

20   contract?

21        A.    I would have preferred to have any

22   multi-year contract defined specifically in a

23   agreement that would have been drawn between us.

24   So yes, I would have been working towards having a

25   definitive agreement drawn, based on the terms and

1    form a joint venture with us or to acquire our

2    plant.

3         Q.   Okay.  When did those -- well, strike

4    that.

5              When we were talking about Avgol before,

6    you talked about the meeting where price was

7    discussed for UTF to acquire Avgol.  Then you

8    testified there was a period where there were some

9    telephone calls, meetings at conventions, and

10   whatnot.

11             Was there a point in time where serious

12   discussions about potential, either joint venture,

13   merger, or acquisition began again between you and

14   Mr. Goldwasser?

15        A.   I would not characterize them as serious

16   discussions.

17        Q.   Okay.

18        A.   They were more fishing expeditions on

19   the part of Mr. Goldwasser.

20        Q.   Okay.  When did those fishing

21   expeditions begin?

22        A.   I can't be sure, but I believe it was in

23   the fourth quarter of 2000.

24             He was going through a management buyout

25   at that period of time.  And so I think most of

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1          Q.    What did Mr. Goldwasser tell you about

2     why he wanted to go through the books?

3          A.    To determine whether or not he would

4     want to buy it.

5          Q.    When did the discussion shift from UTF,

6     potentially, buying Avgol, to Avgol, potentially,

7     buying the UTF plant?

8          A.    I think I've answered that.  I think

9     I've already answered that.

10         Q.    Okay.  Well, just remind me, I'm sorry.

11         A.    I'd rather have -- go back to my

12    original answer.  I mean, it would have been in --

13    sometime during the year 2000, most likely in the

14    later portion of 2000.  But again, I don't want

15    to ---

16         Q.    Was that the fishing expedition?  Is

17    that what we were talking about?

18         A.    That's right.

19         Q.    Okay.

20         A.    That's right.

21         Q.    At that time, in the late 2000 time

22    frame, were -- was Unifi interested in selling the

23    plant?

24         A.    No.

25         Q.    Was ---

02-24-04          Q&R vs. UNIFI\C101641                COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    the wherewithal to do it?

2        A.   Which question do you want me to answer

3    first?

4        Q.   I think it's one question.  I mean,

5    it's ---

6        A.   Well, you gave me either or, and I don't

7    know if I can answer it that way.

8        Q.   Well, answer the first one first.

9        A.   Okay.  Would you repeat it, please?

10       Q.   That was whether you wouldn't sell the

11   plant to him.

12       A.   I'm sorry?

13       Q.   You, being Unifi or UTF wouldn't sell.

14       A.   I don't like answering this way, but I

15   think I have to honestly.  There's always a price

16   that something would be sold, okay.  So I don't

17   think that I would have thought in my mind -- I

18   mean, I -- I sit here today, knowing that there's

19   always a price that something would be sold.  So

20   that would -- was not my concern at the time.

21       Q.   So if the price was right, it could be

22   sold?

23       A.   That's a very broad, generalization of

24   why I would not have thought what you suggested I

25   thought earlier, okay.

1    recall a particular conversation, okay.

2           There were a number of things that the

3    non-binding letter of intent -- let me start

4    again.

5           When I was informed of the non-binding

6    letter of intent and their desire to make an

7    announcement, it would have been one of the

8    reasons why I said they can't do that on a non-

9    binding letter of intent; that I've got a number

10   of business processes underway, with customers

11   with -- that I would -- I think I mentioned Q & R

12   at that time, that's one of the reasons why, you

13   know, there's no deal with Avgol.  And there's no

14   requirement for Avgol to carry out this

15   transaction.  So you cannot make an announcement

16   based on the non-binding agreement that you have

17   in place.

18          Q.   So other than citing Q & R as a reason

19   why there shouldn't be a public ---

20          A.   And that's what ---

21          Q.   --- announcement ---

22          A.   That's the only thing I can recall.

23          Q.   Do you remember ever asking either

24   Mr. Smith or Mr. Delaney to try to write Q & R

25   Associates into the deal -- in the Avgol deal?

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1      A.    I remember telling Mr. Quinn that if

2   there was, you know, any circumstance around a

3   change of control, that just as I had done for our

4   employee, Gene Kelly, I would also do for them.

5            And so I -- I do not recall,

6   specifically, making that request to Delaney or

7   Smith.

8      Q.    Okay.  When did you tell Mr. Quinn that?

9      A.    It would have been either during or

10  right after our conversations in Miami.

11     Q.    The agreement that you had reached in

12  Miami, did you ever refer to that as a North

13  Carolina agreement?

14     A.    Very possibly, I could have.  I do

15  not -- maybe, I -- I think I put that into my --

16  my previous statements, and that would be

17  something that I would -- would have said, so

18  yeah, I probably did say that.

19     Q.    Is that a phrase you use, a North

20  Carolina agreement?

21     A.    I mean, no often, but it -- it would not

22  be out of character.

23     Q.    But what did it mean to you when you

24  said it?

25     A.    That we had agreed upon all of the

1    significant terms and conditions of Q & R

2    representing Unifi.  And that we stood up, left

3    that meeting shaking hands, and so I was agreeing

4    to do what I said I would do.  And I was expecting

5    them to do what they said they would do.

6            And at that time, I thought we had an

7    agreement.

8        Q.   As you sit here, today, do you think

9    that you had an agreement then?

10       A.   At that time, I did.  It was not until

11   later, when I received a message back from

12   Mr. Quinn on two pretty substantive points that

13   indicated to me that he didn't feel like we had an

14   agreement, even though we had agreed upon those

15   same points together, in person.

16       Q.   Do you recall signing an affidavit in

17   this case?

18       A.   I do.

19               (PLAINTIFF'S EXHIBIT

20               NUMBER 25 WAS MARKED

21               FOR IDENTIFICATION)

22       Q.   I hand you Exhibit 25.  I'll just ask

23   you if this is that affidavit that you signed?

24   (Witness examined document)

25       A.   Yes, it appears to be.

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        Q.    Okay.  You want to just take a minute to

2    look at it, or have you had a chance?  Have you

3    reviewed this document recently?

4        A.    Yes, I have.

5        Q.    When did you review it?

6        A.    A week ago.

7        Q.    Now, paragraph nine on page two of your

8    affidavit talks about the meeting in North

9    Carolina at the plant, correct?

10       A.    It does.

11       Q.    Okay.  Now, you give some dates there.

12   The first sentence says, "On or about

13   February 13th and 14th, 2001, Mr. Quinn and

14   Mr. Ranz visited UTF's manufacturing facilities in

15   Mocksville, North Carolina."

16             Do you see that?

17       A.    I do.

18       Q.    Are those dates accurate?

19       A.    To the best of my knowledge.

20       Q.    So is that the early February meeting

21   that we've been talking about this morning?

22       A.    Yes.

23       Q.    Okay.  Do you have any reason to believe

24   those are -- those dates in your affidavit are

25   incorrect?

1        A.    No, I don't.

2        Q.    Now, take a look at paragraph 11 for me.

3    (Witness examined document)

4              Have you had a chance to look at it?

5        A.    Yes, I have.

6        Q.    Okay.  Now, is this paragraph

7    referencing, still, the February 13th and 14th,

8    2001, meeting that we talked about back in

9    paragraph nine?  Is that the same meeting that

10   this happened?

11       A.    Yes, it is.

12       Q.    Okay.  And there -- and paragraph 11

13   talks about a discussion about the possibility of

14   a sale of UTF's manufacturing facilities to Avgol

15   and rumors in the industry.  So there was some

16   discussion in February about those rumors?

17       A.    I'm sorry, is that a question?

18       Q.    Yeah, I had thought, this morning, that

19   you told me that you didn't recall any discussion

20   of the industry rumors at the February meeting.

21   Is that correct?

22              MR. McGAVRAN:  Well, object.  The

23   record will show what he said.

24              THE WITNESS:  Yeah, that -- I would

25   request that we check the record.

02-24-04        Q&R vs. UNIFI\C101641              COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        Q.    (Mr. Packard)   You don't recall saying

2    that this morning?

3        A.    Yeah, I recall saying that there was

4    discussion at the first meeting.

5        Q.    So you ---

6        A.    I don't recall saying that there was

7    none.

8        Q.    That there was not.

9        A.    Yes.

10       Q.    Okay.  So there was some discussion?

11       A.    Yes.  I believe that's what I had

12   testified earlier.

13       Q.    Okay.

14       A.    But without reviewing the record, I

15   can't be sure.

16       Q.    There was also a discussion about the

17   possibility of a sale.  Was that the rumor in the

18   industry?  I'm just looking at paragraph 11.

19       A.    I think it says what it says, yes.

20       Q.    It goes on in paragraph 11 to talk about

21   a -- you stated that there was a conversation

22   underway in the past, and that you were under a

23   confidentiality agreement and could not discuss

24   any such terms.  Is that what you told Mr. Quinn

25   and Mr. Ranz?

1        A.   Yes.

2        Q.   In February?

3        A.   Yes.

4        Q.   Was there a confidentiality agreement in

5   place at that time?

6        A.   To my knowledge, there was.

7        Q.   Paragraph 12 talks about the termination

8   of the discussions with Avgol.  Do you see that?

9        A.   Yes, I do.

10        Q.   And were the discussions terminated, or

11   were they just turned over to somebody else at

12   Unifi?

13        A.   Well, I terminated the discussions that

14   I had with them.

15        Q.   Yeah, but I'm trying to figure out what

16   you mean by "terminated."  Does that -- did Unifi

17   terminate them, or did you just, personally, step

18   away from the discussions?

19        A.   I don't know how else to answer that.  I

20   terminated them.  And then I directed any further

21   conversations they wanted to have back to the

22   corporate office.

23        Q.   Paragraph 13 talks about the meeting in

24   Miami.  Does it not?

25        A.   Yes, it does.

02-24-04          Q&R vs. UNIFI\C101641                COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        Q.    And it's got the date there of

2    March 27th.  Is that the date of the meeting in

3    Miami that we were talking about this morning?

4        A.    I believe it was.

5        Q.    Paragraph 14 talks about the North

6    Carolina agreement.

7        A.    Okay.

8        Q.    It says there that, "After I thought we

9    had reached an agreement, I stated that UTF and

10   Q & R had reached a 'North Carolina agreement' on

11   the terms, as I had stated them, and shook hands

12   with Mr. Quinn and Mr. Ranz on the verbal

13   agreement."  Was there a verbal agreement that

14   day?

15       A.    I believed that there was.

16       Q.    Okay.  You're saying that -- did you say

17   that in the past tense, I believed?  I was just --

18   I may not have heard you correctly.

19       A.    Yes.  I said I believed there was.

20       Q.    Okay.

21       A.    I mean, I'm not an attorney ---

22       Q.    Understood.

23       A.    --- to understand if a point -- a

24   contract exists or not, but at this point, we had

25   agreed on all the substantive terms of them

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        Q.    So I ---

2        A.    It must be a woman.

3        Q.    And by Avgol's agent, that was Cleaver,

4    correct?

5        A.    Again, I -- it says what it says ---

6        Q.    Okay.

7        A.    --- Avgol's agent.

8        Q.    All right.  The next sentence says, "I'm

9    very upset by this, and it makes it very difficult

10    for us to start-up the plant and sell it up with

11    this guy blabbing about our talks."

12            Who is "this guy"?

13        A.    I was referring to Avgol's agent.

14        Q.    And does the agent -- do you know who

15    the agent was?

16        A.    It would have been someone within the

17    Cleaver organization.

18        Q.    You don't know specifically, but

19    somebody in there?

20        A.    No.

21        Q.    The e-mail goes on to say, "I'm,

22    therefore, requesting that the M & A group take

23    over this endeavor and negotiate on behalf of

24    Unifi."

25            Who was the M & A group?

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1        A.    Ron and Mike.

2        Q.    Okay.  Was it by this e-mail that you

3    requested those guys take over the endeavor?  This

4    was the request?

5        A.    Yes.

6        Q.    There wasn't a phone call before this

7    e-mail?

8        A.    I don't recall.

9        Q.    Okay.  It goes on to say, "I'll help in

10    any way possible."  Did they ever ask for your

11    help?

12        A.    No, they did not.

13        Q.    Did you ever offer ---

14        A.    No.

15        Q.    --- any help?

16        A.    No.

17        Q.    Okay.  The bottom of the first paragraph

18    talks about a suggestion for how to value the

19    business.  How did you come up with the numbers in

20    that sentence?  It says "I do -- it starts, "I do

21    suggest, however" -- where did the $10 million per

22    year come from?

23        A.    As it says, "expected future cash flow."

24        Q.    Yeah, but was there a report?  Was this

25    the projection we were talking about?

1    suggested 180 days, and we agreed on 120 days.

2    And that either one of us could terminate it for

3    cause or non-performance without that notice.

4        Q.    Now, on March 30th, 2001, were you aware

5    of the status of the discussions between Unifi and

6    Avgol?

7        A.    No.

8        Q.    In that paragraph on Exhibit 36 that

9    we're looking at, it says "with 120 days notice."

10   Is that a termination provision?  Is that what you

11   intended by that?

12       A.    Yes.

13       Q.    So it could be terminated on 120 days

14   notice?

15       A.    That's correct.

16       Q.    I had thought that earlier this morning,

17   you had said that it was 120 days where

18   commissions would be paid.  Would -- and I don't

19   know if you intended it to mean something other

20   than termination, or if it was just going to be a

21   period where the termination was automatic, but

22   they would keep getting the residual commissions

23   for 120 days, or if they would be out there

24   working for 120 days, following the notice.

25       A.    I believe that there was a subsequent

02-24-04        Q&R vs. UNIFI\C101641                COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1 communication between us to try to clarify that

2 point.  But the phrase 120-day notice meant that

3 we could end the representation, and we would be

4 responsible for their commissions for 120 days.

5   Q.   So the representation would end

6 immediately?

7   A.   Well, and I guess there's some logic in

8 how you do that, based on the circumstances.

9   Q.   And what's -- what is that logic?

10   A.   I think there's another document that

11 outlines that -- the letter that I sent Mike Quinn

12 that had the check attached to it.  I was asking

13 for some clarification on that from him.

14   Q.   I believe that was an April 25th or 26th

15 letter.  Does that sound right?

16   A.   That -- approximately.

17   Q.   I'll find it for you here.  Here it is.

18     (PLAINTIFF'S EXHIBIT

19     NUMBER 37 WAS MARKED

20     FOR IDENTIFICATION)

21     It's Exhibit 37.  Is that the letter

22 you're referring to?

23   A.   Yes, it is.

24   Q.   Who wrote this letter?

25   A.   I did.

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1          A.    I would be guessing.

2          Q.    Do you remember ever asking Ron Smith or

3    Mike Delaney to write Q & R into the deal somehow

4    with Avgol, so that they would, you know, have

5    work to do after the closing?

6          A.    I remember telling Mike Quinn that if

7    there were any subsequent transactions with UTF

8    that I would treat him like I did Gene Kelly.

9          Q.    And how did you treat Gene Kelly?

10         A.    We requested that Q & R take him into

11   their organization, and that his employment would

12   be continued.

13         Q.    Okay.  Do you remember ever doing that

14   for Q & R?

15         A.    You know, I mean, it's -- it says it

16   right here, so you know, and do I remember sitting

17   down and typing the keys, no, I do not remember.

18   It is -- it is apparent that that's what I had

19   said to him.

20         Q.    Okay.  Now, let's go back to Exhibit 41

21   here.  This -- it looks like it's an agenda for

22   the April 10th and 11th Mocksville, North

23   Carolina, business review meeting.  Were -- did

24   you attend this meeting?

25         A.    I don't believe I did.  I don't believe

02-24-04          Q&R vs. UNIFI\C101641          COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1       to Q & R Associates after the binding letter of

2       intent was signed?

3               A.   Can you be specific?

4               Q.   Yeah.  Let me tighten that up for you.

5       What did you -- did you notify Q & R after the

6       binding letter of intent was signed that it had

7       been signed?

8               A.   I did.

9               Q.   Did you call them?

10              A.   I called Mike.

11              Q.   Was that about May 14th, 2001?

12              A.   It was about the day -- the date ---

13              Q.   Somewhere around that time?

14              A.   Yeah.  Yes.

15              Q.   Okay.  Well, what did you tell them?

16              A.   I don't recall the words that I used.

17      But I told them that the binding letter of intent

18      was signed for Avgol to acquire the facility.

19              Q.   Do you recall if Mr. Ranz asked you,

20      during the course of that conversation, whether

21      you had notified anybody else in senior management

22      at Unifi that you had an agreement with them?

23              A.   I don't recall his question, no.

24              Q.   Do you recall any other specifics of the

25      conversation?

02-24-04          Q&R vs. UNIFI\C101641                 COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954