# EXHIBIT H

**MICHAEL QUINN'S DEPOSITION EXCERPTS 11/10/03**

```
 1            IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION

 3                     - - - - -

 4   Q&R ASSOCIATES, INC.,          :
                                    :
 5              Plaintiff,          :
                                    :  CONFIDENTIAL
 6   vs.                            :  CASE NO. C-1-01-641
                                    :  VOLUME I
 7   UNIFI TECHNICAL FABRICS, LLC,  :
     ET AL.,                        :
 8                                  :
                Defendants.         :
 9                                  :
                     - - - - -
10

11        Deposition of MICHAEL QUINN, a witness herein,

12   taken by the Defendants as upon cross-examination

13   pursuant to agreement of counsel and stipulations

14   hereinafter set forth, at the offices of Keating,

15   Muething & Klekamp, PLL, 1400 Provident Tower, One

16   East Fourth Street, Cincinnati, Ohio at 9:37 a.m., on

17   Monday, November 10, 2003, before Heidi L. Constable,

18   RPR, RMR, a Notary Public within and for the State of

19   Ohio.

20
                          - - - - -
21
                    Cin-Tel Corporation
22                     813 Broadway
                   Cincinnati, Ohio  45202
23                    (513) 621-7723

24
```

2

CIN-TEL CORPORATION       

1      A.   No.  This was a disagreement between
2 John and Dennis Durkin.  John is very protective of
3 his customers, therefore, his customers' inventory.
4 He takes it personally and was not happy that Dennis
5 made a decision to take Hospital Specialty's
6 inventory without telling him.
7      Q.   I want to go back and ask you about
8 your time in Mocksville and Yadkinville, North
9 Carolina.  If you want to look at your affidavit,
10 which is Exhibit 68, you talk about this in Paragraph
11 9.  Where did you spend these two days?  Where did
12 you start?
13     A.   We started at the bed and breakfast, I
14 believe, we had breakfast, and then we toured UTF,
15 and then we went to the yarn plant in Yadkinville.
16     Q.   Was this on the -- did you drive down
17 the 13th, have dinner?
18     A.   Yes.
19     Q.   And did the tours the 14th?
20     A.   Yes.
21     Q.   Okay.  You say -- and you say, During
22 our dinner meeting Q&R brought up the industry rumors
23 about Avgol buying UTF.  Was it you or Mr. Ranz who
24 brought it up?

1    A.    Me. I'm guessing -- no, it was me.
2    It was me.
3    Q.    And what do you say in the affidavit?
4    Mebane said he had signed a confidentiality agreement
5    and could not discuss everything that had transpired
6    between Avgol and UTF. Mebane did confirm, however,
7    that several meetings with Avgol management had taken
8    place. When asked about these rumors, Mebane stated
9    ain't going to happen." Who asked him about the
10   rumors?
11   A.    We both did.
12   Q.    And his exact words were ain't going
13   to happen?
14   A.    Ain't going to happen.
15   Q.    And when it was -- now, is this on the
16   dinner meeting that he stood up and shook hands with
17   you and Ranz and said this is a North Carolina
18   agreement, you have my word?
19   A.    Yes.
20   Q.    What was the agreement?
21   A.    That -- that he was not going to
22   sell -- UTF would not be sold to Avgol.
23   Q.    Are you sure he said that on the 14th
24   and didn't say that when you shook hands at the March

1  being sold, and if UTF was sold, especially to Avgol,
2  that we would be protected, that there was a
3  commitment being made to Q&R Associates.
4      Q.   What did Mr. Mebane say?
5      A.   He said he would have to talk to
6  in-house counsel.
7      Q.   So it would be true that when you and
8  Mr. Ranz left that meeting with Mr. Mebane there was
9  no agreement on a commitment to Q&R if the assets
10 were sold to Avgol?
11     A.   There was -- when we left, we stood
12 up, shook hands, and left knowing that there was an
13 agreement that we were going to go out and begin
14 selling.
15     Q.   Wait. There was no agreement for
16 there to be a commitment to Q&R if UTF was sold to
17 Avgol, was there?
18     A.   When I -- when I left, I left with the
19 impression that there was a commitment made to Q&R
20 that we would be taken care of.
21     Q.   Just a minute. I'm not talking about
22 impressions. I'm talking about -- I'm trying to
23 focus on exactly what Mr. Mebane said. Mr. Mebane
24 said he would have to talk to in-house counsel before

1   making such a commitment, did he not?
2        A.   He said there would be a commitment
3   made to Q&R.
4        Q.   Did he say he would have to talk to
5   in-house counsel before making a commitment or did he
6   say there was a commitment made to Q&R?
7        A.   I'm sorry.
8             MR. PACKARD:  Let him finish.
9   BY MR. MCGAVRAN:
10       Q.   I'm trying to find out what he said.
11       A.   He said there will be a commitment
12  made to Q&R.  He didn't say what the commitment was.
13       Q.   He didn't say what the commitment was,
14  but he said he would have to talk to in-house counsel
15  about what that commitment would be?
16       A.   Right.  I requested a dollar amount.
17       Q.   And he said he couldn't?
18       A.   He said we'll have to get the
19  attorneys involved and I said okay.
20       Q.   Was anything else said about a
21  commitment to Q&R if the company was sold to Avgol?
22       A.   Just that -- again, he reiterated it's
23  not going to happen, it's not going to be sold.
24       Q.   Did Mr. Ranz say anything about a

1  A.  30th, 31st. 30th.
2  Q.  What else was said at this meeting by
3  anyone, the one on the 27th?
4  A.  You know, I can't remember. I'm sure
5  that we discussed how successful we were going to be.
6  Q.  Would you look again at your
7  affidavit, Exhibit 68. Do you have it?
8  A.  Yes, sir.
9  Q.  If you go back to Paragraph 17 you
10 say, "At the end of the March 27, 2001 meeting, I
11 shook hands with Mebane and he said, do we have an
12 agreement? I responded affirmatively. Although we
13 had an agreement, both parties discussed
14 memorializing it in a written contract. Mebane said
15 he would start the ball rolling." Is that a correct
16 summary of what you said?
17 A.  Yes.
18 Q.  Okay.
19    (Defendants' Exhibit 80 was marked for
20    identification.)
21 Q.  I'm handing you a document marked for
22 identification as 80 and ask you to identify it if
23 you can.
24 A.  This is an outline of the agreement.

1      Q.     Okay. Were there any terms in the
2  agreement that were not -- that Mr. Mebane did not
3  state in here that you thought were part of the
4  agreement?
5      A.     I sent a response to this on April the
6  1st disputing the paragraph where it says if we need
7  to drop our price below a dollar I disputed that.
8  And I also told him there was no provision in here
9  for if the company was sold.
10     Q.     Now, in the paragraph underneath where
11 you got, you know, the monthly compensation, the last
12 sentence says, "I have attached a small spreadsheet
13 to demonstrate the concept I had in mind." Is that
14 the document we talked about earlier?
15          MR. PACKARD:  74.
16 BY MR. McGAVRAN:
17     Q.     74.
18     A.     Yes.
19     Q.     And you understood that 74 was not a
20 guarantee, it was a spreadsheet to demonstrate the
21 concept he had in mind?
22     A.     Yes.
23     Q.     Now, had there been a discussion of
24 this sharing the pain in your meeting on the 27th if