# EXHIBIT U

**PLAINTIFF'S DEPOSITION EXHIBIT # 13**

# AVGOL LIMITED

May 11, 2001

Unifi, Inc.
7201 West Friendly Avenue
Greensboro, NC 27419-9109

Attention: Michael E. Delaney, Senior Vice President

Gentlemen and Ladies:

    This letter will summarize the conversations we have had concerning the Acquisition referred to below.

1.     *The Proposal.* We hereby submit the following proposal, which when accepted by you as set forth below, will constitute our agreement with you regarding the acquisition (the "*Acquisition*") of certain of the assets, and assumption of certain of the liabilities, of your operations as conducted by Unifi Technical Fabrics, LLC ("UTF") in Mocksville, NC (related to the manufacture and sale of spunbonded nonwoven fabric primarily used in the healthcare and personal hygiene industries, hereinafter the "*Business*") by a company owned and controlled by AVGOL, LTD (the "*Purchaser*").

        a.     *Assets.* The assets will consist of all assets used primarily in connection with the Business as of the date of the closing of the Acquisition (the "*Closing Date*"), and will include, without limitation, the Mocksville, NC real estate, fixed assets together with spare parts, intellectual property reasonably required for the operation of the Business, inventory and contract rights, and will exclude all other assets not specifically enumerated in the definitive documentation, including without limitation, accounts receivable cash and cash equivalents. The assets conveyed will include all of your assets reasonably necessary for the conduct of the Business as conducted on the Closing Date and will include all performance bonds (if any), all rights against and/or guarantees of suppliers of machinery and equipment. You will use your reasonable best efforts to transfer to Purchaser all governmental incentives and grants excluding $800,000 already received by UTF pursuant to the terms of the Agreement for Economic Development Assistance dated August 24, 2000. The treatment of inventory will be as set forth in paragraph 4.

        b.     *Liabilities.* The liabilities to be assumed by the Purchaser shall include the machinery contract with Reifenhauser Gmbh & Co. ("*Reifenhauser*"), such accrued liabilities of the Business existing as of the Closing Date as shall be mutually agreeable to the parties, and all obligatio



EXHIBIT
P1.13

Confidential
UTF 000021

with respect to the conduct of the Business after the Closing Date.

2.   *Purchase Price*. AVGOL is prepared to provide you aggregate transaction consideration (the "*Transaction Consideration*") consisting of (i) a cash consideration payable at the Closing of $37,308,000; (ii) assumption by the Purchaser of liabilities to third parties resulting from capital investments in the Business in the amount of $3,961,000 out of the liabilities set forth on Exhibit B; (iii) an amount up to $100,000 for investments actually made by you in the Business which qualify under GAAP as capital investments, provided that the invoices for the investments were received by you prior to April 29, 2001 and provided further that such investments have not been included in either item (i) or (ii) above; (iv) an amount up to $100,000 for investments actually made by you in the Business which qualify under GAAP as capital investments, provided that the invoices for the investments were received by you on or after April 29, 2001 but not later than the date on which you and the Purchaser make a public announcement of the Acquisition (the "*Announcement*"), and provided further that such investments have not been included in either item (i) or (ii) above; and (v) any capital expenditures made after the date hereof approved by in writing by Purchaser (the "*Additional Capital Expenses*"), less any liabilities assumed (other than those referred to in item (ii) above which includes the Reifenhauser contract). You represent to us that according to your current best estimate the total amount of Additional Capital Expenditures required to render the plant fully operational does not exceed $105,000.

3.   *Financing*. The Purchaser's proposal to acquire the Business is subject to the Purchaser obtaining necessary financing from Bank Hapoalim and/or Bank Leumi or another bank reasonably acceptable to you which Purchaser will use its most diligent efforts to obtain.

On or before May 15, 2001, Purchaser will pay to you a down payment of $1 million to be held pursuant to the terms of the deposit letter dated the date hereof (the "Deposit Agreement").

4.   *Inventories*. The Purchaser shall purchase from you the inventories of raw materials, work in process and finished goods ("*Finished Goods*") of the Business on the Closing Date. Raw materials which are in good usable condition shall be purchased by the Purchaser at their cost to you. Commencing on the date of the Announcement, you will purchase or order new raw materials only after consultation and agreement of the Purchaser, which will not be unreasonably withheld. You will use your best efforts to minimize the quantities of work in progress on the Closing Date. The price of Finished Goods will be agreed between us in the Definitive Agreement based on prices obtained by you in the past for such products less an agreed percentage representing the costs of Purchasers for storing, handling and selling the Finished Goods. The Purchaser shall not be required to purchase inventories of Finished Goods which exceeded on the date of the Announcement $500,000 in value. You will reimburse or indemnify Purchaser for any return or order cancellation by, or claim of, any customer due to any defect in Finished Goods. You will furnish to the Purchaser at the time of execution of the Definitive

Confidential

Agreement a list of the customers of the Business ("*Customers*") with a reasonable credit limit for each of them. You will reimburse to the Purchaser any uncollected amount, within the above credit limit, due to the purchase on or before December 31, 2001, by a Customer of Finished Goods, provided that the Purchaser is unable to collect from such Customer within 90 days from the date payment is due. The price for the raw materials work in progress and Finished Goods will be paid to you at the Closing.

5.   *Definitive Documentation; AVGOL Guarantee*. Upon your acceptance of this proposal we will begin drafting a definitive asset purchase agreement (the "*Definitive Agreement*") and the parties will proceed in good faith to negotiate and execute the Definitive Agreement in such form as shall be mutually satisfactory, containing such representations, warranties and indemnities as are customary in transactions of this nature. You will agree that, for a period of five years after the Closing Date, you and your affiliates will not engage in the Business. You will also agree to provide transition administrative and logistics services to Purchaser for a reasonable period after the Closing on mutually agreeable terms.

AVGOL will guarantee all of the Purchaser's obligations under the Definitive Agreement until such time (if any) as the Acquisition is consummated by the Purchaser. Additionally Avgol will guarantee all of the Purchaser's obligations remaining under the Reifenhauser contract as of the Closing Date and will indemnify you for any costs, expenses or obligations incurred related to the transferred and assigned Reifenhauser contract. You and we agree to negotiate in good faith to finalize and execute, the Purchase Agreement and other definitive documents for the Acquisition as soon as is reasonably practicable, and otherwise to consummate the Acquisition on an expeditious basis.

6.   *Conditions*. Conditions to closing to be contained in the definitive documentation will include conditions customary or appropriate for transactions of this type, including without limitation (a) the absence of any material adverse change in the Business (b) obtaining all governmental and third party consents and approvals necessary or desirable to facilitate consummation of the transaction, including the consent of Reifenhauser to assignment of your contract rights to Purchaser and the agreement of Reifenhauser to our assumption of your obligations thereunder, (c) our reasonable satisfaction with the results of our due diligence review of the Business with respect to the items set forth on Exhibit A, (d) our reasonable satisfaction with the results of a Phase I Environmental Report prepared by environmental consultants of your choosing and at your expense, (e) satisfaction of conditions set forth in the letter of Bank Hapoalim dated April 30, 2001 which copy has been delivered to you, (f) approval by your board of directors of the Definitive Agreement, and (g) the execution of mutually agreeable legal documentation for the Acquisition (including without limitation employment and non-competition agreements, reasonably satisfactory to us, with key members of the Business's management, whom we will have previously identified to you by reference to employment position).

7.   *Management Arrangements*. AVGOL values its employees and looks forward to

Confidential
UTF 000023

long-term relationships with them. We look forward to working with management, and intend to compensate employees consistent with good management and industry practices.

8. *Continuation of Employees*. The Definitive Agreement will identify the employees of the Business to whom the Purchaser will not extend offers of employment. The Purchaser will extend offers of employment to all other employees of the Business, and will be responsible for any costs associated with the future termination by Purchaser of the employment of such employees who accept employment with Purchaser. You will be responsible for the termination costs, if any, of all employees who are not employed by Purchaser.

9. *Timing*. You and AVGOL and its advisers and financing sources will cooperate fully and will devote the necessary resources to consummate the Acquisition expeditiously in accordance with this letter. If the Deposit Agreement is not executed concurrently with this letter or the deposit provided for therein paid on or before May 15, 2001 or the Definitive Agreement has not been executed by June 15, 2001, all rights and obligations under this letter shall cease. The Definitive Agreement will provide for closing not later than June 22, 2001;

10. *Conduct of Business*. Prior to the execution of the Definitive Agreement, the Business will be conducted only in the ordinary course of business and you will use your reasonable commercial efforts to maintain the machinery and equipment in good condition and to maintain the value of its business as a going concern. Notwithstanding anything herein to the contrary, you have the option to manufacture products of the Business at the level of orders received for such products. Final acceptance of the Reifenhauser machinery and equipment will not be given without our written consent.

11. *Pre-Closing Agreements*. Once the Definitive Agreement has been agreed upon by your management, management will recommend approval of the Acquisition to your board of directors and will make reasonable good faith efforts to obtain approval by your board of directors. Subject to such confidentiality agreements as you may reasonably require, and at reasonable times so as not to interfere with the conduct of the Business in any material manner, you agree to provide representatives of AVGOL and its financing sources, including legal, accounting and other representatives, with reasonable access to the Business and all information that any of them reasonably requests. Pending closing of the transaction, neither of the parties will without the consent of the other party make any announcement about such transaction to the public, to the Business' customers or employees, or to any other person or entity unless by law otherwise required.

12. *Expenses*. The parties will each bear their own expenses in connection with the transactions contemplated hereby.

13. *Exclusivity*. In consideration of the time and resources that AVGOL will devote to the transactions contemplated hereby, you agree that, until June 15 2001 you will not, and you will cause your affiliates, directors, officers, employees, representatives and

agents not to, directly or indirectly, solicit or initiate or enter into discussions or transactions with, or encourage, or provide any information to, any corporation, partnership or other entity or group (other than us and our designees) concerning any sale of stock by the stockholders of, or any merger, recapitalization, spin-off or sale of securities or substantial assets of, or any similar transaction or alternative to the Acquisition involving, the Business. You represent that neither you nor any of your affiliated entities is party to or bound by any agreement with respect to any such transaction concerning the Business other than as contemplated by this letter.

14. *Miscellaneous.* This letter sets forth our mutual agreements. This letter with the Deposit Agreement constitute the entire agreement among you, us and/or any of our respective affiliates, and supersedes all prior communications, agreements and understandings, written or oral, with respect to acquisition of the Business by AVGOL except for the Confidentiality Agreement dated April 16, 2001 which shall remain in full force and effect and is incorporated herein by reference. This letter may be signed in counterparts, all of which shall constitute the same agreement, shall be governed by the domestic substantive laws of North Carolina, and shall bind and inure to the benefit of the parties and their respective successors and assigns.

If the foregoing is in accordance with your understanding, please sign this letter in the space indicated below and return it to us.

Very truly yours,

AVGOL LIMITED

By: _____
Name: Nir Peleg,
Title: Co-Managing Director

The foregoing is hereby
agreed to and accepted:

UNIFI, INC.

By: _____
Name: MIKE DELANEY
Title: SR. VP, UNIFI

Confidential
UTF 000025

EXHIBIT "A"

1) Confirmation of outstanding liabilities to be purchased including payables to be assumed

2) Physical verification of assets to be transferred

3) Review of contracts and agreements

4) Employee interviews

5) Customer and supplier interviews

6) Complete technical review of machinery and production equipment

7) Verification of title to land

Confidential
UTF 000026

## Exhibit B

| 102 | Machine (20271) | Machines | 2,476,492.16 |
|---|---|---|---|
| 108 | Auto Knife Positioning and Core Cutting | Machines | 526,315.79 |
| 109 | Rewinder Modification to Run 6.75" Cores | Machines | 8,205.26 |
| 110 | Rewinder Ultrasonic Splicer | Machines | 17,742.11 |
| 111 | 6" Pneumatic winding shaft for Reinserting | Machines | 23,947.37 |
| 112 | 10 Additional Knife Bar Preparations | Machines | 14,736.84 |
| 113 | Kuster's Engrave Roll Modification (Discovery) | Machines | 31,578.95 |
| 114 | Tambour Magazine & Moveable Shaft Extractor | Machines | 23,684.21 |
| 115 | Zone Treatment System | Machines | 23,684.21 |
| 116 | 6" Pneumatic Shafts | Machines | 75,789.47 |
| 117 | 6.75" Pneumatic Shafts | Machines | 118,421.05 |
| 126 | Machine Freight & Insurance | Other | 9,339.88 |
| 159 | Aspex Spintrak System | Other | 70,262.31 |
| 160 | Web Inspection System - Cognex | Other | 41,157.00 |
| 207 | Barloworld Handling - Forklift RENTAL | Other | (4,105.91) |
| 246 | Long roll label at automatic and manual scale | Other | 3,360.00 |
| 247 | Wolfgang Engels control services | Other | 16,748.00 |
| 250 | RF Scanners | Other | 3,600.00 |
| 314 | Spare Calander Rolls | Other | 110,103.31 |
| 136 | Fi-Tech - Credit for incorrect Duty charge | Parts | 3,179.52 |
| 154 | Mechadyne Spare Payment | Parts | 558,310.02 |
| 154 | Mechadyne Spare Parts | Parts | 49,960.00 |

Confidential