# EXHIBIT "F"

```
 1              IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                      WESTERN DIVISION

 3                      - - - - -

 4   Q&R ASSOCIATES, INC.,            :
                                      :
 5              Plaintiff,            :
                                      :  CONFIDENTIAL
 6   vs.                              :  CASE NO. C-1-01-641
                                      :  VOLUME I
 7   UNIFI TECHNICAL FABRICS, LLC,    :
     ET AL.,                          :
 8                                    :
                Defendants.           :
 9                                    :
                        - - - - -
10

11

12

13

14
                   DEPONENT: MICHAEL QUINN
15
                      NOVEMBER 10, 2003
16
                         9:37 A.M.
17

18

19

20

21

22

23   REPORTED BY:
     Heidi L. Constable, RPR, RMR
24
```

                              1
               CIN-TEL CORPORATION



```
 1          Q.    I'm handing you a document marked for
 2   identification as 69 and ask you to identify this if
 3   you can.
 4          A.    This is a trade notice or a press
 5   release announcing that Avgol was going to put a
 6   manufacturing facility in the United States.
 7          Q.    When was the first time you heard that
 8   Avgol was going to do this?
 9          A.    I don't remember.  I don't remember.
10          Q.    Do you remember seeing this Exhibit
11   69?
12          A.    Yes.
13          Q.    Before today?
14          A.    Yes.
15          Q.    Did you have any concern that the
16   United States might develop an excess capacity for
17   this product with a UTF plant and an Avgol plant?
18          A.    No.
19                (Defendants' Exhibit 70 was marked for
20          identification.)
21          Q.    I'm handing you a document marked for
22   identification as Exhibit 70 and ask you to identify
23   this if you can.
24          A.    This was a memo from -- actually this
```

```
 1       was from Cleaver just prompting the sales team on the
 2       Avgol USA manufacturing facility in response to the
 3       trade announcement that they were going to build a
 4       facility in the United States.
 5              Q.    I see.  It says, "The US site is
 6       consistent with Avgol's long-range plan developed
 7       over a year ago."  Had you heard of such a plan in
 8       '99?
 9              A.    No.
10              Q.    It says, "Site has not yet been
11       announced.  We will discuss at an appropriate time."
12       Did you ever ask anybody where the site was?
13              A.    No.
14              Q.    Did anybody ever tell you?
15              A.    No.
16              Q.    Did you suspect that Avgol really
17       wasn't planning on building a plant?
18              A.    No, I think they were.
19              Q.    What makes you think that they were?
20              A.    Primarily because of Procter & Gamble
21       and SCA.  Primarily Procter & Gamble though.
22              Q.    But they didn't -- they never had sold
23       anything to P&G, had they?
24              A.    No.
```

```
1         Q.    When did you first hear that Avgol was
2   talking to UTF about buying UTF's plant?
3         A.    There were rumors in the marketplace
4   in late 2000, early 2001.
5         Q.    And in particular who was saying that?
6         A.    I can't remember.
7         Q.    Was it John Cleaver?
8         A.    No, I don't think so, no.
9         Q.    Did you discuss these rumors with Mr.
10  Ranz?
11        A.    Yes.
12        Q.    And did you try to follow up or
13  investigate the rumors?
14        A.    The only follow-up was we asked Mr.
15  Mebane were these, you know, were true, and he
16  responded no.
17        Q.    Well, didn't he respond that he had a
18  confidentiality agreement and couldn't talk about it?
19        A.    He did respond, but he also said, no,
20  that the rumors are not true.
21        Q.    But he said he had a confidentiality
22  or there was some sort of confidentiality agreement
23  with Avgol?
24        A.    He did -- yes, he did say that.
```

1       Q.      So that you're -- as a businessman,
2   you know that a confidentiality agreement means that
3   talks of some sort are going on between the parties?
4       A.      Yeah. It could have been for a
5   variety of things though.
6       Q.      Sure. But you knew that that meant
7   there was some sort of serious talks going on between
8   the parties?
9           MR. PACKARD: I'm going to object.
10          Mischaracterized his prior testimony.
11  BY MR. McGAVRAN:
12      Q.      You can answer.
13      A.      Say it again.
14      Q.      Yeah. As a businessman you know that
15  when somebody says I can't talk to you about it,
16  there is a confidentiality agreement, that there is
17  something serious going on between the people who
18  have the confidentiality agreement?
19      A.      Something serious, yes.
20          MR. PACKARD: Same objection.
21  BY MR. McGAVRAN:
22      Q.      Did you hear about the possibility of
23  Avgol buying UTF from any of your customers?
24      A.      Customers, no, not that I can

1  remember.
2  Q. Did Mr. Ranz tell you he had heard
3  something like this?
4  A. I'm trying to think. I think it
5  was -- it was me that had heard the rumor.
6  Q. Okay. And did you ask Mr. Goldwasser
7  about it?
8  A. No.
9  Q. Did you ask Mr. Cleaver?
10 A. No.
11      (Defendants' Exhibit 71 was marked for
12 identification.)
13 Q. I'm handing you a document marked for
14 identification as 71 and ask you to identify this if
15 you can.
16 A. This is an article from Nonwovens
17 Industry, March 2001, stating new nonwovens player
18 Unifi.
19 Q. This was produced by your company.
20 Did you copy this and put it in the file?
21 A. I don't know if I did or not.
22 Q. Did you read it at the time?
23 A. I don't remember reading it.
24      (Defendants' Exhibit 72 was marked for

1      A.     No. This was a disagreement between
2   John and Dennis Durkin. John is very protective of
3   his customers, therefore, his customers' inventory.
4   He takes it personally and was not happy that Dennis
5   made a decision to take Hospital Specialty's
6   inventory without telling him.
7      Q.     I want to go back and ask you about
8   your time in Mocksville and Yadkinville, North
9   Carolina. If you want to look at your affidavit,
10  which is Exhibit 68, you talk about this in Paragraph
11  9. Where did you spend these two days? Where did
12  you start?
13     A.     We started at the bed and breakfast, I
14  believe, we had breakfast, and then we toured UTF,
15  and then we went to the yarn plant in Yadkinville.
16     Q.     Was this on the -- did you drive down
17  the 13th, have dinner?
18     A.     Yes.
19     Q.     And did the tours the 14th?
20     A.     Yes.
21     Q.     Okay. You say -- and you say, During
22  our dinner meeting Q&R brought up the industry rumors
23  about Avgol buying UTF. Was it you or Mr. Ranz who
24  brought it up?

1        A.    Me.  I'm guessing -- no, it was me.
2   It was me.
3        Q.    And what do you say in the affidavit?
4   Mebane said he had signed a confidentiality agreement
5   and could not discuss everything that had transpired
6   between Avgol and UTF.  Mebane did confirm, however,
7   that several meetings with Avgol management had taken
8   place.  When asked about these rumors, Mebane stated
9   ain't going to happen."  Who asked him about the
10  rumors?
11       A.    We both did.
12       Q.    And his exact words were ain't going
13  to happen?
14       A.    Ain't going to happen.
15       Q.    And when it was -- now, is this on the
16  dinner meeting that he stood up and shook hands with
17  you and Ranz and said this is a North Carolina
18  agreement, you have my word?
19       A.    Yes.
20       Q.    What was the agreement?
21       A.    That -- that he was not going to
22  sell -- UTF would not be sold to Avgol.
23       Q.    Are you sure he said that on the 14th
24  and didn't say that when you shook hands at the March

1    being sold, and if UTF was sold, especially to Avgol,
2    that we would be protected, that there was a
3    commitment being made to Q&R Associates.
4        Q.    What did Mr. Mebane say?
5        A.    He said he would have to talk to
6    in-house counsel.
7        Q.    So it would be true that when you and
8    Mr. Ranz left that meeting with Mr. Mebane there was
9    no agreement on a commitment to Q&R if the assets
10    were sold to Avgol?
11        A.    There was -- when we left, we stood
12    up, shook hands, and left knowing that there was an
13    agreement that we were going to go out and begin
14    selling.
15        Q.    Wait. There was no agreement for
16    there to be a commitment to Q&R if UTF was sold to
17    Avgol, was there?
18        A.    When I -- when I left, I left with the
19    impression that there was a commitment made to Q&R
20    that we would be taken care of.
21        Q.    Just a minute. I'm not talking about
22    impressions. I'm talking about -- I'm trying to
23    focus on exactly what Mr. Mebane said. Mr. Mebane
24    said he would have to talk to in-house counsel before

```
1      making such a commitment, did he not?
2             A.    He said there would be a commitment
3      made to Q&R.
4             Q.    Did he say he would have to talk to
5      in-house counsel before making a commitment or did he
6      say there was a commitment made to Q&R?
7             A.    I'm sorry.
8                   MR. PACKARD:  Let him finish.
9      BY MR. MCGAVRAN:
10            Q.    I'm trying to find out what he said.
11            A.    He said there will be a commitment
12     made to Q&R.  He didn't say what the commitment was.
13            Q.    He didn't say what the commitment was,
14     but he said he would have to talk to in-house counsel
15     about what that commitment would be?
16            A.    Right.  I requested a dollar amount.
17            Q.    And he said he couldn't?
18            A.    He said we'll have to get the
19     attorneys involved and I said okay.
20            Q.    Was anything else said about a
21     commitment to Q&R if the company was sold to Avgol?
22            A.    Just that -- again, he reiterated it's
23     not going to happen, it's not going to be sold.
24            Q.    Did Mr. Ranz say anything about a
```

```
 1   commitment to Q&R?
 2         A.    Yes. In fact, John wrote it down, he
 3   was taking notes during the meeting, and he wrote it
 4   down.
 5               (Defendants' Exhibit 79 was marked for
 6         identification.)
 7         Q.    Would you look at 79 and identify it
 8   if you can.
 9         A.    These are -- this is the same agenda
10   with John's notes.
11         Q.    And do you see down here where he says
12   change of ownership includes commitment to Q&R?
13         A.    Yes.
14         Q.    He doesn't say what the commitment
15   was, does he?
16         A.    It does not.
17         Q.    In fact, you left that meeting not
18   knowing what the commitment was; isn't that true?
19         A.    I took the man at his word.
20         Q.    You said there was a commitment, but
21   you didn't know what the commitment was, did you?
22         A.    I did not.
23         Q.    Okay. What else was said at this
24   meeting?
```