# EXHIBIT "G"

**William Michael Mebane**                                                                 Page 107

1   end of March, now, are you comfortable
2   characterizing what your understanding of the
3   rumors were at that time?
4       A.   Again, no, I'm not comfortable
5   characterizing what, specifically, rumors were.
6   We did talk, specifically, about the circumstances
7   around what if Unifi sold its plant to Avgol.
8       Q.   Okay.  What were those discussions?
9   What did you say; what did they say; how did it
10  go?
11      A.   Help me with a specific question,
12  please.
13      Q.   Well, okay.  Who raised the issue?
14      A.   I believe they raised the issue.
15      Q.   Okay.  Did they raise that early in the
16  meeting or late in the meeting?
17      A.   I don't recall.
18      Q.   Okay.  How much of this meeting was
19  spent talking about that issue?
20      A.   Not very much.
21      Q.   Okay.  When they raised the issue, what
22  did they ask you?
23      A.   They asked me what happens if Unifi
24  loses control of the plant.
25      Q.   And how did you respond?

02-24-04            Q&R vs. UNIFI\C101641                     COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                              Page 108

1       A.   And at this point of our discussions, we
2  had already defined the -- the primary terms under
3  which they would represent Unifi.
4       Q.   Uh-huh (yes).
5       A.   We had included in those terms an
6  understanding that either side could withdraw from
7  this representation with a certain number of days
8  of commissions paid.  Originally, they had asked
9  for six months's worth of commissions, or 180
10 days.  I had originally offered 90 days of
11 commissions to be paid for them.
12           And we had come to the understanding
13 that 120 days would be what we put into our
14 agreement.  And any reference to a change of
15 control for Unifi would be covered under the 120-
16 day termination understanding.
17      Q.   Is that how you responded when they
18 raised the issue?
19      A.   As ---
20      Q.   We'll exercise our right to terminate?
21      A.   Yeah, said the protection that you have
22 is covered under the termination clause, whether
23 it's for purposes of change of control of the
24 plant, or unable to fulfill it for any reasons.
25      Q.   Did they respond to you in any way after

02-24-04            Q&R vs. UNIFI\C101641                        COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                              Page 109

1      you said that?
2          A.   Mr. Quinn had indicated that he
3      preferred to have a more definitive, separate
4      agreement for change of control.  And I had
5      indicated to him that I was not authorized to --
6      to do that.
7          Q.   Okay.
8          A.   The constraints I had were regarding a
9      commercial relationship, and I could not agree --
10     I could not -- I was not authorized to do anything
11     beyond that.
12         Q.   Did you believe you had reached an
13     agreement with Q & R at this meeting -- in this
14     suite?
15         A.   Yeah, I believe that we had come to an
16     agreement on the terms and conditions under which
17     they would represent us.  Yes, I did.
18         Q.   Now, you said you met with them two
19     other times in Miami.  When was the next meeting?
20         A.   I had lunch, and I believe it was with
21     Mr. Ranz, and one other of my staff members, and
22     I'm sorry, I don't recall exactly who it would
23     have been.  And then we had a -- a meeting with
24     one of the potential customers of ourselves, and
25     Mr. Ranz asked to be included in that meeting, and

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954