# EXHIBIT C:

# MICHAEL J. QUINN'S

# DEPOSITION EXCERPTS

```
 1           IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
 2                    WESTERN DIVISION

 3                    - - - - -

 4   Q&R ASSOCIATES, INC.,         :
                                   :
 5              Plaintiff,         :
                                   : CONFIDENTIAL
 6   vs.                           : CASE NO. C-1-01-641
                                   : VOLUME I
 7   UNIFI TECHNICAL FABRICS, LLC, :
     ET AL.,                       :
 8                                 :
                Defendants.        :
 9                                 :
                      - - - - -
10

11           Deposition of MICHAEL QUINN, a witness herein,

12   taken by the Defendants as upon cross-examination

13   pursuant to agreement of counsel and stipulations

14   hereinafter set forth, at the offices of Keating,

15   Muething & Klekamp, PLL, 1400 Provident Tower, One

16   East Fourth Street, Cincinnati, Ohio at 9:37 a.m., on

17   Monday, November 10, 2003, before Heidi L. Constable,

18   RPR, RMR, a Notary Public within and for the State of

19   Ohio.

20

21                    - - - - -

22              Cin-Tel Corporation
                   813 Broadway
23              Cincinnati, Ohio  45202
                   (513) 621-7723
24
```

2

CIN-TEL CORPORATION 

```
 1          Q.    When did you first hear that Avgol was
 2   talking to UTF about buying UTF's plant?
 3          A.    There were rumors in the marketplace
 4   in late 2000, early 2001.
 5          Q.    And in particular who was saying that?
 6          A.    I can't remember.
 7          Q.    Was it John Cleaver?
 8          A.    No, I don't think so, no.
 9          Q.    Did you discuss these rumors with Mr.
10   Ranz?
11          A.    Yes.
12          Q.    And did you try to follow up or
13   investigate the rumors?
14          A.    The only follow-up was we asked Mr.
15   Mebane were these, you know, were true, and he
16   responded no.
17          Q.    Well, didn't he respond that he had a
18   confidentiality agreement and couldn't talk about it?
19          A.    He did respond, but he also said, no,
20   that the rumors are not true.
21          Q.    But he said he had a confidentiality
22   or there was some sort of confidentiality agreement
23   with Avgol?
24          A.    He did -- yes, he did say that.
```

```
 1          A.     No. This was a disagreement between
 2   John and Dennis Durkin. John is very protective of
 3   his customers, therefore, his customers' inventory.
 4   He takes it personally and was not happy that Dennis
 5   made a decision to take Hospital Specialty's
 6   inventory without telling him.
 7          Q.     I want to go back and ask you about
 8   your time in Mocksville and Yadkinville, North
 9   Carolina. If you want to look at your affidavit,
10   which is Exhibit 68, you talk about this in Paragraph
11   9. Where did you spend these two days? Where did
12   you start?
13          A.     We started at the bed and breakfast, I
14   believe, we had breakfast, and then we toured UTF,
15   and then we went to the yarn plant in Yadkinville.
16          Q.     Was this on the -- did you drive down
17   the 13th, have dinner?
18          A.     Yes.
19          Q.     And did the tours the 14th?
20          A.     Yes.
21          Q.     Okay. You say -- and you say, During
22   our dinner meeting Q&R brought up the industry rumors
23   about Avgol buying UTF. Was it you or Mr. Ranz who
24   brought it up?
```

```
 1        A.    Me.  I'm guessing -- no, it was me.
 2   It was me.
 3        Q.    And what do you say in the affidavit?
 4   Mebane said he had signed a confidentiality agreement
 5   and could not discuss everything that had transpired
 6   between Avgol and UTF.  Mebane did confirm, however,
 7   that several meetings with Avgol management had taken
 8   place.  When asked about these rumors, Mebane stated
 9   ain't going to happen."  Who asked him about the
10   rumors?
11        A.    We both did.
12        Q.    And his exact words were ain't going
13   to happen?
14        A.    Ain't going to happen.
15        Q.    And when it was -- now, is this on the
16   dinner meeting that he stood up and shook hands with
17   you and Ranz and said this is a North Carolina
18   agreement, you have my word?
19        A.    Yes.
20        Q.    What was the agreement?
21        A.    That -- that he was not going to
22   sell -- UTF would not be sold to Avgol.
23        Q.    Are you sure he said that on the 14th
24   and didn't say that when you shook hands at the March
```

1     A.    30th, 31st.  30th.

2     Q.    What else was said at this meeting by
3 anyone, the one on the 27th?

4     A.    You know, I can't remember. I'm sure
5 that we discussed how successful we were going to be.

6     Q.    Would you look again at your
7 affidavit, Exhibit 68. Do you have it?

8     A.    Yes, sir.

9     Q.    If you go back to Paragraph 17 you
10 say, "At the end of the March 27, 2001 meeting, I
11 shook hands with Mebane and he said, do we have an
12 agreement? I responded affirmatively. Although we
13 had an agreement, both parties discussed
14 memorializing it in a written contract. Mebane said
15 he would start the ball rolling." Is that a correct
16 summary of what you said?

17    A.    Yes.

18    Q.    Okay.

19        (Defendants' Exhibit 80 was marked for
20    identification.)

21    Q.    I'm handing you a document marked for
22 identification as 80 and ask you to identify it if
23 you can.

24    A.    This is an outline of the agreement.

```
 1            Q.    Okay.  Were there any terms in the
 2    agreement that were not -- that Mr. Mebane did not
 3    state in here that you thought were part of the
 4    agreement?
 5            A.    I sent a response to this on April the
 6    1st disputing the paragraph where it says if we need
 7    to drop our price below a dollar I disputed that.
 8    And I also told him there was no provision in here
 9    for if the company was sold.
10            Q.    Now, in the paragraph underneath where
11    you got, you know, the monthly compensation, the last
12    sentence says, "I have attached a small spreadsheet
13    to demonstrate the concept I had in mind."  Is that
14    the document we talked about earlier?
15            MR. PACKARD:   74.
16    BY MR. MCGAVRAN:
17            Q.    74.
18            A.    Yes.
19            Q.    And you understood that 74 was not a
20    guarantee, it was a spreadsheet to demonstrate the
21    concept he had in mind?
22            A.    Yes.
23            Q.    Now, had there been a discussion of
24    this sharing the pain in your meeting on the 27th if
```