

Slip Copy
2004-Ohio-153
(Cite as: 2004 WL 67231 (Ohio Ct.Cl.))

Page 1

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Claims of Ohio.

Malcolm McELROY, et al., Plaintiffs
v.
OHIO DEPT. OF TRANSPORTATION, Defendant.

No. 2003-03256-AD.

Decided Jan. 14, 2004.

**Background:** Property owners brought suit against Department of Transportation for promissory estoppel and negligent misrepresentation after Department denied application for permit to build driveway.

**Holdings:** The Court of Claims, No. 2003-03256-AD, Daniel R. Borchert, Deputy Clerk, held that:
(1) Department was not liable to property owners on promissory estoppel theory, and
(2) Department was not liable on negligent misrepresentation theory.
Judgment ordered.

[1] Estoppel 62.2(2)

156k62.2(2) Most Cited Cases

Department of Transportation was not liable to property owners on promissory estoppel theory after denying property owners' requested permit to build driveway after Department had allegedly made assurances that it would grant permit; Department employee, who made assurances did not have authority to grant permit applications, and owners did not reasonably rely on employee's assurances, as they knew there were topographical problems association with land, and should have known that obtaining a permit would be difficult based on compliance issues related to nature of land.

[2] Fraud 23

184k23 Most Cited Cases

Statements of Department of Transportation's employee to property owners that driveway permit would be granted "as long as all [of Department's] spec [ifications] and requirements [were] met" and that "a permit would be issued-- for driving in and out of property" were not justifiably relied on by property owners when considered in context with all other statements made about compliance, and thus Department was not liable for negligent misrepresentation, where property owners were aware of problems involved in obtaining permit, and owners failed to prove the damages claimer were caused by any reliance on statements.

Malcolm McElroy, Lori McElroy, 3575 Bayard Drive, Cincinnati, Ohio, 45208, Plaintiffs, Pro se.

Gordon Proctor, Director, Department of Transportation, 1980 West Broad Street, Columbus, Ohio, 43223, for Defendant.

*MEMORANDUM DECISION*

\*1 {¶ 1} On February 11, 2002, plaintiffs, Malcolm and Lori McElory and a real estate agent, David Cropper, met with Monti Perry, an employee of defendant, Department of Transportation (DOT). Prior to this meeting, plaintiffs had entered into negotiations with Cropper to purchase a tract of land adjacent to DOT's right-of-way along U.S. Route 52 in Brown County. Plaintiffs wanted to construct two driveways on this tract of land which would access U.S. Route 52. Because a permit issued by DOT would be required before any driveway construction could commence, plaintiffs decided to meet with Monti Perry, a DOT representative, to discuss the feasibility and procedures involved in obtaining a permit. Plaintiffs asserted Perry addressed the permit matter at the February 11, 2002 meeting by stating that as long as all DOT specifications and requirements were met, a driveway construction permit would be issued. Additionally, David Cropper related he heard Perry state that a permit would be issued as long as all DOT specifications and requirements were met. Plaintiffs further related they were assured by Perry that there would not be a problem obtaining a permit from DOT for driveway access. Based on the matters addressed at the February 11, 2002 meeting plaintiffs subsequently entered into a contract to purchase the forty-three acre tract of land adjacent to U.S. Route 52.

{¶ 2} After the contract for land purchase was executed, plaintiff, Lori McElroy, made several trips to the Brown County courthouse to conduct research regarding access points on the land for driveway installation. Additionally, plaintiffs engaged an attorney to represent them with final aspects of the land purchase. Plaintiff, Lori McElroy, also traveled on several occasions to meet with surveyors, soil experts, and a DOT representative. All meetings concerned plaintiffs' intent to install driveways on the land they contracted to purchase. Purchase of the real estate was to be finalized contingent upon plaintiffs receiving written permission from DOT to obtain a driveway permit for access from U.S. Route 52 to the property being purchased.



Slip Copy
2004-Ohio-153
(Cite as: 2004 WL 67231 (Ohio Ct.Cl.))

Page 2

{¶ 3} On May 1, 2002, plaintiffs received correspondence from DOT employee, Monti Perry, regarding the issuance of a driveway permit. Perry, who was identified as a Permit Expediter, Office of Real Estate, informed plaintiffs that DOT, "will issue you a permit for the property along U.S. 52 in Brown County as long as all ODOT specs and requirements are met." Perry explained the land where plaintiffs wanted to construct a driveway was characterized as a slip area. Therefore, according to Perry, additional requirements for construction might be required by DOT. Perry wrote, "ODOT may request that the drive be placed and built in a certain way to least affect the hillside." Perry further addressed the permit matter stating, "[h]owever, once the property is purchased by you a permit will be issued in your name for a driveway in and out of the property."

*2 {¶ 4} On May 2, 2002, plaintiffs were sent a letter from DOT employee, Deborah E. Manion, identified as the District 9 Real Estate Administrator. The letter was sent in response to a telephone conversation between plaintiffs and Manion. The telephone conversation involved discussion regarding the correspondence sent from Monti Perry to plaintiffs confirming the probable issuance of a driveway construction permit from DOT. In her May 2, 2002 letter, Deborah E. Manion notified plaintiffs of DOT's intention to rescind all parts of the Perry correspondence concerning assurances that a driveway construction permit would be issued. Manion related the following:

{¶ 5} "As discussed, our concern lies mainly with the fact that the wide right of way in the area was purchased by the Department to protect the integrity of our roadway due to this being a potential slip area. We will begin researching our closed files tomorrow to determine what studies were done in the area with regard to the stability of the land.

{¶ 6} "At your earliest convenience, please provide this office with a detailed driveway construction plan to help us make our determination concerning the issuance of permits for the two drive accesses you are requesting. Your plan should show both accesses, even though I understand that the second drive would not be built until a later time.

{¶ 7} "After your plan is received and our research and field review is completed, if it is determined that revokable permits can be issued for the drive accesses you are requesting, it is understood that the Department will be including a 'save harmless' clause in the permits."

{¶ 8} On May 10, 2002, Deborah E. Manion sent plaintiffs another letter addressing plaintiffs' request to obtain a drive access permit. Manion informed plaintiffs she had discussed the situation with other DOT personnel and the responses she received, "were not favorable to allowing a drive to be constructed" in the land area specified by plaintiffs. The primary area of concern was the stability of the hillside at the proposed site of the drive access. Manion again related to plaintiffs that if they wanted to proceed with their permit request they needed to submit a detailed driveway construction plan for review "by ODOT Central Office employees who are experts in soil management." Additionally, Manion outlined other potential requirements and restrictions in the event a permit was granted after review was conducted.

{¶ 9} On June 7, 2002, defendant's employee Vaughn Wilson sent plaintiff, Lori McElroy, a letter informing her that her request for a drive had been denied after the request was reviewed by DOT's District 9 personnel and Geotechnical Engineering office staff. Wilson, the District 9 Management Administrator, explained two factors for denial of plaintiffs' permit application. These factors for denying the permit request were: 1) the selected drive access site is "located in a slide prone shale, Kape, formation, which when exposed to weathering, deteriorates badly;" 2) "the slopes in the area are approximately 1 1/2:1."

*3 [1] {¶ 10} Plaintiffs have asserted they were assured a permit would be granted for the construction of a driveway on the property they wished to purchase. Plaintiffs suggested they relied on this assurance and incurred expenses based on this reliance. Plaintiffs have contended defendant, Department of Transportation, should be liable to them for certain expenses incurred as a result of certain verbally expressed and written comments DOT employee, Monti Perry, made in connection with the issuance of a drive access permit. Plaintiffs filed this complaint seeking to recover $262.80 for mileage expenses, $750.00 for legal fees incurred from March 18, 2002 to June 13, 2002, and $25.00 for filing fee reimbursement. Plaintiffs maintained they sustained these damages as a result of representations made by defendant through its employee.

{¶ 11} Defendant denied any lability in this matter. Defendant denied any of its personnel, including Monti Perry, actually made assurances a permit would be issued to build a driveway. Defendant asserted plaintiffs have failed to prove they are entitled to reimbursement of expenditures incurred based on representations regarding the issuance of a permit. Defendant related plaintiffs were informed on multiple occasions the site where they wanted to construct a driveway was a slip area. Defendant also related plaintiffs were informed the granting of a permit application was conditional upon compliance with DOT's own specifications and requirements. Defendant argued plaintiffs had no right

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Slip Copy
2004-Ohio-153
(Cite as: 2004 WL 67231 (Ohio Ct.Cl.))

Page 3

to a permit, were not promised a permit, and therefore cannot recover any expenditures incurred based on the failure to obtain a permit.

{¶ 12} Furthermore, defendant contended plaintiffs are barred from any recovery founded in estoppel. As a general authority, promissory estoppel cannot be utilized as a basis for recovery against the state. *Sun Refining & Marketing Co. v. Brennan* (1987), 31 Ohio St.3d 306, 511 N.E.2d 112. However, exceptions to this general principle do apply. Defendant has asserted any exception applies on a limited basis under rare circumstances. The Tenth District Court of Appeals in *Pilot Oil Corp. v. Ohio Dept. of Transp.* (1995), 102 Ohio App.3d 278, at 283, 656 N.E.2d 1379, cited such circumstances exist for applying promissory estoppel against the state where:

{¶ 13} "(1) the state uses its discretion in the interpretation of a law or rule, (2) the state's interpretation is not violative of legislation passed by the General Assembly of Ohio, and (3) the elements of promissory estoppel are otherwise met." Under the conditions described, "promissory estoppel may be employed to bar the state from asserting a contrary interpretation where the state had full opportunity to make an informed decision and, in fact, did make an informed decision."

{¶ 14} Defendant argued its employees never decided to grant plaintiffs a revocable permit and did not promise plaintiffs a permit would be granted. Defendant asserted plaintiffs only received, "a limited assurance that if they conformed with ODOT's requirements they may be eligible for a revocable permit." Defendant insisted the elements to establish a claim grounded in estoppel do not apply under the facts of the present action.

*4 {¶ 15} On September 22, 2003, plaintiffs filed a response to defendant's investigation report. Contrary to defendant's position, plaintiffs have asserted promissory estoppel applies under the facts of the instant claim. Plaintiffs related defendant's employee, Monti Perry, on February 11, 2002, promised a drive access permit would be issued. Plaintiffs maintained they relied on this promise, the reliance was justifiable, and they incurred expenses after relying on the representations made by Perry. Plaintiffs insist their claim is based on detrimental reliance to the assurances made to them by Perry on February 11, 2002. In support of their claim that the doctrine of estoppel is appropriate under the facts of the instant action, plaintiffs cited *Baxter v. Manchester* (1940), 64 Ohio App. 220, 28 N.E.2d 672, *Shapely Inc. v. Norwood Earnings Tax Bd. of Appeals* (1984), 20 Ohio App.3d 164, 485 N.E.2d 273.

{¶ 16} However, in the particular cases referenced by plaintiffs, it was determined estoppel can be used against municipalities. Defendant, Department of Transportation, is classified as a state entity and not a municipality. Plaintiffs cited authorities have no bearing on this claim. See R.C. 2743.01(A) and (B); R.C. 2743.02(A)(1), and R.C. 2743.10(A).

{¶ 17} Plaintiffs insist DOT employee, Monti Perry, verbally promised a drive access permit would be granted to them. Plaintiffs related Perry made this promise on February 11, 2002 and confirmed the promise in written correspondence on May 1, 2002. Plaintiffs argued Perry was the responsible agent of DOT for granting permits in Brown County. Although plaintiffs stated Perry actually granted permits for DOT, no evidence has been presented to establish Perry did in fact enter into the decision making process of granting or denying permit applications. Correspondence dated June 7, 2002 from Vaughn Wilson (DOT District 9 Highway Management Administrator), apparently indicates permit applications are subject to review by several employees of DOT's District 9 Office along with personnel from DOT's Geotechnical Engineering Department. It appears from the information contained in the Wilson correspondence that permit applications are subject to final approval from someone other than Monti Perry. Plaintiffs have not produced sufficient evidence to show Perry was vested with the ultimate authority to grant and issue permits for drive access.

{¶ 18} Plaintiffs maintained they have offered adequate proof of their entitlement to damages claimed based on promissory estoppel. Plaintiffs asserted they were promised a permit on February 11, 2002, and on May 1, 2002, they received written approval from Monti Perry granting the permit. Despite plaintiffs assertions, the trier of fact finds the May 1, 2002 correspondence from Monti Perry to plaintiffs cannot in any way be construed as written approval granting a drive access permit. Plaintiffs further asserted they received a letter on May 2, 2002 from Deborah Manion rescinding approval of the permit. Since the permit application was never approved, the May 2, 2002 letter cannot constitute notice of rescinding an approved permit. Plaintiffs proof, based on promissory estoppel, is confined to the writing contained in the May 1, 2002 correspondence from Monti Perry.

*5 {¶ 19} Plaintiffs entire claim for estoppel is founded on verbal and written statements made by Monti Perry on February 11, 2002 and May 1, 2002. Initially to prove their claim, plaintiffs reference verbal statements made by Perry on February 11, 2002. Plaintiffs related Perry said as long as all DOT specifications and requirements are met, a permit

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Slip Copy
2004-Ohio-153
(Cite as: 2004 WL 67231 (Ohio Ct.Cl.))

Page 4

would be issued. Plaintiffs asserted Perry also said there will be no problems getting a driveway access permit. Real estate agent, David Cropper, confirmed he heard Perry state a permit would be issued as long as all DOT specifications and requirements are met. Additionally, plaintiffs cite the written correspondence Monti Perry sent to them on May 1, 2002. In this correspondence Perry wrote, "[t]he Ohio Department of Transportation will issue you a permit for the property along U.S. 52 in Brown County as long as all ODOT specs and requirements are met." Perry closed this correspondence with the following: "[h]owever, once the property is purchased by you a permit will be issued in your name for a driveway in and out of the property." Plaintiffs argue this preceding statement constitutes a promise by Monti Perry the permit would be granted.

{¶ 20} In the instant claim, plaintiffs have failed to set forth sufficient facts to demonstrate the applicability of estoppel against DOT. Plaintiffs could assert estoppel against defendant only if Monti Perry made a statement that was within his authority to make and that statement actually induced reasonable reliance. *Pilot Oil Corp.*, supra 278, 283. To illustrate the applicability of estoppel under the facts of this claim, therefore, plaintiffs were obligated to demonstrate that it was within the scope of Perry's authority to grant permit applications. Despite Perry's title as a Permit Expediter, he was not charged with the authority to grant permit applications nor did it appear, based on the evidence, that he had any role in making a determination regarding application grants. Perry seemingly did not have a position in the grant process. Furthermore, "the party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, at 145, 555 N.E.2d 630. In claims founded on estoppel the party claiming estoppel must exhibit reasonable reliance on the actions of defendant's agents. *Burke v. Ohio Dept. of Human Serv.* (1994), 74 Ohio Misc.2d 50, 658 N.E.2d 822. The facts of the present claim do not establish plaintiffs' reasonable reliance on the statement of Monti Perry. Plaintiffs were aware of the topographical problems associated with the land where they wanted a drive access. Plaintiffs knew or should have known that obtaining a permit for drive access would be difficult based on compliance issues related to the nature of the land area around the potential access site. Perry's communications to plaintiffs may have been premature with unfortunate consequences, but the conduct is not actionable from an estoppel perspective.

*6 [2] {¶ 21} Alternatively, to their contentions of estoppel, plaintiffs claim the verbal and written communications of Monti Perry constituted negligent misrepresentation. Negligent misrepresentation occurs when "[o]ne who, in the course of his business, profession or employment * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the

{¶ 22} information." *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, quoting 3 Restatement of the Law 2d, Torts (1965) 126-127, Section 552(1). (Emphasis *sic*.)

{¶ 23} Although the general rule requires contractual privity to assert a cause of action in negligence for purely economic damages, the plaintiff may recover under a negligent misrepresentation cause of action if a "sufficient nexus" exists between the parties for the lack of contractual privity. *Clevecon, Inc. v. Northeast Ohio Regional Sewer Dist.* (1993), 90 Ohio App.3d 215, 220, 628 N.E.2d 143. Additionally, the rule concerning contractual privity in a negligent misrepresentation claim is limited to situations in which the parties had no direct interaction with one another. See *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facility Auth.* (1993), 88 Ohio App.3d 73, 76, 623 N.E.2d 134. Not only did a sufficient nexus exist between plaintiffs and defendants, but the parties had multiple, direct interactions pertaining to plaintiffs' desire to obtain a drive access permit. Accordingly, the lack of privity between the McElroys and DOT does not bar the McElroys' claim for negligent misrepresentation against DOT.

{¶ 24} Essentially, plaintiffs claim for negligent misrepresentation is based on two statements from Monti Perry. The first statement made on February 11, 2002 and repeated in a correspondence sent to plaintiffs on May 1, 2002 addressed the issue of granting a permit, "as long as all ODOT specs and requirements are met." The second statement contained at the end of the May 1, 2002 correspondence mentioned that, "a permit will be issued in your name for driving in and out of the property." Plaintiffs insisted they justifiably relied on these statements as assurances or promises a drive access permit would be granted. Establishing justifiable reliance does not require a showing that the plaintiffs reliance conformed to what a "reasonable man" would have believed. *Amerifirst Savings Bank of Xenia v. Krug* (1999), 136 Ohio App.3d 468, 496, 737 N.E.2d 68. Rather, a determination regarding justifiable reliance involves a fact based inquiry into the circumstances

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Slip Copy
2004-Ohio-153
(Cite as: 2004 WL 67231 (Ohio Ct.Cl.))

Page 5

of the claim and the relationship between the parties. *Lepera v. Fuson* (1992), 83 Ohio App.3d 17, 26, 613 N.E.2d 1060. "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances there is no apparent reason to doubt the veracity of the representation." *Crown Property Development, Inc. v. Omega Oil Co.* (1996), 113 Ohio App.3d 647, 657, 681 N.E.2d 1343. Applying the standard to the circumstances in the present claim, the court concludes the McElroys were not justified in relying on Perry's statement that a permit would be issued when taken into context with all other statements made about compliance with specifications and requirements.

*7 {¶ 25} Furthermore, plaintiffs were aware of problems involved in obtaining a permit for the proposed drive access site. Plaintiffs were really only assured a permit would be granted if contingencies were met. It was simply not reasonable for plaintiffs to rely on a statement contained at the end of a correspondence considering all the additional knowledge plaintiffs possessed. Therefore, justifiable reliance has not been shown. Additionally, plaintiffs have failed to prove the damages claimed were caused by any reliance on statements from DOT personnel. Under the circumstances, plaintiffs would still have incurred these expenses claimed, whether a permit was granted or not. Plaintiffs' claim is denied.

{¶ 26} Having considered all the evidence in the claim file and, for the reasons set forth in the memorandum decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in N.E.2d                                                                                                       Page 1
(Cite as: 1986 WL 4395 (Ohio App. 8 Dist.))

▶
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Eighth District, Cuyahoga County.

Anna LeFORT, Admrx., etc., et al., Plaintiffs-Appellants,
v.
CENTURY 21-MAITLAND REALTY CO., et al., Defendants-Appellees.

No. 50262.

April 10, 1986.

Civil appeal from Court of Common Pleas

Case No. 032424

Donald E. Caravona, Cleveland, Ohio, for plaintiffs-appellants.

Hugh M. Stanley, Jr., Foster Fludine, George W. Lutjen and Frank S. Hurd, Cleveland, Ohio, for defendants-appellees.

JOURNAL ENTRY AND OPINION
PRYATEL, Judge.

*1 Anna LeFort and her husband, David LeFort, seek reversal of a jury verdict denying them recovery for the death of her two children and injuries to David LeFort in a house fire. In a cross appeal, one of the defendants, Nationwide Mutual Insurance Company, asks us to reverse the denial of a directed verdict. The LeForts claim that the multiple defendants (1) conspired to obtain fire insurance coverage for the house the LeForts were purchasing, (2) represented to the LeForts that the house was safe and free from any and all defects, and (3) through negligent misrepresentation induced the LeForts to purchase the house.

In March 1979, the LeForts decided to purchase a house at 3229 West 52nd Street, Cleveland, from Areli and Gloria Munoz (third party defendants). Acting as real estate agents for the Munozes were defendants Century 21- Maitland Realty Company and two Maitland agents, Carol Sadowski and Larry Baron; and defendants Century 21-Active Realty Company and Active agent Pat Luke. The loan to finance purchase of the house was obtained from defendant Cardinal Federal Savings & Loan Association through its agent, Henry Steinhagen, also a defendant.

On April 30, 1979, the LeForts received title to the house. Earlier Steinhagen of Cardinal Federal wrote to the LeForts that they were to advise him of the purchase of fire insurance two weeks before the transfer of the house (R. 1640, Exhibit 19-P). Anna LeFort testified that real estate agents Sadowski (Maitland Realty) and Luke (Active Realty) also told her she had to purchase fire insurance.

The LeForts did not move into the house until July. In June, the LeForts' own insurance agent, Jeff Krotine of State Farm Insurance Company, inspected the house. Krotine told Anna LeFort that he would not insure the house because of electrical defects and advised her to have an electrical contractor inspect the house (T. 1085). (Although the property transferred in April, in June the LeForts still could not enter the house without a real estate agent opening the lock box (R. 1092).) Anna LeFort testified that Steinhagen of Cardinal, Sadowski of Maitland and Luke of Active had told her the house had been inspected (R. 762). Anna LeFort said she then went to those three persons to solve her insurance problem as they had solved other problems connected with the purchase (R. 818). Notwithstanding that State Farm refused to insure the house because of electrical defects, Sadowski told Anna LeFort that her (Sadowski's) friend, defendant Mark Somerville (agent for defendant Nationwide Insurance), would insure the house (R. 763, 1802). Somerville called her, arranged to come to the house and fulfilled Sadowski's prophecy that Somerville would insure the house. (R. 764).

The application with Nationwide carried the date of June 15, 1979. However, Steinhagen of Cardinal Federal testified he had a paid receipt for fire insurance from Nationwide back-dated to April 30, 1979 (R. 1640). Anna LeFort questioned Somerville because she could not understand why State Farm would not insure the house, but Nationwide would. Somerville told her that the State Farm agent simply didn't want to insure the home. Anna LeFort quoted Somerville as saying, " 'Don't worry about it, the home has been inspected, it's okay,' that [Krotine] just did not want to give us insurance and there was no problem" (R. 766). She said Somerville told her that he had checked with Steinhagen and Sadowski (*Id.*).

*2 Three or four weeks after the LeForts moved in there were unexpected occurrences (R. 774). Anna LeFort plugged a lamp into a wall socket in the living room and sparking resulted. She testified, "But I left it [the now plugged-in lamp] because Carol [Sadowski] and Pat [Luke] told me it was safe. Usually if you plugged something in, it



Not Reported in N.E.2d                                                                                             Page 2
(Cite as: 1986 WL 4395 (Ohio App. 8 Dist.))

would spark." (R. 775, 778). Sparking also occurred when she plugged a vacuum cleaner into the socket in the dining room (R. 776). She said her husband knew nothing about electrical wiring and told her to call the two women [Sadowski and Luke] (R. 776).

At about 3:15 a.m. on September 5, 1979, a fire occurred in the LeFort home. Anna LeFort's two daughters, Shawn and Sherry Wilson, aged four and six, died as a result of the fire, and David LeFort was seriously injured. Nationwide Insurance paid the LeForts the amount required by the fire insurance contract.

Ronald G. Schultz, a professor of electrical engineering at Cleveland State University, testified that the fire originated in the back of the living room socket (R. 629) where Anna LeFort had plugged in the lamp. He attributed the fire to a loose screw which would not have been discoverable unless the plate of the socket had been removed (R. 624, 682). Further, Schultz testified that it would only have been detected by someone with electrical training if there had been damage to the insulation on the wires to alert that trained person to a problem (R. 681).

The LeForts brought the instant action against those involved in the sale, financing and insuring of the home, alleging that those defendants had negligently misrepresented to the LeForts that the house "was safe and free from any and all defects" and induced the LeForts to rely upon such misrepresentation.

The various defendants denied the allegations and generally defended on the ground that the plaintiffs were negligent and that plaintiffs' negligence was the proximate cause of the injuries suffered. Active Realty cross-claimed against all of the defendants (except its agent Pat Luke) for indemnity and contribution. Cardinal Federal filed a third-party complaint against the Munozes maintaining that Munoz negligently made repairs. Pat Luke filed a cross-claim against all of the defendants, (except her principal Active Realty), and the third-party defendants.

Prior to the start of voir dire conducted on January 22, 1985, Luke's cross claims and the complaints against Steinhagen and Somerville were dismissed on motion of the parties bringing them, all with prejudice (R. 4-8). By journal entry dated January 23, 1985 and journalized January 28, 1985, all of the cross claims and the third party complaints were voluntarily dismissed. [FN1] By journal entry dated January 20, 1985 and journalized February 22, 1985, it was stipulated that all the individual agents were agents for their principals; hence, individuals were dismissed as defendants. The case distilled itself into an action against (1) Maitland, (2) Active, (3) Cardinal and (4) Nationwide.

*3 Nationwide's motion for summary judgment was granted on its claim that Nationwide had no legal duty to warn of defects and no duty to inspect the premises it insured. On appeal, another panel of this court reversed, finding that "the allegations will support a valid theory of conspiracy." LeFort v. Century 21-Maitland Realty Co. (June 7, 1984), Cuyahoga App. No. 47440, unreported.

Trial was conducted for three weeks after which the trial court denied Nationwide's motion for a directed verdict. The judge charged the jury on a Friday afternoon and instructed the two alternates to hold themselves in readiness should something happen to one of the regular jurors. None of the parties objected to that instruction. The jurors retired to deliberate through the early evening hours. A juror was incapacitated in an accident over the weekend and on Monday morning one of the alternates was substituted without notice to counsel.

The jury resumed deliberations. Before 1:00 p.m. that day, the jury returned its general verdicts in favor of all defendants and answered a series of interrogatories, with some signed by the substituted alternate and others signed by the incapacitated juror. There was no objection made because of the impaneling of the alternate juror either before or after the verdict was returned.

The trial court denied plaintiffs' motion for a new trial which order they appeal here assigning the same three errors claimed below. Nationwide cross appeals the denial of its motion for a directed verdict.

*ASSIGNMENT OF ERROR NO. I:*
   I. THE TRIAL COURT ERRED BY GIVING THE DEFENDANTS EIGHTEEN PEREMPTORY CHALLENGES SINCE A CONSPIRACY AMONG THE DEFENDANTS WAS ALLEGED AND THE DEFENDANTS HAD IDENTICAL INTERESTS AND DEFENSES.

Appellants argue that defendants were entitled to only three peremptory challenges rather than the eighteen challenges granted by the trial court. [FN2]

They rely on the following language of Civ.R. 47(B):
   In addition to challenges for cause provided by law, each party peremptorily may challenge three jurors. *If the interests of multiple litigants are essentially the same, "each party" shall mean "each side."* (Emphasis added).

The rule on peremptory challenges was explained in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works


*Christoff v. Dugan* (1931), 39 Ohio App. 475, 476, as follows:
> The general rule of law is that where the statute prescribes that "each party" may exercise peremptory challenges, the statutory expression "each party" must be construed as giving a specific number of challenges to each side, regardless of the number of plaintiffs or defendants on a side, in cases where the interests of the parties are essentially the same, but this rule must be limited to such cases of identity of interest among the defendants or plaintiffs, for, *if the interests of the parties are essentially different or antagonistic, each litigant should be deemed a party and entitled to the full number of peremptory challenges*. The law as thus stated is set forth in 35 Corpus Juris, 409, and in 16 Ruling Case Law, 251, 252, and numerous authorities sustain the proposition. (Emphasis added.)

*4 In similar vein, *Chakeres v. Merchants & Mechanics Federal Savings & Loan Assn.* (1962), 117 Ohio App. 351, looked to whether the several defendants had interests or defenses that were identical in determining the number of challenges to be permitted "each party." The court added that "if the interests of the parties defendant are essentially different or antagonistic, each litigant is ordinarily deemed a party * * * and entitled to the full number of peremptory challenges." *Id.* at 355.

The Supreme Court of Ohio again treated the issue raised here in *Nieves v. Kietlinski* (1970), 22 Ohio St.2d 139. The court found an identification of interests in that the multiple plaintiffs joined in a common petition, used the same statement of facts as a basis for each cause of action and were represented by the same attorney.

In contrast, here each defendant is separately represented by counsel, each filed separate replies and defenses that were varied and each had interests that could be considered as antagonistic to their co-defendants. Additionally, it was possible that any one defendant could have attempted to show that its conduct did not constitute the negligent misrepresentation argued. See *Moore v. Reyes* (Oct. 2, 1975), Cuyahoga App. No. 33647. The parties' defenses did not necessarily stand or fall together.

While the interests of the corporate defendants were identical to the interests of their individual agents, the trial court was unable to determine that based on the information before it at the time of voir dire. The trial transcript (at pages four through seven) indicates that the stipulations that the individual defendants were the agents of their principals extended only to Steinhagen (of Cardinal Federal) and Somerville (of Nationwide) prior to jury selection. Thus,

there was no error in making available three peremptory challenges to Active and three to its agent Luke and three to Maitland and three together to its agents Sadowski and Baron. Plaintiffs exercised only two peremptory challenges, so we need not reach the question whether it was necessary to allow them three peremptory challenges for each of the defendants to whom we allow three as provided in criminal cases. Crim.R. 24(c).

Since none of the defendants together with their agents exercised more than three peremptory challenges and plaintiffs exercised only two, (see footnote 2, *supra*.) no prejudice resulted to plaintiffs.

The first assignment of error is overruled.

*ASSIGNMENT OF ERROR NO. II:*
> II. THE TRIAL COURT ERRED IN SUBSTITUTING AN ALTERNATE JUROR AFTER THE REGULAR JURORS HAD BEGUN DELIBERATING.

Appellants complain that the trial court violated the mandate of Civ.R. 47(C) that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Instead of discharging two alternate jurors after the jury retired, the trial judge instructed them to hold themselves in readiness should their services be required. Appellants interposed no objection to this instruction given on the Friday afternoon when the jury retired to deliberate. While there is no record of hours expended in deliberation, an affidavit filed in opposition to the motion for a new trial indicates that the jurors were dismissed to begin deliberations. They met from about 4:00 p.m. (R. 2254) until about 8:15 p.m. on Friday. When one of the jurors suffered an injury during the weekend and was unable to be present when the jury resumed deliberations on Monday morning, alternate juror Robert Wilbur was seated to replace the ailing juror (R. 2281). [FN3] Appellants complain that counsel for the various parties were not advised of the substitution until after it occurred (R. 2305) [FN4] and that the trial judge questioned neither the alternate nor the regular jurors on the record at the time the substitution was made. The jury, with the substituted alternate, returned its verdict at 12:48 p.m. that Monday.

*5 Appellants rely on one Ohio case, *State v. Locklear* (1978), 61 Ohio App.2d 231, in which, after the jury retired, the court substituted a *previously-excused* alternate for an absent regular juror *over vigorous* objection by the defense counsel. The court found that pursuant to Crim.R. 24, a juror may be substituted only prior to the time the jury retired to consider the verdict. The *Locklear* court indicated that the same rule applied in civil proceedings. Since the


alternate juror in the case before us had not been excused, but had been instructed to hold himself in readiness to serve (without objection of counsel), we do not find *Locklear* to be dispositive.

In *State v. Nabozny* (1978), 54 Ohio St.2d 195, where appellant complained about a challenge for cause on appeal but had failed to object at trial, the court said:
> This court has consistently held that an appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. * * *

*Id.* at 212.

We are aided in our analysis by three federal cases implicating Fed.Crim.R. 24(C) (akin to Ohio's Civ.R. 49(C)) which provides that an alternate juror who does not replace a regular juror shall be discharged after the jury retires to deliberate. See *United States v. Hillard* (C.A. 2, 1983), 701 F.2d 1052, certiorari denied (1983), 461 U.S. 958; *United States v. Kopituk* (C.A. 11, 1982), 690 F.2d 1289, certiorari denied (1982), 461 U.S. 928; (1983), 463 U.S. 1209; *United States v. Phillips* (C.A. 5, 1981), 664 F.2d 971, certiorari denied (1982), 457 U.S. 1136, 459 U.S. 906. The common thread running through these federal cases is the holding that the alternate juror discharge rule is mandatory, although a violation does not require a *per se* reversal absent a showing of prejudice. The courts hold that in extraordinary circumstances and when extraordinary precautions are taken to ensure defendants are not prejudiced, substitution of the alternate juror after deliberations had begun does not constitute reversible error. We agree that "there is a clear need for some procedure short of a mistrial that would permit the fair and efficient resolution of a case once deliberations have begun and a juror becomes unable to continue jury service." *Hillard, supra,* at 1060.

The extraordinary circumstances referred to by the federal courts involve complex cases with lengthy trials where the remedy of mistrial would necessitate a second expenditure of substantial resources by the court and the parties. (The instant trial extended over three weeks; twenty-eight witnesses were called.) The precautions taken to minimize the inherent dangers of substitution by operating to obviate prejudice, according to the federal cases, include (1) inquiries by the trial judge to determine whether the alternate can deliberate fully and fairly with the regular jurors and (2) re-instructing the jurors in full, emphasizing their duty to disregard all prior deliberations (even to the point of confiscating all handwritten materials compiled by the jurors during earlier deliberations), as well as to begin deliberations with a clean slate. The period of time taken for deliberations after the substitution is made also may be a consideration.

*6 One purpose of the alternate dismissal rule is to avoid the substantial and inherent coercive effect upon an alternate juror who joins a jury that has deliberated for some length of time. *Phillips, supra,* at 995. While the federal cases we cite involved criminal proceedings, they are persuasive on the guidelines they offer on juror substitution after the start of deliberations.

While this case, because of its length and complexity, appears to fall within the exceptions carved out in *Hillard, Kopituk* and *Phillips, supra,* we find nothing in the record to demonstrate that any extraordinary precautions were taken. Therefore, we must determine whether plaintiffs were prejudiced by the substitution of the alternate juror.

We are confronted here with more than a technical rule violation. An examination of the proceedings reveals that thirty-six interrogatories were returned by the jury. Seven of them were signed by the juror who became incapacitated. She apparently signed the seven on Friday although the verdict was not reached until Monday. Obviously, a juror cannot sign an interrogatory before a verdict is reached; *i.e.*, before a requisite number of jurors have agreed on their decision. [FN5] Those seven were not signed by her replacement; however, he signed all of the remaining interrogatories. Additionally, the alternate juror signed the four general verdict forms.

Since this was an eight-member jury, six votes were necessary for the concurrence necessary to render a verdict. Civ.R. 48. In all four general verdicts, the vote of the substituted alternate was critical in obtaining a three-fourths concurrence. In more than half of the thirty-seven interrogatories, the concurrence of either the incapacitated juror or her substitute provided the sixth vote. Thus, the unavoidable conclusion is that nine and not eight jurors participated in the determination of the issues in this case. [FN6]

The participation of nine jurors, instead of the mandated eight jurors, in the determinations reached here demonstrates that the jury could not have begun its deliberations anew when the alternate joined the panel. Whether deliberations were begun with a clean slate is, in our judgment, critical to a determination whether plaintiffs here were prejudiced. Since the parties were entitled to have their rights determined by eight and not nine jurors and in view of the fact that the incapacitated juror answered interrogatories before a verdict was reached, we hold that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the plaintiffs were prejudiced and therefore entitled to a new trial.

*ASSIGNMENT OF ERROR NO. III:*
  III. THE TRIAL COURT ERRED IN CHARGING THE JURY ON COMPARATIVE NEGLIGENCE FOR THE INTENTIONAL TORT OF FRAUD.

Appellants admit that they negligently failed to make repairs after they purchased the house. However, they contend that the trial court's instructions on comparative negligence misled the jury into focusing on the LeForts' negligence rather than on the issue of this action--whether the defendants-appellees made negligent misrepresentations to the appellants about the electrical defects, inducing justifiable reliance by appellants.

*7 Although the tort of negligent misrepresentation has been recognized by Ohio courts, those courts have not discussed the narrow issue of whether comparative negligence will limit or bar recovery when that cause of action is asserted. See *Haddon View Investment Co. v. Coopers & Lybrand (1982), 70 Ohio St.2d 154; Gutter v. Dow Jones, Inc.* (May 16, 1985), Franklin App. No. 84AP-1029), unreported; *Younkman v. Riebel* (Dec. 30, 1982), Franklin App. No. 82AP-260, unreported.

However, *DeBardeleben Marine Corp. v. United States (C.A. 5, 1971), 451 F.2d 140,* suggests that the plaintiff's negligence is a consideration in negligent misrepresentation actions. The court said in relation to plaintiff's claim that the weekly notice to mariners aboard its tug failed to reveal the location of a natural gas pipeline that was ruptured by the barge's anchor:
  The consequence is that--as a part of the duty, not just a defense of contributory negligence--the Government's obligation ceases at that time in which a prudent shipowner-navigator would have reasonably received the Notice to Mariner advising of the publication of a revised chart correctly portraying the condition in question.
*Id.* at 149. We also note the following from Restatement of Law 2d, Negligent Misrepresentation (1977), 140, Section 552A, Comment a:
  a. The recipient of a fraudulent misrepresentation who justifiably relies upon it is not barred from recovery by his contributory negligence in doing so. (See § 545A). But when the misrepresentation is not fraudulent but only negligent, the action is founded solely upon negligence, and the ordinary rules as to negligence liability apply. Therefore the contributory negligence of the plaintiff in relying upon the misrepresentation will bar his recovery. This means that the plaintiff is held to the standard of care, knowledge, intelligence and judgment of a reasonable man, even though he does not possess the qualities necessary to enable him to conform to that standard. (See § 464.)
Ohio, of course, has adopted the principle of comparative negligence (to replace that of contributory negligence).

Although appellants' assignment of error speaks to the intentional tort of fraud, their counsel said in closing argument:
  This case is misrepresentation, not fraud or deceit--misrepresentation that saying something that is not true or not having knowledge and saying, "Yes, it's okay." That sounds a lot different than fraud, but there is [sic] some things in here that are fraudulent.
  You don't date a binder April 15th or April 19th when you testify, "I never saw them until June." You don't do that.

* * *

(R. 2139-40).
  So, now, the wheels are turning because what do we have now? We have some anxious people. I'm not saying they are bad, rotten, fraudulent people. They made some negligent misrepresentations that killed her two children and took her husband away.
(R. 2150).

While we recognize that comparative negligence instructions would be inappropriate in an action for fraud, we are unable to conclude that the LeForts' suit was limited to allegations of fraud. By their own counsel's argument, their action was predicated on negligent misrepresentation.

*8 Looking to other jurisdictions, we note that in *Robinson v. Poudre Valley Fed. Credit Union (Colo.Ct.App.1984), 680 P.2d 241,* the court found that contributory negligence principles applied to recipients of negligent misrepresentations. In *Zack Cheek Builders, Inc. v. McLeod (Tenn.1980), 597 S.W.2d 888,* although the affirmative defense of contributory negligence had not been pleaded, the appellate court held it was within the trial court's discretion to instruct on that issue since the parties had tried the issue of contributory negligence along with the issue of negligent misrepresentation. Both issues were tried here.

We hold that the instruction on comparative negligence was properly given and overrule the third assignment of error.

*CROSS-APPEAL ASSIGNMENT OF ERROR NO. I:*
  I. NATIONWIDE HAD NO DUTY TO INSPECT THE WIRING PRIOR TO ISSUING A POLICY OF INSURANCE.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in N.E.2d	Page 6
(Cite as: 1986 WL 4395 (Ohio App. 8 Dist.))

*CROSS-APPEAL ASSIGNMENT OF ERROR NO. II:*
  II. THE EVIDENCE DID NOT ESTABLISH A PRIMA FACIE CASE OF CONSPIRACY.

Cross-appellant Nationwide argues that because it had not duty to inspect wiring prior to issuing an insurance policy on the LeFort's house, had not inspected the house, and the evidence did not establish a prima facie case of conspiracy, Nationwide was entitled to a directed verdict.

It is undisputed that Nationwide had no legal duty to inspect wiring, but that issue is irrelevant to the directed verdict issue. Nationwide ignores the testimony of Anna LeFort who said that Nationwide's agent, when questioned as to why he was willing to insure the house after Krotine refused, told her not to worry; that the house had been inspected and was "okay." Notwithstanding other representations, it is undisputed that the house was not inspected by Nationwide. Nationwide's agent, according to LeFort's testimony, told her he had checked with Steinhagen and Sadowski. There also is the matter of the backdated receipt for insurance. Nor did Steinhagen object when the LeForts failed to advise him of the purchase of fire insurance "two weeks before title transfer."

Based on the testimony presented at trial, and construing the evidence most strongly in favor of plaintiffs, we conclude that pursuant to Civ.R. 50(A)(4) reasonable minds could come to differing conclusions as to whether there was a conspiracy and whether Nationwide was part of it. See Rohde v. Farmer (1970), 23 Ohio St.2d 82, 91.

We find that the trial court properly denied the motion for a directed verdict and overrule the first and second cross-assignments of error. We affirm as to the cross-appeal.

Judgment is reversed and remanded for a new trial on appellants' appeal and affirmed as to cross-appellant's appeal.

It is, therefore, considered that said appellants recover of said appellees their costs herein.

It is ordered that a special mandate be sent to said Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARKUS, P.J., and JACKSON, J., concur.

*9 N.B. This entry is made pursuant to the third sentence of Rule 22(D), Ohio Rules of Appellate Procedure. This is an announcement of decision (see Rule 26). Ten (10) days from the date hereof this document will be stamped to indicate journalization, at which time it will become the judgment and order of the court and time period for review will begin to run.

> FN1. Appellants' counsel asserted at oral argument that no cross claims were pending when voir dire began.
>
> FN2. Three challenges each were made available to Maitland, Active, Luke, Cardinal, Nationwide, and three between Sadowski and Baron. The plaintiffs exercised two peremptory challenges; Maitland none; Active one; Luke one; Cardinal two; Nationwide two; and Sadowski and Baron, none.
>
> FN3. The record contains a parenthetical notation by the reporter as follows, "Thereupon, Juror No. 2 being unable to serve, was replaced by the first alternate, Robert Wilbur, and the jury continued its deliberations." (R. 2281).
>
> FN4. After the verdicts were in, the trial judge first spoke of the substitution on the record. Again, no objections were interposed.
>
> FN5. For instance, the recommended jury instruction reads in pertinent part:
> 1. If you find that (plaintiff) * * * is entitled to recover damages, you will return a verdict in favor of (him) * * * and you will *then* answer the interrogatories.
> 1 OJI 25.20.
>
> FN6. The *Hillard* court cautioned about the risk of being tried by more than the number of jurors mandated or more than one jury. 711 F.2d at 1058.

1986 WL 4395 (Ohio App. 8 Dist.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works