



**H**
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of North Carolina, Gaston County, Business Court.

PACK BROTHERS BODY SHOP, INC., a Corporation, and Ronnie Pack, an individual, Plaintiffs,
v.
NATIONWIDE MUTUAL INSURANCE COMPANY, a corporation, a.k.a. Nationwide Insurance Enterprise and Joe Benkendorf, Individually and as agent of Nationwide Insurance Company, Defendants.

**No. 01 CVS 805.**

Jan. 10, 2003.

{1} This matter is before the Court on Nationwide Mutual Insurance Company and Joe Benkendorf's ("defendants") motion for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. Defendants have moved for summary judgment on the following claims: tortious interference with contractual relations, tortious interference with prospective commercial advantage, unlawful steering under N.C. Gen.Stat. § 58-3-180 (2002), fraud, libel *per se* and *per quod,* slander *per se* and *per quod,* commercial disparagement, unfair and deceptive acts and practices pursuant to North Carolina's Unfair Trade Practices Act, N .C. Gen.Stat. § 75-1.1-89 (2001)("UTPA"), and punitive damages. The Court considered defendants' motions and briefs, plaintiffs' responses, and oral argument held on December 9, 10, and11, 2002. During oral argument, plaintiffs stipulated that their claims for tortious interference, unlawful steering, fraud, and commercial disparagement claims were all subsumed under their claim for unfair trade practices. The Court thus views defendants' summary judgment motion regarding those claims as MOOT. As to the remaining claims, for the reasons set forth below this court will:
*1 1. GRANT defendants' motion for summary judgment as to the libel *per se* claims of Pack Brothers Body Shop, Inc. and Ronnie Pack;
2. GRANT defendants' motion for summary judgment as to the libel *per quod* claims of Ronnie Pack;
3. DENY defendants' motion for summary judgment as to the libel *per quod* claims of Pack Brothers Body Shop, Inc.;
4. DENY defendants' motion for summary judgment as to slander *per se* and *per quod* claims of Ronnie Packand Pack Brothers Body Shop, Inc.;
5. DENY defendants' motion for summary judgment as to the UTPA claims;
6. DENY defendants' motion for summary judgment as to plaintiffs' demand for punitive damages; and
7. Hold that defendants' motion for summary judgment as to the claims of the partnership, Pack Brothers Paint and Body Shop, Inc. are MOOT.

Brooks Law Office, by Joyce M. Brooks, for plaintiffs.

Law Offices of David Phillips, by David A. Phillips, for plaintiffs.

Robinson & Elliott, by William C. Robinson, for defendants.

Nelson Levine de Luca & Horst, by Adam S. Levy and Craig A. Cohen, for defendants.

***ORDER REGARDING DEFENDANTS' SUMMARY JUDGMENT MOTION***

BEN F. TENNILLE, Special Superior Court Judge for Complex Business Cases.

I. BACKGROUND

{2} This case arose out of a dispute between Nationwide Mutual Insurance Company("Nationwide") and Pack Brothers Body Shop, Inc. ("Pack Brothers") over repair costs and rates charged by Pack Brothers. In 1999, tensions between Pack Brothers and Nationwide culminated in a confrontation between Ronnie Pack and Joseph Benkendorf, a Nationwide employee. Nationwide subsequently prohibited its employees from entering Pack Brothers property. As a result of this policy, Nationwide customers could not have their vehicles appraised by a Nationwide adjuster while the vehicles were on Pack Brothers property. Nationwide informed its customers in writing and orally that there would be some difficulties associated with choosing Pack Brothers to repair their vehicles. By February 2001, the relationship between Nationwide and Pack Brothers had further deteriorated. Ronnie Pack and Pack Brothers filed this suit on February 23, 2001 alleging that Nationwide and Joseph Benkendorf are liable on the following theories: libel, slander, tortious interference, fraud, commercial disparagement, unfair and deceptive trade practices and illegal steering.

II. SUMMARY JUDGMENT STANDARD

{3} Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law. *See* N.C. R. Civ. P. 56(c); *see also* *Beam v. Kerlee,* 120 N.C.App. 203, 209, 461 S.E.2d 911, 916 (1995) (recognizing that summary judgment is appropriate only when "there is no dispute as to any material fact"). As moving parties, defendants have "the burden of showing there is no triable issue of material fact." *Farrelly v. Hamilton Square,* 119 N.C.App. 541, 543, 459 S.E.2d 23, 25-26; *see also* *Taylor v. Ashburn,* 112 N.C.App. 604, 606, 436 S.E.2d 276, 278(1993). In determining whether that burden has been met, the court "must view all the evidence in the light most favorable to the non-moving party, accepting all its asserted facts as true, and drawing all reasonable inferences in its favor." *Lilley v. Blue Ridge Elec. Membership Corp.,* 133 N.C.App. 256, 258, 515 S.E.2d 483, 485 (1999); *see also* *Murray v. Nationwide Mut. Ins. Co.,* 123 N.C.App. 1, 472 S.E.2d 358, 362 (1996).

***2** {4} Once the moving party shows that the plaintiff is unable to prove an essential element in the plaintiff's case, the burden shifts to the plaintiff to make a contrary showing. *Roumillat v. Simplistic Enterprises, Inc.,* 331 N.C. 57, 63, 414 S.E.2d 339, 341 (1992). To defeat a motion for summary judgment, the non-moving party may not rely on the mere allegations in the pleadings. *Nicholson v. County of Onslow,* 116 N.C.App. 439, 441, 448 S.E.2d 140, 141 (1998). A response must describe specific facts showing that a genuine issue of fact exists for the trial. *Culler v. Hamlett,* 148 N.C. 389, 392, 559 S.E.2d 192, 194 (2002). If the plaintiff fails to make this contrary showing, the defendant is entitled to summary judgment. *Id.* at 148-392, 559 S.E.2d at 194.

III. DEFAMATION CLAIMS

{5} "The term defamation includes two distinct torts, libel and slander. In general, libel is written while slander is oral." *Tallent v. Blake,* 57 N.C.App. 249, 251, 291 S.E.2d 336, 338 (1982). To recover under a defamation theory, a plaintiff must "allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Boyce & Isley, PLLC v. Cooper,* 2002 N.C.App. LEXIS 1088, 568 S.E.2d 893, 898 (2002) (internal citations omitted).

**III. A. LIBEL**

{6} North Carolina recognizes three classes of libel: "(1)publications obviously defamatory which are called libel *per se;* (2)publications susceptible of two interpretations one of which is defamatory and the other not; and(3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod.*" *Renwick v. News & Observer Pub. Co.,* 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984), ***rehearing denied,*** 310 N.C. 749, 315 S.E.2d 704 (1984), ***cert. denied,*** 469 U.S. 858, 83 L.Ed.2d121 (1984).

{7} ***Libel Per se.*** Libel *per se* is "apublication by writing, printing, signs or pictures which, when considered alone without innuendo, colloquium or explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace." *Renwick,* 310 N.C. at 317- 18, 312 S.E.2d at 408-9 (internal citations omitted). Whether a publication is of the type that properly may be deemed libelous *per se* is a question of law to be decided initially by the trial court. ***See,*** *id.* at 317-18 (defamatory words to be libelous ***per se*** must be susceptible of ***but one meaning*** and of such nature that ***the court*** can presume ***as a matter of law*** that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." (internal citations omitted) (emphasis in original)).

***3** {8} In ***Ellis v. Northern Star Co.,*** the plaintiff company, Ellis Brokerage Company, Inc. (Ellis), was a food broker. *Ellis v.. Northern Star Co.* 326 N.C. 219, 388 S.E.2d 127 (1990). As a food broker, it was the company's function to convince large quantity food buyers, such as hospitals and schools systems, to place orders with the company's clients who are in the business of selling foods. *Id.* at 221, 388 S.E.2d at 128. The defendant, Northern Star Company (Northern) was a potato processor for which Ellis was a broker. *Id.* at 221, 388 S.E.2d at 129. Subsequently, Ellis received Northerns pricing information via telephone and sent price lists based on this information to several potential buyers. *Id.* at 222, 388 S.E.2d at 129. A few months later, Northern terminated its brokerage contract with Ellis; Northern subsequently wrote the following letter to several of the buyers who had received the price list from Ellis:

> We have recently received copies of a price list sent to you from Ellis Brokerage Company regarding pricing on Northern Star potato products. These prices were noted for *bids only,* delivered by Northern Star.
>
> We at Northern Star Company did not authorize such a price list and therefore cannot honor the prices as quoted on June 23, 1986.

*Ellis,* 326 N.C. at 222, 388 S.E.2d at 129 (emphasis in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





original).

{9} The North Carolina Supreme Court held that the letter constituted libel *per se* and stated:

> The language [w]e at Northern Star did not authorize such a pricelist, taken in the context of the entire letter, can only be read to mean that Ellis Brokerage Company, acting in its capacity as broker for Northern Star, did an unauthorized act. Whether that act was publishing certain unauthorized prices within a price list or publishing the entire price list itself without authorization is of no import; either reading is defamatory and impeaches Ellis Brokerage in its trade as a food broker.

*Id.* at 224, 388 S.E.2d at 130.

{10} The North Carolina Court of Appeals had the opportunity to apply the holding in *Ellis* in *Martin Marietta v. Wake Stone Corp.*, 111 N.C.App. 269, 432 S.E.2d 428 (1993). In 1989, Martin Marietta began the process of locating and opening a rock quarry in the same county where Defendant Wake Stone's rock quarry was located. *Id.* After receiving conditional permits from the Division of Land Resources of the North Carolina Department of Environment, Health, and Natural Resources, Martin Marietta requested a zoning variance from the county board of commissioners. *Id.* Wake Stone prepared a document for the county board of commissioners detailing the sequence of events leading to Martin Marietta's acquisition of permits, which purported to demonstrate that Martin Marietta received special treatment. *Id.* The document stated:

> 1. Martin Marietta received a mining permit dated March 26, 1990. The permit was issued by Steve Conrad, Director of the Division of Land Resources. A Division of the Department of Environment, Health and Natural Resources. The department may deny a permit request upon finding ...:
>
> *4 "(3) That the operation will violate standards of air quality, surface water quality, or ground water quality...."
>
> Specifically, the department requires a number of additional permits, which in this case includes a NPDES water discharge permit and a NSPS air pollution discharge permit. Neither of these permits have been issued and are not expected for at least 30 days.
>
> How can the land resources department issue a mining permit before they know whether an operation will meet the criteria of Item 3 above?
>
> Per Tracy Davis, acting mining specialist, it has become standard practice to issue the permit before air and water permits, with the company being notified that the permit is only valid upon the receipt of those additional permits.
>
> Martin Marietta presented the mining permit to Marvin Pridgen and requested a land use permit for its quarry preparation knowing that the permit was not valid until the other permits were received. The land use permit was issued but due to wet weather no work has yet begun.
>
> It should be noted that the permit was specially handled by Steve Conrad, bypassing Tracy Davis, at the request of John Long, Vice President of Martin Marietta and a member of the North Carolina State Mining Commission. Mr. Conrad retires from state government on Friday, March 30, 1990.
>
> The permit usually takes 30 days to be issued following the resolution of all pending matters. In this case the pending matter was the environmental assessment study requested of Martin Marietta. This issue was resolved by a letter from the Attorney General's office to Steve Conrad dated Friday, March 23, 1990. On the following Monday the permit was drafted, typed, reviewed, reclamation bond posted, approved and signed by Mr.Conrad. (Note: be sure to see attached copies of relative information from the Martin Marietta file including a draft of the condition resolving the use of public funds for the project, a.k.a. the environmental assessment issue--the draft was written by Steve Conrad).
>
> 2. The county is concerned about being sued by Martin Marietta for their vested interest in the quarry location. Per Mr. David Owens at the Institute of Government in Chapel Hill ..., an entity does not have a vested interest until all permits are received. Then their vested interest [sic] becomes expenditures from that time forward. Not prior expenditures. From an explanation of the facts of the permitting versus zoning situation Mr. Owens stated that there was definitely no clear cut case which would set precedence. The issuance by the county of the land use permit could be the most damaging event so far. Only the prompt revocation of that permit would stop any vested interests (expenditures) from accruing.
>
> 3. Wake Stone Corporation was told by Marvin Pridgen that when it had all its permits, it could get a land use permit from the county. The mining permit was issued November 1, 1989. All other permits were received just prior to Christmas, 1989. A land use permit was applied for and received in January, 1990. Land preparation could have begun almost three months earlier.
>
> *5 4. Wake Stone Corporation does not expect the commissioners to handle their competition for them. However, we believe it only fair that all applications by industry be handled fairly and in the same manner, not in a way which can beby passed by political influence or pressure. We believe the voters, taxpayers and all citizens would expect the same manner of conduct.

*Martin Marietta*, 111 N.C.App. at 273-74, 432 S.E.2d at 430-32.

{11} After the commissioners denied Martin Marietta's application for a zoning exemption and revoked its land use

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





permit, Martin Marietta sued for libel and unfair and deceptive trade practices. *Id.* at 275, 432 S.E.2d at 432. The trial court awarded summary judgment to defendant. *Id.* The Court of Appeals, upheld the trial court as to the libel claims, holding that the document was not libel *per se.* Judge Orr, writing on behalf of the Court of Appeals panel, distinguished the statements in Wake Stone's letter from the letter in Ellis as follows:

> Unlike the language in the present case, the language in *Ellis* which the Court determined constituted libel *per se* directly charged that the plaintiff company had committed an unauthorized act, no matter how the language was interpreted, and it impeached the company in its business as a food broker by potentially affecting its business relationship with buyers. In the present case, the language in the Document does not directly charge plaintiffs with an unauthorized act, or with improper, unlawful or unethical acts or practices as plaintiffs alleged. Further, the record contains no evidence to show that the language in the Document "impeached" Martin Marietta in its business of mining.
>
> Accordingly, we find that plaintiffs' reliance on *Ellis* is unfounded and affirm the decision of the trial court granting defendants' motion for summary judgment as to plaintiffs' claim for libel.

Martin Marietta, 111 N.C.App. at 280, 432 S.E.2d at 435.

{12} In the case before this Court, plaintiffs ask the Court to find the following language contained in a letter from Nationwide to some of its customers libelous *per se:*

> Nationwide understands that you desire for Pack Brothers Paint & Body Shop to repair your vehicle. Nationwide respects the right of any customer to make an independent choice with respect to a body shop.
>
> However, recently we have refrained our employees from visiting Pack Brothers based on representations made to us by Pack Brothers. Since our employees [sic] safety and welfare is paramount to us, along with customer satisfaction, we will not be able to inspect your automobile on Pack Brothers premises. [FN1]

FN1. *per se* claims on an elusive labor rate sheet allegedly shown by Nationwide to a customer that was also a Pack Brothers customer. Without a writing, there is no libel. At the hearing, plaintiff argued that spoliation maybe an issue as to this rate sheet. The Court does not find evidence in the record that would support those charges as to the rate sheet.

{13} When determining if the statements are defamatory on their face, the Court must view the alleged statement in isolation, stripped of all explanatory circumstances, in the way "ordinary men naturally understand" the statement, ignoring the way "supersensitive persons with morbid imaginations" may view the statement. Flake v. Greensboro News Co., 212 N.C. 780, 786, 195 S.E. 55, 60 (1938). The Court finds that the language in Nationwide's letter is more like the language in *Martin Marietta* than the language in *Ellis.* The words in Nationwide's letter are subject to more than one interpretation. The language in the letter does not directly charge plaintiffs with an "unauthorized act, or with improper, unlawful or unethical acts or practices...." Martin Marietta, 111 N.C.App. at 280, 432 S.E.2d at 435. One interpretation of the safety language is that Pack Brothers had an unsafe condition on the premises that the Pack Brothers had warned Nationwide about; alternatively, Nationwide could have instituted a policy of not sending Nationwide employees onto the premises of any body shop that has a certain kind of machinery. Testimony of recipients indicates that they were "confused" by the language and "didn't understand" it. Thus, as a matter of law, the language is not defamatory on its face.

***6** {14} Furthermore, plaintiffs have brought forward no evidence that defendants impeached the business of Pack Brothers Body Shop, Inc. The letter is not "necessarily hurtful" to the business. *See* Farmer v. Lowe's Companies, Inc., 188 F.Supp.2d 612, 616 (W .D.N.C.2001) (citing Market America, Inc. v. Christman-Orth, 135 N.C.App. 143, 151, 520 S.E.2d 570, 577 (1999)). The record is devoid of evidence suggesting that recipients of the letter selected another repair shop based solely on the letter.

{15} To assert a libel *per se* claim as an individual, Ronnie Pack must also prove that the statement is "of or concerning" him; that the words must reflect on a particular individual. Chapman v. Byrd, 124 N.C.App. 13, 16, 475 S.E.2d 734, 737 (1996). The North Carolina Supreme Court defined this element by stating: "In order for defamatory words to be actionable, they must refer to some ascertained or ascertainable person and that person must be the plaintiff. If the words used contain no reflection on any particular individual, no averment can make them dafamatory [sic]." *Id.* (quoting Arnold v. Sharpe, 296 N.C. 533, 539, 251 S.E.2d 452, 456 (1979)).

{16} Ronnie Pack's name is not contained in any of the alleged defamatory statements. To support Ronnie Pack'es libel claim, plaintiffs have asked the Court to recognize a theory not yet adopted in North Carolina. Namely, that an individual has a defamation claim if their name is highly identified with the company and the individual is the company in the eyes of the public. *See, e.g., Desnick v. American Broadcasting Co.,* 1996 U.S. Dist. LEXIS 4914 (N.D.Ill.) (holding that the use of the owner's name in both

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





an eye center's name and a surgical center's name created a likelihood that the audience would believe that the eye center was involved in equipment rigging even though it was never specifically named in the broadcast). The Court does not believe North Carolina will or should adopt such a theory. The libel *per se* claims of the business have failed; the libel *per se* claims of an individual highly identified with the business cannot survive on their own.

{17} For the aforementioned reasons, the Court GRANTS defendant's summary judgment motion as it pertains to the libel *per se* claims of Pack Brothers and Ronnie Pack.

{18} ***Libel Perquod.*** Unlike libel *per se,* the two categories of libel *per quod* require reference to acts or circumstances outside of the alleged libelous statement. In the first category of libel *per quod,* the publication is not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances the publication becomes libelous, it becomes defamatory. *See* Aycock v. Padgett, 134 N.C.App. 164, 167, 516 S.E.2d 907, 910 (1999). North Carolina recognizes a second, middle tier of libel where publications are susceptible of two interpretations one of which is defamatory and the other not. *Id.* This type of libel requires a plaintiff to prove that the defendant intended a defamatory meaning and that the recipients or readers understood the statement in a defamatory way. Robinson v. Nationwide Ins. Co., 273 N.C. 391, 394, 159 S.E.2d 896, 899 (1968) (citing Wright v. Credit Co., 212 N.C. 87, 192 S.E. 844 (1937)).

***7** {19} The case of *Tyson v. L'Eggs Products, Inc.* provides further guidance on libel *perquod* allegations:

> Whenever an allegedly defamatory publication is ambiguous or capable of a meaning other than the obvious one, it is for the jury to determine how it was understood by the recipient. However, it is the province of the court to determine in the first instance whether a communication is *capable* of a defamatory meaning. Bell v. Simmons, 247 N.C. 488, 495, 101 S.E.2d 383, 388 (1958). In determining whether a published article is libelous, it must be read and considered in its setting. Yancey v. Gillespie, 242 N.C. 227, 230, 87 S.E.2d 210, 212 (1955). The circumstances of the publication are pertinent, as well as the hearers' knowledge of facts which would influence their understanding of the words used. Oates v. Wachovia Bank and Trust Co., 205 N.C. 14, 17, 169 S.E. 869, 871 (1933).

Tyson v. L'Eggs Products, Inc., 84 N.C.App. 1, 13, 351 S.E.2d 834, 841 (1987) (emphasis in original).

{20} The Court is not yet in a position to rule that, asa matter of law, the letters are not capable of defamatory meaning as to Pack Brothers. Plaintiffs have submitted sufficient evidence to survive summary judgment as to this element. However, the letters are not capable of a defamatory meaning as to Ronnie Pack individually. The Court declines to adopt plaintiffs' highly identifiable theory. Pack Brothers is run by three individuals, all of whom share the surname of Pack, yet only one is named as a plaintiff. Even if this Court thought North Carolina wished to adopt this theory, this case is not the appropriate vehicle to do so.

{21} Thus, defendants' summary judgment motion as to Ronnie Pack's libel *per quod* claim is GRANTED and the motion as to Pack Brothers is DENIED.

III. B. SLANDER

{22} Slander consists of spoken defamatory statements and there are two categories--slander *per se* and slander *per quod.* "Slander *per se* is an oral communication to a third person which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." ***Phillips v. Winston Salem/Forsyth County Board of Education,*** 117 N.C.App. 274, 277, 179 S.E.2d 319, 323 (1971) (citing Raymond U v. Duke University, 91 N.C.App. 171, 371 S.E.2d 701, ***disc. review denied,*** 323 N.C. 629, 374 S.E.2d 590 (1988); Morris v. Bruney, 78 N.C.App. 668, 338 S.E.2d 561 (1986).) Slander *per quod* involves a spoken statement of which the harmful character does not appear on its face as a matter of general acceptance, but rather becomes clear "only in consequence of extrinsic, explanatory facts showing its injurious effect...." Donovan v. Fiumara, 114 N.C.App. 524, 527, 442S.E.2d 572, 574-75 (1994) (quoting Badame v. Lampke, 242 N.C. 755, 757, 89, S.E.2d 466, 467-68 (1955)).

***8** {23} There is evidence in the record that an insurance agent with Nationwide falsely accused Ronnie Pack of brandishing a gun while a Nationwide adjuster was on Pack Brother's premises. Nationwide has brought forth evidence that may indicate the agent was an independent contractor and not an employee of Nationwide. Such evidence includes the testimony of the agent and the contract between the agent and Nationwide. The North Carolina Supreme Court has enunciated the factors that may be relevant to determining whether a particular individual is an employee or an independent contractor:

> The person employed (a) is engaged in an independent business, calling, or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price or for a lump sum

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





> or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (e) is not in the regular employ of the other contracting party; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time.... The presence of no particular one of these *indicia* is controlling. Nor is the presence of all required.They are considered along with all other circumstances to determine whether in fact there exists in the one employed that degree of independence necessary to require his classification as independent contractor rather than employee.

Hayes v. Board of Trustees, 224 N.C. 11, 16, 29 S.E.2d 137, 140 (1944) (internal citations omitted).

{24} Given the state of the record before it, the Court is not in a position to rule as a matter of law that the agent's statements can or cannot be imputed to Nationwide. Additionally, plaintiffs have presented evidence that some Nationwide employees told customers that: (1) Pack Brothers cheats people;(2) Pack Brothers is unreliable; (3) Pack Brothers overcharges; (4) Pack Brothers is unprofessional; (5) Pack Brothers does poor work; (6) Pack Brothers is slow; and (7) Pack Brothers will not stand behind their work. Plaintiffs have put forth some evidence that similar statements were made about Ronnie Pack individually. Thus, plaintiffs have presented sufficient evidence to survive a summary judgment ruling on Ronnie Pack's individual slander claims. Therefore, defendants' summary judgment motion on the slander claims of Ronnie Pack and Pack Brothers is DENIED.

III. C. PRIVILEGE

{25} Assuming, *arguendo,* this Court were to find that defendants' actions were defamatory, its analysis does not stop. Defendants may demonstrate privilege as a defense. *See* Market America, 135 N.C.App. at 150, 520 S.E.2d at 576; DiamlerChrysler Corp. v. Kirkhart, 148 N.C.App. 572, 583, 561 S .E.2d 276, 284-85 (2002). A qualified privilege exists when a communication is made:

> (1) on subject matter (a) in which the declarant has an interest, or (b) in reference to which the declarant has a right or duty, (2) to a person having a corresponding interest, right, or duty,(3) on a privileged occasion, and (4) in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest.

***9** DiamlerChrysler, 148 N.C.App. at 583, 561 S.E.2d at 285 (quoting *Phillips v. Winston-Salem/Forsyth County Bd. Of Educ.,* 117 N.C.App. 274, 278, 450 S.E.2d 753, 756 (1994)).

{26} "The essential elements for the qualified privilege to exist are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a manner and [to] the proper parties only." *Id.* (quoting *Long v. Vertical Technologies, Inc.,* 113 N.C.App. 598, 602, 439 S.E.2d 797, 800(1994)). "Whether a communication is privileged is a question of law for the court to resolve, unless a dispute concerning the circumstances of the communication exists, in which case it is a mixed question of law and fact." *Id.* (quoting *Market America,* 135 N.C.App. at 150, 520 S.E.2d at 576). Where the privilege exists, a presumption arises "that the communication was made in good faith and without malice." *Id.* (quoting *Phillips,* 117 N.C.App. 274, 278, 450 S.E.2d 753, 756 (1994)). To rebut this presumption, the plaintiff must show actual malice or excessive publication. *Id.* (quoting *Harris v. Procter Gamble,* 102 N.C.App. 329, 401 S.E.2d 849 (1991)); *Bouligny, Inc. v. Steelworkers,* 270 N.C. 160, 154 S.E.2d 344 (1967); *Raymond U,* 91 N.C.App. 171, 371 S.E.2d 701.

{27} ***Williams v. State Farm Mut. Auto. Ins.Co.*** holds that an insurance company has "a legitimate business interest in getting automobiles which it insured repaired correctly and for the lowest price." *Williams v. State Farm Mut. Auto. Ins. Co.* 67 N.C.App. 271, 277, 312 S.E.2d 905, 909 (1984). Defendants have asked this Court to adopt the holding in ***Williams*** to find that an insurance company has an absolute privilege even as it relates to defamatory conduct. This Court does not believe that our Court of Appeals intended its holding regarding interference with contract to spill into the defamation arena as an absolute privilege. The Court of Appeals found only a protectable interest. The elements necessary to finding a qualified privilege include more than a protectable interest; the elements include limiting the scope of the statement to the protectable interest, good faith, and limited publication. *See* DiamlerChrysler, 148 N.C.App. at 583, 561 S.E.2d at 285.

{28} It is not yet clear from the record that defendants had a qualified privilege. As stated in ***Williams,*** Nationwide has a protectable interest in getting automobiles it insures repaired correctly and for the best price and ensuring the safety of its employees. Whether the letters and statements at issue were limited in their scope, whether the defendants had a good faith belief that its actions were necessary to protect its interest, and whether defendants limited publication of its statements is not clear from the current record. Plaintiffs have presented some evidence that good faith was missing.

III. D. DAMAGES

{29} The two actionable classes of defamation, *per se* and *per quod,* include a requirement that the plaintiff be injured.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





In a *per se* action, "malice and damage are, as a matter of law, presumed...." Donovan v. Fiumara, 114 N.C.App. 524, 527, 442 S.E.2d 572, 574-75 (1994) (internal citations omitted). In a *per quod* action, "the injurious character of the words and some special damage must be pleaded and proved." *Id.* Special damage means pecuniary loss; emotional distress and mental suffering alone are not sufficient. *Id.* Whether plaintiffs ultimately will be able to show that Ronnie Pack suffered pecuniary damages as an individual or that Pack Brothers sustained pecuniary damages is not evident from the record before the Court. However, plaintiffs have presented some evidence of those damages and as a result, summary judgment for defendants would not be proper.

***10** {30} In summary, defendants are GRANTED summary judgment as to the libel claims of Ronnie Pack. Defendants are GRANTED summary judgment as to the libel *per se* claims of Pack Brothers. Plaintiffs have presented some evidence to support the libel *per quod* claims of Pack Brothers and the slander claims of Ronnie Pack and Pack Brothers. Thus, defendants are DENIED summary judgment as to these claims.

IV. TORTIOUS INTERFERENCE CLAIMS

{31} During the summary judgment hearing, plaintiffs stipulated that Ronnie Pack, is not making an individual claim of tortious interference. Plaintiffs also stipulated that the corporation is not submitting a separate tortious interference claim. However, plaintiffs would like to submit evidence that supports a tortious interference claim because such evidence also supports a claim of unfair and deceptive trade practices under North Carolina's UTPA. The Court will allow plaintiffs to present evidence of acts that may have supported a tortious interference claim, and provides guidance as to those claims only insofar as they may be used for an unfair and deceptive trade practices claim. Defendants may also present evidence of defenses they believe might be applicable to a claim of tortious interference.

{32} The Court has had the opportunity to review the standards applicable to tortious interference claims in *Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.;* much of the following analysis is taken directly from that case. *See* Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C., 2002 NCBC 4 (No. 00 CVC 10358, Mecklenberg County Super. Ct. July 10, 2002) (Tennille, J.).

{33} North Carolina recognizes actions for tortious interference that may take the form of "tortious interference with contract" or "prospective contract," but does not recognize claims for interference with "relations." *See id.* at para. § 46}. A careful reading of the North Carolina Supreme Court's opinion in *Owens v. Pepsi Cola Bottling Co.* helps to clarify distinctions between the claims. Owens v. Pepsi Cola Bottling Co., 330 N.C. 666, 412 S.E.2d 636 (1992). Our Supreme Court found that "the court overlooked the principle that an action for tortious interference with prospective economic advantage may be based on conduct which prevents the making of contracts." *Sunbelt,* at para. § 47} (quoting Owens, 330 N.C. at 680, 412 S.E.2d at 644). Our Supreme Court then used the broader category of "business relationships" to encompass the twin components of tortious interference: interference with contract and interference with prospective contract or prospective economic advantage. *Id.* Therefore, it is sufficient for a party to state a claim for interference with "relations" or "business relations" when referring to interference with existing contracts or the prospective likelihood of future contracts. *Id.*

{34} The North Carolina Court of Appeals has summarized the necessary elements of this action:

> ***11** An action for tortious interference with prospective economic advantage is based on conduct by the defendants which prevents the plaintiffs from entering into a contract with a third party. Owens v. Pepsi Cola Bottling Co., 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992). In Coleman v. Whisnant, 225 N.C. 494, 35 S.E.2d 647 (1945), our Supreme Court stated the following:
> We think the general rule prevails that unlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendant[s'] own rights, but with design to injure the plaintiffs, or gaining some advantage at [their] expense.... In Kamm v. Flink, 113 N.J.L. 582, 99 A.L.R., 1, 175 A. 62, it was said: "Maliciously inducing a person not to enter into a contract with another, which he would otherwise have entered into, is actionable if damage results." The word "malicious" used in referring to malicious interference with formation of a contract does not import ill will, but refers to an interference with design of injury to plaintiffs or gaining some advantage at [their] expense.
> 225 N.C. at 506, 35 S.E.2d at 656. Thus, to state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in "inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." Cameron v. New Hanover Memorial Hospital, 58





N.C.App. 414, 440, 293 S.E.2d 901, 917, *disc. review denied and appeal dismissed,* 307 N.C. 127, 297 S.E.2d 399 (1982).
*Walker v. Sloan,* 137 N.C.App. 387, 392-93, 529 S.E.2d 236, 241-42 (2000).

{35} Plaintiffs have conceded that they are not presenting a tortious interference claim; thus, the Court considers defendants' summary judgment as to this claim MOOT.

V. FRAUD CLAIMS

{36} During oral argument, plaintiffs conceded that the "behaviors we say constitute fraud are assumed under unfair trade practices." Thus, plaintiffs are not presenting a separate cause of action for fraud or constructive fraud and defendants' summary judgment motion is MOOT.

VI. COMMERCIAL DISPARAGEMENT

{37} During oral argument, plaintiffs stated that it was not "necessary to have a separate cause of action for the commercial disparagement" as long as the same conduct can be argued under the UTPA. Thus, plaintiffs are not presenting a separate cause of action for commercial disparagement and defendants' summary judgment motion is MOOT.

VII. UNLAWFUL STEERING CLAIMS

{38} Plaintiffs have stated that they do not intend to pursue a claim under North Carolina General Statute section 58-3-180 (2001) ("Anti Steering Statute"), thus defendants' summary judgment motion is MOOT. However, plaintiffs intend to present evidence of actions by Nationwide directed toward Pack Brothers which they claim constitute unfair practices because they violate the public policy reflected in the Anti-Steering Statute. The relevant portions of North Carolina's Anti Steering Statute were not enacted until April 1, 2002, which is after the events giving rise to this claim. Plaintiffs further allege that Nationwide has committed acts that violate this statute after April 1, 2002. The Court has agreed to provide some guidance regarding this issue.

***12** {39} The North Carolina "anti-steering statute" is designed to protect consumers from activities of an insurance company that could prevent the consumer from freely choosing a repair shop. *See* N.C. Gen.Stat. § 58-3-180. The statute states:

(b1) No insurer or insurer representative shall recommend the use of a particular motor vehicle repair service without clearly informing the claimant that (i) the claimant is under no obligation to use the recommended repair service, (ii) the claimant may use the repair service of the claimant's choice, and (iii) the amount determined by the insurer to be payable under the policy will be paid regardless of whether or not the claimant uses there commended repair service.
(b2) The provisions of subsection (b1) of this section shall be included in non fleet private passenger motor vehicle insurance policy forms promulgated by the Bureau and approved by the Commissioner.
(c) *(Effective until July 1, 2002)* Any person who violates this section is subject to the applicable provisions of G.S. 58-2-70 and G.S. 58-33-45, provided that the maximum civil penalty that can be assessed under G.S. 58- 2-70(d) for a violation of this section is two thousand dollars ($ 2,000).

N.C. Gen.Stat. § 58-3-180.

{40} The Court believes the analysis regarding North Carolina General Statute section 58-63-15(11) contained in its October 31, 2002 Order Granting Leave to Modify Complaint as to Some Claims ("October 31, 2002 Order") is relevant to interpreting plaintiffs rights under the anti-steering statute. That language is quoted below:

The North Carolina Supreme Court has held that violations of North Carolina General Statute section 58-63-15(11) can support a finding of unfair or deceptive acts or practices under North Carolina General Statute section 75-1.1. *Gray v. N.C. Ins. Underwriting Assoc.,* 352 N.C. 61, 69-71, 529 S.E.2d 676, 682-83 (2000); *see also Murray v. Nationwide Mutual Ins. Co.,* 123 N.C.App. 1, 472 S.E.2d 358 (1996) (finding Nationwide's violation of § 58-63-15(11) was an unfair act). However, the Unfair Claims Practices which are setforth in N.C.G.S. § 58-63-15(11) are designed to protect consumers or owners of insurance policies. *Gray,* 352 N.C. at 70-71, 529 S.E.2d at 682 ("the acts proscribed in N.C.G.S. § 58-63-15(11) were designed to protect the consuming public.") (citing *Stanley v. Moore,* 339 N.C.717, 723, 454 S.E.2d 225, 228 (1995)). Thus, there is no cause of action under Chapter 75 for third parties arising out of a violation of consumer policyholder's rights under section 58-63-15(11). *See Lee v. Mutual Cmty. Sav. Bank,* SSB, 136 N.C.App. 808, 525 S.E.2d 854(2000). To the extent an auto repair shop such as Pack Brothers seeks to recover under Chapter 75-1.1, its claim must be based upon unfair or deceptive practices committed in connection with the insurance company's relationship with the repair shop, not the insurance company's relationship with its insureds. Our appellate courts have made it clear that damages under Chapter 75-1.1 must result from unfair practices that directly injure the party seeking damages. *See Pleasant Valley Promenade,* 120 N.C.App. 650, 464 S.E.2d 47; *Furr v.*





Fonville Morisey Realty, Inc., 130 N.C.App. 541, 503 S.E.2d 401 (1998), *cert. dismissed,* 351 N.C. 41, 519 S.E.2d 314 (1999); *First Atl. Mgt. Corp. v. Dunlea Realty Co.,* 131 N.C.App. 242, 507 S.E.2d 56 (1998)

***13** {41} Plaintiffs indicated at oral argument that they do not "intend to have someone come up to the witness stand and say Nationwide violated the anti- steering statute that was put into effect in North Carolina." However, the Court has denied defendants' motion in limine to exclude evidence relating to Nationwide's relationship with its policyholders with the proviso that they are free to renew it when specific evidence is offered. To the extent an auto repair shop such as Pack Brothers seeks to recover under Chapter 75-1.1, its claim must be based upon unfair or deceptive practices committed in connection with the insurance company's relationship with the repair shop, not the insurance company's relationship with its insureds.

{42} A possible interrogatory for the jury relating to the unfair trade practice claim might look something like the following:

> Did Nationwide recommend to customers of Pack Brothers to use a different repair service without clearly informing the customer that (i) the customer was under no obligation to use the recommended repair service; (ii) the customer could use Pack Brothers if they chose to do so; and (iii) the amount determined by Nationwide to be payable under the policy would be paid whether or not the customer used Pack Brothers or the recommended repair service.
>
> If so, was such action taken with the intent to injure the business of Pack Brothers?

VIII. CLAIMS UNDER THE UNFAIR OR DECEPTIVE TRADE PRACTICES ACT

{43} The Court next reviews plaintiffs' claim that defendants violated North Carolina's Unfair Trade Practices Act, North Carolina General Statute sections 75-1.1 through 89. The Act declares unlawful all "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce...." N.C. Gen.Stat. § 75-1.1. In order to establish a violation of this section, plaintiff must meet a three-pronged test: (1) there must be a showing of an unfair or deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce;(3) which proximately caused actual injury to the plaintiff. *First Atl. Mgmt. Corp. v. Dunlea Realty Co.,* 131 N.C.App. 242, 507 S.E.2d 56 (1998); *Furr v. Fonville Morisey Realty, Inc.,* 130 N.C.App. 541, 503 S.E.2d 401 (1998), *cert. denied,* 351 N.C. 41, 519 S.E.2d 314 (1999).

{44} The statute was created to provide an additional remedy apart from those less adequate remedies afforded under common law and statutory causes of action. *See Bernard v. Central Carolina Truck Sales,* 68 N.C.App. 228, 314 S.E.2d 582, *cert. denied,* 311 N.C. 751, 321 S.E.2d 126 (1984). As a result, our courts have had the opportunity to find that if a party is able to maintain a claim for certain causes of action, a claim may also be had under Section 75-1.1. Plaintiffs' surviving defamation claims may fall within this category. *See Market Am., Inc.,* 135 N.C.App. at 156-57, 520 S.E.2d at 579-80 (1999).

***14** {45} As explained in preceding sections of this opinion, this court has found that plaintiff has forecast sufficient evidence to warrant those issues proceeding to trial. Therefore, in light of our appellate courts' rulings that these causes of action may also implicate violations of the UTPA, this court is not in a position to undertake the factual inquiry necessary to resolve plaintiff's Section 75-1.1 claim on this summary judgment motion.

IX. PUNITIVE DAMAGES

{46} "Pursuant to our statutes, punitive damages may be awarded only if a claimant proves that the defendant is liable for compensatory damages and that the defendant is guilty of fraud, malice, or willful or wonton conduct. *Combs & Associates, Inc. v. Kennedy,* 147 N.C.App. 362, 374, 555 S.E.2d 634, 642 (2001) (citing N.C. Gen.Stat. § 1D-15(a)(1999)). As discussed above, plaintiffs have presented some evidence that they have suffered some pecuniary damage.

{47} "Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, and managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." *Phillips v. Restaurant Management of Carolina, L.P.,* 146 N.C.App. 203, 215- 16, 552 S.E.2d 686, 694 (2001) (citing N.C. Gen.Stat. § 1D-15(c) (1999)). The aggravating factors are: "(1) fraud, (2) malice, or (3) willful or wonton conduct." N.C. Gen.Stat. § 1D-15(a). Plaintiffs have presented some evidence that Nationwide managers participated in and condoned the allegedly defamatory conduct.

{48} Defendants' motion for summary judgment regarding punitive damages is DENIED.

**X. PACK BROTHERS PAINT AND BODY SHOP, INC.**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





{49} On August 14, 2002, plaintiffs filed a motion for leave to file an amended complaint pursuant to Rule 15(a) of the North Carolina Rules of Civil Procedure. N.C. R. Civ. P. 15(a) (2001). In that motion, plaintiffs sought to correct a misnomer in the caption of the original Complaint to conform the name of the corporate plaintiff to the corporation's articles of incorporation(from "Pack Brothers Paint & Body Shop, Inc., a corporation" to "Pack Brothers Body Shop, Inc., a corporation"). Defendants contended that these were separate and distinct entities and the modification substituted a new plaintiff after the close of discovery. Defendants further argued that even if the Court allowed the amendment, it should do so without the right to relate back any claims set forth in the original Complaint. Both sides thoroughly briefed the issues for the Court. Ultimately, plaintiffs were permitted to amend the complaint to read "Pack Brothers Body Shop, Inc., a corporation."

{50} Plaintiff's business operated as "Pack Brothers Paint and Body Shop" for twenty years. In 1991, under advice from their accountant, "Pack Brothers Paint and Body Shop" incorporated as "Pack Brothers Body Shop, Inc." but continued to operate under the name of "Pack Brothers Paint and Body Shop." "Pack Brothers Paint and Body Shop" is the partnership that owns the land upon which "Pack Brothers Body Shop, Inc." does business. A search of the North Carolina Secretary of State's web site reveals that there is no corporation named "Pack Brothers Paint and Body Shop, Inc.," nor does it list "Pack Brothers Paint and Body Shop" as a registered trade name. The Secretary of State shows "Pack Brothers Body Shop, Inc." as a valid corporation.

***15** {51} The original complaint listed "Pack Brothers Paint and Body Shop, Inc., a corporation" as a party. It is clear to the Court that all parties thought they were dealing with a corporation and not a partnership. Throughout the litigation, the parties have referred to "the plaintiff corporation." Defendants have conducted 30(b)(6) depositions of "Pack Brothers Paint and Body Shop," specifically referring to "a duly designated corporate representative of Pack Brothers Paint & Body Shop, Inc." Defendants have deposed nearly every employee and corporate officer of the partnership and the correct corporation. They have deposed the correct corporation's accountant. In every instance, plaintiffs and defendants may have been confused as to the correct name of the corporation; they were not, however, confused as to the identity of the plaintiff corporation. The correct identity of the corporation in question was part of matters that had appeared before in pleadings, a prior amendment, depositions, and in correspondence between the parties.

{52} The Court reminds defendants that the partnership Pack Brothers Paint and Body Shop, Inc. is not now a party to the lawsuit. At all times, all parties understood that the corporation, Pack Brothers Body Shop, Inc., was the actual plaintiff in spite of the misnomer. Thus, there is no summary judgment to be had as to the partnership.

XI. PLAINTIFFS' OBJECTION TO SUMMARY JUDGMENT MOTION FILED BY DEFENDANT BENKENDORF

{53} In its discretion, the Court will regard the summary judgment motion filed by Mr. Benkendorf as timely.

XII. CONCLUSION

{54} The court has not made any finding of fact in ruling on this motion. It has only determined that genuine issues of material fact exist which are more appropriately determined at trial. Nor has the court concluded that there is any liability arising from defendants' actions. It has only determined that such determinations are best made at trial than at summary judgment.

For the reasons set forth above, it is hereby ORDERED, ADJUDGED, and DECREED that:

1. Defendants' summary judgment motion regarding tortious interference, unlawful steering, fraud, or commercial disparagement claims are MOOT.

2. Defendants' motion for summary judgment as to the libel *per se* claims of Pack Brothers Body Shop, Inc. and Ronnie Pack is GRANTED.

3. Defendants' motion for summary judgment as to the libel *per quod* claims of Ronnie Pack is GRANTED.

4. Defendants' motion for summary judgment as to the libel *per quod* claims of Pack Brothers Body Shop, Inc. is DENIED.

5. Defendants' motion for summary judgment as to slander *per se* and *per quod* claims of Ronnie Pack and Pack Brothers Body Shop, Inc. is DENIED.

6. Defendants' motion for summary judgment as to the UTPA claims is DENIED.

7. Defendants' motion for summary judgment as to plaintiffs' demand for punitive damages is DENIED.

8. Defendants' motion for summary judgment as to the claims of the partnership, Pack Brothers Paint and Body

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





Shop, Inc. is MOOT.

2003 WL 21017395 (N.C.Super.), 2003 NCBC 1

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





C
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

James C. PERTZ, Plaintiff-Appellant,
v.
THE EDWARD J. DeBARTOLO CORPORATION, Defendant-Appellee,
Thistledown Race TRACK, Defendant.

**No. 98-3895.**

Aug. 18, 1999.

On Appeal from the United States District Court for the Northern District of Ohio.

Before GUY, COLE, and CLAY, Circuit Judges.

OPINION

R. GUY COLE, JR., Circuit Judge.

****1** James C. Pertz appeals the district court's grant of summary judgment in favor of The Edward J. DeBartolo Corporation ("the corporation") on Pertz's claims of age discrimination, breach of contract, and promissory estoppel. For the following reasons, we AFFIRM in part and REVERSE in part.

I.

Because this is an appeal from a grant of summary judgment, the facts are presented in the light most favorable to Pertz, the appellant. From 1992 to 1994, Pertz, who was born in 1936, worked for the corporation at Thistledown Race Track, a horse racing venue in Cleveland, as a track steward and a placing judge. Specifically, Pertz worked as an "association steward" [FN1] during the first and last Thistledown racing meets, and as a placing judge during the middle two meets. [FN2]

FN1. Track stewards adjudicate races and have the power to fine and suspend jockeys, trainers, and other workers licensed by the Ohio State Racing Commission. Three stewards work at Thistledown at any given time. Two of these are "association stewards," employed by the corporation, and the third is appointed by the State of Ohio.

FN2. The meets run March to May; May to July; July to September; and September to December.

From the 1960's until 1993, Pertz's wife worked as assistant medical records director at Brentwood Hospital in Warrensville Heights, Ohio. In April of 1993, she was contacted by a recruiter about a job in Florida at Fawcett Memorial Hospital. At about this time, she was conducting a job search of her own because Brentwood Hospital was merging with another hospital and she was concerned about getting "downsized." She received an offer from University Hospital in Cleveland, but decided to accept the Fawcett offer because, in her opinion, Fawcett was a more prestigious hospital, the position paid more money, there was less responsibility involved in the position, and she and her husband had always thought that it would be "nice to live [in Florida] someday."

Before she accepted the position, however, James Pertz contacted Eddie DeBartolo, Sr., president of the corporation. Pertz explained his situation to DeBartolo, noting that his wife would not accept the position unless Pertz was promised continued employment at Thistledown. Pertz sought assurance that he could work, as a steward, only during the first and the last of Thisteldown's four meets. Pertz then would spend most of his time in Florida, returning to Cleveland only for the two meets he would work. Pertz stated that he wanted to work at Thistledown until "retirement age." DeBartolo responded that "as long as the DeBartolo Corporation owns Thistledown, you have a job there." Pertz later discussed the situation with his supervisors, Mel Chadwell and Mike Mackey. Chadwell commented, "You've got it made, I envy you, you have the best of both worlds." He also noted that if things in Florida did not work out, "[n]o problem, your job is always open here, you can come back and I can schedule you if Ron doesn't work out."

Pertz then wrote a letter to DeBartolo, which detailed "our plan ." It indicated that his wife had accepted the offer in Florida, that the couple was about to sell their house, that Pertz intended to work only the spring and fall meets, and that Pertz had presented the plan to Mackey and Chadwell, who stated that it was "no problem" and that "if things did not work out in Florida [he] could always come back and work [his] original schedule." DeBartolo responded with "a short note to thank you for your letter of November 10, 1993, and the update as to your family. I hope all goes well with you and wish you the best in finding a home in Florida in the future."

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





****2** Pertz worked the first and the last meets in 1994, and the first meet in 1995. In August 1995, however, after DeBartolo's death, Pertz received a termination letter from the corporation. It informed him that the corporation had decided to terminate "the part-time steward's job that [Pertz] had been doing." The corporation hired Bill Monteleone "in a full time position as both a steward and backup announcer."

On August 27, 1995, Pertz sent a letter to the corporation, addressed to "John and/or Denise York," DeBartolo's son-in-law and daughter. It explained that DeBartolo had "assured [him] that [his] position was secure with the DeBartolo Corporation" and that he was willing to work all four meets. When this attempt at resolving the matter failed, Pertz filed charges with the Equal Employment Opportunity Commission alleging age discrimination.

Pertz filed a complaint in Cuyahoga Common Pleas Court in late August 1996. The complaint alleged that the corporation's actions violated the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), and several Ohio age discrimination statutes. *See* Ohio Rev.Code § 4101.17, § 4112.02, § 4112.99. Additionally the complaint alleged liability based upon breach of contract and promissory estoppel. Citing federal question jurisdiction, the corporation removed the action to the United States District Court for the Northern District of Ohio. Defendants moved for summary judgment on August 22, 1997. The district court granted the corporation's motion, and this timely appeal followed.

II.

This court reviews de novo a grant of summary judgment. *See J.Z .G. Resources, Inc., v. Shelby Ins. Co.,* 84 F.3d 211, 213 (6th Cir.1996). Summary judgment is proper only when the moving party demonstrates that there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). We construe the facts in the light most favorable to the non- moving party. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Our role is not to determine the truth of the matters asserted or to weigh the evidence, "but to determine whether there is a genuine issue for trial." *Id.* at 249.

II.A Age Discrimination

Because "[a]nalysis of a discrimination claim is similar under Ohio and federal law," *Mack v. B.F. Goodrich Co.,* 699 N.E.2d 97, 98 (Ohio App.1997), we treat Pertz's federal and state age discrimination claims together. [FN3] A plaintiff's age discrimination claim is submissible to the jury if he or she presents either sufficient direct evidence of discrimination or, following the familiar *McDonnell Douglas* formulation, sufficient circumstantial evidence of age discrimination. *See Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1081-82 (6th Cir.1994). Pertz's direct "evidence" simply does not make the grade. There is evidence in the record that Chadwell, Pertz's supervisor, made a comment "about younger blood" at some point between 1992 and 1996. The record also indicates that Chadwell questioned several of Pertz's decisions as a placing judge and told him he needed to get his eyes checked. These "[i]solated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 357 (6th Cir.1998) (internal quotations omitted).

FN3. The corporation raises several procedural arguments regarding Pertz's state law age discrimination claims. In light of our disposition, it is unnecessary for us to reach these arguments, and we decline to do so. *See Andrews v. State of Ohio,* 104 F.3d 803, 808 (6th Cir.1997) (finding that on de novo review, an appellate court may affirm on any grounds supported by the record).

****3** Pertz fares no better under the *McDonnell Douglas* analysis. Assuming, for the sake of argument, that Pertz can make out a prima facie case of age discrimination, the burden shifts to the corporation to articulate a legitimate, nondiscriminatory reason for its actions. *See Manzer,* 29 F.3d at 1082. Plaintiff then must demonstrate, by a preponderance of the evidence, that this asserted justification is pretextual--i.e., "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Id.* at 1084 (internal quotations omitted). The corporation asserts that "Plaintiff's part-time steward position was eliminated and [the corporation] created a full-time position satisfying Thistledown Race Track's need for both a full-time steward and a backup announcer." The evidence in the record indicates that the corporation replaced Pertz with Monteleone, who worked full time as claimed by defendant. Pertz has not demonstrated that the corporation's explanation for its actions is pretextual. Therefore, we affirm the judgment of the district court on Pertz's age discrimination claims.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





II.B. Promissory Estoppel/Breach of Contract

Ohio law presumes that employment contracts are terminable at will "unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 153 n.1 (Ohio 1985). However, Ohio courts recognize at least two exceptions to the employment-at-will doctrine: "(1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee." *Wright v. Honda of Am. Mfg., Inc.*, 653 N.E.2d 381, 384 (Ohio 1995). Pertz claims that both apply in this case.

II.B.1 Promissory Estoppel

"The elements of promissory estoppel are (1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise." *Weiper v. W.A. Hill & Assocs.*, 661 N.E.2d 796, 803 (Ohio App.1995) (citing Restatement (Second) of Contracts § 90 (1973)). The test is "whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forebearace actually resulted and was detrimental to the employee ." *Mers*, 483 N.E.2d at 151 (syllabus ¶ 3).

Taking the facts in the light most favorable to Pertz, as we must at this stage in the litigation, we find that there is a question of fact as to whether a jury could render a verdict in favor of plaintiff on his promissory estoppel claims. As an initial matter, we conclude that there is evidence in the record that DeBartolo made a clear and unambiguous promise to Pertz in a context in which Pertz's reliance was reasonable. Specifically, there is evidence that during a discussion regarding whether Pertz's wife should take a job in Florida, DeBartolo promised Pertz that "as long as the DeBartolo Corporation owns Thistledown, [he would] have a job there." Ohio courts routinely find employer promises of continued secure employment, designed to dissuade an employee from seeking or accepting a position with a different company, both definite and worthy of reasonable reliance. *See, e.g.*, *Hemlick v. Cincinnati Word Processing, Inc.*, 543 N.E.2d 1212, 1217 (Ohio 1989) (summary judgment inappropriate where, to dissuade plaintiff from seeking new employment, employer told her that "a career with the company was in order as long as her job performance was good"); *Patrick v. Painesville Commercial Properties*, 704 N.E.2d 1249, 1255 (Ohio App.1997) (affirming jury verdict for plaintiff where, to dissuade plaintiff from rejecting job offer, defendant "expressly avow[s]" that he could work until he was seventy-two); *Stull v. Combustion Eng'g, Inc.*, 595 N.E.2d 504, 557-58 (Ohio App.1991) (summary judgment inappropriate when, "in the context of discussing Stull's future with the company in the event of a reduction in force," plaintiff was told that he would be with the company until the plant closed); *Uebelacker v. Cincom Sys., Inc.*, 549 N.E.2d 1210, 1217 (Ohio App.1989) (summary judgment inappropriate where, to dissuade plaintiff from transferring, defendant told plaintiff his job was secure); *cf.* *Robeson v. Midwest Ford, Inc.*, No. 94-3405, 1995 WL 496672, at *1-2 (6th Cir. Aug. 17, 1995) (affirming jury verdict for plaintiff where officers told plaintiff his job was secure "as long as they were there" to dissuade him from accepting a higher paying job offer); *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1041 (6th Cir.1992) (noting that reliance on a promise of lifetime employment could be reasonable, but affirming summary judgment in favor of defendant because no showing of reliance on such a promise).

****4** Here, there is no allegation that Pertz ever had or sought another job. Pertz presents an analogous case, however. There is evidence in the record that in 1993, when Pertz was still working full time at Thistledown, his wife obtained job offers in both Cleveland and Florida. If she accepted the Florida position, Pertz would be required to adopt a part-time work schedule that he believed could, and ultimately did, endanger his position with the corporation. Pertz testified at his deposition that when he appraised DeBartolo of this situation, DeBartolo informed him that his job at Thistledown was secure. Thus, there is evidence that Pertz placed his job in what turned out to be a compromised position based on the assurances of DeBartolo. While a jury may, of course, find this evidence unpersuasive, we cannot conclude, at this stage of the litigation, that the promise made by DeBartolo was unclear, indefinite, or ambiguous, or that reliance upon it would have been unreasonable. [FN4]

FN4. We emphasize that we find this case to be unique. Promissory estoppel claims fail where the statements in question were made in contexts where reliance is unreasonable. Routine congratulatory or vague employer statements and actions do not give rise to a claim. *See, e.g.*, *Condon v. Body, Vickers & Daniels*, 649 N.E.2d 1259, 1263 (Ohio App.1994) (hiring into five-year training program is not guarantee of five years of employment); *Penwell v. Amherst Hosp.*, 616 N.E.2d 254, 257 (Ohio App.1992) (in job interview "explaining those infractions ... which lead to automatic termination... does not implicitly limit

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





[an employer's] ability to terminate an employee at will"); Boggs v. Avon Products, Inc., 564 N.E.2d 1128, 1133 (Ohio App.1990) (in context of reprimand for excessive absenteeism, assurances that job would be secure if attendance improved did not alter at-will status). In particular, mere praise for job performance and general discussions of future career development are insufficient. *See Hemlick,* 543N .E.2d at 1216; *see also* Snyder v. A.G. Trucking, Inc., 57 F.3d 484, 489 (6th Cir.1995) (plaintiff told "there would be a place there [for him]. That [he] would be given every opportunity to ... grow with the company. [He] was told about the retirement plan and could expect to be there until retirement."); *Srail v. RJF Int'l Corp.,*--N.E.2d--, 1998 WL 102496, at *13 (Ohio App.1998) (employees told in open letter by company purchaser that if they worked hard they would be presented with opportunity and security); *Clipson v. Schlessman,* 624 N.E.2d 220, 222- 23 (Ohio App.1993) ("at best, praise of [his] job performance and discussions of his future"); *Healey v. Republic Powdered Metals, Inc.,* 619 N.E.2d 1035, 1037 (Ohio App.1992) (praise for past performance and speculation about the future). Such cases are distinguishable from the case at hand, however. Again, there is evidence in this record that, in the context of a discussion about whether his wife should accept a job in Florida that would require plaintiff to accept a job-endangering part-time position at Thistledown, Pertz was told that his employment was secure as long as the corporation owned the track. In this rather narrow context, such a statement is definite enough to reasonably induce reliance under Ohio law.

We also conclude that there is a question of fact regarding Pertz's detrimental reliance. The corporation contends that Pertz would have moved to Florida with or without DeBartolo's alleged promise. Pertz contends, however, that reliance on DeBartolo's statement is what led him to relocate and cease working the middle two meets. Again, this part-time status is what, in the end, placed his job in danger. Furthermore, Pertz claims that he incurred a long-term mortgage in Florida that was double his Ohio mortgage payment, which he would not have done without DeBartolo's promise. We therefore conclude that there is a question of fact as to each of the elements of a promissory estoppel claim under Ohio law and that the district court erred by dismissing Pertz's promissory estoppel claim.

II.B.2 Implied Contract

The second exception to at-will employment in Ohio is "implied ... contractual provisions that alter the terms of discharge." *Wright,* 653 N.E.2d at 384. The question here is whether the parties intended to enter into an employment agreement altering Pertz's at-will status with the corporation. *See Patrick,* 650 N.E.2d at 930. To prevail, Pertz must demonstrate a "meeting of the minds" regarding the terms of discharge, *Bartlett v. Daniel Drake Memorial Hosp.,* 599 N.E.2d 403, 406 (Ohio App.1991), and prove that there was an offer, acceptance, and consideration, *see Tersigni v. General Tire, Inc.,* 633 N.E.2d 1140, 1142 (Ohio App.1993).

> [T]he facts and circumstances surrounding an oral employment-atwill agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge.

Mers, 483 N.E.2d at 154; *see also* Wright, 653 N.E.2d at 384.

We find, for essentially the same reasons set forth above in our discussion of Pertz's promissory estoppel claim, that there is a genuine issue of material fact in this case as to whether DeBartolo's promise to Pertz was sufficient to create an implied contract. *See Mers,* 653 N.E.2d at 155. Again, there is evidence in the record that DeBartolo promised Pertz, in a discussion about whether his wife should take a job in Florida, that his job at Thistledown was secure as long as the corporation owned the track. A rational jury could conclude that this statement was an offer for an implied contract and that Pertz's continued employment constituted acceptance. *See* Tersigni, 633 N.E.2d at 1142-43.

****5** The corporation's contention that Pertz's implied contract claim must fail for lack of consideration is without merit. Although we are not aware of an Ohio Supreme Court case deciding this issue, the clear trend in Ohio is that an employee's continued service and loyalty following an employer's promise provides sufficient consideration for an implied employment contract, when the promisee had been an at-will employee. *See* id. at 1143 (holding that "continued service and loyalty is... evidence of consideration supporting the employment contract"); *Nichols v. Waterfield Fin. Corp.,* 577 N.E.2d 422, 423 (Ohio App.1989) ("[W]e find that even if consideration were required to modify the at-will employment contract, that Nichols' continued employment was sufficient consideration to modify the contract."). This theory appears grounded in two principles: 1) " '[a]s a practical matter, every day is a new day for both employer and employee in





an at-will relationship," ' *Canter v. Tucker*, 674 N.E.2d 727, 730 (Ohio App.1996) (citing *Copeco, Inc. v. Caley*, 632 N.E.2d 1299, 1301 (Ohio App.1992)); and 2) "the at-will employee could have, but did not, quit after learning of the employer's promises," *see Stites v. Napoleon Spring Works, Inc.*, No. F-96-002, 1996 WL 660655, at *4 (Ohio App. Nov. 15, 1996). Considering the evidence in the light most favorable to Pertz, he was presented with a promise of secure employment. At this point, he could have chosen to withhold his services, but he did not. Unquestionably, if this exchange had occurred on the day he was hired, there would be no problem finding that Pertz provided consideration. In light of the fact that he could have left Thistledown at any point, "we see no substantive difference between the promise of [service and loyalty] upon initial hire and the promise of continued [loyalty and service] subsequent to 'day one." ' *Copeco*, 632 N.E.2d at 1301. We believe that if the Ohio Supreme Court were confronted with this matter, it would conclude that Pertz provided sufficient consideration in this case. [FN5]

FN5. While we thus remand Pertz's breach of contract and promissory estoppel claims, we note that these claims were before the court pendant to Pertz's ADEA claim. The supplemental jurisdiction statute provides that a "district court[ ] may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[T]here is no mandatory rule" stating that a district court must dismiss a pendent state law claim if it dismisses all the federal claims in a case. *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992); *see also Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir.1996). Instead, the court must balance the interests of fairness to the parties, judicial economy, avoidance of multiple litigation, and the interest of preventing federal courts from needlessly deciding state law issues. *See Musson*, 89 F.3d at 1254; *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802-03 (6th Cir.1996); *Taylor*, 973 F.2d at 1287; *see generally*, Charles Alan Wright, et. al, *Federal Practice & Procedure*, § 3532.1 at supp. 114-15 (1999). "When all federal claim are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson*, 89 F.3d at 1254-1255.

III.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and REVERSED in part. Specifically, we affirm the court's grant of summary judgment in favor of the corporation on Pertz's age discrimination claim, but remand Pertz's promissory estoppel claim and his breach of contract claim for further proceedings consistent with this opinion.

188 F.3d 508 (Table), 1999 WL 644339 (6th Cir.(Ohio)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works