# EXHIBIT B:

## WILLIAM MICHAEL MEBANE'S DEPOSITION EXCERPTS 02/24/04

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CASE NO. C-1-01-641

Q & R ASSOCIATES, INC.,

        Plaintiff,                   **DEPOSITION**

vs.

UNIFI, INC., et al,

        Defendant.   

## WITNESS: WILLIAM MICHAEL MEBANE

TAKEN AT THE LAW OFFICES OF:
CARRUTHERS & ROTH, P.A.
235 North Edgeworth Street
Greensboro, NC 27401

DATE: 02-24-04
TIME: 08:57 A.M.

**REPORTER: DALE L. RING**
**CHAPLIN & ASSOCIATES, INC.**

CHARLOTTE (704) 335-1954   TRIAD (336) 992-1954   RALEIGH (919) 807-1954

William Michael Mebane                                              Page 108

1       A.   And at this point of our discussions, we
2   had already defined the -- the primary terms under
3   which they would represent Unifi.
4       Q.   Uh-huh (yes).
5       A.   We had included in those terms an
6   understanding that either side could withdraw from
7   this representation with a certain number of days
8   of commissions paid. Originally, they had asked
9   for six months's worth of commissions, or 180
10  days.  I had originally offered 90 days of
11  commissions to be paid for them.
12           And we had come to the understanding
13  that 120 days would be what we put into our
14  agreement.  And any reference to a change of
15  control for Unifi would be covered under the 120-
16  day termination understanding.
17      Q.   Is that how you responded when they
18  raised the issue?
19      A.   As ---
20      Q.   We'll exercise our right to terminate?
21      A.   Yeah, said the protection that you have
22  is covered under the termination clause, whether
23  it's for purposes of change of control of the
24  plant, or unable to fulfill it for any reasons.
25      Q.   Did they respond to you in any way after

02-24-04           Q&R vs. UNIFI\C101641                        COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                              Page 109

1   you said that?
2         A.   Mr. Quinn had indicated that he
3   preferred to have a more definitive, separate
4   agreement for change of control.  And I had
5   indicated to him that I was not authorized to --
6   to do that.
7         Q.   Okay.
8         A.   The constraints I had were regarding a
9   commercial relationship, and I could not agree --
10  I could not -- I was not authorized to do anything
11  beyond that.
12        Q.   Did you believe you had reached an
13  agreement with Q & R at this meeting -- in this
14  suite?
15        A.   Yeah, I believe that we had come to an
16  agreement on the terms and conditions under which
17  they would represent us.  Yes, I did.
18        Q.   Now, you said you met with them two
19  other times in Miami.  When was the next meeting?
20        A.   I had lunch, and I believe it was with
21  Mr. Ranz, and one other of my staff members, and
22  I'm sorry, I don't recall exactly who it would
23  have been.  And then we had a -- a meeting with
24  one of the potential customers of ourselves, and
25  Mr. Ranz asked to be included in that meeting, and

02-24-04            Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1      A.    I remember telling Mr. Quinn that if
2  there was, you know, any circumstance around a
3  change of control, that just as I had done for our
4  employee, Gene Kelly, I would also do for them.
5            And so I -- I do not recall,
6  specifically, making that request to Delaney or
7  Smith.
8      Q.    Okay.  When did you tell Mr. Quinn that?
9      A.    It would have been either during or
10 right after our conversations in Miami.
11     Q.    The agreement that you had reached in
12 Miami, did you ever refer to that as a North
13 Carolina agreement?
14     A.    Very possibly, I could have.  I do
15 not -- maybe, I -- I think I put that into my --
16 my previous statements, and that would be
17 something that I would -- would have said, so
18 yeah, I probably did say that.
19     Q.    Is that a phrase you use, a North
20 Carolina agreement?
21     A.    I mean, no often, but it -- it would not
22 be out of character.
23     Q.    But what did it mean to you when you
24 said it?
25     A.    That we had agreed upon all of the

02-24-04            Q&R vs. UNIFI\C101641                     COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                    Page 146

1   significant terms and conditions of Q & R
2   representing Unifi.  And that we stood up, left
3   that meeting shaking hands, and so I was agreeing
4   to do what I said I would do.  And I was expecting
5   them to do what they said they would do.
6           And at that time, I thought we had an
7   agreement.
8       Q.  As you sit here, today, do you think
9   that you had an agreement then?
10      A.  At that time, I did.  It was not until
11  later, when I received a message back from
12  Mr. Quinn on two pretty substantive points that
13  indicated to me that he didn't feel like we had an
14  agreement, even though we had agreed upon those
15  same points together, in person.
16      Q.  Do you recall signing an affidavit in
17  this case?
18      A.  I do.
19              (PLAINTIFF'S EXHIBIT
20              NUMBER 25 WAS MARKED
21              FOR IDENTIFICATION)
22      Q.  I hand you Exhibit 25.  I'll just ask
23  you if this is that affidavit that you signed?
24  (Witness examined document)
25      A.  Yes, it appears to be.

02-24-04              Q&R vs. UNIFI\C101641              COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                            Page 151

```
 1        Q.   And it's got the date there of
 2   March 27th.  Is that the date of the meeting in
 3   Miami that we were talking about this morning?
 4        A.   I believe it was.
 5        Q.   Paragraph 14 talks about the North
 6   Carolina agreement.
 7        A.   Okay.
 8        Q.   It says there that, "After I thought we
 9   had reached an agreement, I stated that UTF and
10   Q & R had reached a 'North Carolina agreement' on
11   the terms, as I had stated them, and shook hands
12   with Mr. Quinn and Mr. Ranz on the verbal
13   agreement."  Was there a verbal agreement that
14   day?
15        A.   I believed that there was.
16        Q.   Okay.  You're saying that -- did you say
17   that in the past tense, I believed?  I was just --
18   I may not have heard you correctly.
19        A.   Yes.  I said I believed there was.
20        Q.   Okay.
21        A.   I mean, I'm not an attorney ---
22        Q.   Understood.
23        A.   --- to understand if a point -- a
24   contract exists or not, but at this point, we had
25   agreed on all the substantive terms of them
```

02-24-04                Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                          Page 197

1    Q.    So I ---
2    A.    It must be a woman.
3    Q.    And by Avgol's agent, that was Cleaver,
4  correct?
5    A.    Again, I -- it says what it says ---
6    Q.    Okay.
7    A.    --- Avgol's agent.
8    Q.    All right. The next sentence says, "I'm
9  very upset by this, and it makes it very difficult
10 for us to start-up the plant and sell it up with
11 this guy blabbing about our talks."
12         Who is "this guy"?
13   A.    I was referring to Avgol's agent.
14   Q.    And does the agent -- do you know who
15 the agent was?
16   A.    It would have been someone within the
17 Cleaver organization.
18   Q.    You don't know specifically, but
19 somebody in there?
20   A.    No.
21   Q.    The e-mail goes on to say, "I'm,
22 therefore, requesting that the M & A group take
23 over this endeavor and negotiate on behalf of
24 Unifi."
25         Who was the M & A group?

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                              Page 198

1         A.   Ron and Mike.
2         Q.   Okay.  Was it by this e-mail that you
3    requested those guys take over the endeavor?  This
4    was the request?
5         A.   Yes.
6         Q.   There wasn't a phone call before this
7    e-mail?
8         A.   I don't recall.
9         Q.   Okay.  It goes on to say, "I'll help in
10   any way possible."  Did they ever ask for your
11   help?
12        A.   No, they did not.
13        Q.   Did you ever offer ---
14        A.   No.
15        Q.   --- any help?
16        A.   No.
17        Q.   Okay.  The bottom of the first paragraph
18   talks about a suggestion for how to value the
19   business.  How did you come up with the numbers in
20   that sentence?  It says "I do -- it starts, "I do
21   suggest, however" -- where did the $10 million per
22   year come from?
23        A.   As it says, "expected future cash flow."
24        Q.   Yeah, but was there a report?  Was this
25   the projection we were talking about?

02-24-04            Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                          Page 221

1   suggested 180 days, and we agreed on 120 days.
2   And that either one of us could terminate it for
3   cause or non-performance without that notice.
4       Q.   Now, on March 30th, 2001, were you aware
5   of the status of the discussions between Unifi and
6   Avgol?
7       A.   No.
8       Q.   In that paragraph on Exhibit 36 that
9   we're looking at, it says "with 120 days notice."
10  Is that a termination provision?  Is that what you
11  intended by that?
12      A.   Yes.
13      Q.   So it could be terminated on 120 days
14  notice?
15      A.   That's correct.
16      Q.   I had thought that earlier this morning,
17  you had said that it was 120 days where
18  commissions would be paid.  Would -- and I don't
19  know if you intended it to mean something other
20  than termination, or if it was just going to be a
21  period where the termination was automatic, but
22  they would keep getting the residual commissions
23  for 120 days, or if they would be out there
24  working for 120 days, following the notice.
25      A.   I believe that there was a subsequent

02-24-04            Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                            Page 222

```
 1    communication between us to try to clarify that
 2    point.  But the phrase 120-day notice meant that
 3    we could end the representation, and we would be
 4    responsible for their commissions for 120 days.
 5         Q.   So the representation would end
 6    immediately?
 7         A.   Well, and I guess there's some logic in
 8    how you do that, based on the circumstances.
 9         Q.   And what's -- what is that logic?
10         A.   I think there's another document that
11    outlines that -- the letter that I sent Mike Quinn
12    that had the check attached to it.  I was asking
13    for some clarification on that from him.
14         Q.   I believe that was an April 25th or 26th
15    letter.  Does that sound right?
16         A.   That -- approximately.
17         Q.   I'll find it for you here.  Here it is.
18                   (PLAINTIFF'S EXHIBIT
19                    NUMBER 37 WAS MARKED
20                    FOR IDENTIFICATION)
21              It's Exhibit 37.  Is that the letter
22    you're referring to?
23         A.   Yes, it is.
24         Q.   Who wrote this letter?
25         A.   I did.
```

02-24-04              Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

William Michael Mebane                                      Page 248

1       A.   I would be guessing.
2       Q.   Do you remember ever asking Ron Smith or
3  Mike Delaney to write Q & R into the deal somehow
4  with Avgol, so that they would, you know, have
5  work to do after the closing?
6       A.   I remember telling Mike Quinn that if
7  there were any subsequent transactions with UTF
8  that I would treat him like I did Gene Kelly.
9       Q.   And how did you treat Gene Kelly?
10      A.   We requested that Q & R take him into
11 their organization, and that his employment would
12 be continued.
13      Q.   Okay.  Do you remember ever doing that
14 for Q & R?
15      A.   You know, I mean, it's -- it says it
16 right here, so you know, and do I remember sitting
17 down and typing the keys, no, I do not remember.
18 It is -- it is apparent that that's what I had
19 said to him.
20      Q.   Okay.  Now, let's go back to Exhibit 41
21 here.  This -- it looks like it's an agenda for
22 the April 10th and 11th Mocksville, North
23 Carolina, business review meeting.  Were -- did
24 you attend this meeting?
25      A.   I don't believe I did.  I don't believe

02-24-04          Q&R vs. UNIFI\C101641                    COPY

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954