UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Q&R ASSOCIATES, INC., | : | Case No.: C-1-01-641 |
| | : | |
| Plaintiff, | : | Judge Beckwith |
| | : | |
| v. | : | **MOTION OF DEFENDANTS UNIFI** |
| | : | **TECHNICAL FABRICS LLC AND W.** |
| | : | **MICHAEL MEBANE TO EXCLUDE** |
| | : | **TESTIMONY OF PLAINTIFF'S EXPERT** |
| | : | |
| UNIFI TECHNICAL FABRICS LLC, et al., | : | |
| | : | |
| Defendants. | : | |

Pursuant to Fed. Rule Evid. 702, Defendants Unifi Technical Fabrics LLC ("UTF") and W. Michael Mebane move the Court to exclude the opinion testimony of Mark A. Jackson, CPA, Plaintiff Q&R's expert witness, on his "Measure of Damages 2", on the grounds that his opinion is not based upon sufficient facts or data.

This Motion is submitted upon the pleadings and the depositions of Michael F. Quinn, John Ranz, Jr. and Defendant W. Michael Mebane, the Affidavit of Mr. Mebane, and the deposition of Mark A. Jackson, CPA, Plaintiff's expert witness. Excerpts from their depositions and the Mebane Affidavit are attached as Exhibits A, F, G, B, D and C, respectively.

s/ Frederick J. McGavran
Frederick J. McGavran (0011284)
Trial Attorney for Defendants Unifi
Technical Fabrics, LLC and
W. Michael Mebane
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 651-6940 Telephone
(513) 651-6981 Facsimile
fmcgavran@fbtlaw.com

OF COUNSEL FOR DEFENDANT
UNIFI TECHNICAL FABRICS LLC
Gregory A. Wendling
426 W. Friendly Avenue, Suite A
Greensboro, North Carolina 27401
(336) 274-0001
(336) 375-2625

OF COUNSEL FOR DEFENDANTS
Frost Brown Todd LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 651-6800
(513) 651-6981 Facsimile

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed on this the 30th day of July 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Frederick J. McGavran
Frederick J. McGavran (0011284)

## Memorandum

I.   **Statement of the Case.**

   A.   <u>Summary.</u>

   This is a diversity action by Q&R Associates, Inc. ("Q&R") against Defendants Unifi Technical Fabrics, LLC ("UTF") and W. Michael Mebane for breach of contract (Count One), promissory estoppel (Count Two), fraudulent inducement (Count Three) negligent misrepresentation (Count Four), and intentional interference with a business relationship (Count Five). All counts arise from the parties' negotiations for Q&R to become a sales agent for UTF.

   B.   <u>Parties.</u>

   Q&R is an Ohio corporation with its principal place of business in West Chester, Ohio. It is a sales and marketing company that represents manufacturers of fabrics for disposable diapers to customers in the United States. Amended Complaint, ¶¶ 1, 2. Mr. Quinn and Mr. Ranz are its principals. Quinn depo. at 15.[1]

   Defendant UTF is a North Carolina limited liability company with its principal place of business in Greensboro, North Carolina. Mr. Mebane was the President of UTF from August 3, 1999 until July 31, 2001. Amended Complaint ¶¶ 3, 4; Affidavit of Michael Mebane (doc. 4) at ¶¶ 1 and 2.[2]

   C.   <u>The Dispute.</u>

   Prior to selling its assets to Avgol America, Inc. ("Avgol"), UTF owned a manufacturing plant in Mocksville, North Carolina that produced spunmelt fabrics (also called non-wovens) for diapers, protective clothing and similar products. Mebane Affidavit at ¶ 5. From 1995 through March 2001, Q&R was a sub-agent of Cleaver Associates, which in turn had an exclusive written

---

[1] Excerpts from Mr. Quinn's deposition are attached as Exhibit A.
[2] A copy of Mr. Mebane's Affidavit is attached as Exhibit B.

1

agreement with Avgol Non Woven Industries, an Israeli manufacturer, to distribute Avgol spunmelts in the United States. Quinn depo. at 61-62; 74. Avgol spunmelts are used for the top sheet, back sheet and leg cuff barrier on disposable diapers. Quinn depo. at 16.

In 1999 and 2000, UTF built a plant in Mocksville, North Carolina and installed the latest equipment to manufacture spunmelts. Mebane Affidavit at ¶ 5; see Quinn depo. at 142-143. The dispute is whether Q&R and UTF entered into a contract for Q&R to act as its North American sales agent and, if so, the terms of the contract. The basic dispute is the subject of the parties' cross-motions for summary judgment.

**II.     Mark Jackson's Opinion.**

<u>A.     Summary.</u>

In his Report and deposition, Mark A. Jackson, CPA, Q&R's expert witness on damages, opined on two methods of damages. This Motion only addresses "Measure of Damages 2", where Mr. Jackson projects lost commissions "as outlined in the schedule titled 'Q&R Commission and Draw Plan, does not consider SCA and Proctor (sic) at 2%'."[3] Mr. Jackson admitted that the foundation for his opinion was to assume that Q&R would have earned the commissions that Mr. Mebane supposedly projected. Jackson depo. at 62.[4] After deducting costs associated with this revenue, he concludes that Q&R's damages over a three year period are $1,565,053, or about four times as much on an annual basis as Q&R ever earned as a sub agent for Cleaver Associates. Jackson Report at 5, 6. Mr. Jackson should not be permitted to base damages on this schedule, because the record is clear and demonstrates that the schedule upon which his testimony is based is fundamentally flawed, unsubstantiated, and his opinion is pure speculation.

---

[3] A copy of Mr. Jackson's report is attached as Exhibit C.
[4] Excerpts from Mr. Jackson's deposition are attached as Exhibit D.

2

B.	The Schedule is unsubstantiated.

At a meeting with Q&R principals Michael Quinn and John Ranz to explore a possible relationship between UTF and Q&R in February 2001, Mr. Mebane requested that Q&R provide a "customer matrix" that showed customer requirements but not customer names. Mr. Ranz prepared a "matrix" which showed the total U.S. monthly spunmelt requirements of five customers.[5] Q&R had never sold the entire monthly spunmelt requirements for any of these customers.

Mr. Ranz was asked:

> Q.	Okay. This is not a sales projection at all, it's a statement of what - - what they purchase?
>
> A.	It's a statement of what they totally purchase –
>
> Q.	Okay.
>
> A.	--on a monthly basis.
>
> Q.	Okay. And this includes no estimate of how much, if any, of that volume Q&R could switch from Avgol to UTF; is that correct?
>
> A.	It is no estimate whatsoever.[6] (Ranz depo. at 68-69; see Quinn depo. at 166-167.)

Mr. Mebane testified that the matrix "showed the volumes of the customers they would be seeking."[7] Mebane depo. at 153, 154. He understood that the volumes were targets, not guarantees of sales. Q&R did not even tell him which customer's volumes were being projected. Mebane depo. at 157-160.

---

[5] A copy of the matrix, DX 75, is attached as Exhibit E.
[6] Excerpts from Mr. Ranz's deposition are attached as Exhibit F.

3

On March 27, 2001, Mr. Quinn, Mr. Ranz and Mr. Mebane met in UTF's suite at the Idea trade show in Miami, Florida to discuss Q&R representing UTF in the sale of spunmelts. Mr. Mebane sent Mr. Quinn an Email dated March 30, 2001 stating what he believed were the terms of the verbal understanding between UTF and Q&R.[8] Attached to that Email was DX 74, the Schedule upon which Mr. Jackson bases "Measure of Damages No. 2."[9]

Mr. Mebane testified that he applied the proposed commission rate to Q&R's "matrix" to illustrate how the commission structure would work. If Q&R actually sold the volumes stated in the matrix, it would earn the projected commissions. There was no certainty, however, that these volume "targets" would be met.

> The plant has this capacity. If the plant were operative and Q&R was able to do what they said they could do, then, in theory, this could have been a – a—could have been realized. But there's so many things that are beyond my control, or beyond the control of the plant that would have to happen, so that they could realize the collections and the eventual commissions.
>
> . . . .
>
> Q.   So the volumes that would have to be generated to create this collection was within the capacity of the plant?
>
> A.   It was within the capacity of the plant, but I had no way of knowing whether they were going to be able to deliver upon the volumes that they had represented to us.
>
> Q.   And what were the volumes that they had represented to you?
>
> A.   Which had come from the customer matrix.
>
> Q.   Exhibit 27 [DX 75]?
>
> A.   That's correct. (Mebane depo. at 167, 168.)

Mr. Quinn had the same understanding. He testified:

---

[7] Excerpts from Mr. Mebane's deposition are attached as Exhibit G.
[8] A copy of DX 80, Mr. Mebane's March 30, 2001 email is attached as Exhibit H.

4

> Q. Well, he wasn't telling you that regardless of how much of this stuff you sell you're going to earn these commissions, did he?
>
> A. He said this - - I am forecasting this is the amount of commission you will make from Unifi Technical Fabrics.
>
> Q. If you sell this volume of product?
>
> A. Yes. (Quinn depo. at 169.)

To assume that Q&R would have sold the entire North American requirements to each of the five customers on the "matrix" is pure speculation. Q&R had never sold the entire North American requirements of these customers. Mr. Quinn testified that Drypers, Q&R's largest customer, wanted two sources of supply for each of its plants. Quinn depo. at 124. As a result of Drypers' policy, it is impossible to assume that Q&R could sell Drypers its entire North American requirements.

Mr. Mebane prepared DX 74 to show how the commission structure would work if certain volumes were sold. He did not represent that Q&R would earn these commissions. Nevertheless, Mr. Jackson testified:

> Q. Okay. So if I understand what you did in Measure of Damages No. 2, you assumed that Q&R, had its relationship with UTF continued, would have earned the commissions shown on Exhibit 74?
>
> A. Yes. (Jackson depo. at 62.)

Basing his "Measure of Damages No. 2" on this assumption, Mr. Jackson concluded that Q&R would have earned $1,128,000 in commissions in 2003, nearly four times as much as he projects in "Measure of Damages No. 1" and over four and a half times as much as it earned in 1998, its best year with Cleaver Associates.[10] His opinion is not related to the facts and evidence

---

[9] A copy of DX 74 is attached as Exhibit I.
[10] Compare Exhibit II to Jackson Report, showing assumed damages under "Method 2", with Exhibit I, showing damages under "Method 1" and Exhibit III, showing historical commissions.

5

in this case and produces damages at a multiple of any commissions Q& R ever actually earned from these customers.

    C.    <u>Mr. Jackson did not know what the "matrix" was.</u>

In his deposition, Mr. Jackson testified that he had never seen the Q&R matrix. He didn't recall reading the testimony of Mr. Quinn or Mr. Ranz about it in their depositions. Jackson depo. at 62, 63. Similarly, he did not know that Mr. Mebane had taken the sales figures from the "matrix" and used it to illustrate how the commission structure would work, assuming Q&R sold the entire amount. He said he was lost by the questions about the "matrix" and its relation to Mr. Mebane's Email. Jackson depo. at 64, 65.

Mr. Jackson was asked:

> Q. [D]id Mr. Quinn or Mr. Ranz tell you at any time they had sold the entire North American requirements of any customer?
>
> A. I don't recall that, no.
>
> Q. In fact, the subject of entire North American requirements never came up, did it?
>
> A. I don't recall that at all. (Jackson depo. at 68, 69.)

Under Fed. Rule Evid. 702, an expert may not base an opinion on damages on such speculative numbers so divorced from any reality in the case.

**III.    Argument**

    A.    <u>The *Daubert* Rule.</u>

In *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that federal judges must act as "gatekeepers" in determining whether scientific expert testimony is relevant and reliable before it is admitted into evidence at trial. *See id.* at 589. Interpreting Fed. Rule Evid. 702, the Court rejected the test established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which stated that scientific evidence must be "generally accepted"

from within the scientific community in order to be reliable. The *Daubert* Court declared that the "focus [of whether to admit scientific expert testimony into evidence] must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 595. The Court listed several factors to assist a judge in determining the reliability of the methodology:

> (1) whether the theory or technique has been tested,
>
> (2) whether it has been subjected to peer review,
>
> (3) whether there is a known or potential rate of error, and
>
> (4) whether the methodology has gained general acceptance. *Daubert,* at 593-94.

In *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997), the Sixth Circuit added a fifth factor:

> (5) whether the experts' testimony grows naturally out of research conducted independent of the litigation, or whether they developed their opinions expressly for the purposes of testifying. *Id.* at 303.

Fed. Rule Evid. 702 was amended in 2000 in response to *Daubert* and its progeny. See *Staff Notes to Fed. R. Evid. 702.* The amended Rule reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.* Fed. Rule Evid. 702 (emphasis added to amendment section).

The amended rule does not attempt to codify the specific factors in *Daubert*, but instead, "the standards set forth in the amendment are broad enough to require consideration of any or all the specific *Daubert* factors where appropriate." *Staff Notes to Fed. Rule. Evid. 702.*

7

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Court expanded the *Daubert* test to all expert testimony, not just scientific expert testimony. *See also United States v. Jones*, 107 F.3d 1147, 1159-61 (6th Cir. 1997) (holding that *Daubert* applied to all expert testimony two years before *Kumho Tire* was decided). The Court held that expert testimony that does not apply to the specific facts of the case should not be admitted. 526 U.S. 137, 154.

In *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997), the Supreme Court held that opinion evidence may not be admitted where it is connected to the underlying data "only by the *ipse dixit* of the expert." Applied to expert opinions on damages, this means that a court must consider how the expert's opinion "fits" with the data or facts in the case. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000); *Target Market Publ'g v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir. 1998).

B.  Fed. Rule Evid. 702 precludes "Measure of Damages No. 2."

Two decades before *Daubert*, the Sixth Circuit held that expert testimony is inadmissible when the facts upon which the expert bases his testimony contradict the evidence. *United States v. Chaney*, 577 F.2d 433, 435 (6th Cir. 1978); *cited with approval Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999). Five years before *Daubert*, a federal district court excluded a CPA's testimony on lost profits where the opinion was based on subjective belief and speculation, including unsupported assumptions. *JMJ Enterprises, Inc. v. Via Venato Ice, Inc.*, No. 97-CV-06521, 1998 U.S. Dist. LEXIS 5098, at *1, *18-*19 (E.D. Pa. Apr. 15, 1998).[11] As is the case with Mr. Jackson, the CPA knew little about the industry in question. *See id.* at *19. This case is the very first time Mr. Jackson has ever done a lost profits analysis for a sales agency such as Q&R or for any other business. Jackson depo. at 10, 14.

---

[11] A copy is attached as Exhibit J.

An unfounded opinion cannot sustain a verdict. In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), the Court stated:

> When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. Cf. *J. Truett Payne Co., Inc., 451 U.S. at 564-565* (referring to expert economic testimony not based on "documentary evidence as to the effect of the discrimination on retail prices" as "weak" at best). Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them. As we observed in *Matsushita*, "expert opinion evidence . . . has little probative value in comparison with the economic factors" that may dictate a particular conclusion. *475 U.S. at 594, n. 19.*
> 509 U.S. 209, 242.

Relying on *Brooke Group, supra*, in *Wallace v. Bank of Bartlett*, 55 F.3d 1166 (6th Cir. 1995), the Court affirmed a summary judgment where an expert's affidavit was based on facts that supported the defendant's defense as well as they supported the plaintiff's claims.

> Buckalew's affidavit is not sufficient to defeat the Banks' motion for summary judgment. In *Brooke Group Limited v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), the Supreme Court held that an economist's expert testimony which was based on insufficient facts could not be relied upon to support a jury verdict. *Id.* at 242. The Court stated that "expert testimony is useful as a guide to interpreting market facts, but is not a substitute for them." *Id.* Buckalew's conclusions are based on nothing more than facts which, as we have already stated, are equally consistent with independent actions by the Banks. 55 F.3d 1166, 1170.

Where the expert's testimony is based upon speculation and is at odds with the facts of the case, it must be excluded. In *Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001), the Court excluded an expert's damage opinion, which the district court found "speculative and based wholly on conjecture." Like Mr. Jackson here, the expert's opinion was the same regardless of what claims were asserted or what the facts were in the case. *Id.* Similarly, in *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22-23 (2nd Cir. 1996), the Court of Appeals remanded to the district court for a new determination of damages because

Boucher's expert based his opinion on speculative assumptions about Boucher's work history that were not supported by the record.

*Target Market Publ'g v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir. 1998) is very similar to this case. Although the district court had not made detailed findings in support of its exclusion of plaintiff's lost profits claim, the Court of Appeals itself carefully analyzed the record. The Court found that the opinion was based on assumptions that did not support the conclusion. Like Mr. Jackson in this case, the expert assumed that the plaintiff's product "could instantaneously achieve full penetration into dozens of geographic zones in which no sales effort had even begun . . . ." 136 F.3d 1139, 1144. The problem with the expert's report is the same problem Mr. Jackson has here:

> The plan sought to demonstrate what Select Auto's profits might be given certain assumptions that had not yet, and might never, come to pass. 136 F.3d 1139, 1145.

Like Mr. Jackson's "Measure of Damages 2", the expert's report was inadmissible to show lost profits.

In *General Electric Company v. Joiner*, 522 U.S. 136 (1997), Chief Justice Rehnquist reasoned that the trial court, not the expert, must decide whether the opinion is sufficiently connected to the underlying facts and evidence to be admitted.

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. See *Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349, 1360* (CA 6), cert. denied, *506 U.S. 826, 121 L. Ed. 2d 47, 113 S. Ct. 84 (1992)*. That is what the District Court did here, and we hold that it did not abuse its discretion in so doing. 522 U.S. 136, 146.

The Eighth Circuit applied *General Electric Company's* emphasis on the "fit" of an expert's opinion to the data or facts of a case to an expert's damage testimony in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000). Finding that the expert's model for a hypothetical market in an antitrust case was not consistent with the facts of the case, the Court reversed the district court and ordered the testimony to be stricken and Brunswick's motion for judgment to be granted. *Id.* at 1057-58.

Similarly, in *Irvine v. Murad Skin Research Laboratories*, 194 F.3d 313 (1st Cir. 1999), the Court set aside a verdict and remanded for a new trial where the plaintiff's expert based his opinion on an unsubstantiated assumption. The expert assumed that all the plaintiff's sales were of the product in dispute, but there was no testimony to substantiate the assumption. *Id.* at 320-21.

At least two district courts in the Sixth Circuit have reached similar conclusions. In *Lake Michigan Contractors, Inc. v. The Manitowoc Company*, 225 F. Supp. 2d 791 (W.D. Mich. 2002), the Court refused to admit expert testimony based upon the unsubstantiated assumption of the expert. In *De Jager Construction, Inc. v. Schleininger*, 938 F. Supp 446 (W.D. Mich. 1996), the Court refused to admit an expert's testimony that was based on hearsay and incorrect assumptions. District courts in other circuits have also reached similar conclusions. *JMJ Enterprises, Inc. v. Via Venato Italian Ice, Inc.*, No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098, at *1, (E.D. Pa. Apr. 15, 1998): *G.T. Laboratories, Inc. v. The Cooper Companies, Inc.*, No. 92 C 6647, 1998 U.S. Dist. LEXIS 15745, at *1 (N.D. Ill Sept. 24, 1998).[12]

There is too great an analytical gap between Mr. Jackson's opinion and its basis, DX 75, Mr. Ranz's estimate of the entire North American spunmelt requirements for five major purchasers, especially where Q&R had never sold the entire North American requirements to any

of them. Mr. Jackson was not even aware of Mr. Ranz's deposition testimony. Jackson depo. at 62, 63.

Mr. Jackson's "Method of Damages 2" is based upon a document (DX 74) illustrating what commissions would be, that is in turn based upon a document stating the entire North American requirements for five major diaper manufacturers (DX 75). Mr. Jackson's "opinion" is speculation based upon speculation based upon speculation. It has no foundation and is inadmissible under Fed. Rule Evid. 702.

### III.   Conclusion

In *Nelson v. Tennessee Gas Pipeline Company*, 243 F.3d 244 (6th Cir. 2001), the Court summarized *Daubert* and its progeny as follows:

> As the court in Daubert stated, the inquiry must be "solely on principles and methodology, not on the conclusions they generate." 509 U.S. at 595. However, as the Court later clarified, "conclusions and methodology are not entirely distinct from one another." *Joiner*, 522 U.S. at 146. A district court is not required to admit expert testimony "that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* The magistrate judge did not abuse his discretion by finding that Kilburn's testimony presented just such a case. 243 F. 2d 244, 254.

In other words, a court may look at an opinion and ask whether it makes sense. Authorities in the area of business valuations call this final review "a sanity test" or "reality check". *See* II JAY E. FISHMAN, ET AL., GUIDE TO BUSINESS VALUATIONS, §802 (2000); SHANNON P PRATT, ET AL., VALUING SMALL BUSINESSES AND PROFESSIONAL PRACTICES, Chapter 28 (3rd ed. 1998).

Mr. Jackson's "Measure of Damages 2" fails the sanity test. "Measure of Damages 2" is

---

[12] copy is attached as Exhibit K.

based upon Mr. Mebane's DX 74 estimate of commissions if Q&R sold all the product listed on DX 75. Q&R's John Ranz, however, testified that DX 75 was never intended to be an estimate of the product Q&R could sell.

> Q. Okay. And this [DX 75] includes no estimate of how much, if any, of that volume Q&R could switch from Avgol to UTF; is that correct?
>
> A. It is no estimate whatsoever. (Ranz depo. at 68-69).

Assuming without any supporting data that Q & R would sell the entire North American requirements of five major spunmelt users, Mr. Jackson fabricated damages for lost commissions over a three year period of $1,565,053, or about four times as much on an annual basis as Q&R ever earned as a sub agent for Cleaver Associates. This opinion has no basis in reality and should be excluded.

It is therefore respectfully requested that Mr. Jackson's "Measure of Damages 2" be excluded.

Respectfully submitted,

/s/ Frederick J. McGavran
Frederick J. McGavran (0011284)
Trial Attorney for Defendants Unifi
Technical Fabrics, LLC and
W. Michael Mebane

13