# EXHIBIT "C"



*Jackson, Rolfes, Spurgeon & Co.*
CERTIFIED PUBLIC ACCOUNTANTS AND BUSINESS ADVISORS

Mark A. Jackson • James P. Rolfes • Roger K. Spurgeon • Jeffrey H. Oehler • Dennis J. Tebe

630 Northland Boulevard • Cincinnati, OH 45240-3236
Telephone (513) 595-8800 • Fax (513) 595-8885 • www.jrscpas.com

Q & R Associates, Inc.

v.

Unifi Technical Fabrics, LLC

Case No.: C-1-01-641

Financial Impact Report

Prepared By: Mark A. Jackson, CPA, CVA

August 18, 2003

Members
Schneider Downs Network of Accounting & Consulting Firms
The International Group of Accounting Firms
Private Companies Practice Section of American Institute of Certified Public Accountants

## Introduction

Q & R Associates, Inc. ("Q&R"), is a sales and marketing company with its principal place of business in Butler County, Ohio. Michael J. Quinn is the President and John H. Ranz, Jr. is the Vice President. Unifi Technical Fabrics, LLC (UTF) is a North Carolina Corporation with its principal place of business in Owensboro, North Carolina. Michael Mebane is the former President of UTF. Per the Plaintiffs Motion for Leave to file a First Amended Complaint, Q&R has asserted claims against UTF for breach of contract, promissory estoppel, fraudulent inducement, negligent misrepresentation and intentional interference with a business relationship.

## Assignment

I was asked to assume that Q&R would prevail on its legal theories in this case and to compute the financial loss to Q&R resulting from the allegations made in the first amended complaint.

My opinions and findings are based upon my work to date and the pattern of facts I have thus far observed. This report may be modified or updated at a later date based upon additional documents or information.

This report has been prepared solely in connection with this litigation and is intended for no other use. This report may not be copied or reproduced in any manner without the express written consent of Jackson, Rolfes, Spurgeon & Co.

## Key Documents Relied upon for this Analysis

The following documents were relied on to develop the model to calculate the financial loss to Q&R Associates, Inc.

- Company financial statements as compiled by the company's outside accountants. Statements for the quarter ended March 31, 1995 through March 31, 2003 were obtained for the analysis.
- Company Federal Corporate tax returns for 1999 through 2002.
- Email copy dated 30 March 2001 from Mike Mebane to Mike Quinn and attached schedule "Q & R Commission and Draw Plan;" related notes "Unifi/Q&R Partnership".
- Volume and Profit Prospects for Key Nonwovens Used in Hygiene Products; a paper by Lynda A. Kelly, Insight Conference, October 2001.
- Analysis of Billings from John Cleaver/Avgol 1995-2002.
- Q & R Invoices to Providencia

## Work Performed

I reviewed various business records, tax returns, correspondence, court documents and other items produced in discovery. I interviewed Mr. John Ranz and Mr. Michael Quinn of Q&R Associates, Inc. I also interviewed Ms. Lynne LaMacchia, the company's independent certified public accountant. I prepared an analysis of lost profits as described in the section titled Methodology and Assumptions.

## Methodology and Assumptions

I have computed damages using two different relevant measures of damages based on alternative theories of liability.

Under Measure of Damages 1, the assumption was made that the relationship between Q & R and Cleaver/Avgol was not interrupted in 2001.

Under Measure of Damages 2, I assumed that Q & R would receive the commissions as outlined in the schedule titled "Q & R Commission & Draw Plan", does not consider SCA and Proctor (sic) at 2%".

## Measure of Damages 1

### Incremental Revenue

Because of the actions of the defendants, Q & R will no longer receive commissions from the Cleaver/Avgol relationship. The first step in the computation of lost profits for this measure is to determine the lost revenue to Q&R. The amount of revenue lost is the amount of commission revenue that Q&R would have received from Cleaver and Associates relating to the sale of Avgol products. The relationship between Q&R and Cleaver ended shortly after the first quarter of 2001.

I reviewed a billing analysis of Cleaver commissions prepared by the company's independent certified public accountant and noted the following:

- Commissions began in September, 1995 and ended after March, 2001.
- 1996 through 2000 each contained 12 monthly commission amounts.
- The compound annual growth rate of the commissions for 1996 to 2000 was 11.48%.

When comparing the first quarter of 2000 to the first quarter of 2001, a growth rate of 32% is observed.

I estimated commission income for the second through fourth quarters of 2001 by applying a 10% growth rate to the same period of 2000. This rate was utilized to take into account the historical growth rate and industry estimates.

Utilizing 2001 as a base year, commissions were grown at 9% through the first quarter of 2006. The 9% growth rate is reflective of historical growth of the commission payments together with industry information which indicates a growth rate in the mid to high single digits for spunmelt polypropylene through at least the middle of the decade.

Commission information is shown in Exhibit III.

Costs Associated with Incremental Revenue

The next step of the analysis is to determine the costs associated with lost revenues.

I reviewed historical cost information and interviewed management and the outside accountant for the company. As a manufacturers' representative, Q&R represents various suppliers of material used in the manufacture of disposable absorbent products. As such they often call on the same customers to sell more than one of the suppliers represented. Thus, the firm must travel, call upon and service the same customers for the sale of spunmelt polypropylene as well as the other items they represent.

Our analysis determined the following costs to be incremental to the lost revenue stream.

| | |
|---|---|
| Salary of Terminated Employee | $ 42,000 |
| Taxes | 3,200 |
| Retirement | 6,300 |
| Rent | 3,000 |
| Auto | 3,000 |
| Medical | 6,000 |
| | $ 63,500 |

An employee was terminated April 30, 2002 due to reduced commission income resulting from the loss of the Avgol line. The reduction in salary and related costs represent the primary cost reduction achieved as a result of the reduced revenues. Thus the cost of the salary and benefits for 8 months of 2002 as well as 2003 through the first quarter of 2006 was taken into account in the analysis. A growth rate of 3% was used.

Other expenses were reviewed on a line by line basis. The following additional expenses were identified as being related to the lost revenue:

Auto Rental, Gifts, Meals/Entertainment, Travel and Telephone

I reviewed the relationship of these expenses to the total revenue generated by the company, and found that they averaged 16.01% of revenue for the period analyzed. I then applied this percentage to the revenue stream to determine the costs associated with the lost revenue.

By subtracting the incremental costs from the lost revenue stream I arrived at lost profits.

Effect of Mitigation

I next considered the impact of mitigation on the analysis. I was able to determine that Q&R has attempted to replace the lost revenue stream with commissions generated by another supplier.

I reviewed the billings to this supplier. I found that a total of $2,802 was billed in 2002 and $30,772 was billed through July, 2003. Based on discussions with management, future billings of $59,000 for the remainder of 2003, $275,000 for 2004, $300,000 for 2005 and $75,000 for the first quarter of 2006 were estimated.

For the cost associated with the production of this revenue, I assumed a cost ratio of 16.01% of revenues for other costs. I also assumed that due to increasing sales volume, an employee would be added in 2004 to replace the terminated employee.

I considered the payment of $25,000 received by Q & R from UTF.

Period of Damages

I determined the appropriate period of recovery to be sixty months.

I based this upon the steps that must be taken by Q&R to replace the revenue. Q & R must first find a suitable supplier willing to do business with them. Next customers had to be approached to secure sales.

The nature of the industry is that the sales cycle is long with the customers served by Q&R. This is due to a number of factors including that nature of the materials which require a substantial amount of testing, qualification and approval before a switch is made. It must also be noted that agreements in place may last up to three years, thus lengthening the time it will take Q&R to replace the revenue. For these reasons, I believe five years to be appropriate.

I discounted the future lost profits to January 1, 2004, a date which approximates the projected date of trial. A rate of 5% was chosen to correspond with the incremental borrowing rate of Q & R.

Conclusion

Under this measure, I have calculated the financial damages to Q & R Associates, Inc. to be $556,727.

## **Measure of Damages 2**

Incremental Revenue

Because of the actions of the defendants, Q & R will not receive the commissions outlined in Mr. Mebane's e-mail.

Thus, for the second measure, I assumed that Q & R would receive the commissions as outlined in the schedule titled "Q & R Commission & Draw Plan, does not consider SCA and Proctor (sic) at 2%".

I derived lost revenues from this schedule in the following manner.

For 2001, commissions of $25,000 for April through October, $24,000 for November and $28,000 for December were used. The total amounted to $227,000. For 2002, I used the amounts beginning in January of $32,000 and ending in December of $80,000. The total for this period was $680,000.

For 2003, I used the amounts beginning in January of $84,000 through April of $96,000. The months of May through December were held constant at $96,000 for an annual total of $1,128,000. For the first 3 months of 2004, a monthly commission of $96,000 was used and grown at 3% for a total of $296,640.

## Costs Associated with Incremental Revenue

The incremental costs needed to produce the lost revenue were derived in a manner similar to Measure 1. In addition to the costs of compensation contemplated in Measure 1, I included the costs of a shared employee. Discussions with management indicated that Q & R would have been responsible for certain commission payments to the employee. UTF would have paid monthly expenses, benefits and a monthly salary. I have estimated the cost of the shared employee to Q & R to be 5% of commission revenue.

I applied a cost factor of 16.01% to the incremental revenue to account for other variable costs.

By subtracting the costs from gross revenue I arrived at lost gross profits.

Effect of Mitigation

The impact of mitigation was calculated as described under Measure 1.

Period of Damages

For this measure, I assumed the period of damages to be three years, which is the term outlined in the e-mail from Mr. Mebane dated March 30, 2001.

Conclusion

Under this measure, I have calculated the financial damages to Q & R Associates to be $1,565,053.

**Qualifications**

I am a founding principal of Jackson, Rolfes, Spurgeon & Co., Certified Public Accountants and have been with the firm since its inception in 1985. I am a Certified Public Accountant licensed in the states of Ohio and Kentucky. I am also a Certified Valuation Analyst. A copy of my Curriculum Vitae (CV) is provided in Exhibit VI.

**Summary of Conclusions and Opinion**

In my opinion, the financial loss to be incurred by Q & R Associates, Inc. will approximate $556,727 under Measure of Damages 1 or $1,565,053 under Measure of Damages 2 on a present value basis. The calculations do not include any pre and/or post judgment interest or any costs of litigation (legal/professional or any other fees).

*Mark Jackson CPA, CVA*

Mark A. Jackson, CPA, CVA
August 18, 2003

Q & R ASSOCIATES, INC.
CALCULATION OF LOST PROFITS
MEASURE OF DAMAGES 1
EXHIBIT I
CASE NO.:C-1-01-641

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| LOST COMMISSION REVENUE | $195,084 | $280,034 | $305,237 | $332,708 | $362,652 | $98,823 |
| COMPENSATION COSTS | $0 | $42,333 | $65,405 | $67,367 | $69,388 | $17,887 |
| OTHER COSTS | $31,233 | $44,833 | $48,888 | $53,267 | $58,061 | $15,822 |
| LOST PROFITS | $163,851 | $192,867 | $190,964 | $212,075 | $235,203 | $65,134 |
| EFFECT OF MITIGATION PAYMENT RECEIVED FROM UTF | -$25,000 | | | | | |
| NET REVENUES FROM COMPETING LINE | $0 | -$2,353 | -$75,399 | -$163,605 | -$182,582 | -$45,125 |
| TOTAL LOST PROFITS | $138,851 | $190,514 | $115,564 | $48,469 | $52,622 | $20,009 |
| PRESENT VALUE AT 5% TO JANUARY 1, 2004 | | | | 0.952 | 0.907 | 0.896 |
| PRESENT VALUE OF TOTAL LOST PROFITS | $138,851 | $190,514 | $115,564 | $46,143 | $47,728 | $17,928 |
| TOTAL | $556,727 | | | | | |

Q & R ASSOCIATES, INC.
CALCULATION OF LOST PROFITS
MEASURE OF DAMAGES 2
EXHIBIT II
CASE NO.:C-1-01-641

|  | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| COMMISSION REVENUE | $227,000 | $680,000 | $1,128,000 | $296,640 |
| COMPENSATION COSTS | | | | |
| EXISTING EMPLOYEE | $0 | $42,333 | $65,405 | $16,842 |
| SHARED EMPLOYEE | $11,350 | $34,000 | $56,400 | $14,832 |
| OTHER COSTS | $36,343 | $108,868 | $180,593 | $47,492 |
| LOST PROFITS | $179,307 | $494,799 | $825,602 | $217,474 |
| EFFECT OF MITIGATION | | | | |
| PAYMENT RECEIVED | | | | |
| FROM UTF | -$25,000 | | | |
| NET REVENUES FROM | | | | |
| COMPETING LINE | | -$2,353 | -$75,399 | -$40,901 |
| TOTAL LOST PROFITS | $154,307 | $492,445 | $750,203 | $176,573 |
| PRESENT VALUE AT 5% | | | | |
| TO JANUARY 1, 2004 | | | | 0.952 |
| PRESENT VALUE OF | | | | |
| TOTAL LOST PROFITS | $154,307 | $492,445 | $750,203 | $168,097 |
| TOTAL | $1,565,053 | | | |

Q & R ASSOCIATES
CLEAVER COMMISSIONS
EXHIBIT III
CASE NO.:C-1-01-641

|  | YEAR | DOLLARS | GROWTH | 1996 to 2000 CAGR |
|---|---|---|---|---|
| ACTUAL | 1996 | $130,124 | | |
|  | 1997 | $208,376 | 60.14% | |
|  | 1998 | $245,032 | 17.59% | |
|  | 1999 | $184,493 | -24.71% | |
|  | 2000 | $224,044 | 21.44% | 11.48% |
| (FIRST QUARTER) | 2001 | $61,828 | | |
| ACTUAL | 2001 | $61,828 | | |
| ESTIMATED | 2001 | $195,084 | | |
|  | 2001 Total | $256,912 | | |
| ESTIMATED | 2002 | $280,034 | | |
|  | 2003 | $305,237 | | |
|  | 2004 | $332,708 | | |
|  | 2005 | $362,652 | | |
|  | 2006 | $98,823 | | |

NOTE: THE AMOUNTS FOR 1996 THROUGH THE FIRST QUARTER OF 2001 ARE ACTUAL
AMOUNTS TAKEN FROM THE ANALYSIS OF BILLINGS FROM JOHN CLEAVER.
THE ESTIMATED 2001 AMOUNT FOR THE REMAINING 3 QUARTERS IS BASED UPON THE
SAME PERIOD FROM 2000 AND THEN GROWN AT 10%.
BEGINNING IN 2002, COMMISSIONS ARE BASED UPON THE PRIOR YEAR AMOUNT GROWN AT
9%. THE 2006 AMOUNT IS FOR THE FIRST QUARTER ONLY.
CAGR IS THE COMPOUND ANNUAL GROWTH RATE OF REVENUE FOR THE FIVE
YEARS FROM 1996 TO 2000.

Q & R ASSOCIATES
FINANCIAL DATA
INCREMENTAL EXPENSES RELATING
TO LOST REVENUE
EXHIBIT IV
CASE NO.:C-1-01-641

| | Dec-95 | Dec-96 | Dec-97 | Dec-98 | Dec-99 | Dec-00 | Dec-01 | Dec-02 |
|---|---|---|---|---|---|---|---|---|
| Sales | $82,762 | $118,341 | $128,416 | | | $10,350 | | |
| Commissions | $379,472 | $421,148 | $459,572 | $546,580 | $543,537 | $581,696 | $467,267 | $340,317 |
| Other | $1,362 | | | | | $1,730 | $300 | |
| Refunds | -$8,338 | -$5,629 | | | | | | |
| Total Revenue | $455,258 | $533,860 | $587,988 | $546,580 | $543,537 | $593,776 | $467,567 | $340,317 |
| | | | | | | | | |
| Incremental Expenses | | | | | | | | |
| Auto Rental | $2,822 | $2,398 | $1,821 | $4,217 | $3,023 | $4,352 | $1,695 | $406 |
| Gifts | $2,919 | $6,931 | $3,497 | $4,463 | $4,188 | $6,865 | $4,013 | $2,544 |
| Meals & Entertainment | $17,808 | $23,355 | $30,795 | $34,296 | $31,904 | $36,004 | $24,967 | $8,606 |
| Telephone | $17,879 | $17,009 | $16,815 | $17,945 | $19,996 | $20,909 | $16,145 | $15,349 |
| Travel & Lodging | $23,733 | $19,304 | $19,054 | $34,704 | $39,643 | $45,874 | $23,641 | $9,406 |
| Total | $65,161 | $68,997 | $71,982 | $95,625 | $98,744 | $114,004 | $70,461 | $36,311 |
| % of Revenue | 14.31% | 12.92% | 12.24% | 17.50% | 18.17% | 19.20% | 15.07% | |
| Average 1996 to 2000 | 16.01% | | | | | | | |

NOTE: INFORMATION IS FROM Q & R ASSOCIATES, INC. QUARTERLY FINANCIAL STATEMENTS

Q & R ASSOCIATES, INC.
CALCULATION OF LOST PROFITS
NET REVENUES FROM
COMPETING LINE
EXHIBIT V
CASE NO. C-1-01-641

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| ACTUAL BILLINGS | $0 | $2,802 | $30,772 | | | |
| ESTIMATED FUTURE BILLINGS | | | $59,000 | $275,000 | $300,000 | $75,000 |
| TOTAL BILLINGS | $0 | $2,802 | $89,772 | $275,000 | $300,000 | $75,000 |
| | | | | | | |
| COST ASSOCIATED WITH BILLINGS | | | | | | |
| COMPENSATION COSTS | | | $0 | $67,367 | $69,388 | $17,867 |
| OTHER COSTS | | $449 | $14,372 | $44,028 | $48,030 | $12,008 |
| | | | | | | |
| NET REVENUES | | $2,353 | $75,399 | $163,605 | $182,582 | $45,125 |

CURRICULUM VITAE
Mark A. Jackson, CPA, CVA
Jackson, Rolfes, Spurgeon & Co.
630 Northland Blvd.
Cincinnati, OH 45240
513/595-8800
mjackson@jrscpa.com

## Summary

Mr. Jackson has over 20 years of experience as a Certified Public Accountant. He began his career with a "Big Eight" national accounting firm and is a founding partner of Jackson, Rolfes, Spurgeon & Co..

## Licenses and Certifications

Certified Public Accountant (CPA) Ohio and Kentucky

Certified Valuation Analyst (CVA)

## Education

MBA, concentration in finance   Miami University, 1980

BS, Accountancy, Miami University, 1979

## Employment

Mr. Jackson is founding partner of Jackson, Rolfes, Spurgeon & Co., Cincinnati, Ohio. As such he works with a variety of clients to satisfy their tax, accounting and business consulting needs. Main areas of practice include taxation and business valuation/litigation support. Prior to founding Jackson, Rolfes, Spurgeon & Co., he was an audit supervisor with Touche, Ross & Co.

Examples of past valuation and litigation engagements include:

- Marital Dissolution    Valuation of a service company at two different dates; Reviewed three opposing expert reports to assist counsel.
- Receivership    Appointed as receiver. The assignment included the liquidation of a local company.
- Mediation    Worked with counsel as an ad hoc mediator to assist in a partnership dispute.
- Valuation    Valuation of a local printing company for estate and gift tax planning.

- Marital Dissolution — Valuation of a specialty construction services company for a marital dissolution.
- Receivership — Retained by the receiver as the accountant for the receivership. The matter involved a dispute between two partners over alleged misappropriation of assets.
- Valuation — Valuation of a job shop manufacturer to facilitate the election of S-Corporation status.
- Bankruptcy — Participated as a principal on an engagement where our firm was retained to serve as the accountants for an unsecured creditors committee.

## Professional Affiliates:

Mr. Jackson is a member of the Ohio Society of Certified Public Accountants, the National Association of Certified Valuation Analysts and the American Institute of Certified Public Accountants. He is the past chair of the Forest Park Economic Development Commission. He currently serves as the Treasurer of the St. Antoninus Athletic Association and is a member of the Cincinnati United Way and Community Chest Audit Review Committee.