# EXHIBIT "D"

CIN-TEL CORPORATION (513) 621-7723 Fax (513) 621-6558

Page 1

1  IN THE UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF OHIO
2            WESTERN DIVISION
3         - - - - -
4  Q&R ASSOCIATES, INC.,            :
                                    :
5         Plaintiff,                :
                                    :
6  vs.                              : CASE NO. C-1-01-461
                                    :
7  UNIFI TECHNICAL FABRICS, LLC,    :
   ET AL.,                          :
8         Defendants.               :
                                    :
9         - - - - -
10
11
12
13         CONFIDENTIAL
14  DEPONENT: MARK A. JACKSON
15      FEBRUARY 20, 2004
16         9:00 A.M.
17
18
19
20 REPORTED BY:
   ANGELA S. BERENS
21
22
23                                    COPY
24

Page 10

1    Q.    What is it generally that you do?

2    A.    I do -- I'm an accountant, certified
3  public accounting. I do tax work, but I also do
4  business evaluations and some litigation support, but
5  more consultive than testimony.

6    Q.    Out of your practice can you give me
7  an estimate of how much time is spent in litigation
8  support and serving as an expert witness? Like five
9  percent, ten percent?

10   A.    If you include the matters where I do
11 business evaluations that don't always go to trial,
12 maybe 10 to 20 percent.

13   Q.    What expertise did you use in this
14 engagement?

15   A.    Well, I drew upon my experience as a
16 certified public accountant, my experience as a
17 business valuator and the experiences that I have had
18 in the past in litigation.

19   Q.    What experience have you had in
20 estimating lost sales for sales agents such as Q&R?

21   A.    For sales agents such as Q&R, this
22 would be the first one I've done.

23   Q.    And estimating lost commissions for a
24 sales agent such as Q&R is distinct from evaluating a

CIN-TEL CORPORATION (513) 621-7723 Fax (513) 621-6558

Page 14

1   loss?

2         A.    I would have to have a definition of
3   economic loss.

4         Q.    Do you have a definition of economic
5   loss?

6         A.    No, I do not.

7         Q.    Is there any difference between a
8   financial loss and damages?

9         A.    I would assume they're probably used
10  in a very similar context in this matter.

11        Q.    You say you assume. Do you know?

12        A.    No, I do not.

13        Q.    Have you ever done an analysis to
14  determine lost profits for some other business?

15        A.    No.

16        Q.    So this is your first lost profit
17  analysis ever?

18        A.    Yes.

19        Q.    Did you consult any literature in any
20  area, it could be accounting, it could be
21  economics, in connection with this engagement?

22        A.    Yes.

23        Q.    What did you consult?

24        A.    Literature, I consulted with

CIN-TEL CORPORATION (513) 621-7723 Fax (513) 621-6558

Page 62

1    Q.    -- now, what you're using here is the
2    measure -- what you're referring to, I believe, and
3    let me pull out a document so we're sure about this.
4    A.    Sure.
5        MR. McGAVRAN:  Let's mark this as 74
6    and the next one as 75.
7        (THEREUPON, Defendant's Exhibit Nos.
8    74 and 75 were marked for identification.)
9    Q.    Would you look at a document that
10   we've marked for identification as 74 --
11   A.    Yes.
12   Q.    -- and identify it if you can.
13   A.    It is a document, Q&R 1923, Q&R
14   Commission and Draw Plan.
15   Q.    Now, is this the document that you
16   refer to in Measure of Damages No. 2 as the Q&R
17   commission and draw plan?
18   A.    Yes, it is.
19   Q.    Okay.  So if I understand what you did
20   in Measure of Damages No. 2, you assumed that Q&R,
21   had its relationship with UTF continued, would have
22   earned the commission shown on Exhibit 74?
23   A.    Yes.
24   Q.    Okay.  Would you look at Exhibit 75

CIN-TEL CORPORATION (513) 621-7723 Fax (513) 621-6558

Page 63

1  and identify that if you can.
2      A.   I have not seen this before.
3      Q.   Okay.  Did you read any of the
4  testimony of Mr. Quinn or Mr. Ranz about Exhibit 75?
5      A.   I don't recall.
6      Q.   Well, let me ask you to make some
7  assumptions that I believe are based on what the
8  testimony was.
9           The first assumptions is that Exhibit
10 75 is what Mr. Quinn and Ranz call a matrix or a
11 nonwoven matrix that shows the entire North American
12 requirements for five of their major customers for
13 nonwovens.  That's what it shows.
14     A.   It's their -- the total?
15     Q.   North American requirements of these
16 five major customers.
17     A.   Okay.
18     Q.   It does not -- Exhibit 75 is not, I
19 repeat, is not a statement of what Quinn and Ranz had
20 ever sold to these major customers.  It instead is a
21 statement of what these major customers had
22 historically purchased.  And then let me ask you to
23 assume that Mr. Quinn or Mr. Ranz gave Exhibit 75 to
24 Mr. Mebane.

Page 64

1	A.	I'm trying to follow this.
2	Q.	Okay.
3	A.	Go ahead.
4	Q.	Okay. And then I asked you to assume is that what Mr. Mebane did was take the figures from Exhibit 75, assume Quinn and Ranz sold the entire North American requirements of these five major purchases and showed what the commissions would be. Make those assumptions, do you know whether or not Quinn and Ranz had ever sold the entire North American requirements of these five major purchasers?
12	A.	No, I don't know that.
13	Q.	Do you know whether or not Mr. Quinn and Mr. Ranz intended to represent to Mr. Mebane that, in fact, they could sell the entire North American requirements of these major purchases?
17	A.	No, I don't know.
18	Q.	Do you have any reason to believe with those assumptions that when Mr. Mebane ran out the commissions on a computer and printed them out on Exhibit 74 he was doing anything other than just running numbers to see what commissions would look like if Quinn and Ranz sold to the entire Northern American production customers?

Page 65

```
 1        A.      I'm really kind of confused on this.
 2   I've not seen this before.
 3        Q.      I understand.
 4        A.      I've seen this document.
 5        Q.      I know.
 6        A.      You've given me a lot of assumptions
 7   and I'm really not following them.  I'm sorry.  I'm
 8   truly lost.
 9        Q.      When you say this document, you mean
10   you haven't seen 75 before?
11        A.      I don't believe I've seen this one.
12        Q.      Okay.
13        A.      It may have been in the documents, but
14   I don't remember looking at it, and I don't know what
15   it is.  I've seen this one.
16        Q.      Okay.
17        A.      74 I've seen.
18        Q.      Okay.  When you did Measure of Damages
19   No. 2 --
20        A.      Uh-huh.
21        Q.      -- what you did was assume that
22   Exhibit 74 was a guarantee that Quinn and Ranz would
23   earn the commissions shown on 74; isn't that correct?
24        A.      I assumed that it was an approximation
```

CIN-TEL CORPORATION (513) 621-7723 Fax (513) 621-6558

Page 68

1    Q.    What's their commission with
2 Providencia?
3    A.    I believe it's four. I believe it
4 started a little higher. I believe it's four.
5    Q.    The same as it was going to be with
6 UTF?
7    A.    Four percent.
8    Q.    If we were going to prepare a
9 commission projection for Quinn and Ranz for some
10 period of time between May -- April or May of 2001
11 and, you know, some later date, in your opinion would
12 it be more reasonable to base the projected sales
13 upon historical sales of Quinn and Ranz or upon the
14 entire North American requirements of five major
15 customers which Quinn and Ranz had never sold the
16 entire North American requirements to?
17    A.    You would have to base the commission
18 projection on a number of factors. Historical would
19 also play a role in it. You would also consider what
20 the difference was between what they sold
21 historically and what they're selling now.
22    Q.    To your knowledge -- well, did
23 Mr. Quinn or Mr. Ranz tell you that at any time they
24 had sold the entire North American requirements of

CIN-TEL CORPORATION (513) 621-7723 Fax (513) 621-6558

Page 69

1  any customer?
2      A.   I don't recall that, no.
3      Q.   In fact, the subject of entire North
4  American requirements never came up at all, did it?
5      A.   I don't recall that at all.
6      Q.   Okay.  Are you aware that in his
7  deposition Mr. Quinn said that this Exhibit 74 that
8  Mebane said this is a forecast of what Q&R sold in
9  volume?
10     A.   I don't recall that.  His deposition
11 was very long.  I went through it.  I didn't read it
12 every word.
13     Q.   Are you aware Mr. Ranz said this is
14 not an estimate of how much of that volume Q&R could
15 transfer to UTF?
16     A.   I don't recall looking and seeing that
17 in this context, no.
18     Q.   You applied the same incremental
19 revenue to these commissions as you had with the
20 others; is that right?
21     A.   Percentages, plus I believe I used an
22 additional employee.
23     Q.   Did you put Quinn and Ranz's salaries
24 in that?