# EXHIBIT "J"

JMJ ENTERPRISES, INC. v. VIA VENETO ITALIAN ICE, INC.

CIVIL ACTION No. 97-CV-0652

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1998 U.S. Dist. LEXIS 5098

April 15, 1998, Decided
April 15, 1998, Filed, Entered

**DISPOSITION:** [*1] Defendant Via Veneto's Motion for Summary Judgement is GRANTED with respect to JMJ's claim for attorney's fees; Defendant Via Veneto's Motion for Summary Judgement is DENIED with respect to all other claims; and Defendant Via Veneto's Motion to Disallow Plaintiff's Expert Report and Bar Plaintiff From Presenting Expert Evidence is GRANTED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff distributor filed suit against defendant corporation seeking damages for breach of contract, detrimental reliance, and intentional interference with contractual relations.

**OVERVIEW:** A distributor brought an action seeking damages for breach of contract, detrimental reliance and intentional interference with contractual relations against a corporation after it terminated the parties' relationship and sold its product directly to some of the distributor's former sub-distributors. The court held: (1) there was sufficient evidence for a fact finder to conclude that the parties' manifestations of assent to an oral agreement gave rise to an enforceable contract; (2) there was evidence that the distributor detrimentally relied on the promise of the corporation; (3) a reasonable trier of fact could conclude that the corporation intentionally hindered the distributor's performance of its sub-distributor contracts; (4) there was no apparent statutory authority for an award of attorneys' fees; (5) the distributor's expert testimony on the issue of damages was inadmissible because the methodology was not reliable and its probative value was substantially outweighed by its unfair prejudicial effect and the likelihood that it would confuse the jury under *Fed. R. Evid. 403*.

**OUTCOME:** The court granted the corporation's motion for summary judgment with respect to the distributor's claim for attorney's fees, denied the corporation's motion for summary judgment with respect to all other claims, and granted the corporation's motion to disallow the distributor's expert report.

**CORE TERMS:** subdistributor, container, expert testimony, projection, water ice, reliable, summary judgment, trier of fact, factual basis, accountant, expert report, margin, fact finder, written contract, speculation, unrecovered, helpful, methodology, unrealistic, discovery, induce, expert evidence, operating expenses, net profit, pizza, shop, enforceable contract, admissible, deposition, hinderance

**LexisNexis(TM) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]Under *Fed. R. Civ. P. 56(c)*, summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The court on appeal is required, in resolving a motion for summary judgment pursuant to Rule 56, to determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. In making this determination, the evidence of the nonmoving party is to be believed, and the district court must draw all reasonable inferences in the nonmovant's favor.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN2]While the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact, Rule 56(c) requires the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Contracts Law > Formation*

[HN3]In order to have an enforceable agreement under Pennsylvania law, both parties must manifest an intention to be bound, the terms of the agreement must be sufficiently definite to be specifically enforced, and the agreement must be supported by consideration. In the context of a motion for summary judgment, there must be an objective demonstration of accord, concreteness, and predictability before a fact finder may infer an enforceable contract.

*Contracts Law > Formation*

[HN4]Under Pennsylvania law, when the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact.

*Contracts Law > Formation*

[HN5]Contemplation of a written agreement does not negate manifestations of assent that would otherwise create an enforceable contract.

*Contracts Law > Formation > Detrimental Reliance*

[HN6]Under Pennsylvania law, the elements of a detrimental reliance claim are: (1) a promise to a promisee; (2) which the promisor should reasonably expect will induce action by the promisee; (3) which does induce such action, and (4) which should be enforced to prevent injustice to the promisee.

*Contracts Law > Remedies > Punitive Damages*

[HN7]Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others.

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN8]Absent a statutory exception, litigants must pay their own attorneys' fees.

*Evidence > Witnesses > Expert Testimony*

[HN9]The Federal Rules of Evidence require that the trial judge make a preliminary assessment to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand. Helpfulness to the trier of fact is the ultimate touchstone for admissibility of expert testimony. In order to be helpful: (1) the witness must be qualified as an expert; (2) the expert must have a reasonable factual basis for their testimony; (3) the testimony must be based on reliable methods; and (4) the testimony must be relevant to facts in issue. *Fed. R. Evid. 702, 703. Fed. R. Evid. 702*, requires that the trial court examine the helpfulness of all expert evidence.

*Evidence > Witnesses > Expert Testimony*

[HN10]If an expert's testimony is not based on admissible evidence, *Fed. R. Evid. 703*, requires that the expert base their opinion on data that is reasonably relied upon by experts in the particular field.

*Evidence > Witnesses > Expert Testimony*

[HN11]*Fed. R. Evid. 702*, states that expert testimony is only admissible if it will assist the trier of fact.

*Evidence > Witnesses > Expert Testimony*

[HN12]Expert testimony must be based on reliable processes or techniques. The expert's opinion must be based on the methods or procedures of science rather than on subjective belief or unsupported speculation. The focus at this stage is solely on the principles and methodology of the expert and not on the conclusions that they generate.

*Evidence > Witnesses > Expert Testimony*

[HN13]When examining reliability, the court asks whether the methods applied by an expert produce reasonably consistent results.

*Evidence > Witnesses > Expert Testimony*

[HN14]Expert testimony is relevant if it will assist the trier of fact to understand the evidence or to determine a fact in issue.

**COUNSEL:** For JMJ ENTERPRISES INC., PLAINTIFF: SHONA K. GIBSON, SPECTOR, GADON & ROSEN, P.C., PHILADELPHIA, PA USA.

For VIA VENETO ITALIAN ICE INC., DEFENDANT: CARY L. FLITTER, SCOTT F. WATERMAN, LUNDY, FLITTER & BELDECOS, P.C., NARBERTH, PA USA.

**JUDGES:** JAMES McGIRR KELLY, J.

**OPINIONBY:** JAMES McGIRR KELLY

**OPINION: MEMORANDUM AND ORDER**

J. M. KELLY, J.

APRIL 15, 1998

Presently before the Court is Defendant Via Veneto Italian Ice, Inc.'s ("Via Veneto") Motion for Summary Judgment; and Motion to Disallow Plaintiff's Expert Report and Bar Plaintiff From Presenting Expert Evidence. For the reasons stated below, Via Veneto's Motion for Summary Judgment is granted in part and denied in part. Via Veneto's Motion to Disallow Plaintiff's Expert Report and Bar Plaintiff From Presenting Expert Evidence is granted.

I. Motion for Summary [*2] Judgment

A. Background

Via Veneto makes Italian water ice. Domenic Stabile, Natale Stabile and Vito Parisi are the principals of Via Veneto. In 1994, Mark McFadden ("McFadden"), James V. Fiumara, Jr. ("Fiumara") and James V. Fiumara, Sr. formed JMJ Enterprises, Inc. ("JMJ") for the purpose of distributing Via Veneto water ice.

In August of 1994, the principals of JMJ and Via Veneto met at the Via Veneto pizza shop to discuss the possibility of selling water ice in Florida. The parties subsequently exchanged drafts of a formal written contract, but were unable to reach an agreement. They held another meeting at the pizza shop in September, 1994.

The parties' recollection of the meetings at the pizza shop varies. Fiumara recalls that an agreement was reached at the second meeting. According to Fiumara, the parties agreed that JMJ would be the exclusive distributor of Via Veneto water ice in the west coast of Florida, the purchase price would be $ 14 per container, JMJ could sell to subdistributors, there were no minimum quotas and the duration of the agreement would be twelve years.

Shortly after the second meeting, McFadden and Fiumara moved to Florida. They leased office [*3] space and developed marketing materials. Several more draft contracts were exchanged, but the parties could not reach a formal, written agreement.

Via Veneto shipped whatever quantities of water ice JMJ ordered. JMJ sold approximately 6,000 containers in 1995, and 6,000 containers in the first half of 1996. JMJ's business plan was to act as a distributor selling to subdistributors. JMJ sold to subdistributors in Florida and later sold to subdistributors in Ohio, Louisiana and Pennsylvania.

In May of 1996, a disagreement arose over JMJ's business plan. Via Veneto did not approve of JMJ's use of subdistributors or its sales outside of Florida. Via Veneto claimed that their understanding was that JMJ would sell directly to retailers, and only in Florida. Via Veneto demanded that JMJ enter into a formal, written contract. JMJ rejected several drafts, and Via Veneto stopped shipping its product.

After terminating its relationship with JMJ, Via Veneto sold its product directly to some of JMJ's former subdistributors. JMJ brought this suit seeking damages for breach of contract, detrimental reliance and intentional interference with contractual relations.

B. Summary Judgment Standard [*4]

[HN1]Under *Fed. R. Civ. P. 56(c)*, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This court is required, in resolving a motion for summary judgment pursuant to Rule 56, to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. In making this determination, the evidence of the nonmoving party is to be believed, and the district court must draw all reasonable inferences in the nonmovant's favor. See *id. at 255*. [HN2]While the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact, Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish [*5] the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*.

C. Analysis

1. Breach of Contract

Via Veneto and JMJ did not enter into a formal, written contract. JMJ claims that the parties reached an enforceable oral agreement and that Via Veneto breached that agreement when it refused to ship water ice. Via Veneto contends that a contract was never formed.

[HN3]In order to have an enforceable agreement under Pennsylvania law, both parties must manifest an intention to be bound, the terms of the agreement must be sufficiently definite to be specifically enforced, and the agreement must be supported by consideration. *Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986)*. In the context of a motion for summary judgment, "there must be an objective demonstration of accord, concreteness, and predictability before a fact finder may infer an enforceable contract." *City of Rome v. Glanton, 958 F. Supp. 1026, 1034 (E.D. Pa. 1997)*.

Via Veneto's President concedes that there was an agreement on price and a [*6] sales territory. Via Veneto argues that there is no contract because the parties did not agree on a number of essential terms including duration, grounds for termination, and discounts. At least one of the principals involved in the

negotiations, Fiumara, recalls that there was an agreement on price, exclusive territory, the use of subdistributors, quotas and a twelve year term. If Fiumara's testimony is believed, then the parties agreed to terms that are sufficiently definite to permit a finding that a contract was formed. See *Linnet v. Hitchcock,* 324 Pa. Super. 209, 471 A.2d 537, 540 (Pa. Super. 1984).

[HN4]"Under Pennsylvania law, when the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact." *Channel Home Ctrs.,* 795 F.2d at 300 n.9 (citing *Field v. Golden Triangle Broad., Inc.,* 451 Pa. 410, 305 A.2d 689 (Pa. 1973)). A jury must decide whose recollection of the pizza shop meetings is worthy of credence.

Via Veneto argues that since the parties intended to enter into a written agreement, they did not intend to be bound by the purported oral agreement. Via Veneto points out that [*7] "under Pennsylvania law, when one party has expressed an intent not to be bound until a written contract has been executed, the parties are not bound until that event has occurred." *Schulman v. J.P. Morgan Inv. Mgmt. Inc.,* 35 F.3d 799, 808 (3d Cir. 1994). In Schulman, negotiating parties stated in their drafts that no contract arose until an agreement was formally executed. *Id. at 808.* All that Schulman states is that where there is clear evidence of intent, that intent controls. Via Veneto cannot point to evidence that either party "expressed an intent not to be bound" without a written contract.

[HN5]Contemplation of a written agreement does not negate manifestations of assent that would otherwise create an enforceable contract. *Field,* 305 A.2d at 693; *Kazanjian v. New England Petroleum Corp.,* 332 Pa. Super. 1, 480 A.2d 1153, 1157 (Pa. Super. 1984); *Restatement (Second) of Contracts § 27* (1981). The question is still one of intent. There is sufficient evidence for a fact finder to conclude that the parties' manifestations of assent to an oral agreement gave rise to an enforceable contract.

2. Detrimental Reliance

[HN6]Under Pennsylvania law, the elements [*8] of a detrimental reliance claim are: (1) a promise to a promisee; (2) which the promisor should reasonably expect will induce action by the promisee; (3) which does induce such action, and (4) which should be enforced to prevent injustice to the promisee. *C & K Petroleum Prods., Inc. v. Equibank,* 839 F.2d 188, 192 (3d Cir. 1988) (citing *Central Storage and Transfer Co. v. Kaplan,* 487 Pa. 485, 410 A.2d 292, 294 (Pa. 1979)).

Via Veneto argues that there is no promise to enforce. As discussed above, if Fiumara's testimony is believed, Via Veneto promised that JMJ would have the exclusive right to sell its product on the west coast of Florida for twelve years. Via Veneto should have expected that such a promise would induce reliance. There is sufficient evidence for a fact finder to conclude that Via Veneto made a promise and that JMJ reasonably relied on that promise to its detriment.

3. Intentional Interference with Contractual Relations

The Restatement identifies two types of tortious interference claims. Section 766 applies to situations in which the defendant "induces" a third party to breach its contract with the plaintiff. *Restatement (Second) of Torts § 766* [*9] (1979); see *Windsor Secs., Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 660 (3d Cir. 1993). The Pennsylvania Supreme Court has expressly adopted Section 766. *Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (Pa. 1978).

Section 766A prohibits interference intended to prevent a plaintiff from performing contracts with third parties or intended to make performance "more expensive or burdensome." *Restatement (Second) of Torts § 766A* (1979); See *Windsor Secs.,* 986 F.2d at 660. While Section 766 prohibits "inducement" of third parties to breach contracts, Section 766A prohibits "hinderance" of contracts by acts directed at the plaintiff. Id. The Pennsylvania Supreme Court has not yet adopted Section 766A. *Windsor Secs.,* 986 F.2d at 661-63 (expressing doubt as to Pennsylvania's adoption of Section 766A).

There is evidence that would allow a reasonable fact finder to conclude that Via Veneto intentionally "hindered" JMJ's performance of its subdistributor contracts. JMJ's principals spent time and money to market Via Veneto's product and develop relationships with subdistributors. Via Veneto then refused to ship its product to JMJ [*10] but was willing to ship it to the subdistributors. Via Veneto's reasons for these actions are a question of fact for the jury.

There is also evidence that Via Veneto contacted some of JMJ's subdistributors and induced them to agree to direct contracts. Fiumara and McFadden both testified that Via Veneto contacted some of their subdistributors. Via Veneto admits that several of the former subdistributors actually did buy water ice directly form them.

It is not necessary to predict, at this point, whether the Pennsylvania Supreme Court will adopt Section 766A. There is evidence to support the tortious interference claim under either the "inducement" or "hinderance" theory. If the evidence at trial supports only a

"hinderance" claim, then the Court will predict whether the Pennsylvania Supreme Court would allow such a claim.

4. Damages

Via Veneto argues that it is entitled to summary judgment on all of JMJ's claims because JMJ did not prove damages. As discussed below, the testimony of JMJ's damages expert is inadmissable. This does not mean that JMJ could not prove damages.

Pennsylvania law requires that the evidence supply "a reasonable basis from which the fact finder can [*11] calculate the plaintiff's loss." *Delahanty v. First Pennsylvania Bank, 318 Pa. Super. 90, 464 A.2d 1243 (Pa. Super. 1983).* Evidence of JMJ's sales may be sufficient to allow a jury to infer lost profits. In addition, there is evidence that JMJ's principals expended time and money in reliance on a contract or promise with Via Veneto. There is prima facie evidence of damages in the record.

5. Punitive Damages

[HN7]"Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others." *Martin v. Johns-Manville Corp., 508 Pa. 154, 494 A.2d 1088, 1097 (Pa. 1985).* The principals of JMJ claim that Via Veneto encouraged them to relocate to Florida, market their product and develop a network of subdistributors. They claim that Via Veneto then forced them out of business and dealt directly with their subdistributors. Taking the evidence in the light most favorable to the Plaintiff, there is evidence to support the claim for punitive damages.

6. Attorneys Fees

[HN8]Absent a statutory exception, litigants must pay their own attorneys' fees. *Krassnoski v. Rosey, 454 Pa. Super. 78, 684 A.2d 635,* [*12] *637 (Pa. Super. 1996).* Although a claim for attorneys' fees was made in the complaint, JMJ did not address the issue in its brief. There is no apparent statutory authority for an award of attorneys' fees in this case. Via Veneto is entitled to summary judgment on the claim for attorneys' fees.

II. Motion to Bar Plaintiff's Expert Evidence

A. Background

Via Veneto moves to exclude JMJ's expert report and bar JMJ from presenting expert testimony at trial. JMJ retained Leon A. LaRosa, Jr.("LaRosa") as an expert on damages. LaRosa met with JMJ's principals and reviewed JMJ's tax returns, accounting, payroll and sales records. He also reviewed some of the deposition testimony taken in this case. Based on this information, he concluded that JMJ lost $ 4,591,420 in profits. To reach this conclusion LaRosa: (1) projected sales; (2) determined a net profit margin n1 ; (3) multiplied net profit margin by projected sales; (4) subtracted operating expenses; and (5) discounted to present value using a 6% annuity factor. Via Veneto argues that LaRosa's report and testimony should be barred because it is not helpful to the trier of fact. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n1 [retail price] - [wholesale cost] = [gross margin] - [shipping and storage (variable expenses)] = [net margin].

[*13]

n2 Via Veneto also contends that, pursuant to *Fed. R. Civ. P. 37(b)(2)(B),* JMJ's expert evidence should be barred as a sanction for their dilatory conduct during discovery. JMJ's counsel failed to respond to a number of discovery requests. On Via Veneto's motions, the Court compelled proper responses and imposed monetary sanctions. JMJ produced their expert report by the final deadline imposed by the Court. Exclusion of evidence is an extreme sanction. *In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 791-92.* JMJ's expert evidence will not be excluded as a sanction for its conduct during discovery.

- - - - - - - - - - - - End Footnotes- - - - - - - - -

B. Analysis

In *Daubert v. Merrell Dow Pharms., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993),* the Supreme Court examined the standards for admissibility of expert testimony established by the Federal Rules of Evidence. The Court found that Rule 702 displaced the "austere" common law rule that required that scientific evidence be "generally accepted" by the relevant scientific community before that evidence could be presented in court. *Id. at 588-89.* Rule 702 calls [*14] for a more "flexible" inquiry. *Id. at 594.* [HN9]The Rules of Evidence require that the trial judge make a preliminary assessment to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id. at 597.*

Helpfulness to the trier of fact is the "ultimate touchstone" for admissibility of expert testimony. *In re Paoli Railroad Yard PCB Litigation, 916 F.2d 829, 857 (3d Cir. 1990).* In order to be helpful: (1) the

Page 5

witness must be qualified as an expert; (2) the expert must have a reasonable factual basis for their testimony; (3) the testimony must be based on reliable methods; and (4) the testimony must be relevant to facts in issue. *Fed. R. Evid. 702, 703*; *General Electric Co. v. Joiner, 522 U.S. 136, 139 L. Ed. 2d 508, 118 S. Ct. 512, 519 (1997); Daubert, 509 U.S. at 589;* In re Paoli Railroad Yard PCB Litigation (" *Paoli II"), 35 F.3d 717, 741-42, 748-49 (3d Cir. 1994).*

Rule 702 requires that the trial court examine the helpfulness of all expert evidence. While the evidence at issue in Daubert was "novel scientific evidence," the Court's reasoning, in a general sense, applies to all expert testimony. See *Frymire-Brinati* [*15] *v. KPMG Peat Marwick, 2 F.3d 183, 186 (7th Cir. 1993)*(applying Daubert analysis to testimony of accountant); *Robert Billet Promotions v. IMI Cornelius, 1998 U.S. Dist. LEXIS 4235, at *6, No. 95-1376 (E.D. Pa. April 1, 1998)* (Daubert applies in "general manner" to proffered testimony of damages expert); *Stecyk v. Bell Helicopter Textron, 1998 U.S. Dist. LEXIS 44, at *16, No. 94-1818, 1998 WL 42302, at *2 (E.D. Pa. Jan. 5, 1998)* (applying Daubert analysis to technical evidence).

1. Qualifications

LaRosa holds a Bachelor's Degree in Business Administration and a Master's degree in Taxation. He is a Certified Public Accountant and a Certified Fraud Examiner. He has worked as an accountant and business advisor for over twenty years.

LaRosa's opinion is based on a sales projection and not on accounting. An "accountant" is "a person whose work is to inspect, keep, or adjust accounts." Webster's New World Dictionary 9 (3d ed. 1988). LaRosa's opinion goes beyond his area of expertise. Nevertheless, the requirement that an expert possess knowledge, skill or experience in the area on which they will render an opinion is "liberally construed." *Paoli II, 35 F.3d at 741-42.* If qualifications were the only shortcoming, [*16] LaRosa's testimony might be admissible. However, since his testimony will be excluded for other reasons we need not dwell on the issue of qualifications.

2. Factual Basis

An expert's testimony must have some connection to existing facts. Experts are expected to make inferences and state opinions and they are granted wide latitude in determining what data is needed to reach a conclusion. Questions as to the sufficiency of an expert's factual basis are generally left to the jury. Nevertheless, expert testimony that ignores existing data and is based on speculation is inadmissable.

The requirement of a reasonable factual basis for an expert's testimony arises from Rules 702 and 703. [HN10]If an expert's testimony is not based on admissible evidence, Rule 703 requires that the expert base their opinion on data that is "reasonably relied upon by experts in the particular field." *Fed. R. Evid. 703.*

[HN11]Rule 702 states that expert testimony is only admissible if it "will assist the trier of fact." *Fed. R. Evid. 702.* Expert testimony that is based on speculation or unrealistic assumptions is not helpful.

The Third Circuit has dispensed with metaphysical distinctions between the two rules. [*17] Since both rules are aimed at ensuring reliable expert testimony, the analysis of an expert's factual basis is similar to the analysis of methodology. The Third Circuit has stated: "when a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *Paoli II, 35 F.3d at 749;* see also 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 703.05(2)(c) ("A trial judge may now be required to independently evaluate the reasonableness of both the reliance and the data underlying an expert's opinion").

The Supreme Court recently reaffirmed this common sense rule:

Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Electric Co. v. Joiner, 522 U.S. 136, 139 L. Ed. 2d 508, 118 S. Ct.* [*18] *512, 519 (1997)*(citations omitted); see also *Target Market Publ'g, Inc. v. ADVO, Inc., 136 F.3d 1139, 1998 U.S. App. LEXIS 2412, 1998 WL 63814 (7th Cir. 1998)*(excluding testimony of damages expert that was based on optimistic assumptions that were implausible in light of evidence); *Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18 (2d Cir. 1996)*(excluding expert testimony that was based on "unrealistic assumptions" about plaintiff's earning potential); *Tyger Const. Co. v. Pensacola Constr. Co., 29 F.3d 137 (4th Cir. 1994)*(excluding expert testimony that was speculative and not supported by the record); *Joy v. Bell Helicopter Textron, Inc., 303 U.S. App. D.C. 1, 999 F.2d 549 (D.C. Cir. 1993)*(reversing decision to admit expert testimony that "was based solely on guesswork, speculation, and conjecture" where court perceived

that "the decision to receive expert testimony was simply tossed off to the jury under a 'let it all in' philosophy.").

LaRosa's sales projection is the linchpin of his testimony. The records that LaRosa reviewed show that JMJ sold approximately 6,000 containers of water ice in 1995, and 6,000 containers in the first half of 1996. LaRosa determined that this "trend" of annually [*19] doubling sales would continue and JMJ would sell a total of 20,000 containers in 1996; 57,600 containers in 1997; and 115,200 containers per year from 1998 through 2006.

LaRosa did very little to verify his sales projection. LaRosa stated that he relied, in large part, on the information in JMJ's tax returns. He felt that this information was the most trustworthy, because the returns were prepared by an independent accountant. LaRosa did not attempt to verify the information in the tax return. During his deposition, McFadden stated that he sold a number of JMJ's freezers, for cash, as he was winding down the business. He admitted that he did not report this income on his tax return. Despite this, LaRosa did not verify the information in the return.

JMJ was actually in business from the middle of 1994 through the middle of 1996. LaRosa did not review any data on JMJ's 1994 sales. He did not believe that 1994 sales were important to the sales "trend."

At the hearing, LaRosa agreed that the owner's experience, was a factor that affected a company's potential success. Fiumara and McFadden had no experience in retail food sales. Fiumara was an insurance agent and McFadden was a roofer [*20] before starting JMJ.

LaRosa knew very little about JMJ's industry. He did not perform or review any market surveys or studies. He did not conduct or review any research on the water ice industry or like businesses. LaRosa admitted that these were common tools used to predict the potential of a business. LaRosa's reply during the hearing was that the Plaintiffs did not retain him to perform market research, and did not authorize such expenditures.

JMJ operated as a distributor selling to a network of subdistributors. Fiumara testified at his deposition that SJM Enterprises, one of JMJ's subdistributors, stayed in business and sold approximately 14,000 containers of water ice in 1997. LaRosa's sales projection is based on Fiumara's testimony and the assumption that JMJ would sell to seven other subdistributors who would each sell half as much as SJM in 1997, and the same amount as SJM by 1998. This meant that each subdistributor would sell approximately 7,000 containers in 1997 and approximately 14,000 containers per year from 1998 through 2006.

LaRosa knew almost nothing about SJM or the other subdistributors. He had no independent verification of SJM's sales. He did not have any [*21] information about SJM's business either before or after its association with JMJ. LaRosa did not review any data on actual sales by any of the subdistributors. He did not review any subdistributor agreements and he did not know whether any of the subdistributors were associated with JMJ at the time of the alleged breach or whether any of them stayed in business after JMJ's demise. He did not consider their level of experience, capitalization or allocation of territories. Other than SJM, LaRosa did not even reveal the identities of the subdistributors in his report.

The American Institute of Certified Public Accountants promulgates guidelines for accountants ("AICPA guidelines").

The AICPA guidelines state a common sense rule:

The attention devoted to the appropriateness of a particular assumption should be commensurate with the likely relative impact of that assumption on the prospective results. Assumptions with greater impact should receive more attention than those with less impact.

AICPA Guideline 6.31. LaRosa concedes that the assumption that 8 subdistributors would each sell 7,000 containers in 1997 and 14,000 containers per year from 1998 through 2006 was a significant [*22] assumption. Yet, LaRosa knew almost nothing about the subdistributors or their industry.

LaRosa did nothing to bridge the "analytical gap" between JMJ's actual sales and his projection. His sales projection does not rise above the level of "subjective belief or unsupported speculation."

3. Reliability

[HN12]Expert testimony must be based on reliable processes or techniques. *Paoli II, 35 F.3d 717 at 742.* The expert's opinion must be "based on the methods or procedures of science" rather than on "subjective belief or unsupported speculation." *Daubert, 509 U.S. at 590.* The focus at this stage is "solely on the principles and methodology of the expert and not on the conclusions that they generate." *Daubert, 509 U.S. at 595.*

LaRosa's "methodology" for determining damages is as follows: (1) project sales; (2) determine net profit margin; (3) multiply net profit margin by projected sales; (4) subtract operating expenses; (5) discount to present value using a 6% annuity factor; and (6) add unrecovered investment.

LaRosa's methodology is not reliable. First, as discussed above, LaRosa's conclusion is based on an unrealistic sales projection. This can be viewed as a methodological flaw. **[*23]** See *Parkway Garage, Inc. v. City of Philadelphia, 1994 U.S. Dist. LEXIS 10900, at *30, No. 90-7752, 1994 WL 412430, at *7 (E.D. Pa. Aug. 3, 1994)*(an expert's opinion should have a reliable basis in the knowledge and experience of his discipline). Second, LaRosa makes several significant errors that render his testimony unreliable. See *Raskin v. The Wyatt Co., 125 F.3d 55, 67 (2d Cir. 1997)*(expert testimony that contains "elementary" error is not helpful); *Wilkinson v. Rosenthal & Co., 712 F. Supp. 474, 479 (E.D. Pa. 1989)* (same).

LaRosa determined that JMJ lost $ 4,591,420 in profits. He also determined, by adding the losses reported on tax returns, that JMJ lost $ 159,307 in "unrecovered investment." LaRosa then added the "unrecovered investment" to "lost profits" to arrive at total damages of $ 4,750,727. During the hearing, LaRosa eventually conceded that if the business continued operating, the unrecovered investment would be paid out of the stream of profits. "Unrecovered investment" and "lost profits" are alternative measures of damages. See *National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, 499 (3d Cir. 1987)*. JMJ clearly is not entitled to both.

LaRosa claimed that JMJ's **[*24]** operating costs would not increase from 1996 through 2008, even though sales were going to go from 6,000 containers to 115,000 containers per year. On cross examination, LaRosa conceded that operating expenses would increase. He explained that the increase in operating, or fixed expenses, would be offset by a decrease in variable expenses (such as shipping and storage) caused by "economies of scale." He testified that variable expenses would probably go from $ 2 to $ 1 per container. LaRosa admitted, however, that this estimate was not in his report and was not based on any evidence or calculation. He stated that it was based on "his thirty-one years of professional experience."

While LaRosa claims that most of JMJ's expenses will not increase, he claims that other expenses will disappear. For example, JMJ's 1996 tax return shows that it spent $ 4,810 for advertising and $ 6,359 for interest on equipment. These amounts are not reflected in LaRosa's report. According to LaRosa, there will be no advertising or interest expenses from 1997 through 2006. Similarly, JMJ's financial statements show that they spent the following on paper cups: $ 2,360 in February, 1995; $ 1,108 in March; **[*25]** $ 1,736 in May; $ 1042 in October; $ 485 in November; $ 444 in April, 1996; $ 277 in May; and $ 286 in June, 1996.

LaRosa admitted that there is no line item deduction for "cups" in his report. Considering that the total annual expenses reported by LaRosa are about $ 60,000, these omissions are significant.

[HN13]When examining reliability, the court asks whether the methods applied by an expert produce reasonably consistent results. See *Daubert, 509 U.S. 579 at 590-91 n.9, 125 L. Ed. 2d 469, 113 S. Ct. 2786*. A reasonable accountant does not report certain expenses, and choose to omit other, like expenses. Such accounting practices do not produce consistent results. Further, an expert must be able to point to methods that he applied. An expert cannot simply base his conclusions on his "thirty-one years of experience."

4. Relevance

[HN14]Expert testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786*. Reliable expert testimony on damages would be relevant to this case.

5. Confusion/Unfair Prejudice

"'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating **[*26]** it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.'" *Daubert, 509 U.S. at 595* (citations omitted); see also *Paoli II, 35 F.3d at 747*.

LaRosa's testimony has very little, if any, probative value. JMJ is simply presenting their unrealistic hopes through the mouth of an expert. This conclusion follows from the conclusion that LaRosa's factual basis was inadequate and his methods were improper.

The probative value of LaRosa's testimony is substantially outweighed by its unfair prejudicial effect and the likelihood that it will confuse the jury. *Fed. R. Evid. 403*. There is a significant danger that the jury will accept LaRosa's faulty assumptions as fact. His sales projection is presented as a simple underlying component of his conclusion. A jury may not appreciate the importance of the unsupported sales projection in LaRosa's conclusion. "Scrutiny of expert testimony is especially proper where it consists of 'an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." **[*27]** *Tyger Constr. Co., 29 F.3d at 145* (citations omitted).

LaRosa's behavior on the witness stand increases the danger of unfair prejudice and confusion. Several times during the hearing, LaRosa described himself as the "independent objective expert." The Court would

like to believe that professionals, called as expert witnesses, will comment on evidence with some degree of objectivity. Mr. LaRosa was not objective. He argued with defense counsel and made gratuitous remarks such as: "when you have a business that has been destroyed in its embryo stages . . . " and "what I am trying to do here is to project profits in the future of a business that was destroyed." LaRosa's behavior during the evidentiary hearing is consistent with his projections of lost profits. LaRosa was acting as an advocate, and not as an objective evaluator of evidence.

C. Conclusion

According to LaRosa, a company that actually sold 6,000 units in 1995, and 6,000 units in the first half of 1996, would sell 57,000 units in 1997 and 115,000 units per year from 1998 through 2006. At the same time, the company's supplier would repay its initial investment and the company's operating expenses would either remain [*28] constant or disappear. That is how a company that lost $ 159,000 in two years of business can earn $ 4.7 million in the next ten years.

Success stories, such as the one described above, do happen. The court cannot, however, allow a jury to find that JMJ would have been such a remarkable success just because an "expert" says it is so. LaRosa did not point to reliable evidence that would bridge the gap between the facts and his conclusion. Without evidence, LaRosa's success story is pure speculation. LaRosa's testimony would not be helpful to the trier of fact and thus, it is not admissible.

**ORDER**

AND NOW, this 14th day of April, 1998, after consideration of Defendant Via Veneto Italian Ice, Inc.'s Motion for Summary Judgment and Motion to Disallow Plaintiff's Expert Report and Bar Plaintiff From Presenting Expert Evidence, and all responses thereto, it is hereby ordered:

1. Defendant Via Veneto's Motion for Summary Judgement is GRANTED with respect to JMJ's claim for attorney's fees;

2. Defendant Via Veneto's Motion for Summary Judgement is DENIED with respect to all other claims; and

3. Defendant Via Veneto's Motion to Disallow Plaintiff's Expert Report and [*29] Bar Plaintiff From Presenting Expert Evidence is GRANTED.

BY THE COURT:

JAMES McGIRR KELLY, J.