UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Q&R ASSOCIATES, INC., | ) | Case No. C-1-01-641 |
| | ) | (Judge Beckwith) |
| Plaintiff, | ) | |
| | ) | **RESPONSE IN OPPOSITION TO** |
| -v- | ) | **MOTION OF DEFENDANTS UNIFI** |
| | ) | **TECHNICAL FABRICS LLC AND W.** |
| UNIFI TECHNICAL FABRICS, LLC, *et al.*, | ) | **MICHAEL MEBANE TO EXCLUDE** |
| | ) | **TESTIMONY OF PLAINTIFF'S** |
| Defendants. | ) | **EXPERT** |
| | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |

**I.   INTRODUCTION**

The Defendants' motion to exclude Plaintiff's expert witness should be denied because disputes concerning an expert's conclusions should be resolved by the jury. Unlike the Defendants' motion, a true *Daubert* motion challenges an expert's methodologies or techniques. In this case, the Defendants never seriously question the generally accepted and reliable methodologies used by the Plaintiff's expert. Instead, Defendant's take issue with the conclusions Plaintiff's expert drew from the underlying facts in this case. In fact, the Defendants' entire motion reads like a preview of their expected cross-examination of Plaintiff's expert. Since the Defendants have not made a serious *Daubert* challenge, their motion should be denied.

**II.   BACKGROUND**

Plaintiff Q&R Associates, Inc. ("Q&R") seeks to recover lost income and other damages arising from the Defendants' misrepresentations and breach of contract. (Ranz Aff. at ¶ 1-2 (Ex. A); Quinn Aff. at ¶ 1-2 (Ex. B)). Q&R is a small closely held company that acts as a sales agent

for manufacturers of nonwoven "spunmelt" fabrics. (Ranz Aff. at ¶ 3 (Ex. A); Quinn Aff. at ¶ 3 (Ex. B)). Q&R contends that it was misled into abandoning a long-standing and beneficial business relationship with Cleaver Associates in favor of a new business relationship with Defendant Unifi Technical Fabrics LLC ("UTF").

From 1995 to March 2001, Q&R acted as a sub-agent for Cleaver, selling nonwoven materials manufactured by Avgol, an Israeli company, to a short list of customers selected by Cleaver. (Ranz Aff. at ¶ 2 (Ex. A); Quinn Aff. at ¶ 2 (Ex. B)). In February and March 2001, Defendant W. Michael Mebane, the president of UTF, solicited Q&R to terminate its relationship with Cleaver and Avgol and begin selling nonwoven materials manufactured by his company's new plant in Mocksville, North Carolina. (Ranz Aff. at ¶ 8-11 (Ex. A); Quinn Aff. at ¶ 8-12 (Ex. B)). Around the same time, Q&R was aware of industry rumors that Avgol might somehow acquire UTF's new plant in North Carolina. (Ranz Aff. at ¶ 7 (Ex. A); Quinn Aff. at ¶ 9 (Ex. B)). Concerned about the rumors, Q&R principals John Ranz and Michael Quinn directly asked Mebane about the possibility of a sale of UTF's plant to Avgol. (Ranz Aff. at ¶ 7 (Ex. A); Quinn Aff. at ¶ 9 (Ex. B)). Mebane flatly denied the possibility of such a transaction saying it "ain't going to happen." (Quinn Aff. at ¶ 9 (Ex. B)).

Relying upon Mebane's representations, Q&R terminated its relationship with Cleaver and Avgol and began representing UTF's products. (Ranz Aff. at ¶ 13-14 (Ex. A); Quinn Aff. at ¶ 17-18 (Ex. B)). Within a few short months, however, UTF sold its assets to Avgol, including the Mocksville plant. (Quinn Aff. at ¶ 22 (Ex. B)). Not surprisingly, Avgol and Cleaver refused to re-hire Q&R. Left with no products to sell and no commissions to earn, Q&R was financially devastated.

Q&R's damages expert, accountant Mark A. Jackson, CPA, calculated Q&R's financial loss using two approaches. First, Mr. Jackson calculated the amount of profits Q&R would have realized from its relationship with Cleaver had UTF and Mebane not interfered with that relationship. Mr. Jackson called that approach "Measure of Damages 1" and calculated lost profits of $556,727. Defendants do not challenge "Measure of Damages 1" in their *Daubert* motion. Mr. Jackson also calculated the amount of profit Q&R would have realized had UTF performed under its contract with Q&R and not misrepresented the possibility of a sale of UTF's assets to Avgol. Under this approach which Mr. Jackson called "Measure of Damages 2," he based lost future revenues upon a written "commission and draw plan" prepared by Mr. Mebane on March 30, 3001, which projected Q&R's commissions from UTF. (Def. Ex. 74, attached hereto as Ex. F). Under this approach, Mr. Jackson calculated Q&R's damages to be $1,565,053. The Defendants are trying to exclude "Measure of Damages 2" by arguing that the "commission and draw plan" prepared by Mr. Mebane was not reliable.

### III.  ARGUMENT

  **A.  The *Daubert* Rule Does Not Authorize a Trial Court to Substitute its View of the Specialized Evidence for Those of Well-Qualified Experts Whose Opinions Are Based On Standard Methodologies.**

In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), the U.S. Supreme Court held that the standard for determining the admissibility of scientific opinion evidence was no longer the "general acceptance" test originated in *Frye v. United States*, 293 F. 1013 (1923), but that Federal Rule of Evidence 702 had supplanted *Frye* with a more flexible approach. This more flexible approach is sometimes referred to as the scientific reliability test. The test is whether scientific testimony is "grounded in the methods and procedures of science. The Supreme Court emphasized, however, that the focus "must be solely

on the principles and methodologies, not on the conclusions that they generate." *Daubert*, at 595.

The Supreme Court listed four non-exclusive factors to be considered under the scientific reliability test: (1) whether the theory or technique can and has been tested; (2) whether the technique has a known or potential rate of error; (3) whether the theory or technique has been subjected to peer review and publication; and (4) whether the theory or technique is generally accepted within the relevant scientific community. *Id.* at 593-94. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999), the Supreme Court later extended its holding in *Daubert* to all expert testimony.

The role of the trial court as the "gatekeeper" of expert evidence is to determine whether the evidence comes within the bounds of admissible evidence. Its role is not to determine whether the evidence is correct, or whether the court is persuaded by the expert testimony. Its role is not to choose between competing views of reputable experts using standard methodologies. As with other admissible evidence, disputed expert testimony is subject to "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* at 596.

As discussed in detail in this Memorandum, the challenged testimony of Mr. Jackson is grounded in accepted accounting methods and procedures, and meets all of the *Daubert* factors. The testimony is not based on any novel theories or speculation. At most, there is merely a dispute between competing expert views. That dispute is a matter for the jury to decide, not the court.

    **B.**    **The Reliability of the Mebane's "Commission and Draw Plan" is for the Jury to Decide**

On March 30, 2001, shortly after Q&R and UTF came to their agreement, Defendant Mebane prepared a "commission and draw" plan that projected commissions Q&R could expect to earn from its relationship with UTF. (Def. Dep. Ex 74, attached hereto as Ex. F). Mr. Jackson used Mr. Mebane's commission and draw plan as the starting point of his analysis in "Measure of Damages 2." The Defendants are now in the unenviable position of arguing that the commission and draw plan prepared by Mebane, UTF's president, is somehow an unreliable basis for the Plaintiff's damage expert. The Defendants try to discredit the validity of Mebane's original commission and draw plan by arguing that it was based upon faulty information found in a "customer matrix" prepared by Q&R. (Pl. Ex. 27, attached hereto as Ex. E).

**1.    The Defendants arguments are not based upon facts in the record.**

First, the Defendants' argument that the commission and draw plan was based upon the "customer matrix" is not supported by the record. Mr. Mebane, the author of the commission and draw plan (Ex. F) could not say in his deposition exactly how he used the "customer matrix" (Ex. E) in arriving at his calculations of Q&R's commissions:

> Q.  Okay. How did you calculate the amount of collections that was shown in the collections column on this attachment [the commission and draw plan]?
>
> \* \* \* \*
>
> A.  My tendency is to tell you I do not recall what – what the actual formula was. But it was based upon the volumes and the time to qualification and full production, translated into sales under the commissions – under the collection side.
>
> Q.  Did you – were you relying, exclusively, on the volumes listed in Exhibit 27 [the matrix] or were you adding in volume from somewhere else?
>
> A.  I don't recall. . . .

(Dep. of W. Michael Mebane, at pp. 163-164, attached hereto as Ex. D). Considering Mr. Mebane's inability to testify as to the formula he used in March 2001 to calculate Q&R's expected commissions, it is disingenuous for the Defendants to suggest that it was somehow calculated on allegedly incorrect information found in the customer matrix. There is simply no evidence to support their position.

### 2. The Defendants do not even try to apply the *Daubert* factors.

Worse yet, the Defendants attack on the reliability of their own commission and draw plan has **nothing** to do with the *Daubert* factors. What the Defendants are attacking is not the opinion testimony of Mr. Jackson, but rather the reliability of their own commission and draw plan. The commission and draw plan, however, is unquestionably admissible *evidence* in this case. Since the Defendants are attacking the credibility of their own prior representations – and not the methodology of the Plaintiff's expert witness – this is not a proper *Daubert* challenge at all. In fact, the Defendants never once try to apply the *Daubert* factors to Mr. Jackson's methodology in this case.

As Mr. Jackson explains in his Affidavit (attached hereto as Ex. C), the methodology he used in calculating damages is tested, generally accepted, and is found in peer reviewed literature, including Pratt, Litigation Support Services, Ch. 31 (3d Ed. 1998), and Litigation Support Services, Vol. 1, Chapter 3. (Jackson Aff. at ¶ 5). Mr. Jackson noted that there was nothing novel or new about his methodology, and that the Defendants' own expert witness had used the same methodology in this case. (Jackson Aff. at ¶ 7). Finally, Mr. Jackson attested that he used the same intellectual rigor and methodologies in calculating Q&R's damages as he uses in his non-litigation support practice. (Jackson Aff. at ¶ 8). The Defendants ignore all of these issues.

It is obvious that the sole issue raised by the Defendants' motion is a factual dispute about the weight to be given the commission and draw plan prepared by Defendant Mebane. The Defendants who authored the commission and draw plan now argue that it is not reliable. The Plaintiffs disagree and seek to hold the Defendants to their prior representations. The resolution of this dispute has nothing to do with the *Daubert* factors or Mr. Jackson's *methodology* in calculating damages. The cases cited by the Defendants in their brief all deal with challenges to the opinions and methodologies of the experts in those cases, and not the weight to be given to evidence relied upon by the experts. As a result those cases are all easily distinguishable from the case at bar.

   3.   **The Plaintiff's Expert Does Not Speculate**

The Defendants argue that Mr. Jackson is somehow required to "speculate" in his calculation of damages under "Measure of Damage 2." Nothing could be further from the truth. Mr. Jackson does not speculate at all – he simply relies upon the commission and draw plan that Mr. Mebane himself created. The weight to be given the commission and draw plan is for the jury to decide. If the jury believes the Defendants and finds Mr. Mebane's commission and draw plan is inaccurate, it will not award Plaintiff damages under "Measure of Damages 2." On the other hand, the jury may well decide to hold Mr. Mebane to his original projection of Q&R's commissions, in which case "Measure of Damages 2" is perfectly appropriate and not at all speculative. In either case, the jury should hear the evidence and decide the issue.

   C.   **The Plaintiff's Damages Calculations Pass the "Reality Check"**

At the very end of their brief, the Defendants argue that Mr. Jackson's "Measure of Damages 2" does not pass a "sanity" or "reality" check because the damages are "about four times as much on an annual basis as Q&R ever earned as a sub agent for Cleaver Associates."

Of course, the Defendants are comparing apples to oranges. The relationship between Q&R and Cleaver was very different from the relationship Q&R had with UTF. First, Q&R was earning commissions from UTF at a rate that was double the rate Q&R earned from Cleaver. (Jackson Aff. at ¶ 9). This fact alone accounts for much of the increase in commissions. In addition, Q&R could only call on select clients for Cleaver, but had the right to call on the entire domestic market for UTF. (Jackson Aff at ¶ 9). Finally, UTF was a domestic supplier, while Cleaver's supplier was based in Israel. (Jackson Aff. at ¶ 9). All of these factors provide a perfectly "sane" explanation for the increase in revenues Q&R expected to earn from UTF over those earned working for Cleaver.

### IV.     CONCLUSION

For all of the forgoing reasons, Q&R respectfully requests that the Defendants' motion to exclude testimony related to "Measure of Damages 2" be overruled.

Respectfully submitted,

  s/Dwight A. Packard, II
James E. Burke (0032731)
Dwight A. Packard, II (0067182)
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
Tel: (513) 579-6428
Fax: (513) 579-6457
jburke@kmklaw.com
dpackard@kmklaw.com
*Attorneys for Plaintiff,*
*Q&R Associates, Inc.*

OF COUNSEL:

KEATING, MUETHING & KLEKAMP, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
(513) 579-6400

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing Memorandum in Opposition to Defendants' Motion to Exclude the Plaintiff's Expert was filed electronically through the Court's ECF system on July 9, 2004, which will electronically serve all counsel of record in this action.

                                                                        ___s/Dwight A. Packard, II_____
                                                                        Dwight A. Packard, II