# EXHIBIT B:

# MICHAEL J. QUINN'S

# AFFIDAVIT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Q&R ASSOCIATES, INC., | ) | Case No. C-1-01-641 |
| Plaintiff, | ) | (Judge Spiegel) |
| -v- | ) | |
| UNIFI, INC., et al., | ) | **AFFIDAVIT OF MICHAEL J. QUINN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |
| Defendants. | ) | |

STATE OF OHIO        )
                     ) ss.
COUNTY OF HAMILTON   )

I, Michael J. Quinn, being first duly sworn, do hereby state the following:

1. I am the President/Co-Owner of Q&R Associates, Inc. ("Q&R") and have been since its inception on January 1, 1992.

2. Q&R is an Ohio Corporation with its principal place of business in Cincinnati Ohio.

3. Q&R is a sales and marketing company founded in January of 1992. Our company represents companies who produce raw materials to sell primarily to the disposable hygienic markets. These products include infant disposable diapers, feminine hygienic products, and adult incontinent products. The two primary and/or emphasis product lines are polyethylene film and spun melt polypropylene nonwoven fabric. Each of these two product lines represent approximately 40% of Q&R's total sales and gross revenues. From September, 1995 until March 30, 2001, Q&R had been selling and marketing spun melt polypropylene nonwoven manufactured by Avgol Nonwoven Industries (Based in Holon, Israel) through a business partnership with Cleaver Associates, Inc. (Based in Paoli, Pennsylvania).

4. Q&R's sole place of business is in the Greater Cincinnati, Ohio area. Q&R operates two offices: One in West Chester, Ohio and one in Evendale, Ohio. All sales and marketing efforts are coordinated through these two offices. A third office located in Mason, Ohio was closed in September, 2001. Q&R has never advertised in any trade magazine. The majority of Q&R sales are in Ohio, Kentucky, Indiana, and Arkansas.

5. On September 20, 2000, I received an unsolicited telephone call from Michael Mebane of UTF in Mocksville, North Carolina. This call came into my West Chester, Ohio office. I was traveling and returned the call from my cell phone. Mr. Mebane introduced himself and explained that UTF was soon to be producing spun melt nonwoven and was in search of a sales agent. Mebane knew at that time that we represented Avgol in the same industry Unifi was seeking to break into. He asked if John Ranz and I would come to Mocksville next week. I told him that I would need to speak with Ranz, and that I would get back with him.

6. I had no further contact with Mr. Mebane through 2000.

7. Around November of 2000, Mr. Moshe Goldwasser, from Avgol, called me and asked if Mr. Mebane had contacted me. I told him yes. Mr. Goldwasser said he was going to call Mebane and tell him not to call Q&R again.

8. In January of 2001, I called Mebane back, he suggested that Q&R visit the UTF Mocksville facility, without commitment on the part of any party. We agreed to visit North Carolina on February 13 and 14, 2001.

9. During the meetings of February 13-14, 2001, Q&R toured the UTF Mocksville facility, as well as two Unifi facilities in Yadkinville, North Carolina. During our visit, all meetings and discussions were between Q&R and Mebane. During our dinner meeting on February 13, 2001 at "Samuel's Bed and Breakfast," Q&R brought up the industry rumors about Avgol buying UTF. Mebane blamed John Cleaver for these rumors. Mebane said he had signed a Confidentiality Agreement and could not discuss everything that had transpired between Avgol and UTF. Mebane did confirm, however, that several meetings with Avgol management had taken place. When asked again about these rumors, Mebane stated, "Ain't going to happen." During this same meeting Mebane stood and shook hands with Ranz and I. As he was doing this he said, "This is a North Carolina Agreement, you have my word."

10. During the meeting on the February 14, 2001, Q&R agreed to supply a matrix of possible business that Q&R might be able to help generate. This matrix included a time line but did not include the names of customers. At the breakfast meeting on February 14, 2001, the rumor of a sale of UTF to Avgol was discussed again. Mebane's response again was "It ain't going to happen. I am going to email Moshe and tell him I have no further interest in partnering or selling to Avgol." Q&R forwarded the matrix to Mebane on March 5, 2000.

11. In early March 2001, John Ranz, Mebane and I agreed to meet in Miami, Florida at the IDEA Nonwovens Show the last week of March to try and finalize a business agreement between Q&R and UTF. In preparation for this meeting, Mebane requested that Q&R put together a list of what we needed in order to get the deal going. Mebane also asked Q&R to address Gene Kelly's position, (a current UTF employee). Mebane wished to place Kelly under the control of Q&R as part of our agreement.

- 3 -

12. The meeting took place at 9:00 A.M. on March 27, 2001 in Mr. Mebane's personal suite at the Loews Hotel in Miami Beach, Florida. Ranz, Mebane, and I were the only parties to this meeting. It ended shortly before noon on March 27, 2001.

13. During the course of this meeting, Q&R again expressed concern that UTF would be sold to Avgol. We made clear that if we left Avgol for Unifi and UTF was sold to Avgol, that we would be committing professional suicide. Ranz told Mebane, "This is our last trip down the spunbound road." We intended to represent UTF for the rest of our careers, if not longer if the company continued to survive and thrive after Ranz and I retired. Mebane answered unequivocally that UTF would not be sold to Avgol. Mebane also said that any "change in ownership includes a commitment to Q&R." In reliance upon these assurances, we continued our discussions and began finalizing a business relationship.

14. During this meeting in the hotel room an agreement was structured. Quinn made it very clear that the 120 day termination had nothing to do with a change of control. The 120 day termination clause dealt only with termination due to nonperformance of either Q&R or Unifi.

15. During the Florida meeting, Mebane admitted that "Gene Kelly is not the guy to get the job done and Doug Nichols does not do well in front of customers."

16. We went on to discuss in detail our compensation package, starting at 5%. We settled on 4% commissions, with two exceptions. Procter & Gamble and SCA Molynke would be 2% commissions. Mebane indicated he would confirm all of this in writing to Q&R. This written confirmation came in the form of an email from Mebane to Q&R, dated March 30, 2001. We were to have exclusivity for sales & marketing. Therefore, all quotes, correspondence, advertising, and entertainment for all of UTF's products and Unifi's Sorbtek product, would be in Ohio. We would also be in charge of collection for all past due accounts, and all paperwork from Q&R orders would pass through our Cincinnati offices. Warehoused goods for Q&R's orders were to be stored in Ohio and Arkansas.

17. At the end of the March 27, 2001 meeting, I shook hands with Mebane and he said "do we have an agreement?" I responded affirmatively. Although we had an agreement, both parties discussed memorializing it in a written contract. Mebane said he would start the ball rolling.

18. Mebane then asked when we were going to tell John Cleaver and Avgol about our agreement. We told Mebane that we had a commitment to our customers that we had to meet. Mebane, however, insisted that we inform Cleaver at the end of the show, March 29, 2001. We reluctantly agreed to so, largely in reliance upon Mebane's assurances that Q&R and UTF had a deal.

- 4 -

19. We attempted, but were not able to inform Cleaver about our arrangement with Unifi on March 29, 2001, due to scheduling conflicts. On March 30, 2001, I called John Cleaver and informed him of our decision to leave Cleaver and Avgol in favor of UTF.

20. On April 10 and 11, 2001, Ron Honerlaw, Ranz and I visited UTF Mocksville, NC, to discuss moving forward as fast as possible with customer qualification. Mebane was out of town and did not attend these meetings. During this visit we discovered that UTF was not commercially ready to do business. They did not have a surfactant system and had not performed any clinical evaluations.

21. On May 8 and 9, 2001, I visited the Mocksville facility again with my wife. Very little had happened technically since the April 10-11, 2001 and this visit. Pressure was building from one customer, Arquest, to get material. On the afternoon of May 9, 2001, Mebane came into the staff meeting I was attending and said he needed to talk to me on Monday.

22. On Monday, May 14, 2001, Mebane called and said that the worst possible thing had happened. UTF had been sold to Avgol. I immediately called Ranz and told him the bad news. We called Mebane back and asked him two questions. When he was notified about the sale to Avgol? He responded April 18th or 19th while in England. The second question was whether Mebane had notified his senior management on his return from Miami that he had reached an agreement with Q&R to act as UTF's exclusive sales agent? Mebane's response was that he was not at liberty to say, and that we should contact Charles McCoy, Unifi's in-house counsel.

23. During the same conversation, Mebane stated that he would call John Cleaver to see if Cleaver "would take us back." Mebane further stated that he would live up to the 120 day clause. This was completely unacceptable because the 120 day period related only to termination for cause, and this was not such a termination. Mebane ended this conversation by saying, "Well, good luck." We have not spoken since that day.

Further Affiant Sayeth Naught.

_____
Michael J. Quinn

Sworn to before me and subscribed in my presence on this the 26th day of November 2001.

- 5 -

_____
Notary Public

JAMES R. BURKE, Attorney at Law
Notary Public, State of Ohio
My commission has no expiration date
Section 147.03 O. R. C.

- 6 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Affidavit of Michael J. Quinn was served upon counsel for Unifi, Inc. and UTF, Frederick J. McGavran, Frost Brown Todd LLC, 2200 PNC Center, 201 E. Fifth Street, Cincinnati, Ohio 45202-4182, by ordinary U.S. mail, this 27th day of November, 2001.

_____
James E. Burke

919781.1